## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ASSOCIATION FOR EDUCATION
FINANCE AND POLICY, INC.,
  1344 Disc Drive, #3091
  Sparks, NV 89436,

  and

THE INSTITUTE FOR HIGHER
EDUCATION POLICY,
  1615 L Street, NW, Suite 310
  Washington, DC 20036,

      *Plaintiffs*,

      v.

LINDA MCMAHON, in her official
capacity as Secretary of Education,
  400 Maryland Avenue, SW
  Washington, DC 20202,

  and

U.S. DEPARTMENT OF
EDUCATION,
  400 Maryland Avenue, SW
  Washington, DC 20202,

      *Defendants*.

No. 25-999

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    In 2002, Congress enacted, and the President signed, the Education Sciences Reform Act of 2002, Pub. L. 107-279. As then-Secretary of Education Rod Paige remarked, the bipartisan legislation recognized the need for "an invigorated research agency that is capable of carrying out a coordinated, focused agenda of high-quality research, statistics, and evaluation that is relevant to the educational challenges of the nation." To accomplish this goal, the statute

reorganized existing research initiatives at the Department of Education (ED)—some of which had been underway since the 1860s—and established the Institute of Education Sciences (IES), and four National Centers of Research within it. Congress charged IES with a duty to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities" to "expand[] fundamental knowledge and understanding of education from early childhood through postsecondary study," and to provide "reliable information" to "parents, educators, students, researchers, policymakers, and the general public." 20 U.S.C. § 9511(b)(1)–(2); *see also* 20 U.S.C. § 3419. The statute transferred the duties to undertake several existing research initiatives to IES, including the National Assessment of Educational Progress (NAEP)—informally referred to as the Nation's Report Card, and also imposed new duties.

2.      Congress has not repealed the Education Sciences Reform Act or otherwise eliminated the statutory mandates that require IES and the National Education Centers to collect and analyze data, support research on specific topics, and provide access to research and data to the public. To the contrary, Congress has periodically *added new* mandatory tasks for IES and its components. And Congress has continued to appropriate hundreds of millions of dollars for IES to conduct its statutorily mandated activities.

3.      Nonetheless, as part of what Defendant Secretary of Education Linda McMahon has referred to as the Department's "final mission," Defendants have made the decision to terminate IES's work and taken steps to effectuate that decision. Specifically, Defendants have (1) canceled contracts *en masse* that either directly implement IES's statutory responsibilities, or allow IES employees to do so; (2) as part of a "reduction in force," eliminated approximately 90% of the staff positions at IES—including nearly all positions that oversee and coordinate statutorily mandated research; and (3) terminated outside researchers' remote access to data. These actions

effectively halt all new IES-sponsored research, make it impossible to use or access existing research, and otherwise make it impossible for IES to perform the jobs with which it has been tasked by Congress.

4.    Plaintiffs, an association of scholars and practitioners working on education finance and policy issues, and a nonprofit research organization dedicated to providing evidence-based and data-driven analyses to policymakers and institutions in order to expand access to and success in higher education, rely on IES's performance of its functions in doing their work. Defendants' actions to terminate IES programs have impeded, and will continue to impede, Plaintiffs and their members' ability to continue their work.

5.    Each of Defendants' actions in terminating the work of IES is ultra vires, violates statutory directives, and reflects a failure to engage in reasoned decisionmaking.

6.    Plaintiffs bring this lawsuit seeking an order requiring Defendants to fulfill their statutory duties and vacating Defendants' mass contract terminations, reduction in force, and license cancellations that make it impossible for IES to achieve its statutory mission.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely, the United States Constitution and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706.

8.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because defendants are officers and agencies of the United States and because at least one defendant resides in Washington, D.C.

## PARTIES

9.     Plaintiff Association for Education Finance and Policy (AEFP) is a nonprofit membership organization incorporated under Florida law, with a principal place of business in Sparks, Nevada. Its mission is to provide a forum for discussion and debate as to what drives effective education and related services for children, youth, and adults, while promoting research and development, and encouraging and supporting experimentation and reform which will make the field of educational finance responsive to emerging needs. AEFP has approximately 1,000 scholar and practitioner members who work in a range of settings—including at institutions of higher education, in public K-12 schools, and in state and local governments—all of whom share a common interest in the advancement of knowledge and its application to the improvement of education finance and policy. AEFP offers opportunities for members to engage with one another around rigorous research that can inform education finance and policy decisions. AEFP operates the Live Handbook, a digital hub for education policy research and informed decision-making. AEFP publishes *Education Finance and Policy*, a quarterly journal of research papers and policy briefs concerning education finance, policy, and practice. It holds an annual conference for discussion and collaboration regarding research in school finance and education policy. AEFP also operates programs designed to connect education researchers with one another and with professional resources, including community groups, a fellowship program, and a mentorship program.

10.     Plaintiff the Institute for Higher Education Policy (IHEP) is a nonpartisan, nonprofit research, policy, and advocacy organization that is committed to promoting postsecondary access and success for all students. Since its founding more than thirty years ago, IHEP has provided timely, evidence-based, and student-centered research to inform policy

decisions and address the nation's most pressing higher education challenges. To accomplish this, IHEP employs a team of professionals who, themselves and in coordination with third parties, conduct and publish research on issues relating to college access, affordability, success and post-college outcomes. IHEP makes its work publicly available on its website, and also provides its research and analysis directly to policymakers and higher education institutions.

11.     Defendant Linda McMahon is the Secretary of Education and is sued in her official capacity.

12.     Defendant U.S. Department of Education is an agency of the United States, headquartered in Washington, D.C.

## FACTS

**The Establishment and Statutory Functions of IES and its Centers**

13.     In 2002, Congress sought to reorganize ED's existing research initiatives, largely operated out of the Office of Educational Research and Improvement (OERI), "to provide the mechanism for valid research that would be cumulative and inform education practices at the State and local levels with well-documented findings." H.R. Rep. 107-404, at 30–31 (2002).

14.     Finding "restructuring coupled with serious reform" necessary, Congress replaced OERI with the Institute of Education Sciences, "initiat[ing] a new chapter in high-quality research." *Id.* at 31. While placed within ED, Congress intended for IES to function semi-independently, under the direction of a Director appointed by the President for a six-year term, 20 U.S.C. § 9514, who is in turn advised by the National Board for Education Sciences, *id.* § 9516. As part of this semi-independence, the statute limits the ability of the Secretary to assign IES tasks other than those specified in the statute. *Id.* § 9513(b).

15.    Congress also reorganized existing research centers into four separate "National Education Centers" within IES—the National Center for Education Research (NCER), the National Center for Education Statistics (NCES), the National Center for Education Evaluation and Regional Assistance (NCEE), and the National Center for Special Education Research (NCSER). *Id*. § 9511. The Act charged each Center with specific obligations to obtain and share information with policymakers, researchers, educational institutions, students, and members of the public. *Id*. §§ 9511(c)(3), 9531–9567b. The Act also assigned the responsibility for several pre-existing statutorily mandated studies to IES and its components.

16.    As specified in the statute, IES's mission is to "provide national leadership in expanding fundamental knowledge and understanding of education from early childhood through postsecondary study, in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about" the state of education in the United States, educational practices, and the effectiveness of education programs. *Id*. § 9511(b)(1). To carry out this mission, the statute states that IES "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute." *Id.* § 9511(b)(2).

17.    The Education Sciences Reform Act further requires IES to use appropriated funds to, either directly or through grants and contracts, among other things, "conduct and support scientifically valid research activities," "widely disseminate the findings and results of scientifically valid research in education," and "strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education." *Id*. § 9512. Any grants or contracts are required to be awarded on a competitive basis "and, when practicable, through a

process of peer review." *Id*. § 9520. The results of any research conducted or supported by IES must also "be subjected to rigorous peer review" before publication or dissemination. *Id*. § 9576(c).

18.     The Education Sciences Reform Act includes several requirements related to access to data and information. For one, any data collected by IES and its subsidiaries "shall be made available to the public, including through use of the internet." *Id*. § 9574. In addition, the statute requires IES to "make customer service a priority," by, among other things, "establishing and improving feedback mechanisms," "disseminating information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," and "utilizing the most modern technology and other methods." *Id.* § 9575.

19.     In addition to the responsibilities assigned to it in the Education Sciences Reform Act, Congress tasked IES with conducting and disseminating research and evaluation related to implementation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1464, and on the condition of career and technical education (CTE) and effectiveness of federally funded CTE programs under the Perkins Act, 29 U.S.C. § 2324. Congress also assigned IES with duties related to various grant programs, requiring IES to evaluate program activities and provide resources to grant recipients. *See, e.g.*, *id*. § 6645 (Comprehensive Literacy State Development Grants), § 6633(c) (Teacher and School Leader Incentive Program), § 7275(f) (Full-Service Community Schools Program).

20.     Each of the four National Education Centers also has specific statutory obligations. NCES, which has existed in some form since the 1860s, has responsibilities impacting all aspects of education in America, including, for example, the conduct and dissemination of the National Assessment of Educational Progress, 20 U.S.C. § 9622; the maintenance of the Integrated

Postsecondary Education Data System (IPEDS), *id*. § 1015a(i)(4); the regular conduct and dissemination of national surveys of federal student aid recipients as to the costs of postsecondary education, *id*. § 1015a(k); the regular collection and report of information on career and technical education, *id*. § 2324(a)(3); and the collection of data on the education of migratory children, *id*. § 6398(e).

21.    Pursuant to the Higher Education Opportunity Act of 2008, NCES is also required to collect, analyze, and disseminate additional data about postsecondary education costs. Pub. L. 110-315, §§ 111, 1188 (2008) (codified at 20 U.S.C. §§ 1015 and 1015a).

22.    NCES is also required to generate data and information used by other parts of ED, and other federal agencies. For example, the average cost of undergraduate tuition, as calculated by NCES, is used to determine the amounts of educational assistance provided to veterans under 38 U.S.C. § 3015, to determine the amounts of assistance provided to states for Indian education, 25 U.S.C. § 5348(b)(1)(B)(i), and to determine the amounts of funds for career and technical education assistance provided to local educational agencies, 20 U.S.C. § 2351(a)(1)(B).

23.    NCER's statutory mission is "to sponsor sustained research" on a variety of topics, "to support the synthesis and, as appropriate, the integration of education research," "to promote quality and integrity through the use of accepted practices of scientific inquiry to obtain knowledge and understanding of the validity of education theories, practices, or conditions," and "to promote scientifically valid research findings that can provide the basis for improving academic instruction and lifelong learning." *Id.* § 9531. To carry out this mission, NCER is required to, among other things, "maintain published peer-review standards"; propose and implement a plan "to carry out scientifically valid research" consistent with IES's mission, including on the topics of "successful State and local education reform activities", "the impact of technology," and methods of

mathematics and science teaching that may be used in low-performing schools to improve achievement, as required by the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6301 et seq.); "synthesize and disseminate, through [NCEE], the findings and results of education research conducted or supported by [NCER]," and assist in the preparation of the biennial report on education required by 20 U.S.C. § 9519. *Id.* § 9533.

24.     In addition to disseminating research, NCEE's mission is to provide technical assistance, evaluate Federal education programs, support the "synthesis and wide dissemination" of its own work, and "encourage the use of scientifically valid education research and evaluation throughout the United States." *Id.* § 9561. In furtherance of this mission, Congress has required NCEE to "widely disseminate information on scientifically valid research, statistics, and evaluation on education, particularly to State educational agencies and local educational agencies, to institutions of higher education, to the public, the media, voluntary organizations, professional associations, and other constituencies" on specified topics, including by making information accessible in a user-friendly, timely and efficient manner (including through use of a searchable Internet-based online database.)" *Id.* § 9562(a).

25.     The statute also requires NCEE to establish and maintain various information clearinghouses, and to respond "to inquiries from schools, educators, parents, administrators, policymakers, researchers, public and private entities." *Id.* §§ 9562(a)(7), 9562(b).

26.     NCEE also has the responsibility to establish and maintain "a networked system of 10 regional educational laboratories," which are in turn required to, among other things, conduct research; provide training and technical assistance to state and local educational institutions and agencies; and develop and widely disseminate "research, information, reports, and publications

that are usable for improving academic achievement, closing achievement gaps, and encouraging and sustaining school improvement" to schools, parents, policymakers, and the public. *Id.* § 9564.

27.     The National Library of Education is also a part of NCEE, and is required to collect and archive a wide range of products, publications, and research, and to provide services to federal employees, contractors, grantees, and members of the public. *Id.* § 9562(d).

28.     Finally, NCSER is the smallest of the four national centers, and is dedicated to sponsoring research related to "the needs of infants, toddlers, and children with disabilities," and to improve services provided under, and support the implementation of, the IDEA, and to, in coordination with NCEE, conduct evaluation activities regarding IDEA implementation. *Id.* § 9567. The statute identifies 17 specific topics as to which NCSER "shall carry out research activities," the results of which must be synthesized and disseminated through NCEE. *Id.* §§ 9567b(a), (e).

29.     In 2024, Congress appropriated $793,106,000 for IES to conduct its work. *See* Department of Education Appropriations Act, 2024, Div. D, Title III of the Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, 138 Stat. 690 (Mar. 23, 2024). This includes appropriations of $121,500,000 for NCES, $53,733,000 for the RELs, and $193,300,000 for the NAEP. Congress has continued funding at these levels for 2025. *See* S. Rept. 118-84 at 247 (incorporated into statute by Pub. Law 118-47 § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024); Sec. 1101(a)(8), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4.

**Defendants' Termination of IES's Activities**

30.     Since February 2025, Defendants have taken a series of actions to terminate IES's performance of statutorily required functions. These actions have harmed, and will continue to

harm, the ability of AEFP, AEFP members, and IHEP to access information and to conduct their work.

- ***ED's En Masse Cancellation of IES Contracts***

31.    Approximately 90% of IES's data collection and reporting is performed by contractors. In addition, IES relies on contractors to perform a wide range of tasks that support that work, and that allow IES to operate. For example, in many instances, NCES does not hold data in a facility it owns, but rather pays contractors to maintain that data. Similarly, IES relies on contractors to design and maintain most of its websites.

32.    On February 10, 2025, IES employees were informed that employees of the so-called "Department of Government Efficiency" (DOGE) had made the decision to cancel most of IES's contracts and begun the process to do so. DOGE subsequently announced this decision on its X account, and has since posted on its "Wall of Receipts" website that approximately 90 IES contracts were canceled on February 10 or 11, 2025—including contracts for research activities and contracts that allowed for the basic functioning of IES.[1]

33.    Many of the cancelled contracts were for studies already underway and for studies required by statute. For example, ED, at the apparent instruction of DOGE, "terminated for convenience" two contracts for the National Postsecondary Student Aid Study (NPSAS), a study designed to fulfill the requirements of 20 U.S.C. § 1015a(k),[2] and the results of which have been, and were scheduled to continue to be, posted publicly on NCES's website, https://nces.ed.gov/surveys/npsas/.

---

[1] https://www.doge.gov/savings

[2] *See, e.g.*, *id.* (referencing Award ID 91990018C0039 and 91990022C0017).

34.    ED terminated the contract for the High School and Beyond Longitudinal Study of 2020, which was shifted to 2022 due to the COVID-19 pandemic, and had already begun to produce valuable data for researchers.[3]

35.    ED terminated the contract for the Early Childhood Longitudinal Study-Kindergarten (ECLS-K:2024), which had already begun to produce useful data for researchers and policymakers after several years of planning.[4]

36.    ED terminated contracts for the National Teacher and Principal Survey, which collects data every two to three years on core topics including teacher and principal preparation, classes taught, school characteristics, and demographics of the teacher and principal labor force—a version of which has been conducted since 1987.[5]

37.    ED also terminated contracts necessary to the Common Core of Data and the Private School Survey. These surveys are necessary to select and create a proper survey for the National Assessment of Educational Progress (NAEP). These surveys also generate data used to calculate the distribution of roughly $16 billion in federal Title I funding for low-income children.

38.    ED also terminated the contract for the National Assessment of Adult Education, which was designed to implement IES's obligations under section 242 of the Adult Education and Family Literacy Act (AEFLA), 29 U.S.C. § 3332(b)(3).[6] Other cancelled contracts for statutorily mandated research include contracts for evaluation of the DC Opportunity Scholarship Program,

---

[3] *See id.* (referencing Award ID 91990018F0018).

[4] *Id.* (referencing Award ID 91990019C0002).

[5] *Id.* (referencing Award ID 91990022F0328).

[6] *Id.* (referencing Award ID 91990018C0057).

which is mandated by the Scholarships for Opportunity and Results (SOAR) Re-Authorization Act, and contracts for evaluation of career and technical education required under the Perkins Act.[7]

39.    ED has also terminated contracts necessary for the Condition of Education, a report produced annually by NCES to fulfill its statutory obligation to annually produce "a statistical report on the condition and progress of education in the United States." 20 U.S.C. § 9545(b).

40.    With respect to IES operations, ED terminated the contracts by which the agency was complying with the public dissemination and performance management requirements of the Education Sciences Reform Act, 20 U.S.C. § 9574–75, including the contract for its "DATALAB" web platform[8] and contracts for its What Works Clearinghouse.[9] It terminated the contracts for peer review of grants and research that the agency was using to comply with the requirements of 20 U.S.C. §§ 9520 and 9576(c).[10] ED also terminated the National Library of Education's contracts relating to interlibrary loans, cataloging, and historical documents management, which the Library used to carry out the duties required by 20 U.S.C. § 9562(d).[11] And it terminated the contract for NCES's mail center—which is necessary to distribute questionnaires and other survey components, as NCES does not have its own mail center.[12] ED did not replace these contracts or the services that they provided to IES, which enabled it to carry out its statutory responsibilities.

41.    Since the initial tranche of contract cancellations, ED has continued to cancel contracts that allow IES to function and fulfill its statutory responsibilities. For example, on or

---

[7] *Id.* (referencing Award ID 91990019C0004, 91990020F0346, and 91990021F0368).

[8] *Id.* (referencing Award ID 91990019F0001).

[9] *Id.* (referencing Award ID 91990024F0316, 91990025F0014, and 91990021F0370).

[10] *Id.* (referencing Award ID 91990022C0008 and 91990022C0066).

[11] *Id.* (referencing Award ID 91990024F0026).

[12] *Id.* (referencing Award ID 91990020F0309).

around February 13, 2025, ED terminated the contracts for the ten statutorily required Regional Educational Laboratories to conduct their statutorily mandated work.[13] While ED referred to these contracts in press releases as "woke spending,"[14] they funded widely respected non-ideological work and technical assistance, ranging from practice guides on the use of assessment data to inform the teaching of reading skills, to a cooperative study with the Texas Higher Education Coordinating Board to evaluate its new embedded associate degree program.[15] ED did not attempt to distinguish between "woke" and other work conducted by RELs, and simply terminated the contracts for all ten RELs around the country.

42.     On or around February 19, 2025, ED terminated one of the components of the National Assessment for Educational Progress, the long-term assessment for age 17.

43.     On or around March 10, 2025, ED canceled the contract to develop a "centralized, streamlined, and more efficient approach to disseminating research and statistics to stakeholders as directed by the Education Sciences Reform Act."[16]

44.     As a result of the termination of contracts, hundreds of millions of dollars that have already been spent were wasted, as long-term studies were shut down midstream—sometimes years into multi-year studies. Data that was collected and/or maintained by contractors was lost. And services that were being provided to students as part of these studies were terminated without notice.

---

[13] *Id.* (referencing several contracts, including Award ID 91990023C0003 and 91990022C0008 through C0015).

[14] https://www.ed.gov/about/news/press-release/us-department-of-education-cancels-additional-350-million-woke-spending

[15] *See* https://ies.ed.gov/use-work/regional-educational-laboratories-rel

[16] *Id.* (referencing contract Award ID 91990024F0051).

45.    When ED terminated these contracts, it forbid IES contracting employees from directly communicating with contractors, making it impossible to develop or implement transitions.

46.    Many of the canceled contracts have "data deletion" clauses which require contractors to delete all confidential information in their possession upon termination of the contract. Defendants failed to consider the impact of such data destruction.

47.    Defendants canceled contracts en masse without considering how IES could comply with its statutory obligations without them, how the contracts impacted the ability for IES to continue other work, or how the resulting losses of data, research, and services would impact researchers like IHEP, AEFP, and AEFP members.

48.    Because Defendants have eliminated the contract for peer review services, without a replacement, there is no way for the agency to recompete contracts consistent with the statutory peer review requirements.

- ***Defendants' Mass Elimination of 90% of IES Staff Positions***

49.    Even after the decision to terminate IES's contracts was made, some work at the agency was theoretically able to continue—both via the contracts that had not yet been terminated and by IES staff who coordinate and oversee contracts and provide other services. According to the Office of Personnel Management, as of September 2024, IES had a total of 186 employees.

50.    As of March 2025, IES's staff directory showed 166 employees.

51.    On March 11, 2025, as part of what Defendant McMahon referred to as ED's "final mission," Defendants initiated a mass reduction in force (RIF), firing nearly 90% of IES

employees.[17] The RIF eliminated the positions of nearly all of the staff in NCER, NCES, and NCEE—leaving approximately 20 employees.

52.    On information and belief, NCER and NCEE will each be left with a single employee—their respective Commissioners—one of whom also serves as the Acting Director of IES. NCES will be left with 3 employees.

53.    The RIF included various statutorily mandated positions, including the only librarian position at the National Library of Education—which is required to "be headed by an individual who is highly qualified in library science." 20 U.S.C. § 9562(d)(1)(A).

54.    The Director of Information Technology and the Information Security Specialist, who run the servers that host IES websites and make sure that sensitive data remains confidential, were subject to the RIF.

55.    While the IES employees' employment will not formally end until June 9, 2025, the employees lost physical access to ED facilities as of March 11, 2025, and were given limited IT access to transition their work only until March 21, 2025. As of March 21, 2025, the employees subject to the RIF were placed on administrative leave and no longer had access to any ED accounts or systems.

56.    Between March 11 and March 21, 2025, IES employees subject to the RIF were not allowed to send external emails, making it impossible for them to communicate with contractors, constituents, or others served by the agency, or to effectively develop transition plans.

---

[17]    https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force

57.     Only three contracting officer representatives are left at IES. It is not possible for three staff members to oversee the contracts that remain in force, to re-compete the contracts that Defendants canceled, or otherwise ensure that statutorily mandated programs continue.

58.     The RIF has made it impossible for IES to perform its multiple statutory tasks. IES has been functionally eliminated.

- ***Defendants' Mass Termination of Remote Data Licenses and Delay of Data Reviews***

59.     IES maintains both "restricted-use data" and "public-use data." Data is "restricted use" when it contains individually identifiable information. Access to restricted-use data is limited to qualified organizations, through a strict licensing process.

60.     IES, via NCES, grants both "physical" and "remote" restricted-use data licenses. A holder of a physical restricted-use data license is provided data in a CD-ROM form, and must use that data on a standalone, desktop computer not connected to the internet, and contained in a secure facility referred to as a "cold room." A holder of a remote restricted-use data license, on the other hand, may access data through a specific secure web-based application.

61.     On February 10, 2025, the same day that Defendants issued their mass termination of contracts, citing "budgetary and programmatic considerations," IES informed all remote restricted-use data license holders that those licenses would be terminated effective June 1, 2025, and that it would no longer accept new applications. IES stated it was "truly sorry for any difficulties" this sudden about-face "may cause for [license holders'] research."

62.     Anytime a restricted data license holder intends to share research or analysis based on restricted data with a third party—be it in a conference presentation, a journal article, dissertation, or a blog post, they must first obtain permission from IES through a disclosure risk review. Typically, such reviews are completed within five to ten business days.

63.     On February 14, 2025, IES emailed data license holders stating that disclosure risk reviews may be delayed "[d]ue to recent reductions in resources."[18] On information and belief, those reductions refer to one or more of Defendants' actions challenged in this suit.

64.     On the morning of March 28, 2025, some NCES data users received an email from an office of the National Science Foundation stating that, "until further notice, all disclosure review and additional actions such as license renewals are paused," and that restricted data licenses "may not release any output, such as tabulations or estimates, until the pause is lifted and your output is cleared through disclosure review." No reason for this "pause" was given.

65.     After this "pause" was publicly reported and criticized, on March 31, 2025, a "correction" was sent from the same National Science Foundation office stating that "Disclosure reviews continue, although users should expect delays in responses to both new and existing requests."

**Defendants' Unlawful Actions Harm AEFP, AEFP Members, and IHEP**

66.     Defendants' actions harm AEFP, AEFP members, and IHEP in a number of ways.

67.     Several AEFP members who were employed by organizations with canceled contracts, including Cara Jackson, have been laid off as a direct result of the cancellation of their contracts. Other AEFP members have had funding for work terminated. AEFP members who still have grants or contracts are unable to get in touch with staff at IES whose approval and assistance is necessary for their work on those grants and contracts to continue. Many AEFP members have grant proposals pending before IES which were expected to be acted upon by IES staff, but have not been. Peer review panels that were conducting reviews of such proposals have been told to stop their work.

---

[18] https://nces.ed.gov/statprog/licenseapp/LicenseInfo

68.    Defendants' termination of the contracts, staff, and licenses that allow for the collection and dissemination of information impair AEFP, its members, and IHEP's ability to access, and use, that information.

69.    AEFP, its members, and IHEP all rely on research conducted and disseminated by IES in doing their work.

70.    AEFP directly relies on IES research and data in its Live Handbook, available at https://livehandbook.org/, which contains fifty chapters dedicated to a range of topics in Early Childhood Education, K-12 education, and higher education. Live Handbook seeks to serve as the premier digital hub for evidence-based education policy, offering comprehensive analyses that empower informed decision-making and foster impactful educational outcomes. Each chapter synthesizes the most rigorous research available across various disciplines and methodologies. The chapters rely heavily on IES published data and reports—ranging from educator workforce data and higher-education enrollment and cost information, to evaluations of curricula and the impacts of high-quality child care. Live Handbook is designed to be updated every year based on the most current research. IES's failure to conduct and disseminate such research will make it harder for Live Handbook to serve its intended function in synthesizing and sharing knowledge.

71.    Defendants' actions will also impact AEFP's ability to publish its journal, Education Finance and Policy (EFP). Over the last year, the majority of the articles published in EFP were produced with IES funding, used IES data, or cited IES studies. Without the research and data that IES funds and disseminates, there will be less evidence-based research for AEFP to publish in EFP.

72.    AEFP members will also be impacted by Defendants' actions that impede the collection, analysis, and dissemination of evidence-based data, which they rely on in doing their

work. AEFP members' work spans the full spectrum of early childhood, K-12, higher education, and adult and career education, and its members use IES's research across these areas as well.

73.    In performing its mission, IHEP relies extensively on a range of IES data collections, including data obtained through IES's IPEDS, the College Scorecard—which itself relies on IPEDS data collections, the NPSAS, the Beginning Postsecondary Students (BPS) Longitudinal Study, and the Baccalaureate and Beyond (B&B) Longitudinal Study.

74.    There is no ready alternative to the information that IES data collections and studies provide to IHEP, AEFP, and AEFP members. While some state-level early childhood, K-12, and higher education data exists, that data does not use consistent metrics and definitions and thus does not allow for comparisons and analyses across state lines. The Common Core of Data effectively serves as a nationwide census of K-12 institutions, and is not replicated by any other source. Similarly, IPEDS relies on mandatory data reporting by institutions around the country. While some state-level entities require similar data to be reported, not all do, and no states collect all of the data that is collected through IPEDS. AEFP, its members, and IHEP regularly rely on the data collected and shared through CCD and IPEDS in doing their work.

75.    IES also collects data through nationally representative surveys that cannot be duplicated on a state level. At the K-12 level, this includes the National Teacher and Principal Survey, which AEFP members rely upon in doing their work. Other IES data collections that AEFP, its members, and IHEP rely upon, including NPSAS, BPS, and B&B, provide crucial insights about student enrollment, degree completion, affordability, and on-campus experiences not available through other sources. In addition, their large sample size, incorporation of ED administrative data (such as from the FAFSA), and collection of certain demographic and other interview data allows analyses not possible via other data sources.

76.     By terminating data collections, Defendants deprive AEFP, its members, and IHEP of the ability to obtain data. Not only will no new data be collected moving forward, but, as a result of data destruction clauses, data already collected pursuant to now-terminated contracts may never be made available. Data that is returned to IES will not be able to be processed and disseminated due to a lack of staff to do so.

77.     Even where data collections have not been terminated, Defendants' termination of various support contracts, and RIF of personnel, will impede the timely collection of data upon which AEFP, its members, and IHEP rely. For example, for several days prior to the April 2, 2025 reporting deadline for IPEDS data, the NCES website for institutions to report that data was inoperable. Without IPEDS data, ED cannot update its College Scorecard.

78.     The termination of support contracts and RIF will also impede the timely dissemination of data AEFP, its members, and IHEP rely upon, while also harming the quality of that data.

79.     For example, on or around March 28, 2025, Defendants announced IES would no longer provide technical assistance for the Statewide Longitudinal Data Systems (SLDS) grant program, established by 20 U.S.C. § 9607. This technical assistance program had provided a "wide range of support to help states and territories succeed in their SLDS efforts and sustain the systems over time."[19] Eliminating this support will negatively impact the quality of data produced as part of SLDS grants—data which Plaintiff AEFP and its members rely upon in their work.

80.     Defendants' actions have also harmed AEFP, its members, and IHEP's ability to access data that IES has already seen fit to disseminate. For example, Defendants have terminated the contracts and staff that provide support for the functionality of DataLab. DataLab is the

---

[19] https://nces.ed.gov/Programs/SLDS/pdf/SLDS_TA_for_All_Nov2023.pdf

platform by which IES makes education data collected and managed by NCES, including the data obtained through the National Postsecondary Student Aid Study (NPSAS) and the Beginning Postsecondary Students Longitudinal Study (BPS) available to researchers for quick and reliable analysis, while maintaining rigorous student privacy protections. Since Defendants' mass cancellation of support contracts, AEFP members and IHEP staff have had difficulty accessing and utilizing DataLab. Without regular maintenance, DataLab will continue to erode over time and become unusable—dramatically limiting AEFP, its members, and IHEP's ability to access and utilize important information.

81.     Plaintiff IHEP will be significantly injured by the upcoming termination of its remote restricted-use data license. IHEP's employees are fully remote, and thus it is unclear if a physical restricted-use data license would be a feasible option for IHEP. Even if it were, it would cost IHEP a substantial amount of money to construct a cold room that would meet the standards for a physical restricted-use data license.

82.     Plaintiff IHEP and AEFP members who use restricted data are also harmed by Defendants' actions eliminating the staff that perform disclosure risk reviews. IHEP submitted such a request for a disclosure risk review on February 7, 2025. That request, as well as two others submitted in March 2025, has still not been processed, keeping IHEP from publishing research as planned. Several AEFP members have also had to delay or alter planned publications and presentations as a result of IES's failure to act on pending disclosure risk review applications. AEFP student members have had to alter their dissertation plans to avoid any reliance on restricted data to ensure that they can graduate on time.

83.     IES and the Centers regularly hosted trainings, conferences, and other events to disseminate their work, and promote the broader dissemination of evidence-based knowledge

among stakeholders. AEFP members have regularly attended these events, which have increased their ability to obtain, use, and understand data. Since, and as a result of, Defendants' actions at issue in this case, nearly all such events have been canceled. IHEP was scheduled to present at one such event, a conference for NCES data users, in February. That event was canceled the week beforehand.

## COUNT I
### (Non-statutory review of official and agency action)

84.     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

85.     Members of the Executive Branch have only those powers conferred on them by the Constitution and federal statutes.

86.     Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. U.S. Const., art. I. Members of the Executive Branch have no authority under the Constitution to amend statutes unilaterally.

87.     IES and the National Education Centers were established by statute and charged with specific responsibilities. IES and the National Education Centers can be eliminated only by a statute enacted by Congress.

88.     Defendants' actions to terminate IES's performance of its statutory functions exceed their authority and usurp legislative authority conferred on Congress by the Constitution.

## COUNT II
### (Administrative Procedure Act – Contrary to Law – Violation of Education Sciences Reform Act and Higher Education Opportunity Act)

89.     The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

90.    Defendants' decision to end the programs and activities of IES, and their mass cancellation of contracts, large-scale reduction-in-force, and termination of remote restricted data use licenses are final agency actions.

91.    Defendants' actions in terminating the functions of IES are contrary to the statutes that require IES and its Centers to exist, and perform those functions, including 20 U.S.C. §§ 9511, 9512, 9531, 9532, 9533, 9541, 9542, 9543, 9561, 9562, and 9567.

92.    Defendants' actions in terminating the contracts and personnel that enable the collection and dissemination of IES data and reports, and in terminating remote restricted-use data licenses are contrary to 20 U.S.C. § 9575, which requires IES to "[d]isseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public" and to "utilize the most modern technology and other methods available…to ensure the efficient collection and timely distribution of information," and "mak[e] information available to the public in an expeditious fashion."

93.    Defendants' actions also violate 20 U.S.C. § 9543(a), which requires NCES to collect, report, analyze, and disseminate statistical data on specific topics and in specific manners; § 9545(c), which requires NCES to issue regular reports on education topics; § 9546(e)(2), which requires NCES to provide "all interested parties" with access to NCES data; § 9533(a)(7), which requires the synthesis and dissemination of NCER data; § 9562(a)(2)–(3) and (b), which requires the wide dissemination of NCEE research, statistics, and evaluation on specific topics "in a user-friendly, timely, and efficient manner (including through the use of a searchable Internet-based online database)" and in a manner "that includes the most current research findings; and § 9574, which requires all non-restricted data collected by the Institute "be made available to the public, including through use of the Internet."

94.     Defendants' termination of the contracts and staff that allow for peer review is contrary to 20 U.S.C. § 9576(c).

95.     Defendants' termination of the contracts that allow the functioning of the National Library of Education is contrary to 20 U.S.C. § 9562(d)(1)–(2).

96.     Defendants' elimination of the sole librarian position at the National Library of Education is contrary to 20 U.S.C. § 9562(d)(1)(A).

97.     Defendants' termination of the contracts that establish and allow the functioning of the Regional Educational Laboratories is contrary to 20 U.S.C. §§ 9562(a)(4) and 9564.

98.     Defendants' termination of the contracts and personnel that enable the collection, analysis, dissemination and use of higher education cost data required by 20 U.S.C. § 1015(a)(3) and (b), and § 1015a(k), including the contracts for NPSAS, is contrary to those statutory provisions.

99.     Defendants' termination of the personnel that enable the functioning of IPEDS is contrary to 20 U.S.C. § 1015a(i)(4).

## COUNT III
**(Administrative Procedure Act – Arbitrary and Capricious)**

100.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

101.    Defendants have offered no reasoned explanation for their actions and have failed to account for the interests of researchers, nonprofit organizations, institutions, and other stakeholders that benefit from a functioning IES and the work it performs, including via the ability to access and use data.

102.    Defendants acted arbitrarily and capriciously by attempting to render an executive agency incapable of carrying out the statutory functions that Congress has directed it to fulfill.

## COUNT IV
## (Administrative Procedure Act – Contrary to Law – Impoundment Control Act)

103.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

104.    The Impoundment Control Act requires the executive to make appropriated funds "available for obligation" unless the President sends a special message to Congress detailing a request to rescind or reserve funds and Congress then passes a recission bill rescinding the funding. 2 U.S.C. § 683.

105.    The President has not sent a special message to Congress requesting that the funds appropriated for IES's operations, payroll, contracts, and research activities be rescinded, and Congress has not rescinded the appropriations.

106.    The Impoundment Control Act also requires the President to send a special message to Congress whenever the executive proposes to defer spending appropriated funds, and it prohibits deferral of any budget authority except to provide for contingencies, to achieve savings made possible by changed requirements or greater efficiency, or as otherwise specifically provided by law. *Id.* § 684.

107.    The President has not sent a special message to Congress requesting deferral of the budget authority for IES's operations, contracts, and research activities, and none of the statutory circumstances that would permit such a deferral are applicable.

108.    By refusing to spend funds that Congress has appropriated for IES operations, contracts, and research activities, Defendants have rescinded funds in a manner contrary to the Impoundment Control Act, in violation of the APA.

109.    In the alternative, by refusing to spend funds that Congress has appropriated for the IES's operations, contracts, and research activities, Defendants have deferred a budget authority in a manner contrary to the Impoundment Control Act, in violation of the APA.

**COUNT V**
**(Administrative Procedure Act – Contrary to Law – Violation of Anti-Deficiency Act)**

110.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

111.    The Anti-Deficiency Act provides, in relevant part, that "[i]n apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1).

112.    By refusing to spend funds that Congress has appropriated for IES's operations, contracts, and research activities, Defendants have acted contrary to the Anti-Deficiency Act, in violation of the APA, by creating a reserve that is not authorized by any of the Anti-Deficiency Act's three exceptions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(A) Declare that Defendants' actions terminating IES's performance of statutorily mandated activities and impounding funds that IES would otherwise use to pay salaries, operating costs, and contract and grant obligations are unlawful;

(B) Declare unlawful and set aside Defendants' mass termination of contracts, reduction in force, and termination of remote restricted-use data licenses, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to

constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

(C) Order Defendants to take steps to restore terminated contracts that execute statutorily mandated tasks or enable the agency to do so;

(D) Vacate any RIF as to IES employees necessary to perform the agency's statutory functions;

(E) Vacate the decision to terminate all remote restricted-use data licenses;

(F) Enjoin Defendants from taking any further steps that hinder IES's ability to perform its statutorily mandated tasks;

(G) Issue a temporary restraining order and preliminary injunction directing Defendants to cease immediately actions to cease IES's operations;

(H) Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

(I) Grant such other relief as the Court deems necessary, just, and proper.

Dated: April 4, 2025                                  Respectfully submitted,

/s/ Adam R. Pulver
Adam R. Pulver (DC Bar No. 1020475)
Karla Gilbride (DC Bar No. 1005886)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

*Attorneys for Plaintiffs*