## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC.; THE INSTITUTE FOR HIGHER EDUCATION POLICY, <br><br> Plaintiffs, <br><br> v. <br><br> LINDA MCMAHON, in her official capacity as Secretary of Education; U.S. DEPARTMENT OF EDUCATION, <br><br> Defendants. | Civil Action No. 25-999-TNM |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Adam R. Pulver (DC Bar No. 1020475)
Karla Gilbride (DC Bar No. 1005886)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

*Counsel for Plaintiffs*

April 17, 2025

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

FACTS ................................................................................................................... 8

LEGAL STANDARD ............................................................................................ 17

ARGUMENT ......................................................................................................... 17

    I.    Plaintiffs are likely to succeed on the merits. ................................................ 17

        A.    Plaintiffs have shown a likelihood of standing. ....................................... 17

            1.    Organizational standing ...................................................................... 18

            2.    Associational standing ........................................................................ 21

        B.    Plaintiffs are likely to succeed on their claims. ...................................... 24

            1.    Defendants' actions are reviewable final agency action. ................... 24

            2.    The termination of IES research and dissemination activities was unlawful. .......... 27

                a.    The termination of IES activities was arbitrary and capricious. ............................ 27

                b.    Terminating IES's activities is contrary to ESRA and the Higher Education Opportunity Act. ............................ 33

                c.    Defendants' refusal to spend appropriated funds is unlawful. ............................... 35

                d.    Halting IES's work is contrary to the separation of powers and ultra vires. .......... 36

            3.    The termination of the remote access program for restricted-use data is unlawful. . 38

    II.    AEFP, AEFP members, and IHEP will suffer irreparable harm absent a preliminary injunction. ...................................................................................... 40

    III.    The balance of equities and the public interest support the grant of a preliminary injunction. ...................................................................................... 42

CONCLUSION ...................................................................................................... 43

# TABLE OF AUTHORITIES

*AIDS Vaccine Advocacy Coalition v. U.S. Department of State*,
  __ F. Supp. 3d __, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ...................................... 25, 34, 35

*Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits System*,
  357 F.3d 62 (D.C. Cir. 2004) ........................................................................................... 25

*American Federation of Government Employees v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ......................................................................................... 26

*American Great Lakes Ports Ass'n v. Zukunft*,
  296 F. Supp. 3d 27 (D.D.C. 2017) ................................................................................... 32

*American Historical Ass'n v. National Archives & Records Admin*istration,
  516 F. Supp. 2d 90 (D.D.C. 2007) ................................................................................... 18

*American Immigration Council v. U.S. Department of Homeland Security*,
  470 F. Supp. 3d 32 (D.D.C. 2020) ................................................................................... 40

*American Wild Horse Preservation Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ......................................................................................... 27

*Armstrong v. Exceptional Child Center, Inc.*,
  575 U.S. 320 (2015) ......................................................................................................... 23

*Beattie v. Barnhart*,
  663 F. Supp. 2d 5 (D.D.C. 2009) ..................................................................................... 39

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................................................................... 24

*Biden v. Texas*,
  597 U.S. 785 (2022) ......................................................................................................... 24

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................................. 41

*CC Distributors, Inc. v. United States*,
  883 F.2d 146 (D.C. Cir. 1989) ......................................................................................... 22

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ......................................................................................... 17

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ...................................................................................... 35

*Coalition for Humane Immigrant Rights v. U.S. Dep't of Homeland Security*,
  No. 1:25-cv-00943 (TNM), 2025 WL 1078776 (D.D.C. Apr. 10, 2025)................................. 17

*Correctional Services Corp. v. Malesko*,
  534 U.S. 61 (2001) ...................................................................................... 37

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*,
  365 F. Supp. 3d 28 (D.D.C 2019)........................................................................ 18

*Center for Biological Diversity v. Environmental Protection Agency*,
  56 F.4th 55 (D.C. Cir. 2022)........................................................................... 21

*Center for Biological Diversity v. Regan*,
  734 F. Supp. 3d 1 (D.D.C. 2024)........................................................................ 21

*Center for Biological Diversity v. U.S. International Development Finance Corp.*,
  77 F.4th 679 (D.C. Cir. 2023).......................................................................... 19

*Department of Homeland Security v. Regents of the University of California*,
  591 U.S. 1 (2020) .................................................................................. 26, 39

*Doctors for America v. Office of Personnel Management*,
  __ F. Supp. 3d __, 2025 WL 452707 (D.D.C. Feb. 11, 2025) ............................................. 22

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017).......................................................................... 17

*Environmental Defense Fund v. Environmental Protection Agency*,
  922 F.3d 446 (D.C. Cir. 2019)....................................................................... 18, 20

*Federal Election Commission v. Akins*,
  524 U.S. 11 (1998) ..................................................................................... 17

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) .................................................................................... 17

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
  561 U.S. 477 (2010) .................................................................................... 37

*Friends of Animals v. Jewell*,
  824 F.3d 1033 (D.C. Cir. 2016)......................................................................... 18

*In re Aiken County,
   725 F.3d 255 (D.C. Cir. 2013)........................................................... 34

Immigration & Naturalization Service v. Chadha,
   462 U.S. 919 (1983) ...................................................................... 35

J. Does 1-26 v. Musk,
   No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ........................ 35

J.W. Hampton, Jr. & Co. v. United States,
   276 U.S. 394 (1928) ...................................................................... 36

Kingman v. Park Civic Ass'n v. Bowser,
   815 F.3d 36 (D.C. Cir. 2016)............................................................ 17

*League of Women Voters of United States v. Newby,
   838 F.3d 1 (D.C. Cir. 2016)........................................................ 20, 41

Local 2677, American Federation of Government Employees v. Phillips,
   358 F. Supp. 60 (D.D.C. 1973) ......................................................... 37

Love v. Thomas,
   858 F.2d 1347 (9th Cir. 1988) .......................................................... 32

*Megapulse, Inc. v. Lewis,
   672 F.2d 959 (D.C. Cir. 1982)........................................................... 25

Michigan v. Environmental Protection Agency,
   576 U.S. 743 (2015) ...................................................................... 26

Mistretta v. United States,
   488 U.S. 361 (1989) ...................................................................... 36

*Motor Vehicles Manufacturers Ass'n of U.S. v. State Farm Mutual Automobile Insurance Co.,
   463 U.S. 29 (1983) ....................................................................... 26

National Ass'n of the Deaf v. Trump,
   486 F. Supp. 3d 45 (D.D.C. 2020)...................................................... 40

National Council of Nonprofits v. Office of Management & Budget,
   __ F. Supp. 3d __ , 2025 WL 597959 (D.D.C. Feb. 25, 2025) .................... 32

*National Treasury Employees Union v. Vought,
   Civ. No. 25-0381 (ABJ), 2025 WL 942772 (D.D.C. Mar. 28, 2025) ..... 21, 24, 27, 41

*New York. v. Trump,*
  __ F.4th __, 2025 WL 914788 (1st Cir. Mar. 26, 2025)........................................ 24

*Natural Resources Defense Council v. Raimondo,*
  Civ. No. 23-982 (BAH), 2024 WL 4056653 (D.D.C. Sept. 5, 2024)....................................... 23

*Open Communities Alliance v. Carson,*
  286 F. Supp. 3d 148 (D.D.C. 2017).......................................................... 41

*Payne Enterprises, Inc. v. United States,*
  837 F.2d 486 (D.C. Cir. 1988)............................................................ 40

*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture,*
  797 F.3d 1087 (D.C. Cir. 2015)........................................................... 22

*Powder River Basin Resource Council v. U.S. Department of Interior,*
  749 F. Supp. 3d 151 (D.D.C. 2024)........................................................ 23

*Pursuing America's Greatness v. Federal Election Commission,*
  831 F.3d 500 (D.C. Cir. 2016)............................................................ 17

*Robertson v. District of Columbia,*
  __ F. Supp. 3d __, 2025 WL 211056 (D.D.C. Jan. 16, 2025) ........................................ 17

*Seton Historic Aviation Foundation v. U.S. Department of Defense,*
  785 F.3d 719 (D.C. Cir. 2015)............................................................ 22

*Spirit Airlines, Inc. v. U.S. Department of Transportation,*
  997 F.3d 1247 (D.C. Cir. 2021)......................................................... 24, 30

*Transohio Savings Bank v. Director, Office of Thrift Supervision,*
  967 F.2d 598 (D.C. Cir. 1992)............................................................ 25

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ..................................................................... 17

*Turlock Irrigation Dist. v. Federal Energy Regulatory Commission,*
  786 F.3d 18 (D.C. Cir. 2015)............................................................. 19

*U.S. Conference of Catholic Bishops v. U.S. Department of State,*
  No. 1:25-cv-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ............................... 25

*United Farm Workers v. Perdue,*
  No. 1:20-cv-01452-DAD, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020) ............................... 40

*Utility Air Regulatory Group v. Environmental Protection Agency*,
   573 U.S. 302 (2014) ...................................................................................... 36, 37

*Widakuswara v. Lake*,
   No. 25-CV-2390 (JPO), 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ................. 24, 27, 33, 41

*Wilkerson v. Rahrer*,
   140 U.S. 545 (1891) .......................................................................................... 36

**Statutes and Regulations**

Impoundment Control Act:

   2 U.S.C. § 683 ................................................................................................... 34

   *2 U.S.C. § 683(b) ............................................................................................. 34

Administrative Procedure Act:

   5 U.S.C. § 702 ................................................................................................... 25

   5 U.S.C. § 704 ................................................................................................... 26

   *5 U.S.C. § 706(2)(A) ........................................................................................ 23

Higher Education Opportunity Act

   20 U.S.C. § 1015a(i)(4) ...................................................................................... 4

   *20 U.S.C. § 1015a(k) ........................................................................... 4, 18, 33

20 U.S.C. § 1464 ...................................................................................................... 6

20 U.S.C. § 2324 .................................................................................................... 6, 9

20 U.S.C. § 2324(a)(3) .............................................................................................. 4

20 U.S.C. § 2351(a)(1)(B) .......................................................................................... 5

*20 U.S.C. § 3473(a) ............................................................................................... 36

20 U.S.C. § 6398(e) ................................................................................................... 5

20 U.S.C. § 6633(c) ................................................................................................... 6

20 U.S.C. § 6645 ....................................................................................................... 6

20 U.S.C. § 7275(f) ................................................................................................ 6

Education Sciences Reform Act of 2002, Pub. L. 107-279 ................................... 3

*20 U.S.C. § 9511 ................................................................................................ 4

20 U.S.C. § 9511(b) ............................................................................................. 36

*20 U.S.C. § 9512 ........................................................................................... 4, 18

20 U.S.C. § 9513 ................................................................................................... 4

*20 U.S.C. § 9520 ............................................................................................... 28

20 U.S.C. § 9533 ................................................................................................... 5

*20 U.S.C. § 9533(a)(7) ..................................................................................... 18

*20 U.S.C. § 9534(b)(2) ..................................................................................... 36

*20 U.S.C. § 9543(a) ...................................................................................... 9, 18

*20 U.S.C. § 9545(b) .................................................................................... 10, 33

*20 U.S.C. § 9545(c) .......................................................................................... 18

*20 U.S.C. § 9546(e)(2) ..................................................................................... 18

*20 U.S.C. § 9562(a) ...................................................................................... 5, 18

*20 U.S.C. § 9562(b) ...................................................................................... 5, 18

20 U.S.C. § 9562(d) ........................................................................................ 6, 13

*20 U.S.C. § 9564 ........................................................................................... 5, 11

20 U.S.C. § 9567 ................................................................................................... 6

20 U.S.C. § 9567b ................................................................................................. 6

20 U.S.C. § 9573(c) ............................................................................................ 14

*20 U.S.C § 9574 ....................................................................................... 4, 14, 18

*20 U.S.C § 9575 ............................................................................................ 4, 39

*20 U.S.C. § 9576(c) ......................................................................................... 28

Educational Technical Assistance Act

20 U.S.C. § 9603 ............................................................................................... 28

National Assessment of Educational Progress Authorization Act

20 U.S.C. § 9622 ................................................................................................. 4

20 U.S.C. § 9622(b) ....................................................................................... 9, 33

20 U.S.C. § 9622(f) ............................................................................................. 9

25 U.S.C. § 5348(b)(1)(B)(i) .............................................................................. 5

29 U.S.C. § 3332(b)(3) ................................................................................. 10, 33

31 U.S.C. § 1512(c)(1) ...................................................................................... 35

38 U.S.C. § 3015 ................................................................................................. 5

44 U.S.C. § 3582(a) .......................................................................................... 39

Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, 138 Stat. 690 ...................... 7

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4, 139 Stat. 9 .... 7

**Regulations and Executive Actions**

5 C.F.R. § 1321.4(d) ......................................................................................... 39

Executive Order 14210, "Implementing the Presidents 'Department of Government Efficiency'
    Workforce Optimization Initiative 90 Fed. Reg. 9669 (February 14, 2025) .................. 14, 29

**Congressional Materials**

H.R. Rep. 107-404 ............................................................................................... 3

S. Rept. 118-84 .................................................................................................... 7

Cong. Res. Serv., K-12 Education: Highlights of the No Child Left Behind Act of 2001
    (P.L. 107-110), Jan. 7, 2008, https://www.congress.gov/crs-product/RL31284 ...................... 3

**Other Executive Materials**

DOGE, (@DOGE), X.com (Feb. 10, 2025 7:43pm),
    https://x.com/DOGE/status/1889113011282907434 ................................................... 8

*DOGE, Wall of Receipts, https://www.doge.gov/savings ........................................... 8

ED (@usedgov), X.com (Feb. 12, 2025 5:16pm),
    https://x.com/usedgov/status/1889800710084317454 ........................................... 39

ED, Department of Education Fiscal Year 2004 Congressional Action,
    https://www.ed.gov/sites/ed/files/about/overview/budget/budget24/24action.pdf ................... 7

ED, ED*Facts* Workbook and Frequently Asked Questions (FAQs),
    Version 2.5, SY 2023-24, Jan. 2025,
    https://www.ed.gov/sites/ed/files/about/inits/ed/edfacts/eden/edfacts-workbook-with-faqs-23-
    24.pdf ................................................................................................ 9

ED, EDPass User Guide, Version 2.2, Nov. 2024, https://www.ed.gov/sites/ed/files/2024-
    11/EDPass%20User%20Guide.pdf ................................................................ 8

*ED, Press Release, "U.S. Department of Education Initiates Reduction in Force," Mar. 11,
    2025, https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-
    reduction-force ..................................................................................... 12

Federal Procurement Data System, http://www.fpds.gov ........................................... 8

IES, "Celebrating the ECLS-K:2024: Providing Key National Data on Our Country's Youngest
    Learners," Mar. 11, 2024, https://ies.ed.gov/learn/blog/celebrating-ecls-k2024-providing-key-
    national-data-our-countrys-youngest-learners ..................................................... 31

IES, IES Staff, https://ies.ed.gov/about/directory ................................................. 12

IES, Restricted Use Data Security Plan Form,
    http://nces.ed.gov/statprog/rudman/pdf/SecurityPlanRemoteAccess_508c.pdf ................... 15

IES, The Regional Educational Laboratory (REL) Program, https://ies.ed.gov/use-work/regional-
    educational-laboratories-rel ..................................................................... 29

NCES, Assessment Calendar, https://nces.ed.gov/nationsreportcard/about/calendar.aspx ......... 11

NCES, Condition of Education 2024, https://nces.ed.gov/use-work/resource-
    library/report/compendium/condition-education-2024 ........................................... 10

NCES, DataLab, About, https://nces.ed.gov/datalab/about ....................................... 11

NCES, Early Childhood Longitudinal Studies (ECLS) Program, https://nces.ed.gov/ecls/ ........... 9

NCES, High School & Beyond Longitudinal Studies, https://nces.ed.gov/surveys/hsb/ ............. 10

NCES, National Assessment of Educational Progress, Resources for Researchers,
    https://nces.ed.gov/nationsreportcard/researchcenter/ ................................................. 9

NCES, National Postsecondary Student Aid Study (NSPAS), https://nces.ed.gov/surveys/npsas/ 9

NCES, National Postsecondary Student Aid Study (NPSAS), About NPSAS,
    https://nces.ed.gov/surveys/npsas/about.asp ............................................................. 31

NCES, National Teacher and Principal Survey, Overview,
    https://nces.ed.gov/surveys/ntps/overview.asp?OverviewType=1 ............................................. 9

NCES, New Restricted-Use License Application,
    https://nces.ed.gov/statprog/licenseapp/LicenseInfo ................................................. 16

NCES, Restricted-Use Data Procedures Manual, Apr. 2019,
    https://nces.ed.gov/statprog/rudman/pdf/IES_Licensing_manual_2019.pdf . ........................ 14

NCES, Statistical Standards Program, Restricted Use Data Licenses,
    https://nces.ed.gov/statprog/instruct.asp. ............................................................. 15

Office of Personnel Management, FedScope, https://www.fedscope.opm.gov/ ......................... 12

ResearchDataGov, https://www.researchdatagov.org/. .................................................. 16

ResearchDataGov.org (RDG) User Guide, Mar. 2025,
    https://manager.researchdatagov.org/RDG_User_Guide.pdf .................................................. 15

U.S. Census Bureau, "Non-Fiscal Surveys of the Common Core of Data (CCD),"
    https://www.census.gov/econ/overview/go2000.html ..................................................... 9

**Other Authorities**

American Statistical Ass'n & Council on Professional Ass'ns on Federal Statistics, "Fix the
    Staffing Shortage at the National Center for Education Statistics (NCES)," 2024,
    https://www.amstat.org/docs/default-source/amstat-documents/pol-nces_
    staffingappropsfy24.pdf............................................................................................. 7

American Statistical Ass'n, "National Center for Education Statistics," The Nation's Data at
    Risk: Meeting America's Information Needs for the 21st Century,
    https://www.amstat.org/docs/default-source/amstat-documents/the-nation's-data-at-risk-
    supporting-materials/national-center-for-education-statistics.pdf?v=1024 ............................... 7

Jill Barshay, "Chaos and confusion as the statistics arm of the Education Department is reduced to a skeletal staff of 3," The Hechinger Report, Mar. 14, 2025, https://hechingerreport.org/proof-points-chaos-confusion-statistics-education/ ...................... 10

Jill Barshay, "NAEP, the Nation's Report Card, was supposed to be safe. It's not," The Hechinger Report, Apr. 7, 2025, https://hechingerreport.org/proof-points-naep-not-safe/ ...................... 10

Kalyn Belsha, "Crucial research halted as DOGE abruptly terminates Education Department contracts," Chalkbeat, Feb. 11, 2025, https://www.chalkbeat.org/2025/02/11/elon-musk-and-doge-cancel-education-department-research-contracts/ ........................................................... 32

Rebecca Carballo & Juan Perez, Jr., "DOGE announces $881 million in cuts for Education Department contracts," Politico, Feb. 10, 2025, https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-00203494 ..................................................................................................................... 8

Lexi Lonas Cochran, "Research arm of Education Department sees cuts after DOGE review," The Hill, Feb. 11, 2025, https://thehill.com/homenews/education/5138004-education-department-research-arm-doge-review/ ................................................................................. 8

Benjamin Feder & Jonathan N. Mills, Coleridge Initiative, "Fostering a community of practice around restricted use surveys for the public good" (2023), https://www.census.gov/fedcasic/fc2023/pdf/6B-FederB.pptx. ................................................ 15

Linda Jacobson, "After Declaring NAEP Off-Limits, Education Department Cancels Upcoming Test," The 74, Feb. 20, 2025, https://www.the74million.org/article/after-declaring-naep-off-limits-education-department-cancels-upcoming-test/ ........................................................... 12

Jonaki Mehta, "How the Education Department cuts could hurt low-income and rural schools," NPR, Mar. 21, 2025, https://www.npr.org/2025/03/21/nx-s1-5330917/trump-schools-education-department-cuts-low-income ................................................................................. 13

Naaz Modan, "What will NCES layoffs mean for the Nation's Report Card," K-12 Dive (Mar. 18, 2025), https://www.k12dive.com/news/Education-Department-nces-layoffs-leaves-naep-assessments-nations-report-card-barebones/742837/ ........................................................... 13

Nicole M. McNeil & Robert Stuart Siegler, "Helping teachers learn what works in the classroom − and what doesn't − will get a lot harder without the Department of Education's Institute of Education Sciences," The Conversation, Feb. 12, 2025, https://theconversation.com/helping-teachers-learn-what-works-in-the-classroom-and-what-doesnt-will-get-a-lot-harder-without-the-department-of-educations-institute-of-education-sciences-247675 ................................... 42

Ryan Quinn & Katherine Knott, "$900 Million in Institute of Education Sciences Contracts Axed," Inside Higher Ed, Feb. 12, 2025, https://www.insidehighered.com/news/faculty-issues/research/2025/02/12/900m-institute-education-sciences-contracts-axed# ................... 38

Mark Schneider, "Modernizing Access to Education Data Could Improve Student Learning," *Education Next*, June 12, 2024, https://www.educationnext.org/modernizing-access-to-education-data-could-improve-student-learning/ ..................................................................... 37

Benjamin Michael Superfine, *New Directions in School Funding and Governance: Moving from Politics to Evidence*, 98 Ky. L.J. 653, 686 (2010). ........................................................... 3

Greg Toppo, "Is Trump Gutting Education Research a New Beginning or Just 'Slashing & Burning'?", The 74, Feb. 11, 2025, https://www.the74million.org/article/is-trump-gutting-education-research-a-new-beginning-or-just-slashing-burning/ ........................................... 27

Greg Toppo, "Stunned Education Researchers Say Cuts Go Beyond DEI, Hitting Math, Literacy," The 74, Feb. 13, 2025, https://www.the74million.org/article/stunned-education-researchers-say-cuts-go-beyond-dei-hitting-math-literacy/................................................... 40

## INTRODUCTION

Based on its judgment that educational policy at the federal, state, and local levels is best informed by scientific evidence and a robust infrastructure for gathering that evidence on a national level, Congress in 2002 created the Institute of Education Sciences (IES) as a semi-independent division within the Department of Education (ED). Congress then, and repeatedly since, tasked IES with numerous obligations to conduct research on all aspects of education in America, and to make research and data widely available to researchers and the public. Last year, Congress appropriated nearly $800 million to IES to perform those tasks—largely via contracts with third parties, overseen by a relatively small staff.

By a series of actions over the last two months, Defendants ED and Secretary of Education Linda McMahon (collectively, ED) have stopped IES's statutorily mandated work and neutered its ability to resume that work. First, ED terminated IES's performance of several functions by cancelling en masse dozens of contracts related to research studies, dissemination activities, and IES's basic internal and support operations. ED did so although those functions were necessary for IES to carry out its statutorily mandated tasks, and without considering how the resulting cessation of those functions would impact researchers, policymakers, and educational institutions that rely on that work. One month later, ED initiated a reduction-in-force as to 90% of IES employees and placed them on administrative leave. And it did so without instituting a plan to transition the vital functions upon which researchers and others rely, thus halting those functions. By these actions, ED began to dismantle a congressionally mandated agency—based on an unreasoned judgment that the research and evaluation that Congress has specifically directed, and on which policymakers, researchers, practitioners, and the public rely to improve education in America, is inefficient. ED has no authority to substitute its policy view for the will of Congress, embodied in statute.

1

The arbitrariness by which Defendants halted the performance of IES functions is confirmed by subsequent developments. Two weeks *after* deciding to terminate one of the mechanisms by which IES collects data for several statutory mandated assessments (a program called EDFacts), ED scrambled to reinstate the program. And on April 4, seven weeks *after* IES announced the termination of its remote access program for restricted-use data and halted its processing of new applications to access restricted-use data, and weeks after it eliminated the staff that had been clearing for publication researchers' work that relied on such data, IES sent an email to restricted-use data users "to assess the level of program support required to continue … vital service and comply with applicable law." Such a "cut first, ask questions later" approach is the epitome of arbitrary and capricious decisionmaking. Moreover, by ceasing statutorily mandated functions and refusing to spend the funds appropriated to perform them, Defendants' actions are contrary to law.

The impacts of Defendants' actions are not speculative. Beyond the restricted-use data program, peer review of grant applications has ceased, and, because peer review is required by statute, no new grants can be approved. In addition, because ongoing data collections have been canceled, and websites that are used to collect or access data are not operational, users of that data, including Plaintiffs Association for Education Finance and Policy (AEFP) and Institute for Higher Education Policy (IHEP), have suffered, and will continue to suffer harm. AEFP is an association of 1,000 education researchers and practitioners and IHEP is a research, policy, and advocacy organization—both of which have already experienced harm in performing their core activities of analyzing and disseminating data as a result of Defendants' actions. AEFP, its members, and IHEP rely on IES's performance of its statutory mandate by gathering and timely dissemination of current, irreplaceable research and data. The termination of IES's collection and dissemination of

research causes irreparable harm that cannot be remedied a year or more down the road. As data degrades and disappears, study participants move, and as contractors and terminated employees move on, it will be harder, if not impossible, to rebuild IES. Preliminary relief is thus appropriate to stop the harms that are already occurring and the harms that are likely to follow should Defendants be allowed to complete the evisceration of IES and termination of its statutory functions.

**BACKGROUND**

The turn of the century saw the passage of several landmark pieces of education-related legislation at the federal level, all of which emphasized scientifically based research and accountability. Perhaps most well-known is the No Child Left Behind Act of 2001, Pub. L. 107-110, enacted in January 2002, which amended the Elementary and Secondary Education Act of 1962 (ESEA) and "extensively amended and reauthorized most federal elementary and secondary education aid programs."[1] In conjunction with that law, Congress also reorganized the federal government's educational research functions, which had previously been mostly located within the Office of Educational Research and Improvement. That office "ha[d] been attacked for supporting fragmented, short-term, and overly politicized research, and funding for educational research ha[d] long been limited."[2] To address those criticisms, Congress enacted the Education Sciences Reform Act of 2002 (ESRA), Pub. L. 107-279, "to provide the mechanism for valid research that would be cumulative and inform education practices at the State and local levels with well-documented findings." H.R. Rep. 107-404, at 30–31 (2002). ESRA established IES as a new,

---

[1] Cong. Res. Serv., K-12 Education: Highlights of the No Child Left Behind Act of 2001 (P.L. 107-110), Jan. 7, 2008, https://www.congress.gov/crs-product/RL31284.

[2] Benjamin Michael Superfine, *New Directions in School Funding and Governance: Moving from Politics to Evidence*, 98 Ky. L.J. 653, 686 (2010).

semi-independent division of ED, and vested IES with responsibilities both for continuing to conduct existing studies like the National Assessment of Educational Progress (NAEP), and for undertaking or sponsoring new research, along with responsibilities to make research and data widely available to researchers and the public. *See* 20 U.S.C. §§ 9501–9584. ESRA specifies that the duties created by ESRA may not be delegated by the Secretary of Education to entities other than IES, and limits the additional responsibilities that the Secretary may impose on IES. *See id*. § 9513.

Within IES are four separate "National Education Centers"—the National Center for Education Research (NCER), the National Center for Education Statistics (NCES), the National Center for Education Evaluation and Regional Assistance (NCEE), and the National Center for Special Education Research (NCSER). *Id*. § 9511. In ESRA, Congress prescribed duties for both IES as a whole and for each of the centers—duties that include the conduct of research and evaluation on dozens of topics, and the dissemination of the results of that research and evaluation in specific ways. *See, e.g.*, *id.* § 9512 (requiring IES to "conduct and support scientifically valid research activities," and "widely disseminate the findings and results of scientifically valid research in education"). Among its dissemination mandates, Congress required that any data collected by IES and its subsidiaries "shall be made available to the public, including through use of the internet," *id*. § 9574, and that IES "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," "utilizing the most modern technology and other methods," *id.* § 9575.

The largest of the four centers has been NCES, which has existed in some form since the 1860s. The responsibilities of NCES include, among other things, the conduct and dissemination of NAEP, 20 U.S.C. § 9622; the maintenance of the Integrated Postsecondary Education Data

System (IPEDS), *id.* § 1015a(i)(4); the regular conduct and dissemination of national surveys of federal student aid recipients as to the costs of postsecondary education, *id.* § 1015a(k); the regular collection and report of information on career and technical education (CTE), *id.* § 2324(a)(3); and the collection of data on the education of migratory children, *id.* § 6398(e). NCES is also required to generate data and information used by other parts of ED and other federal agencies. For example, NCES calculates the average cost of undergraduate tuition, and agencies use its calculation to determine the amounts of educational assistance provided to veterans under 38 U.S.C. § 3015, to determine the amounts of assistance provided to states for Indian education, 25 U.S.C. § 5348(b)(1)(B)(i), and to determine the amounts of funds for career and technical education assistance provided to local educational agencies, 20 U.S.C. § 2351(a)(1)(B).

The other centers also have particular functions specified by statute. NCER is required, for example, to "maintain published peer-review standards"; propose and implement a plan "to carry out scientifically valid research" on a number of topics, and synthesize and disseminate that research. *Id.* § 9533. NCEE is required to "widely disseminate information on scientifically valid research, statistics, and evaluation on education" to researchers, educational agencies, and the public on specified topics, "including by making information accessible in a user-friendly, timely and efficient manner (including through use of a searchable Internet-based online database." *Id.* § 9562(a). NCEE also is required to establish and maintain various information clearinghouses, and to respond "to inquiries from schools, educators, parents, administrators, policymakers, researchers, public and private entities." *Id.* §§ 9562(a)(7), 9562(b). Congress also charged NCEE with establishing and maintaining "Regional Educational Laboratories" around the country, which not only are required to conduct and disseminate research, but also to provide training, technical assistance, and other resources to state and local educational institutions and agencies, schools,

parents, policymakers, and the public. *Id.* § 9564. NCEE also operates the National Library of Education, which is required to collect and archive a wide range of products, publications, and research, and to provide services to federal employees, contractors, grantees, and members of the public. *Id.* § 9562(d).

Finally, NCSER, the smallest of the four national centers, is dedicated to sponsoring research related to "the needs of infants, toddlers, and children with disabilities." *Id.* § 9567(b). NCSER also works to improve services provided under, and support the implementation of, the Individuals with Disabilities Education Act (IDEA), and, in coordination with NCEE, to conduct evaluation activities regarding IDEA implementation. *Id.* The statute specifies 17 topics as to which NCSER "shall carry out research activities," the results of which must be synthesized and disseminated through NCEE. *Id.* §§ 9567b(a), (e).

In addition to the responsibilities assigned to it in the Education Sciences Reform Act, other statutes task IES with conducting and disseminating research and evaluation related to implementation of the IDEA, 20 U.S.C. § 1464; and on the condition of career and technical education, and effectiveness of federally funded career and technical education programs under the Perkins Act, *id.* § 2324. Congress also assigned IES duties related to various grant programs, requiring IES to evaluate program activities and provide resources to grant recipients. *See, e.g.*, *id.* § 6645 (Comprehensive Literacy State Development Grants), § 6633(c) (Teacher and School Leader Incentive Program), § 7275(f) (Full-Service Community Schools Program).

IES, and the studies and data collections it oversees, have been vital to educational research in America over the past several decades. "IES, its data sets, and the principles and demands that it has placed on educational researchers have led to more methodologically sound studies." Decl.

of Douglas N. Harris ¶ 10. It has "provid[ed] the education research infrastructure in this country." Decl. of Cara Jackson ¶ 14.

In 2024, Congress appropriated $793,106,000 for IES to conduct its work. *See* Department of Education Appropriations Act, 2024, Div. D, Title III of the Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, 138 Stat. 690 (Mar. 23, 2024). This amount includes appropriations of $121,500,000 specifically for NCES, $53,733,000 for the Regional Educational Laboratory program, $28,500,000 for statewide longitudinal data systems, $193,300,000 for the NAEP, and $73,500,000 for program administration. *See* ED, Department of Education Fiscal Year 2024 Congressional Action, at 8, https://www.ed.gov/sites/ed/files/about/overview/budget/budget24/24action.pdf ; S. Rept. 118-84 at 247 (incorporated into statute by Pub. Law 118-47 § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024)). Congress has continued funding at these levels for 2025. *See* Sec. 1101(a)(8), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4 (Mar. 15, 2025). Because only the "program administration" funds may be used to pay salaries of IES employees, IES has long relied on contractors, rather than staff, to carry out its duties.[3]

The President has not proposed the rescission of any funds appropriated to IES.

---

[3] *See* Am. Statistical Ass'n & Council on Prof. Ass'ns on Fed. Statistics, "Fix the Staffing Shortage    at    the    National    Center    for    Education    Statistics    (NCES)," 2024, https://www.amstat.org/docs/default-source/amstat-documents/pol-nces_staffingappropsfy24.pdf; Am. Statistical Ass'n, "National Center for Education Statistics," The Nation's Data at Risk: Meeting America's Information Needs for the 21st Century, https://www.amstat.org/docs/default-source/amstat-documents/the-nation's-data-at-risk-supporting-materials/national-center-for-education-statistics.pdf?v=1024.

## FACTS

### *The Mass Termination of IES Programs*

Since February 2025, Defendants have terminated several IES programs en masse. The decision to do so was first announced on February 10, 2025, when representatives of the "Department of Government Efficiency" (DOGE) arrived at IES and informed senior IES leadership of their decision, ratified by Defendants, that most of IES's contracts would be canceled. *See* Decl. of Erin Pollard Young ¶ 7; Decl. of Abigail Doe ¶ 6. The decision was made without any discussion or input of any IES staff—including the staff that oversaw these programs. Young Decl. ¶¶ 8–9; Abigail Doe Decl. ¶ 10. DOGE subsequently announced this decision on its X account,[4] and has since posted on its "Wall of Receipts" website that 90 IES contracts were canceled between February 9 and 11, 2025.[5] This list may be incomplete, however; reports indicate the cancellation of as many as 170 contracts at that time.[6] On the "Wall of Receipts." DOGE counted the full value of terminated contracts as "savings" to taxpayers, indicating that the money that had been allocated to these contracts will not be funneled to other IES work.

Although the full scope of work on the canceled contracts is not publicly available, available information reveals that IES terminated several IES initiatives, including[7] :

---

[4]    DOGE,    (@DOGE),    X.com    (Feb.    10,    2025    7:43pm), https://x.com/DOGE/status/1889113011282907434.

[5] DOGE, Wall of Receipts, https://www.doge.gov/savings.

[6] Lexi Lonas Cochran, "Research arm of Education Department sees cuts after DOGE review," The Hill, Feb. 11, 2025, https://thehill.com/homenews/education/5138004-education-department-research-arm-doge-review/; Rebecca Carballo & Juan Perez, Jr., "DOGE announces $881 million in cuts for Education Department contracts," Politico, Feb. 10, 2025, https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-00203494.

[7] The termination of these contracts was reflected on both the DOGE "Wall of Receipts," and on the Federal Procurement Data System, http://www.fpds.gov, neither of which allow linking

- The EDFacts Initiative, which is "the foundation and primary collection system for elementary and secondary education data, and a centralized information management tool for ED, state education agencies and lead agencies."[8] EDFacts is the tool by which data is collected for the Non-Fiscal Common Core of Data (CCD)—which in turn is used for the National Assessment of Educational Progress (NAEP), required by 20 U.S.C. § 9622.[9] EDFacts is also used by various ED offices to implement numerous reporting and evaluation requirements, including those imposed by the Every Student Succeeds Act, Individuals with Disabilities Education Act, McKinney-Vento Homeless Program, and the Gun-Free Schools Act.[10]

- The National Teachers and Principals Survey (NTPS), which collects data every two to three years on "core topics including teacher and principal preparation, classes taught, school characteristics, and demographics of the teacher and principal labor force"—a version of which has been conducted since 1987.[11]

- The National Postsecondary Student Aid Study (NPSAS), a survey required by 20 U.S.C. § 1015a(k), the results of which have been, and were scheduled to continue to be, posted publicly on NCES's website.[12]

- The National Implementation Study of Career and Technical Education under Perkins V, required by 20 U.S.C. § 2324.[13]

---

to a specific contract. Plaintiffs thus provide the relevant Award ID numbers for each contract discussed.

[8] Award ID 91990023D0008/91990024F0331; ED, EDPass User Guide, Version 2.2, Nov. 2024, https://www.ed.gov/sites/ed/files/2024-11/EDPass%20User%20Guide.pdf.

[9] ED, ED*Facts* Workbook and Frequently Asked Questions (FAQs), Version 2.5, SY 2023-24, Jan. 2025, at 12, https://www.ed.gov/sites/ed/about/inits/ed/edfacts/eden/edfacts-workbook-with-faqs-23-24.pdf (explaining relationship between ED*Facts* and CCD); U.S. Census Bureau, "Non-Fiscal Surveys of the Common Core of Data (CCD)," https://www.census.gov/econ/overview/go2000.html (explaining relationship between CCD and NAEP).

[10] ED*Facts* Workbook, at 7–15.

[11] Award ID 91990020A0014/91990022F0328; *see* NCES, National Teacher and Principal Survey, Overview, https://nces.ed.gov/surveys/ntps/overview.asp?OverviewType=1.

[12] Award ID 91990022C0017/91990018C0039; *see* NCES, National Postsecondary Student Aid Study (NSPAS), https://nces.ed.gov/surveys/npsas/.

[13] Award ID 91990019D0002/91990025F0014 and 91990021F0368.

- The Early Childhood Longitudinal Study, Kindergarten: 2024 (ECLS-K:2024), by which IES was fulfilling its duties under 20 U.S.C. § 9543(a)(1)(B) and (L), and which had already begun to produce valuable data for researchers.[14]

- The NAEP Research and Development Program, which fulfills the requirements of 20 U.S.C. § 9622(b)(5) and (f), and, according to IES, "support[s] NAEP in maintaining its reputation as the 'gold standard of student assessment.'"[15] This program includes the NAEP Validity Studies Panel (NVS), which "maintains the rigorous quality of the exam by studying whether the questions on the tests are measuring the skills we care about and if the scores can be trusted."[16]

- The High School and Beyond Longitudinal Study of 2022 (HS&B:22), which had been delayed due to the pandemic but had already begun to produce valuable data for researchers.[17]

- The National Assessment of Adult Education, which was designed to implement IES's obligations under section 242 of the Adult Education and Family Literacy Act (AEFLA), 29 U.S.C. § 3332(b)(3).[18]

- The Condition of Education Report "an annual report mandated by the U.S. Congress [per 20 U.S.C § 9545(b)] and is designed to help policymakers and the public monitor the condition and progress of education in the United States," which includes more than 45 indicators and comprehensive data about all stages of education from early childhood through K-12 through postsecondary through job attainment.[19]

The termination of the contracts for these data collections and studies meant these programs ceased to exist.

---

[14] Award ID 91990019C0002; *see* NCES, Early Childhood Longitudinal Studies (ECLS) Program, https://nces.ed.gov/ecls/.

[15] Award ID 91990023D0006; *see* NCES, National Assessment of Educational Progress, Resources for Researchers, https://nces.ed.gov/nationsreportcard/researchcenter/.

[16] Jill Barshay, "NAEP, the Nation's Report Card, was supposed to be safe. It's not," *The Hechinger Report*, Apr. 7, 2025, https://hechingerreport.org/proof-points-naep-not-safe/

[17] Award ID 91990018F0018; *see* NCES, High School & Beyond Longitudinal Studies, https://nces.ed.gov/surveys/hsb/.

[18] Award ID 91990018C0057.

[19] Award ID 91990024F0347; NCES, Condition of Education 2024, https://nces.ed.gov/use-work/resource-library/report/compendium/condition-education-2024.

In addition, Defendants halted the performance of other IES programs by terminating dozens of contracts necessary for IES staff and contractors to conduct, analyze, and disseminate research, including contracts for information technology support, including the restricted-data use program, discussed in greater detail below,[20] for the mail center that sends out and processes survey responses for several data collections,[21] for statutorily mandated peer review of grant applications and completed research,[22] and for basic services for the National Library of Education.[23]

Finally, Defendants ended programs by which IES shares data and research with researchers, policymakers, practitioners, and the public, including halting maintenance of DataLab—the secure, web-based platform that provides access to public data collected and managed by NCES,[24] the What Works Clearinghouse,[25] and the production and dissemination of other reports and internet materials.[26]

Since the initial tranche of contract cancellations was publicly posted on the DOGE website and Federal Procurement Data System, approximately thirty additional IES contract cancellations have been noted on those sites. On February 13, for example, ED terminated the contracts for the

---

[20] Award ID 91990023D0046/91990023F0330, 91990020A0002/91990025F0013, 91990023D0046/91990024F0327.

[21] Award ID 91990020F0309.

[22] Award ID 91990023D003/91990024F0304, 91990022C0008 and 91990022C0066.

[23] Award ID 03310320D0223 and 91990024F0026.

[24] Award ID GS-35F-0329Y/91990019F0001; *see* NCES, DataLab, About, https://nces.ed.gov/datalab/about.

[25] *E.g.*, Award ID 91990021A0003/91990023F0336, 91990021A0004/91990023F0072; 91990021A0022/91990024F0342; 91990020D0005/91990024F0310, 91990023A0001/91990024F0316

[26] Award ID 91990023D0005, 91990024F0330, 91990023D0042/91990024F0347, 91990023D0029/91990024F0345

ten Regional Educational Laboratories, required by 20 U.S.C. § 9564.[27] On or around February 19, 2025, ED terminated one of the components of the National Assessment for Educational Progress, the long-term assessment for age 17.[28] And on or around March 10, 2025, ED canceled the contract to develop a "centralized, streamlined, and more efficient approach to disseminating research and statistics to stakeholders as directed by the Education Sciences Reform Act."[29]

After their initial decision to cancel IES programs, Defendants revisited their decision to terminate EDFacts. The Federal Procurement Data System reflects that they took steps to reinstate it on February 28, 2025.[30]

### *The Reduction in Force of 90% of IES Staff Positions*

Even after ED made the decision to terminate many of IES's programs, some work at the agency was theoretically able to continue—both via the contracts that had not yet been terminated and by IES staff who coordinate and oversee contracts and provide other services. According to the Office of Personnel Management, as of September 2024, IES had a total of 186 employees.[31] As of March 2025, IES's staff directory showed 166 employees.[32] But any notion that the work of

---

[27] Award ID 91990022C0003, 91990022C0008, 91990022C0009, 91990022C0010, 91990022C0011, 91990022C0012, 91990022C0013, 91990022C0014, 91990022C0015.

[28] It is unclear if this cancellation was tied to a particular contract, but Defendants have confirmed the cancellation of this assessment. *See* NCES, Assessment Calendar, https://nces.ed.gov/nationsreportcard/about/calendar.aspx ("The LTT assessments for age 17 were cancelled based on a decision made by the U.S. Department of Education in February 2025."); *see also* Linda Jacobson, "After Declaring NAEP Off-Limits, Education Department Cancels Upcoming Test," The 74, Feb. 20, 2025, https://www.the74million.org/article/after-declaring-naep-off-limits-education-department-cancels-upcoming-test/ (quoting Feb. 19, 2025 email from NCES announcing that "The U.S. Department of Education has decided not to fund the NAEP 2024-2025 Long-Term Trend Age 17 assessment.").

[29] Award ID 91990024F0051.

[30] Award ID 91990024F0331.

[31] OPM, FedScope, https://www.fedscope.opm.gov/.

[32] IES, IES Staff, https://ies.ed.gov/about/directory.

IES would continue—including the work previously performed by contractors, was put to rest on March 11, 2025.

That day, as part of what Defendant McMahon referred to as ED's "final mission," Defendants initiated a mass reduction-in-force (RIF), firing approximately 90% of IES employees.[33] The RIF eliminated the positions of nearly all of the staff in NCER, NCES, and NCEE—leaving approximately 20 employees. Young Decl. ¶ 14. NCER and NCEE will each be left with a single employee—their respective Commissioners—one of whom also serves as the Acting Director of IES. *Id.* NCES will go from a staff of approximately 100 to a staff of 3. *Id.*[34] The RIF included statutorily mandated positions, including the only librarian position at the National Library of Education, which is required to "be headed by an individual who is highly qualified in library science." 20 U.S.C. § 9562(d)(1)(A). The Director of Information Technology and the Information Security Specialist, who run the servers that host IES websites and make sure that sensitive data remains confidential, were also subject to the RIF. Young Decl. ¶ 14. Terminated staff included the employees tasked with ensuring the quality of the data collected as part of NAEP and undertaking post-collection analysis.[35]

While the IES employees' employment will not formally end until June 10, 2025, the employees lost physical access to ED facilities as of March 11, 2025. *See* Young Decl. ¶ 13.

---

[33] ED, Press Release, "U.S. Department of Education Initiates Reduction in Force," Mar. 11, 2025, https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force.

[34] *See* Jonaki Mehta, "How the Education Department cuts could hurt low-income and rural schools," NPR, Mar. 21, 2025, https://www.npr.org/2025/03/21/nx-s1-5330917/trump-schools-education-department-cuts-low-income.

[35] Naaz Modan, "What will NCES layoffs mean for the Nation's Report Card," K-12 Dive, Mar. 18, 2025, https://www.k12dive.com/news/Education-Department-nces-layoffs-leaves-naep-assessments-nations-report-card-barebones/742837/ .

Between March 11 and March 21, 2025, IES employees subject to the RIF were not allowed to send external emails, making it impossible for them to communicate with contractors, constituents, or others served by the agency. Young Decl. ¶ 13. As of March 21, 2025, the employees subject to the RIF were placed on administrative leave; they no longer have access to any ED accounts or systems. *Id.* Staff who supervised contracts terminated as part of Defendants' mass February actions were not able to complete the closeouts of those contracts prior to being placed on administrative leave, or make plans to reinitiate the terminated programs, thus leaving it uncertain whether data and other products related to those contracts will ever be sent to IES. *Id.* ¶¶ 13, 15.

On April 10, 2025, the IES employees subject to the RIF received a formal notice of separation. *See* Young Decl. ¶ 13, Ex. 2. Those notices indicated that entire units of IES were being abolished. They cited Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," 90 Fed. Reg. 9669 (Feb. 11, 2025), as the basis for the action. *Id.*

***The Winddown of the Restricted-Use Data Program***

Defendants' contract terminations and placement of 90% of IES staff on leave have already resulted in the termination of several IES functions, even beyond research and other initiatives like ECLS-K:2024, and programs like the Regional Educational Laboratories, which were directly terminated when the contracts by which they operated were canceled. The most glaring public examples have been with respect to IES's Restricted-Use Data Program.

As background, IES is required to make all data that it collects publicly available "including through use of the internet." 20 U.S.C § 9574. Because some of that data contains individually identifiable information, the statute, 20 U.S.C. § 9573(c), requires IES to develop and enforce confidentiality standards regarding access to and use of that data, which IES refers to as

"restricted-use data."[36] Access to restricted-use data is limited to qualified organizations and provided through a strict licensing process, administered by NCES.[37] Traditionally, IES issued only "physical" licenses, by which users were provided data on CD-ROMs, which could only be used on a standalone, desktop computer not connected to the internet, and contained in a secure facility referred to as a "cold room."[38] In 2020, "due to prior access issues highlighted during the COVID-19 pandemic," IES launched its remote access program for restricted-use data.[39] The program, like programs for remote access to data operated by other federal statistical agencies, utilizes the Administrative Data Research Facility, hosted by the Coleridge Initiative, and allows researchers to access data remotely, through a specific secure web-based application.[40] Prior to February 10, 2025, ED was planning to transition the remote program from Coleridge to a new service platform. *See* Voight Decl. ¶ 18, Ex.1. Anytime a restricted-use data license holder (whether that license is a physical one or a remote one) intends to share research or analysis based on restricted data with a third party (whether in a conference presentation, a journal article, dissertation, or a blog post), they must first obtain permission from IES through a disclosure risk review.[41]

---

[36] NCES, Restricted-Use Data Procedures Manual, Apr. 2019, at 7, https://nces.ed.gov/statprog/rudman/pdf/IES_Licensing_manual_2019.pdf .

[37] *Id.*

[38] *Id.* at 22–23, 32–35.

[39] Benjamin Feder & Jonathan N. Mills, Coleridge Initiative, "Fostering a community of practice around restricted use surveys for the public good" (2023), https://www.census.gov/fedcasic/fc2023/pdf/6B-FederB.pptx.

[40] ResearchDataGov.org (RDG) User Guide, Mar. 2025, at 20, https://manager.researchdatagov.org/RDG_User_Guide.pdf; *see also* IES, Restricted Use Data Security Plan Form, http://nces.ed.gov/statprog/rudman/pdf/SecurityPlanRemoteAccess_508c.pdf.

[41] NCES, Statistical Standards Program, Restricted Use Data Licenses, https://nces.ed.gov/statprog/instruct.asp.

Defendants' mass terminations of contracts and staff have led to changes to both access to, and use of, restricted-use data. At least one of the contracts cancelled as part of Defendants' mass termination provided the staff for the Statistical Standards and Data Confidentiality office, the IES office that deals with restricted-use data licenses and uses of data obtained through such licensing.[42] On February 10, 2025, the same day that contract was canceled, citing "budgetary and programmatic considerations," IES informed all remote restricted-use data license holders that, contrary to prior plans, ED was terminating its remote access program effective June 1, 2025, and that it would no longer accept new applications. Voight Decl. ¶ 18, Ex. 1. Consistent with this announcement, ResearchDataGov,[43] the web-portal through which researchers apply for restricted use licenses, currently includes the following banner:

> **IMPORTANT NOTICE: TEMPORARY PAUSE ON NATIONAL CENTER FOR EDUCATION STATISTICS DATA ACCESS APPLICATIONS**
>
> ★ THE NATIONAL CENTER FOR EDUCATION STATISTICS (NCES) IS CURRENTLY NOT ACCEPTING NEW APPLICATIONS FOR ACCESS TO DATA THROUGH THE STANDARD APPLICATION PROCESS. REVIEW OF APPLICATIONS FOR ACCESS TO DATA FROM THE NATIONAL CENTER FOR EDUCATION STATISTICS IS ALSO PAUSED UNTIL FURTHER NOTICE.

On February 14, 2025, IES announced that disclosure risk reviews, which typically are completed within five to ten business days, may be delayed "[d]ue to recent reductions in resources."[44] Declaration of Brent J. Evans ¶ 10, Ex.1. On the morning of March 28, 2025, some NCES data users received an email from an office of the National Science Foundation stating that, "until further notice, all disclosure review and additional actions such as license renewals are paused," and that restricted data licensees "may not release any output, such as tabulations or estimates, until the pause is lifted and your output is cleared through disclosure review." Decl. of

---

[42] Award ID 91990022F0006.

[43] https://www.researchdatagov.org/.

[44] NCES, New Restricted-Use License Application, https://nces.ed.gov/statprog/licenseapp/LicenseInfo.

Belinda Doe ¶ 3, Ex. 1. No reason for this "pause" was given. After this "pause" was publicly reported and criticized, on March 31, 2025, a "correction" was sent from the same National Science Foundation office stating that "Disclosure reviews continue, although users should expect delays in responses to both new and existing requests." *Id.* ¶ 4, Ex. 2.

## LEGAL STANDARD

To obtain a preliminary injunction, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the preliminary injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). In actions to enjoin the government, the final two preliminary-injunction factors—balancing the equities and the public interest—merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ARGUMENT

I.    **Plaintiffs are likely to succeed on the merits.**

A.    **Plaintiffs have shown a likelihood of standing.**

A plaintiff seeking a preliminary injunction must show a substantial likelihood of standing. *Elec. Privacy Inf. Ctr. v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017)). "An organizational plaintiff can demonstrate standing by either organizational standing, showing injury to itself, or associational standing—that is, 'a cognizable injury to one or more of its members.'" *Robertson v. D.C.*, No. CV 24-0656 (PLF), 2025 WL 211056, at *4 (D.D.C. Jan. 16, 2025) (quoting *Kingman v. Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016)). AEFP has standing under both theories, and IHEP has organizational standing.

17

### 1.    Organizational standing

AEFP and IHEP have standing because Defendants' conduct "has directly affected and interfered with the organization[s'] core activities." *Coalition for Humane Immigrant Rights v. DHS*, No. 1:25-cv-00943 (TNM), 2025 WL 1078776, at *4 (D.D.C. Apr. 10, 2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)). Specifically, Defendants' actions have deprived, and continued to deprive, AEFP and IHEP of "information [that] would help [them] (and others to whom [the organization] would communicate it)." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 441–42 (2021) (recognizing that a plaintiff suffers a concrete injury where they are denied information required to be disclosed by law, and that denial has "downstream consequences"). "The law is settled that 'a denial of access to information' qualifies as an injury in fact 'where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (quoting *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040–41 (D.C. Cir. 2016)); *see Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 39–45 (D.D.C 2019) (finding organization had standing based on delayed production of other ED data). This harm exists even where the production of data is merely delayed. *See Am. Hist. Ass'n v. NARA*, 516 F. Supp. 2d 90, 106 (D.D.C. 2007) (recognizing that "denial of 'timely access'" to documents is a cognizable informational injury).

Here, several provisions of ESRA require IES to provide information to AEFP and IHEP. The statute requires IES both to conduct research, and to "widely disseminate the findings and results of scientifically valid research in education." 20 U.S.C. § 9512. It requires that all data collected by IES "be made available to the public," subject to privacy protections. *Id*. § 9574. And

it requires IES to "[d]isseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," to "utilize the most modern technology and other methods available…to ensure the efficient collection and timely distribution of information," and to "mak[e] information available to the public in an expeditious fashion." *Id*. § 9575. In addition, several other provisions of ESRA and other laws require IES to conduct information and research on specific topics, and to disseminate the information to the public. *See, e.g.*, 20 U.S.C. § 1015a(k)(4); § 9533(a)(7); § 9543(a); § 9545(c); § 9546(e)(2), § 9562(a)(2)–(3) and (b). These provisions reflect a "clear command" for IES "to provide robust public information," and thus "there can be no doubt that these provisions create a right to information sufficient for [Plaintiffs'] injury." *Ctr. for Bio. Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023).

Both AEFP and IHEP use the information that IES disseminates in ways that will be impeded by Defendants' actions. Part of AEFP's mission is to promote education research and development, and to encourage and support experimentation and reform based on evidence-based research. *See* Decl. of Michal Kurlaender ¶ 6. One of the activities by which it furthers that mission is the "Live Handbook," a website that offers comprehensive analyses of evidence-based research across various fields of education research, and relies heavily on IES published data and reports. Decl. of Douglas Harris ¶¶ 6–7, 9; *see also* Kurlaender Decl. ¶ 8. Live Handbook is designed to be updated every year based on the most current research. Harris Decl. ¶¶ 3, 5. If IES does not conduct and disseminate such research, it will be harder for AEFP to operate Live Handbook to serve its intended function in synthesizing and sharing the most up-to-date knowledge. *Id.* ¶ 7. In addition, AEFP publishes a journal, *Education Finance and Policy* (*EFP*). Kurlaender Decl. ¶ 9. Over the last year, the majority of the articles published in the journal were produced with IES

funding, used IES data, or cited IES studies. *Id.* Without the research and data that IES funds and disseminates, EFP will receive fewer high-quality, nationally representative studies to publish. *Id.* By eliminating data sources and mechanisms for accessing data that AEFP relies on in publishing Live Journal and *EFP*, Defendants' actions "perceptibly impair[]" AEFP's "ability to provide services," i.e., the dissemination of evidence-based research, to its members, policymakers, educators, and the public. *Turlock Irr. Dist. v. FERC,* 786 F.3d 18, 24 (D.C. Cir. 2015).

Like AEFP, IHEP directly relies on IES-produced data in doing its work, including data obtained through IES's Integrated Postsecondary Education Data System (IPEDS), the College Scorecard (which itself relies on data collections from IPEDS), NPSAS, and the Beginning Postsecondary Students (BPS) Longitudinal Study. *See* Decl. of Mary Voight ¶¶ 6–12. The termination of NPSAS—which provides data for BPS—will impede IHEP's ability to obtain and use the information it relies upon to do its work. *Id.* ¶ 12. IHEP staff have also experienced difficulties accessing public-use data already collected by IES as part of those studies through DataLab since the contract for that site's upkeep was terminated. *Id.* ¶ 16. In addition, IHEP holds a remote restricted-use data license, which, as a result of Defendants' actions, will be terminated on June 1. *Id.* ¶¶ 17–18. The loss of that license, and resulting deprivation of information, will further harm IHEP's ability to do its work. *Id.* ¶ 19. Finally, IHEP has been unable to publish research it has already conducted that uses restricted-use data due to ED's failure to process requests for disclosure risk reviews. *Id.* ¶¶ 20–22.

These harms are not speculative. Defendants have already terminated studies like NPSAS and ECLS-K:2024. And Defendants have announced changes to the restricted-use data program and explicitly tied them to the actions challenged here. Defendants' actions "unquestionably make it more difficult for Plaintiffs to accomplish [their] primary missions," *League of Women Voters*

*of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), of promoting research and development and encouraging and supporting experimentation and reform in educational policy (AEFP), and harnessing data to inform policy decisions that will improve postsecondary access and success for all students (IHEP). *See* Kurlaender Decl. ¶¶ 5–7; Voight Decl. ¶¶ 4–5, 25.

"The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the [plaintiffs'] reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Environmental Defense Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (internal quotation marks and citation omitted). Here, because continued access to research and data published by IES will help AEFP and IHEP, the organizations have established injury traceable to Defendants' dismantling of IES and the termination of its research and dissemination functions. And an order requiring those functions to be restored would redress those injuries. As the D.C. Circuit recently recognized, district courts have the authority to require agencies to rescind notices of contract termination, bar the wholesale cancellation of contracts, and prohibit large-scale terminations of employees where doing so would prohibit the functioning of a statutorily mandated agency. *Nat'l Treas. Emps. Union v. Vought*, No. CV 25-0381 (ABJ), 2025 WL 942772, at \*46 (D.D.C. Mar. 28, 2025) (ordering agency to rescind notices of contract termination and reinstate employees), *stay denied in relevant part*, No. 25-5091 (D.C. Cir. Apr. 11, 2025)*.*

## 2. Associational standing

In addition, AEFP has associational standing. A membership organization may assert associational standing if "'(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and

(3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation.'" *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 32 (D.D.C. 2024) (quoting *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022)). Each of these requirements is satisfied.

First, the accompanying declarations of Brent Evans, Kevin Gee, Cara Jackson, Michal Kurlaender, and Kevin Stange show that AEFP members will suffer, or have suffered, harm as a result of the challenged actions. Some of these harms are financial. For example, AEFP member Cara Jackson has lost her job because the contracts she was working on were terminated, and the IES employees her projects relied upon placed on leave. *See* Jackson Decl. ¶¶ 11, 13. AEFP member Kevin Gee had grant proposals that were pending before IES, but he has been told that those proposals will not be acted upon as a result of Defendants' actions. Decl. of Kevin Gee ¶¶ 8–11; *see also* Kurlaender Decl, ¶ 11 (discussing similar reports from other AEFP members). AEFP members cannot get in touch with the project officers overseeing their grants. Kurlaender Decl. ¶¶ 11, 14. Other injuries are informational. AEFP members have experienced difficulties accessing data on DataLab. Decl. of Kevin Stange ¶ 14; Harris Decl. ¶ 7; *see also* Kurlaender Decl. ¶ 12. The termination of the remote access program for restricted-use data will also impede AEFP members' future projects. Stange Decl. ¶¶ 11–12. And AEFP members have been forced to shelve, reconsider, or postpone research because of the cancellation of research that they rely upon in doing their work, or because of delays in the restricted-data process. *See* Gee Decl. ¶¶ 12–15 (discussing impact of cancellation of ECLS-K:2024); Stange Decl. ¶¶ 13–14 (discussing impact of delays in disclosure reviews and of cancellation of NPSAS); Kurlaender Decl. ¶¶ 12–14 (discussing impacts on AEFP members and her own research); Evans Decl. ¶¶ 11–13 (discussing suspension of his and others' work due to changes to disclosure review process).

22

These harms are concrete and cognizable under Article III. AEFP members' difficulties or inability to access information that enables them to do their work—information that Congress has explicitly provided must be made available to them—is an "injury both concrete and specific to the work in which they are engaged." *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015); *see Doctors for Am. v. Office of Personnel Mgmt.*, __ F. Supp. 3d __, 2025 WL 452707, at *4 (D.D.C. Feb. 11, 2025) (holding professional association had standing based on denial of information that would impact members' ability to do their jobs). And the inability to compete for grants is also sufficient harm to establish standing. *See Seton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (holding that "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* ... even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity" (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)).

As with the injuries to AEFP and IHEP as organizations, these injuries to AEFP members are caused by Defendants' dismantling of IES and terminating its performance of its research and dissemination functions. An order requiring those functions to be restored would redress those harms.

The other two elements of associational standing are easily met as well. This action is plainly germane to AEFP's mission of providing a forum for discussing, and encouraging and supporting, evidence-based education-related research. *See* Kurlaender Decl. ¶¶ 5–7. And individual member participation is not necessary in this case given the nature of plaintiffs' claims and because AEFP "seek[s] prospective and injunctive relief, not damages for its members." *Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151, 163 (D.D.C.

2024); *see also NRDC v. Raimondo*, No. CV 23-982 (BAH), 2024 WL 4056653, at *15 (D.D.C. Sept. 5, 2024).

**B.      Plaintiffs are likely to succeed on their claims.**

Under the Administrative Procedure Act (APA), a court may set aside final agency action when that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). And apart from the APA, federal courts have inherent authority to "grant injunctive relief" against federal officers "who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Here, Defendants have taken a series of interrelated actions that, both individually and collectively, violate their statutory obligations and reflect a complete lack of reasoned decisionmaking, and are outside the scope of their authority under the Constitution.

**1.      Defendants' actions are reviewable final agency action.**

While Defendants have not completed the dismantling of IES, they have taken at least four discrete agency actions to carry out that goal: (1) They made the decision to terminate programs by canceling contracts en masse, announced on February 10, 2025. (2) They made the decision to terminate the Regional Educational Laboratory program, announced on February 13, 2025. (3) They instituted a reduction-in-force affecting 90% of IES staff, announced on March 11, 2025. (4) They terminated the remote access program for restricted-use data, effective June 1, 2025, announced on February 10, 2025. *See NTEU v. Vought*, 2025 WL 942772, at *13 ("There is nothing abstract about firing employees, cutting off the funding stream, terminating contracts, or stopping all work."). Each of these actions is reviewable by this Court pursuant to sections 702 and 704 of the APA.

First, each action is a final agency action, as it reflects "the consummation of the agency's decisionmaking process" and are ones "from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The final agency action requirement is satisfied where, for example, it "limits or defeats a party's ability to enter into an advantageous [] arrangement," *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1252 (D.C. Cir. 2021), or binds agency "staff by forbidding them to continue [a] program," *Biden v. Texas*, 597 U.S. 785, 802 (2022). Here, the challenged actions have deprived researchers and the public of information by terminating ongoing research and activities and methods for disseminating that research, stopped 90% of IES employees from performing work tasks, and shut off all remote access to restricted-use data. These actions have "direct and appreciable legal consequences." *Bennett*, 520 U.S. at 178. That Defendants have taken several final agency actions at once does not make those actions nonreviewable. *See New York v. Trump*, __ F.4th __, 2025 WL 914788 (1st Cir. Mar. 26, 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once."); *Widakuswara v. Lake*, No. 25-CV-2390 (JPO), 2025 WL 945869, at *5 (S.D.N.Y. Mar. 28, 2025) ("The termination of contracts with partner organizations and the dismantling of critical infrastructure leading to the complete halt of agency programming are final agency actions.").

Second, the sovereign immunity waiver of 5 U.S.C. § 702 has not been displaced by any other statute. The Tucker Act does not displace Plaintiff's claims about the termination of IES's functions to the extent that the claims relate to the cancellation of contracts because they are not "disguised contract claims." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982). As this Court recently recognized, "even if a dispute implicates a contract, it may be heard in district court if it still 'stems from a statute or the Constitution.'" *U.S. Conf. of Cath. Bishops v. U.S. Dep't of*

*State*, No. 1:25-CV-00465 (TNM), 2025 WL 763738, at *4 (D.D.C. Mar. 11, 2025) (quoting *Transohio Sav. Bank v. Dir., Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)). Whether a claim that implicates federal contracts may proceed in district court under the APA "turns on two key considerations: 'The source of the rights upon which the plaintiff bases its claims' and 'the type of relief sought.'" *Id.* (quoting *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)). Here, Plaintiffs' rights derive from statutes—including the APA and ESRA—and the relief sought is not monetary, but rather an injunction requiring the agency to continue its statutorily mandated work. "[E]ven to the extent that payments might result from Plaintiffs' APA claims, they do not resemble a 'money damages' claim, for breach of contract or otherwise." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *8 (D.D.C. Mar. 10, 2025). Rather, "Plaintiffs assert APA claims to invalidate agency policy directives." *Id.* at *9. By the same token, to the extent Plaintiffs' claims arise out of mass reductions-in-force, they are not displaced by any statute related to federal-sector employment. Their challenge—based on failures to comply with the reasoned decisionmaking requirements of the APA and termination of functions required by ESRA, the Higher Education Opportunity Act, and other statutes—are "wholly collateral to the statutory scheme[s]" enforced by the Federal Labor Relations Authority and Merit Systems Protection Board, and outside the expertise of those agencies. *Am. Fed. of Gov't Emps. v. Trump*, 929 F.3d 748, 760 (D.C. Cir. 2019). Whether the reduction-in-force complied with the statutes enforced by those agencies is not at issue here.

Finally, no other adequate alternative remedy exists by which Plaintiffs may obtain relief. *See* 5 U.S.C. § 704. There is no administrative or other mechanism to challenge the termination of the remote access program for restricted-use data. Whether or not some other parties may able to

challenge the termination of contracts, or the reduction-in-force, there is no doubt that Plaintiffs, who are harmed by those actions, have no mechanism to do so. Moreover, any actions brought by such parties would not provide the relief sought here: vacatur of the challenged actions.

> **2.    The termination of IES research and dissemination activities was unlawful.**

> **a.    The termination of IES activities was arbitrary and capricious.**

The APA "requires agencies to engage in 'reasoned decisionmaking.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). To do so, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (cleaned up). Courts reviewing agency action for compliance with this standard "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (cleaned up). Where an agency fails "to consider or to adequately analyze the… consequences of" its actions, it has failed to engage in reasoned decisionmaking. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017). Defendants' decisions to terminate IES activities by terminating IES programs en masse and to eliminate 90% of IES staff, without any reasoned explanation, do not comply with this requirement of rationality. *See NTEU v. Vought*, 2025 WL 942772, at *40 (finding plaintiffs likely to succeed on the merits of their APA claim where "there was little or no analysis undertaken before the employees were ordered to put their pencils down, before all of the agency's contracts were cancelled"); *Widakuswara*, 2025 WL 945869, at *5 (finding defendants violated the APA where they "failed to provide adequate reasoning behind the sweeping changes to [an agency] and seemingly failed to consider any reliance issues in effectively closing the agency").

Defendants failed to consider several important factors before terminating IES research and dissemination activities. For one, Defendants did not consider that IES could not fulfill its statutory mission without the terminated programs. Defendants canceled these programs without any input from IES staff members who oversee them, and who could have explained how the programs fulfill statutory duties—either directly or indirectly. *See* Young Decl. ¶ 8. And Defendants failed to consider the interrelatedness of canceled programs with other programs; as the former IES Director appointed by President Trump in his first term, Mark Schneider, put it, contracts were canceled without realizing that "[i]f you break X, you're actually breaking Y and Z," reflecting "a lack of experience, a lack of information."[45]  For example, ED canceled a contract to provide support to the Administrative Data Division, which is actually necessary for the conduct of NAEP—a program that agency says it does not intend to cancel.[46]

Defendants also failed to consider how their actions would make it impossible to re-launch programs via new contracts. For example, terminating the peer review program means that IES cannot award new grants or contracts, or publish IES-supported research, because the statute requires peer review to do so. *See* 20 U.S.C. §§ 9520, 9576(c). And eliminating 90% of staff means there is no one left to oversee the bidding and awarding process of any new contracts. *See* Young Decl. ¶ 16.

Indeed, because of the mass termination of contracts, IES staff will have *more* work to do, not less. IES staff resources are necessary not only to close out contracts, but, if IES's statutory

---

    -  [45] Greg Toppo, "Is Trump Gutting Education Research a New Beginning or Just 'Slashing & Burning'?", The 74, Feb. 11, 2025, https://www.the74million.org/article/is-trump-gutting-education-research-a-new-beginning-or-just-slashing-burning/ (quoting former IES Director Mark Schneider).

    [46] Award ID 91990020A0014/91990022F0350; *see* Barshay, note 16, *supra.*

work is to continue, to either do work that had been done by contractors themselves or to oversee the bidding and selection processes for new contracts. *See* Young Decl. ¶ 14. There is no indication that Defendants took these needs into consideration before slashing 90% of IES staff. To the contrary, Defendants' placement of 90% of IES staff on administrative leave means that work required by statute that IES staff members were already performing has ceased—even for programs as to which Defendants *did not* terminate contracts. For example, because none of the staff who work on the National Evaluation of Comprehensive Centers program, which is mandated by 20 U.S.C. § 9603, remain on active work status, that program has halted—even though the contracts those staff members supervised remain open. Jackson Decl. ¶¶ 12–13. The remaining staff cannot carry out the work that is left. *See* Declaration of Thomas Weko ¶ 22; Young Decl. ¶¶ 15–16; Abigail Doe Decl.¶ 14. As NCES's former Deputy Commissioner put it, "The idea of having three individuals manage the work that was done by a hundred federal employees supported by thousands of contractors is ludicrous and not humanly possible."[47]

Although Defendants have pointed to Executive Order 14210 as the basis for the RIFs, Young Decl. ¶ 13, Ex. 2, nothing in Executive Order 14210 required Defendants to terminate 90% of IES staff—or to do so without considering the impacts of that action on the ability to perform statutory functions. To the contrary, section 3(c) of that order, which directs agency heads to "undertake preparations to initiate large-scale reductions in force," directed that "offices that perform functions *not* mandated by statute or other law shall be prioritized in the RIFs." 90 Fed. Reg. at 9669 (emphasis added). IES, though, performs functions mandated by statute, as discussed above. And, in both section 3(c) and section 5(b), the Executive Order makes clear that any

---

[47] Jill Barshay, "Chaos and confusion as the statistics arm of the Education Department is reduced to a skeletal staff of 3," The Hechinger Report, Mar. 14, 2025, https://hechingerreport.org/proof-points-chaos-confusion-statistics-education/.

reductions in force must be "consistent with applicable law." *id.* at 9669, 9671. Nothing in the Order suggests that agencies are required to terminate the employees necessary to comply with statutory obligations, as Defendants have done.

There is also no indication that Defendants considered any relevant factors in terminating the cancellation of the contracts for the Regional Educational Laboratory program. ED's contemporaneous explanation, that the contracts were "woke spending," is irrational. Whatever the term "woke spending" means, such a label cannot be described en toto to the work of the ten statutorily mandated Regional Educational Laboratories around the country, whose widely respected non-ideological work and technical assistance ranged from practice guides on the use of assessment data to inform the teaching of reading skills, to a cooperative study with the Texas Higher Education Coordinating Board to evaluate its new embedded associate degree program.[48] To terminate *all* work of the Regional Educational Laboratories because of a vague disagreement with some unidentified subset of that work, without even considering more surgical action, is arbitrary and capricious. *See Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (holding that the requirement of considering responsible alternatives and giving a reasoned explanation for such alternatives "goes to the heart of reasoned decisionmaking" and "is not limited to rulemaking"); *see also* Abigail Doe Decl. ¶ 8 (explaining how contracts could have been modified to eliminate work that raised specific policy concerns).

Defendants also failed to consider the wastefulness of their actions. By terminating longitudinal studies mid-stream, Defendants wasted money that had already been spent developing surveys and collecting data—data that may be of little use given that the studies were shutdown

---

[48] *See* IES, The Regional Educational Laboratory (REL) Program, https://ies.ed.gov/use-work/regional-educational-laboratories-rel.

midstream without any adequate time to prepare to close out those studies. *See, e.g.*, Abigail Doe Decl. ¶¶ 10–11. Even if that data *could* be of use, Defendants' rash actions make it unlikely that it can be. IES staff is necessary to ensure that data from terminated contracts is preserved—but the staff left is insufficient to do so. Young Decl. ¶¶ 15–16.

Defendants also failed to take into consideration how terminating programs would impact reliance interests of researchers and others, or even to acknowledge and explain how their termination of these contracts reflected a reversal in policy. Several of the canceled research contracts were for research that ED had previously acknowledged was important and irreplaceable. For example, NCES had previously described ECLS-K:2024 as "provid[ing] the statistics policymakers need to make data-driven decisions to improve education for all; contributing data that researchers need to answer today's most pressing questions related to early childhood and early childhood education; and allow[ing] [NCES] to produce resources for parents, families, teachers, and schools to better inform the public at large about children's education and development."[49] The study was important, NCES explained, because it "allows [NCES] to provide answers at a national level," was the first NCES "early childhood stud[y] to provide data on a cohort of students who experienced the coronavirus pandemic," and would "provide information on a variety of topics not fully examined in previous national early childhood studies."[50] ED has given no explanation as to why it changed its mind and canceled the study. Researchers, including AEFP members, were relying on the study for their work. *See* Gee Decl. ¶ 13.

---

[49] IES, "Celebrating the ECLS-K:2024: Providing Key National Data on Our Country's Youngest Learners," Mar. 11, 2024, https://ies.ed.gov/learn/blog/celebrating-ecls-k2024-providing-key-national-data-our-countrys-youngest-learners.

[50] *Id.*

Similarly, NCES had recognized that NPSAS is "the primary source of information used by the federal government (and others, such as researchers and higher education associations) to analyze student financial aid and to inform public policy on such programs as the Pell grants and Direct/Stafford loans."[51] There is no indication Defendants considered what it would mean for this primary source of information to disappear, or how researchers like IHEP rely on the information NPSAS produces. *See* Stange Decl. ¶ 14; Evans Decl. ¶¶ 5, 14; Voight Decl. ¶¶ 11–12.

Defendants' cancellation of contracts related to IES's dissemination functions similarly ignored the reliance interests of researchers. For example, Defendants failed to appreciate how DataLab is used by researchers in doing their daily work, and that without the terminated support contracts, the platform would crash. *See* Stange Decl. ¶ 14; Voight Decl. ¶¶ 15–16. And Defendants did not consider how terminating the remote access program for restricted-use data and slashing the staff that perform disclosure risk reviews would cause that program to come to a halt, depriving researchers of access to information that they rely on to do their work and making it impossible for researchers to publish that work. *See* Stange Decl. ¶¶ 12–13; Voight Decl. ¶¶ 19–25; Evans Decl. ¶¶ 11–14; Gee Decl. ¶¶ 14–15; Harris Decl. ¶ 7.

Only now, *after* Defendants terminated contracts and staff, are Defendants assessing what resources are necessary for IES to function—as reflected by IES's April 4 email to restricted-use data users. *See* Voight Decl., Ex. 2. The time to ask questions about what resources are needed to "continue … vital service[s] and comply with applicable law," *id.*, is *before* terminating contracts and staff. Slashing programs first and asking questions later is the pinnacle of arbitrary and capricious decisionmaking. *See Love v. Thomas,* 858 F.2d 1347, 1363 (9th Cir. 1988) (holding that

---

[51] NCES, National Postsecondary Student Aid Study (NPSAS), About NPSAS, https://nces.ed.gov/surveys/npsas/about.asp.

agency acted arbitrarily and capriciously by "suspending first and asking questions later"); *Nat'l Council of Nonprofits v. OMB*, __ F. Supp. 3d __ , 2025 WL 597959, at *14 (D.D.C. Feb. 25, 2025) (concluding that a "freeze first, ask questions later" approach was likely arbitrary and capricious). "[R]easoned decisionmaking requires giving present consideration to important aspects of problems—not merely promising to consider those matters at some point *in the future*." *Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 52 (D.D.C. 2017), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020). As former IES Director Schneider put it, "These guys came in with a sledgehammer and they just broke s**t."[52] Defendants' actions are arbitrary and capricious.

> **b.    Terminating IES's activities is contrary to ESRA and the Higher Education Opportunity Act.**

In addition, Defendants' actions to dismantle IES are contrary to the statutes that both establish IES and that vest it with statutory duties. While Defendant McMahon has stated that "[t]he Department of Education will continue to deliver on all statutory programs that fall under the agency's purview," doing so is not possible as to IES's dozens of statutory duties. Without the contracts that have been canceled and with the skeletal remaining staff, ED cannot perform these duties, which range from mandates to conduct and disseminate research on dozens of topics, to obligations to continue specific surveys and methods of disseminating information. *See* Young Decl. ¶¶ 15–16; Weko Decl. ¶ 23; Abigail Doe Decl. ¶ 14; *see also Widakuswara*, 2025 WL 945869 at *8 (holding agency likely acted contrary to law when its actions in terminating contracts and staff meant that "none of the statutory requirements [for the agency] can be effectuated").

---

[52] Kalyn Belsha, "Crucial research halted as DOGE abruptly terminates Education Department contracts," Chalkbeat, Feb. 11, 2025, https://www.chalkbeat.org/2025/02/11/elon-musk-and-doge-cancel-education-department-research-contracts/.

Even on the limited record available, it is clear that Defendants have terminated research required by statute, without instituting replacements, including, as discussed above, at pp. 9–10, the National Assessment of Adult Education, required by 29 U.S.C. § 3332(b)(3), the Condition of Education, required by 20 U.S.C § 9545(b), and NPSAS, required by 20 U.S.C. § 1015a(k). In addition, ED canceled contracts for studies not explicitly mentioned in statutes, but which are the only way ED fulfills broader statutory duties. For example, in 2024, ED acknowledged that "NCES is congressionally mandated to collect data on early childhood," and that it "meet[s] that charge by conducting ECLS program studies like the ECLS-K:2024 that follow children through the early elementary grades."[53] Now, ED has terminated ECLS-K:2024, without a replacement. ED has also terminated *all* work of all ten statutorily mandated Regional Educational Laboratories. And ED has terminated one of the three long-term trend NAEP assessments required by 20 U.S.C. § 9622(b)(2)(F). Terminating statutorily required research and canceling the contracts for statutorily mandated peer review, without even the hint of a plan for replacement, is contrary to law. In addition, other statutorily mandated research that has not been formally canceled has functionally been, as ED canceled auxiliary contracts that are necessary for that research to be done—like the contract for the mailing of surveys.

ED has also terminated the contracts by which it fulfills its statutorily mandated dissemination activities. By terminating the contract for DataLab, without a replacement, ED has violated its duty to "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," and "utilizing the most modern technology and other methods." *Id.* § 9575. And by gutting IES staff, the elimination of staff means that there is no one left to supervise those contracts, "clean" and analyze the data, and

---

[53] "Celebrating the ECLS-K:2024," *supra* note 49.

prepare the results for public dissemination as required by law. *See* Weko Decl. ¶¶ 19, 23; Young Decl. ¶¶ 13–14; Abigail Doe Decl. ¶¶ 12–14.

###### c.    Defendants' refusal to spend appropriated funds is unlawful.

By halting IES activities, Defendants have also likely violated appropriations law. "Where the executive has policy reasons ... for wanting to spend less than the full amount appropriated by Congress for a particular project or program, … even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill," pursuant to the Congressional Budget and Impoundment Control Act of 1974 (ICA), 2 U.S.C. § 683. *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). Absent compliance with that procedure, congressionally appropriated funds "shall be made available for obligation." 2 U.S.C. § 683(b). Because none of the ICA's statutory preconditions have been satisfied, Defendants lack authority to withhold appropriated funds, as they are doing here by eliminating IES's contracts, and its staff—including $ 53,733,000 specifically obligated for the operation of the now completely shuttered Regional Educational Laboratories. *See AIDS Vaccine Advocacy Coalition*, 2025 WL 752378, at *15–17. To the extent that Defendants are simply holding onto the appropriated funds, doing so is prohibited by the Antideficiency Act, which specifies that the executive branch may reserve appropriated funds "only … to provide for contingencies; … to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or … as specifically provided by law." 31 U.S.C. § 1512(c)(1). Defendants have not identified any contingencies or sources of law that justify holding appropriated IES funds in reserve when statutory programs are *not* being performed. And as explained above, any suggestion that the mass termination of contracts and staff will support efficiency gains is unsupported by any evidence or

reasoned analysis.

> **d.    Halting IES's work is contrary to the separation of powers and ultra vires.**

As explained in the accompanying declarations of current and former IES employees, Defendants' actions effectively dismantle IES by making it impossible to perform its statutory functions. *See* Weko Decl. ¶ 23; Young Decl. ¶¶ 15–16; Abigail Doe Decl.¶ 14. IES, however, is a creation of statute, and Defendants' actions to shut down a statutorily created agency are *ultra vires*.

The Framers of the U.S. Constitution "divide[d] the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983). As relevant here, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). And no exception for statutes that establish agencies and imbue them with specific functions exists. *See J. Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring) ("[T]he Executive branch may not eliminate a *congressionally* created and funded agency withou*t congressional* authorization.").

Here, rather than respecting Congress's exclusive "power to make a law," *Wilkerson v. Rahrer*, 140 U.S. 545, 562 (1891), Defendants have disregarded Congress's legislative authority entirely—seeking to terminate IES's performance of its statutory functions, in direct contravention of both the statutes that establish IES and its functions, and of 20 U.S.C. § 3473(a), which prohibits the Secretary from "aboli[shing]" any statutory entity within ED, or reassigning congressionally allocated functions to another ED entity.

Defendants' justifications for their actions make clear that the termination of IES's programs and activities are not an exercise of "executive discretion" to "interpret[ ] a statute and direct[ ] the details of its execution," *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928), or to flexibly implement Congress's "broad general directives," *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Rather, Defendants apparently disagree with the very principle underlying Congress's creation of IES and its continued annual appropriations to IES: that supporting, conducting, and disseminating evidence-based education research is important and valuable. *See* 20 U.S.C. § 9511(b) (setting out IES's mission). In a thread on X, "setting the record straight about IES and its contracts," ED suggested that IES's work was jettisoned because (citing IES data) "[t]here has been no meaningful increase in average math scores from IES' inception to pre-pandemic" and because federal money should not be spent on "conferences and reports on reports."[54] But Congress has not conditioned IES's continued operations on increases in test scores. And while current leadership may think "reports on reports" are wasteful, Congress has explicitly required "reports on reports"—more formally known as research evaluations and mandated by 20 U.S.C. § 9562(a) and § 9534(b)(2). Defendants' disagreement with this requirement does not allow them to disregard it. *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

"An administrator's responsibility to carry out the Congressional objectives of a program does not give him the power to discontinue that program, especially in the face of a Congressional mandate that it shall go on." *Loc. 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 77–

---

[54]    ED    (@usedgov),    X.com    (Feb.    12,    2025    5:16pm). https://x.com/usedgov/status/1889800710084317454.

78 (D.D.C. 1973). That is what Defendants are doing here. Plaintiffs are thus likely to prevail on their claim that Defendants' actions in dismantling IES violate the separation of powers and that they are therefore entitled to permanent injunctive relief on the first Count of their complaint, ECF 1 at ¶¶ 84–88. *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing an implied right of action under the Constitution to seek injunctive relief for a separation-of-powers violation).

### 3.    The termination of the remote access program for restricted-use data is unlawful.

In addition to their mass actions to halt activities of IES by terminating contracts and eliminating staff, the termination of the remote access program for restricted-use data is independently unlawful. As former Director Schneider explained, IES's remote access program for restricted-use data, "eases access to sensitive confidential microdata" and serves as "a model of how data can be protected while facilitating access to contemporary cloud infrastructure for improved collaboration, access to shared computing resources, and other benefits."[55] The creation of the program was a means of providing "state education and workforce agencies, post-secondary institutions, and non-profits" with "safe access to NAEP and other student data from IES."[56] As discussed above, on February 10, citing "budgetary and programmatic considerations," Defendants announced the termination of the entire remote access to restricted-use data program. Voight Decl., Ex. 1.  As one researcher explained, this cancelation means "that we are now gonna

---

[55]    Mark Schneider, "Modernizing Access to Education Data Could Improve Student Learning," *Education Next*, June 12, 2024, https://www.educationnext.org/modernizing-access-to-education-data-could-improve-student-learning/.

[56] *Id.*

look at data on CDs, they're gonna be mailed out across the country instead of stored securely in an online data platform."[57] Limiting access to restricted-use data to cold rooms will significantly impact researchers' ability to use such data. *See* Stange Decl. ¶¶ 11–12 (explaining how physical-access computers lack computing power of remote server and cause access issues); Voight Decl. ¶ 19 (noting infeasibility of a cold room for IHEP).

Defendants' cursory explanation accompanying their announcement does not suffice to satisfy the requirements of reasoned decisionmaking. To the contrary, the February 10 email indicates that Defendants acted so rashly that they were still unsure whether they could set up a plan to transfer "all user-generated materials (code, output, etc.)" from the existing remote system "to NCES so that the materials could then be transferred to users who establish cold rooms." Voight Decl., Ex. 1. And the April 4 email suggests that Defendants made no assessment as to the needs of restricted data users at all before making their decision to terminate the program. *Id.*, Ex. 2. No emergency required this sudden, arbitrary termination of the program. Defendants had sufficient financial and staff resources to continue the program; they have chosen to terminate their employees instead. Moreover, Defendants did not explain why they had changed their view that the remote access program was important to address the access issues that had led it to be created in the first place. In addition, Defendants were required "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" before terminating the program. *DHS v. Regents of Univ. of Cal.*, 591 U.S. at 33. There is no evidence that Defendants did so. But organizations like IHEP and researchers like

---

[57] Ryan Quinn & Katherine Knott, "$900 Million in Institute of Education Sciences Contracts Axed," Inside Higher Ed, Feb. 12, 2025, https://www.insidehighered.com/news/faculty-issues/research/2025/02/12/900m-institute-education-sciences-contracts-axed#.

AEFP members rely on remote restricted-use data licenses to do their work and have built their work flows around it. Voight Decl. ¶ 19; Stange Decl. ¶ 12.

Moreover, Defendants failed to consider policy considerations mandated by Congress—thus acting both arbitrarily and capriciously and contrary to law. The Confidential Information Protection and Statistical Efficiency Act directs federal statistical agencies, including NCES, to expand secure access to confidential data used to inform policymaking. 44 U.S.C. § 3582(a); *see also* 5 C.F.R. § 1321.4(d) (implementing regulation relating to "innovation and burden reduction"). Defendants' termination of all remote access to that data is contrary to this mandate. In addition, ESRA requires IES to "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," and "utilizing the most modern technology and other methods." 20 U.S.C. § 9575. Limiting access to restricted data to dedicated secure facilities and physical media neither involves an "easily accessible and usable" format nor does it reflect "the most modern technology."

For all these reasons, Plaintiffs are likely to prevail on their claims based on the termination of the remote access program for restricted-use data.

## II.    AEFP, AEFP members, and IHEP will suffer irreparable harm absent a preliminary injunction.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). Here, Plaintiffs' injuries are not only imminent and certain—they are already occurring. Plaintiffs are suffering, and will continue to suffer, irreparable harm from Defendants' termination of IES research and dissemination activities, reduction-in-force, and termination of the remote access program for restricted-use data.

As a result of Defendants' actions, AEFP, its members, and IHEP will be denied access to information they are statutorily entitled to, and/or face delays in obtaining that information. Courts in this district have frequently recognized injuries that derive from a lack of timely access to current information as irreparable. *See, e.g.*, *Am. Immigration Council v. DHS*, 470 F. Supp. 3d 32, 37–38 (D.D.C. 2020); *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 58 (D.D.C. 2020); *see also Payne Enters., Inc. v. United States,* 837 F.2d 486, 494 (D.C. Cir. 1988) (recognizing that "stale information is of little value"). The facts here show why--AEFP members and IHEP have already had to make changes to their plans to conduct and disseminate research and analysis. And, come June 1, IHEP will have no way of accessing restricted-use data, because it is impractical and burdensome for them to meet the requirements for a physical data license. Voight Decl. ¶ 19. There is no legal recourse to remedy the injury caused when a researcher cancels a project, or delays or cancels publication based on either a lack of data from IES, or because of IES's delays in approving publication. *See United Farm Workers v. Perdue*, No. 120CV01452DADJLT, 2020 WL 6318432, at *15 (E.D. Cal. Oct. 28, 2020) (granting preliminary relief because otherwise "data will not have been gathered and will not be available when it is needed"). Such is the case with the injuries suffered here.

Preliminary relief is also necessary to avoid a devastating long-term impact of research pauses, halted longitudinal studies and long-term data collections. Waiting to restart them, as one researcher explained, would be "comparable to the interruption of the COVID epidemic, which shut many researchers out of schools for months, diluting the effectiveness of their research and, in some cases, requiring them to insert asterisks for the years when no data was available."[58] Now,

---

[58] Greg Toppo, "Stunned Education Researchers Say Cuts Go Beyond DEI, Hitting Math, Literacy," The 74, Feb. 13, 2025, https://www.the74million.org/article/stunned-education-researchers-say-cuts-go-beyond-dei-hitting-math-literacy/.

only two months out from the contract cancellations, researchers' contact information for study participants likely remains current, and teams can likely be rebuilt. Similarly, the backlogs in restricted-use data reviews will only get longer because no staff is on board to work on them. Just as important, the IES staff who are currently on administrative leave, who have the requisite knowledge about the impacted programs and statutory mandates, can be restored to active-duty status before their termination in June. Similarly, the longer that websites go un-updated or maintained, the harder it will be to restore them. As one court recently recognized, "shutting down necessary systems, laying off personnel, and terminating contracts, even ones that might be able to be eventually reinstated, halt agency function in the short term and threaten the efficacy of the agency in the long-term." *See Widakuswara*, 2025 WL 945869, at 9. If not promptly restored, it would take months, if not years, to piece back together the infrastructure, staff, and contractual relationships to restart IES and make it fully functional. And money damages cannot remedy these harms. *See id.*; *NTEU v. Vought*, 2025 WL 942772, at *41 ("Once the agency is gone, there will be no opportunity to afford relief at a later point in the litigation.").

## III. The balance of equities and the public interest support the grant of a preliminary injunction.

Finally, the balance of equities and the public interest support Plaintiffs' requested relief. "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Thus, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that [injunctive relief] would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And "[t]here is generally no public interest in the perpetuation of an unlawful agency action." *Open Cmties. Alliance*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary,

there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted).

Here, there is a substantial public interest in allowing IES to continue to function and serve its statutory mission. IES's work is vital to not just researchers like IHEP and AEFP members, but to policymakers, educators, and the public. *See*, *e.g.*, Weko Decl. ¶ 23 (explaining how IES helps "federal and state policymakers, those who lead and manage higher education institutions, researchers, and the public at large to understand the state of the U.S. education system"); Harris Decl. ¶ 10 (explaining that, without IES's work, "the education research community as a whole will suffer"); Gee Decl. ¶ 7 (explaining how canceled project would impact educators); Stange Decl. ¶ 9 (explaining how restricted-use data is necessary for tool to be used by researchers and policymakers). The data it produces is irreplaceable. *See*, *e.g.*, Stange Decl. ¶ 15*,* And, through its evaluation work, IES "identifies what works and what doesn't."[59] As reflected by Congress's creation of IES, and continued appropriations of hundreds of millions of dollars for its work, the public is well-served by the evidence-based infrastructure for education research and policy that IES has provided for more than twenty years.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a preliminary injunction and (1) order Defendants' to take steps to restore the activities canceled as a result of their mass contract termination; (2) order the restoration of the IES employees who were placed

---

[59] Nicole M. McNeil & Robert Stuart Siegler, "Helping teachers learn what works in the classroom − and what doesn't − will get a lot harder without the Department of Education's Institute of Education Sciences," *The Conversation*, Feb. 12, 2025, https://theconversation.com/helping-teachers-learn-what-works-in-the-classroom-and-what-doesnt-will-get-a-lot-harder-without-the-department-of-educations-institute-of-education-sciences-247675.

on administrative leave *en masse* to active work status; and (3) suspend the termination of the remote access program for restricted-use data.

Dated: April 17, 2025                                        Respectfully submitted,

                                                             /s/ Adam R. Pulver
                                                             Adam R. Pulver (DC Bar No. 1020475)
                                                             Karla Gilbride (DC Bar No. 1005886)
                                                             Public Citizen Litigation Group
                                                             1600 20th Street NW
                                                             Washington, DC 20009
                                                             (202) 588-1000
                                                             apulver@citizen.org

                                                             *Attorneys for Plaintiffs*

44