UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC.; THE INSTITUTE FOR HIGHER EDUCATION POLICY,<br><br>Plaintiffs,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of Education; U.S. DEPARTMENT OF EDUCATION,<br><br>Defendants. | Civil Action No. 25-999-TNM |

**DECLARATION OF KEVIN GEE**

I, Kevin Gee, declare as follows:

1. I am a Professor in the School of Education and Director of the School Policy, Research, and Action (SPARC) Center at the University of California at Davis. I also am a Faculty Research Affiliate with the University's Center for Poverty & Inequality Research. I received a B.A. in City and Regional Planning from the University of California at Berkeley. Subsequently, I received an M.P.I.A. (Master of Public and International Affairs) from the University of California at San Diego and an Ed.D. (Doctor of Education) in Quantitative Policy Analysis from Harvard University.

2. I am a member of the Association for Education Finance and Policy (AEFP).

3. My primary research aim is to generate rigorous and data-informed insights about students who face particular challenges in education, including those who are vulnerable to chronic absenteeism, bullying, food insecurity, abuse, and neglect.

4. In my work, I perform research that relies on contracts and grants provided by the Institute of Education Sciences (IES), a research agency within the Department of Education (ED). I also rely heavily on data that is maintained by IES. As explained below, defendants' actions in shutting down the work of IES have made it so I am unable to complete or initiate research projects that are administered by IES or access research datasets that are critical to my own research.

5. For example, IES operates the What Works Clearinghouse (WWC), which, among other things, publishes practice guides to help school teachers and administrators address various educational challenges. *See* https://ies.ed.gov/ncee/wwc/PracticeGuides. Research teams, operating under contracts with IES, produce these handbooks after gathering and analyzing the best evidence and best research studies. In August 2024, Mathematica, the contractor, invited me to serve as an expert panelist to consult with their team, which was working to produce a practice guide to help educators address the problem of student absenteeism, an area in which I have focused my academic research. The practice guide would have been an important resource for K-12 schools struggling with the problem of absenteeism, which skyrocketed during the COVID-19 pandemic and remains quite high. In California, the rate of student absenteeism today remains double the rate pre-pandemic.

6. To serve as an expert panelist on this project, I signed a contract that set forth the commitments I was undertaking. The expert panel would play a role in all stages of the practice guide development process. For example, panelists would (1) define the focus for the practice guide; (2) support development of the practice guide by unpacking systematic evidence review results, developing clear recommendations and concrete actionable strategies for educators, and offering potential solutions to obstacles in carrying out the recommendations; and (3) help disseminate the practice guide. Expert panel members were expected to participate in up to five,

multi-part panel meetings. The first four meetings would have been six to eight hours in duration, including meeting time and preparatory work. Between September and October of 2024, I participated in a series of four meetings (5.5 hours total), which comprised the first multi-part panel meeting. For that meeting I was to receive $1,300, but I have not received payment to date. In total, I was to receive a $6,500 honorarium for the work.

7. On February 12, 2025, I received an email from the research analyst at Mathematica who was helping coordinate and oversee the project, notifying me that, effective February 10, the work to develop a WWC practice guide on school attendance had been canceled and was part of a wave of contract cancellations at IES. A true and correct copy of that email, with sender information redacted, is attached as Exhibit 1. This was an enormous let-down. Not only had IES canceled a project in which I was investing my time and effort—and thus, it was a loss of a wonderful professional opportunity for me—but it was a terrible development for schools nationwide. Educators would have benefited from the planned handbook's important and timely set of recommendations on how they should address the crisis of chronic student absenteeism.

8. The dismantling of IES also has impeded my ability to obtain approval of a research funding proposal I submitted to IES in September 2024, in response to a grant competition announcement. My proposal was to conduct a multi-year research project on student absenteeism to figure out what school districts in California are doing to get students back to school and whether those various actions are working. Students of color, with disabilities, and with certain disadvantages have higher rates of absenteeism than other students, and so my proposed study would have assessed what schools are doing to address inequities and disadvantages that are associated with higher rates of absenteeism. If IES approved my grant proposal, I would conduct

3

research through the University of California at Davis that would be funded by IES. I believe my research could move the needle in addressing what is again, a problem of crisis proportions.

9. As indicated, I submitted my grant proposal in September 2024. IES typically operates under a timeline for reviewing proposals in February, following up with the researcher with questions and comments, and then making a decision whether to approve proposals, usually by the spring of the following year. Under my proposal, research would then have begun in the summer of 2025. On this timeline, IES would have started reviewing my proposal by February and ordinarily would have reached out to me by now with comments, questions, or feedback.

10. I have checked the IES grant system where IES posts information about the proposal. Although the grant system says my proposal had been forwarded for peer review and the funding decision says "pending," IES's website gives indications that review of the proposal is not actually underway. For example, I can no longer access any current information about the review process or figure out who is on the review panel. I checked published information about the IES grant peer review process I had downloaded last fall, but the link in the section regarding review procedures no longer works. I also know that one of my colleagues involved on a peer review panel for IES research proposals received a stop work order from IES on February 10, 2025. Thus, I have every reason to believe that IES will not be reviewing my grant proposal.

11. These unexpected developments at IES have now delayed this important research project by a year and perhaps indefinitely. If IES had approved my proposal, I would have begun work on the project by summer. Or, if I had learned earlier that IES would reject my proposal, I could have promptly submitted it to foundations or other potential sources of funding. As it stands, now that it is spring, I have to pivot quickly to find other sources of funding if this project is to happen. And my odds of obtaining funding have sharply declined because there are only a couple

private foundations that will fund the kind of research I am contemplating. On top of that, I believe that foundation funding will become even more competitive to obtain because, in the absence of IES funding, more educational researchers will be submitting proposals to these foundations. There are no adequate substitutes for IES when it comes to providing the scope and scale of the funding I would need to support my educational research and that would produce timely evidence to address chronic student absenteeism. Meanwhile, an entire generation of kids continues to miss large amounts of school.

12. The elimination of IES's functions has harmed my research efforts regarding student absenteeism for the additional reason that IES has stopped new data collections and paused renewals of access to existing data collections. IES was funding a vital nationwide, longitudinal study called the Early Childhood Longitudinal Study, Kindergarten: Class of 2024 (ECLS-K:2024) that was tracking a cohort of kindergartners through third grade. That contract was terminated for convenience on February 11. ECLS-K:2024 was the first such longitudinal study to be conducted post-COVID-19 pandemic and it would have allowed me to study the impacts of the pandemic. This is one of the most comprehensive data sources that would have allowed me to look at how the youngest students across our nation are performing academically and whether and how their absences have affected their outcomes (both academic and socioemotional), especially in the post-pandemic schooling era.

13. I was planning to use the data from ECLS-K:2024 to conduct parallel studies for my own research. In particular, I was planning on conducting a study comparing, through regression and other analyses, a similar IES dataset collected in 2011 with the new data. I recently published a paper using the 2011 data, which is old now, comparing rates of chronic absenteeism among students with disabilities and those without. With the data from ECLS-

K:2024, I would have had valuable data from which I could have made direct comparisons between sets of students pre- and post-COVID-19. IES's termination of this longitudinal study is a tremendous lost opportunity.

14. Even my plans to conduct research using the 2011 childhood longitudinal dataset are now on pause. As of January 2025, I had a restricted-use license permitting me to use non-public data from the 2011 dataset, but my license was set to expire in February. I contacted IES to review my license, but I have not heard back. I cannot use the restricted-use version of the data until my license is renewed. My plans to conduct research relying on this IES data (both from 2011 and the expected data from ECLS-K:2024) have now ground to a halt.

15. There is no substitute for the nationwide data from these datasets. Statewide data, such as from California, is far less comprehensive than the national dataset. The loss of national childhood longitudinal data means that I have no option but to try to piece together bits of data from a variety of sources, and even with that extra effort, I will not be able to match the data I was expecting to access from ECLS-K:2024 in the future.

16. Finally, I am also concerned about my continued access to other data in which IES may have a role to play. For example, I use a dataset called the School Crime Supplement (SCS) to the National Crime Victimization Survey, https://nces.ed.gov/programs/crime/scs/. I use this dataset to track national-level trends in school bullying. The dataset is managed jointly by the National Center for Education Statistics (NCES), which is a Center within IES, and the Bureau of Justice Statistics, within the Department of Justice. I have no information so far that access to this dataset has been canceled, but I am worried that the lack of IES staff will mean that

the new SCS datasets may not be made available because there are no IES staff available to process and post the data.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April  15 , 2025

_____
Kevin Gee

# EXHIBIT 1



Kevin Gee <kagee@ucdavis.edu>

## Cancellation of contract for WWC practice guide on attendance
1 message

Wed, Feb 12, 2025 at 11:30 AM
Kevin Gee <kagee@ucdavis.edu>,

Dear Panelists,

We are writing with very sad news. Our work to develop a WWC practice guide on attendance has been canceled. This cancellation, effective Monday (2/10), is part of a wave of contract cancellations at the U.S. Department of Education's Institute of Education Science. You can read news coverage about the cancellations here and here.

For our work, this means we will not be holding any more panel meetings and work on the evidence review and practice guide development will be discontinued. The WWC Attendance Panel email inbox will not be able to receive email messages.

We are deeply grateful for the time and energy you committed to this important project. We had four insightful panel discussions that generated insights that will surely inform our work, and hopefully the work of other panel members, for years to come. We developed a comprehensive approach to reviewing evidence on attendance interventions, including a detailed list of intervention types that may be influential for others in the field – please find the final review protocol attached for your reference. As we mentioned in a recent email we sent you, our team was deep into the process of screening about 2,000 studies, and we were carefully reviewing up to 200 studies that aligned with our review protocol. We believe we were on a path to developing practical and needed guidance that would have supported educators and students who are facing the challenges and consequences of chronic absenteeism.

We deeply value your contributions to our work together, and to the work you do every day to support and empower educators, students, and their families. We are thinking of you in these uncertain times and sending support and care.

Please feel free to reach out to                                          if you have any questions and we will do our best to answer them.

It has been an honor to work with you all and we sincerely hope that our paths cross again in the future.

Best,