UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | ) | |
| ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC., et al., | ) | Civil Action No. 25-00999 |
| Plaintiffs, | ) | |
| vs. | ) | |
| LINDA McMAHON, et al., | ) | Washington, D.C. May 16, 2025 9:33 a.m. |
| Defendants. | ) | |
| * * * * * * * * * * * * * * * * | ) | |

---

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | ) | |
| NATIONAL ACADEMY OF EDUCATION, et al., | ) | Civil Action No. 25-01266 |
| Plaintiffs, | ) | |
| vs. | ) | |
| DEPARTMENT OF EDUCATION, et al., | ) | Washington, D.C. May 16, 2025 9:33 a.m. |
| Defendants. | ) | |
| * * * * * * * * * * * * * * * * | ) | |

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE TREVOR N. McFADDEN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS AEFP/IHEP: ADAM PULVER, ESQ.
ADINA ROSENBAUM, ESQ.
PUBLIC JUSTICE, P.C.
1620 L Street, Northwest
Suite 630
Washington, D.C. 20036

APPEARANCES, CONT'D:

FOR THE PLAINTIFFS NAE/NCME: COLIN BURKE, ESQ.
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street
Fifth Floor
New York, New York 10006

FOR THE DEFENDANTS: ERIKA OBLEA, ESQ.
DIMITAR GEORGIEV-REMMEL, ESQ.
UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION
601 D Street, Northwest
Washington, D.C. 20530

REPORTED BY: LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

THE COURTROOM DEPUTY: Your Honor, we're on the record for Civil Cases 25-999, *Association for Education Finance and Policy, et al., versus McMahon, et al.*, and Civil Case 25-1266, *National Academy of Education, et al., versus Department of Education, et al.*

Starting with the Plaintiffs, please approach and identify yourselves for the record.

MR. PULVER: Good morning, your Honor. Adam Pulver from the Public Citizen Litigation Group for the Plaintiffs in 25-999. I'm joined by my colleague Adina Rosenbaum at the counsel table.

Thank you.

THE COURT: Good morning, folks.

MR. BURKE: Good morning, your Honor.

And good morning to the court staff.

Colin Burke for Plaintiffs, the National Academy of Education and the National Council for Measurement in Education.

THE COURT: Good morning, Mr. Burke.

MS. OBLEA: Good morning, your Honor. Erika Oblea for the Government.

THE COURT: Good morning, Ms. Oblea. Say your last name one more time.

MS. OBLEA: Erika Oblea, O-B-L-E-A.

THE COURT: "Oblea." Yes. Good morning,

Ms. Oblea.

MR. GEORGIEV-REMMEL: And good morning, your Honor. Dimitar Georgiev for the United States.

THE COURT: Good morning, sir.

All right. We're here for a motion hearing in this preliminary injunction case.

Have the Plaintiffs chatted amongst yourselves about the best way to allocute arguments on your side?

MR. PULVER: Yes, your Honor.

So the Plaintiffs' counsel have conferred, and we propose that we would each address the standing and irreparable injury to our particular clients. And then I will primarily address the likelihood of success on the merits to the extent that they overlap in the cases. And then Mr. Burke will address the other factors for the preliminary injunction.

THE COURT: Terrific.

MR. PULVER: And we're happy to go in whatever order of those issues the Court would find most useful.

THE COURT: I think the way you suggested sounds just fine.

MR. PULVER: Thank you, your Honor.

THE COURT: You may begin, sir.

MR. PULVER: Good morning.

Through various laws, Congress has mandated not

only that the Institute of Education and Sciences exist, but that it perform specific data collections and analyses on specific topics and make that data and those analyses publicly available.

Congress has provided IES with the funds necessary to carry out those tasks. But over the past three months, Plaintiffs have produced evidence -- as produced by Plaintiffs' evidence and unrebutted by any evidence submitted by Defendants, the Defendants have halted the performance of specific activities.

This includes the mandated quadrennial study of postsecondary education costs, or NPSAS, as the parties have referred to it as, the National Postsecondary Student Aid Survey; the peer review program for the evaluation of grants, which is required by statute; and the work of the network of Regional Educational Laboratories, or RELs.

They've also announced the termination of the program that allows Plaintiffs, particularly IHEP, the Institute for Higher Education and Policy, to access the restricted-use data remotely and indefinitely paused applications for new licenses.

THE COURT: Have these been -- you've mentioned a number of programs here. Are there any that would have come out as of today and have not? Or are these kind of announcements they've made where the impact has yet to be

felt?

MR. PULVER: So June 1st will be the impact of the remote -- the end of the remote restricted data access. I'll try to go slower. Sorry.

The peer review program, which is required by statute, has already been halted. And we've explained -- the declaration of Dr. Gee has explained how that has meant that he -- his grant is no longer under active consideration, because the statute requires that peer review program before a grant can be given out.

The inability to get new licenses has already gone into effect.

THE COURT: And who is the doctor again?

MR. PULVER: Gee, G-E-E.

THE COURT: Okay.

MR. PULVER: So he had a grant that was pending and is no longer in an active pending state because there's no peer review program.

The same declarant has also explained why he cannot get a new license and has sought a license but is unable to get it, because the license program has been halted.

And then the inability to access -- to get approval of the use of restricted-use data has already affected Plaintiffs and their members. At least one request

has been pending since February. And these traditionally were five to ten business days. And just by several requests, there's still no action on that request. So it cannot be used.

THE COURT: So it sounds to me like there's been -- the access has been interrupted already. There's no reports that were supposed to have been published by this date that have not been published. Is that fair?

MR. PULVER: So the report publication dates are not specific in the statutes. The report collection dates are what is specified. So, for example, NPSAS, the National Postsecondary Student Aid Survey, is required quadrennially. And the last one was 2020. The agency is working on the 2024 study. And that has been terminated.

And so --

THE COURT: And what was the statutory deadline for that?

MR. PULVER: There's no deadline, other than quadrennially. It says every four years. And so the last one -- there's no deadline for producing it. But the study must be conducted every four years.

THE COURT: And so that was due in 2024. Is that --

MR. PULVER: It was a study of the 2023-2024 school year. And so the report, which is required to be

published quadrennially, would have been published sometime this year because it takes time to analyze the data.

So there's no -- and certainly if it was a week late, you know, Plaintiffs would be hard pressed to find there was harm. But since it's been terminated completely, it seems reasonable to assume it's not going to be published this year, since it was terminated.

In addition, there is an appropriations rider that required it specifically to be done in 2024 and 2026. And so even though that -- they were already doing 2024 when that rider came in, it just is a second requirement that it be done in 2024.

THE COURT: Thank you.

MR. PULVER: The Court had -- in the questions that were disseminated, the Court had asked a question about *Newby* as well and whether under the D.C. Circuit's decision in *Newby* all organizational injury automatically suffices to show an irreparable injury.

We would take the position that it does not alone stand for that proposition because a plaintiff must still show, one, imminence and, two, the inability to remediate that harm later in the case. So certainly there could be something that qualifies as an organizational injury for standing purposes that doesn't meet those two other requirements.

THE COURT: Okay. So I guess you're getting a little ahead of yourself to the second factor.

MR. PULVER: Yes.

THE COURT: But you would agree, I imagine, with the Government's position that organizational standing does not alone also give you irreparable harm?

MR. PULVER: Correct. So those other elements must be met. And obviously, on the facts of *Newby*, if facts are analogous to the facts in *Newby*, we would say that under that case from the Circuit that that is sufficient to meet harm.

And here, there have been declarations submitted explaining how devastating the impact of the loss of access would be to the day-to-day operations of the IHEP and why -- which is the organizational, you know, entity. And so that would meet -- is analogous to what's at issue in *League of Women Voters*.

The other kind of -- going to that irreparable nature, explaining why these harms can't be remedied at the end of this case, one is IHEP, for example, has said the entire purpose of the organization is to provide on a nonpartisan basis access to information to policymakers while they are considering policy issues. You can't go back in time and provide that material after the fact.

The remote access data program in particular, it's

unclear how the government is terminating it. But it's likely that that program won't just be able to be turned back on in two years with the flick of a switch.

THE COURT: Did you say the remote access is also statutorily required?

MR. PULVER: The remote access specifically is not statutorily required. The statute does require information be provided in the most technologically -- I'll find the term -- the most technologically advanced way possible, I think, is the term. That's in 20 USC 9575.

And I think -- and then I don't want to go too much to the merits at this point, but obviously the termination of a program, even if it's not statutorily required, cannot can be arbitrary and capricious. And I'll address that later.

And to be clear, going back to -- just taking a step back and explaining my understanding of how the remote access program works, so the statute requires all data be made available to the public, including researchers specifically. And then it says: Except to the extent that there's confidential personal identifiable information, safeguards need to be in place.

And so how the agency has set out those safeguards is the restricted-use data licensing process, whereby individual organizations apply for licenses; they pass the

test and they can either get a general license where you use the cold room or a remote-only license, where the only way they can access this data is through this remote system.

So that is the system that -- the license that IHEP has is a remote-only license. So as of June 1st, completely cut off from that.

THE COURT: And is IHEP the one that said that installing a cold room would be very expensive and would be also impossible for some of its employees who work remotely?

MR. PULVER: Correct.

And also, there's also, as Dr. Stange, S-T-A-N-G-E, said in his declaration, who is an AEFP member, he's explained why the computing power is different between the cold room and the remote access.

THE COURT: Right.

MR. PULVER: I think unless I have -- unless the Court has questions on the standing --

THE COURT: Well, I mean, it looked to me like you had several -- you have a couple Plaintiffs and various theories to standing. Why don't you tell me your best route to standing. And I take it it would be -- you need to show standing per claim. Is that the right way I should be thinking about this?

MR. PULVER: So I think it's -- I'm not sure if it's claim per se versus action that we're challenging.

THE COURT: Okay.

MR. PULVER: And I think -- so the first is we -- we're challenging the termination of the remote restricted-use data program. IHEP will be -- has a license for that program. That license will be effectively terminated. The exact process, whether it's terminated or it's useless, is -- makes them the direct object of the government's action here.

So that is classic standing injury, just like any business whose license is terminated or access to a program is cut off. The fact that they're a nonprofit really for that doesn't really matter.

But --

THE COURT: So that would be organizational standing?

MR. PULVER: So that's an organization. Yeah. IHEP is not an association. So its only standing is organizational.

So that goes to the restricted-use data program itself.

The -- they've also explained -- and this can take a while, because it's lots of statutes here and lots of statutory claims. But the NPSAS data, they explained -- both IHEP and several of the declarants who are members have explained why that data is irreplaceable. They need it to

do their work. And that -- without that study being continued, they will suffer harm. And I think under the D.C. Circuit's precedence about informational injury, that is a classic informational injury, including under *FEC versus Akins*. The fact that the government is no longer collecting data that they argue that there's a statutory entitlement to, putting aside the merits, is sufficient for standing.

And I think that goes for a number of the other studies that we've explicitly talked about both in the declarations and in the briefs that have been terminated by the government.

THE COURT: And each of those, I'd also be looking to IHEP for organizational standing on those various programs?

MR. PULVER: Not on all of them. IHEP -- IHEP is higher education focused. So IHEP relies in particular -- there's the High School and Beyond study, which falls out of NPSAS. I'm trying to avoid acronyms as much as possible. And there are other studies that are mentioned in the Voight declaration, V-O-I-G-H-T. So IHEP relies on those in doing its work.

And then AEFP, as an associational standing, the individual members' declarations that we have provided, they identify numerous studies that have been canceled and how

they would be relying on those to do their work and cannot.

THE COURT: So those additional -- again, I'm just trying to -- you know, I need to be able to map out and show standing here for each one of these.

MR. PULVER: Sure.

THE COURT: You've got a lot of different theories and a lot of people. And if you want me to get back in any sort of, you know, reasonable timeframe --

MR. PULVER: Sure.

THE COURT: -- I need you to tell me how you think you show standing through here.

MR. PULVER: Sure. So let me just flip to it, because as you know it's a list. So it's easier for me to read at that point.

So Dr. Gee, G-E-E, in his declaration here refers to -- and we have these acronyms -- the early childhood longitudinal survey, kindergarten 2024, which the parties refer to and the Government has referred to ECLS-K. That's E-C-L-S. Then the BPS study, which I am blanking on what it stands for -- Beyond Postsecondary; there we go -- that is cited in the Evans declaration. That study has been terminated.

THE COURT: So Gee and Evans are both members of your --

MR. PULVER: Of AEFP.

THE COURT: And so this would be associational standing?

MR. PULVER: Correct.

And then Dr. Stange also relies on NPSAS. But that overlaps with IHEP. So obviously, only one of them would need to have standing for that survey.

In addition to the data collections that were canceled, the data lab program, which is the means by which the Department has complied with its obligation to make all this information available on the internet, which is itself a statutory requirement, we have -- the data lab support contracts have been canceled.

And Dr. Stange, Dr. Harris and Dr. Kurlaender, K-U-R-L-A-E-N-D-E-R, have all attested in their declarations to the difficulties that that website being broken at several points since the contract to maintain it has been terminated.

And then again, going to -- and this relates back to the conversation we had about harms that are already occurring. Dr. Gee attests in his declaration that he is being directly harmed by the pause on new license applications. That's effectively been halted for three months now. And he is an AEFP member.

And then we have the halted peer review program as well, which is required by statute.

THE COURT: That was Dr. Stange?

MR. PULVER: Dr. Gee.

THE COURT: Okay.

MR. PULVER: Unless the Court has further questions on standing or irreparable injury, I'm going to turn to my colleague to address his clients.

THE COURT: Great. Thank you.

MR. PULVER: Thank you.

THE COURT: Mr. Burke.

MR. BURKE: Good morning again. So again, Colin Burke for Plaintiffs, National Academy of Education and the National Council For Measurement in Education.

And I will briefly address our clients' standing and then turn to irreparable harm and the public interest.

So Plaintiffs and their members are suffering and will continue to suffer an informational injury because of Defendants' actions.

Defendants are required to publicize data sets to the public generally, including Plaintiffs. Plaintiffs then rely on that data for their research and teaching. By denying them access to these data sets, Defendants are causing an informational harm to our clients and their members.

The balance of equities also favors our clients. Would you like --

THE COURT: Yes.

MR. BURKE: Our clients are being harmed and will continue to be harmed without preliminary relief. As we speak, Defendants' actions of failing to collect, maintain and publicize data will continue to harm Plaintiffs and their members far into the future. And the failure to collect that data means that data is lost forever.

There can be no doubt that the public interest in this case favors an injunction. Plaintiffs and their members rely on IES data to conduct research that is critical for the continued improvement of the American education system.

For instance, Professor Ho uses the National Assessment of Educational Progress to create the Stanford Education Data Archive which allows researchers, policymakers and practitioners to see how school districts perform compared to state and national trends.

Without preliminary relief, Defendants' actions will prevent Professor Ho and Plaintiffs and their members from continuing their routine activities of teaching and researching.

Finally, Defendants are not harmed by an injunction because there can be no harm to Defendants by ending an illegal practice.

THE COURT: All right. So do you want to run

through your best theory on standing for each of the harms that you're alleging here?

MR. BURKE: Yes, your Honor.

So we're alleging informational harm to both Plaintiffs as an organization as well as their members. And so I can start with associational standing.

THE COURT: Okay.

MR. BURKE: So first, both the academy and the council members would otherwise have standing to sue in their own right. And that's because they have been harmed by Defendants' failure -- failure to disclose statutorily mandated data.

First, 20 USC 9574 requires that the Institute make data it collects publicly available; or 20 USC 1015b requires the release of data associated with postsecondary school financial aid, which has taken the form of the National Postsecondary Student Aid Study, or otherwise referred to as NPSAS.

Next, Plaintiffs both have members who rely on that data in their routine teaching and research activities.

For example, Professor Michael Bastedo is a member of the academy and relies on restricted-use data from the high school longitudinal study in his research on student success in STEM fields. He applied for that license and was informed -- he applied for that license in February and was

informed in April that the restricted-use applications were paused until further notice.

THE COURT: What was that professor's last name?

MR. BURKE: Bastedo. It's Exhibit 1. B-A-S-T-E-D-O.

THE COURT: And so what is he a member of?

MR. BURKE: He is a member of the academy.

THE COURT: Okay.

MR. BURKE: Yes.

And Professor Andrew Ho, who is a member of both the council and the academy, who uses the National Assessment of Educational Progress and EDFacts in his research on student academic performance. Contracts necessary for the maintenance and collection of these data sets were cut in February and March 2025. And the staff in the NCES, National Center For Economic Statistics, has been cut by over 90 percent.

And he also has had his contract to advise the improvement of the What Works Clearinghouse canceled, leaving him unable to perform on his project.

Second, the interests that these organizations seek to protect are germane to the organizations' purpose. So the academy's mission is to advance high-quality research to improve education policy and practice.

Protecting its members' access to IES's

high-quality, statutorily mandated data is germane to its mission of advancing high-quality research to improve educational policy and practice. And Defendants do not dispute this on an associational standing.

And, third, neither the claim asserted nor the relief requested requires the participation of individual members.

When Plaintiffs request prospective and injunctive relief, they do not require the individual participation of members as opposed to money damages.

And also, the APA claims turn on the record here and not on any individual member.

THE COURT: Mr. Burke, I think you're relying on associational standing and an informational injury. Correct?

MR. BURKE: Yes, your Honor.

THE COURT: Does informational injury to individuals work the same as informational injury to organizations?

MR. BURKE: Yes, your Honor.

THE COURT: Okay. So it's kind of the same analysis?

MR. BURKE: Yes. It's the same analysis.

And the courts in the D.C. Circuit have recognized this, including the *Center For Biological Diversity* case,

which was in 2019, which specifically distinguished traditional organizational standing in the form of diversion of resources from an informational harm and stated that those two tests do not merge when an organization brings an informational injury claim.

THE COURT: Okay.

MR. BURKE: And that is also consistent with the D.C. Circuit precedent, including *Friends of Animals v. Jewell*.

THE COURT: All right. This feels like a bit of an unusual case. I know your injuries are these various programs or the access has been restricted. But the remedy you're looking for is, you know, turn around the RIF or return funding. I mean, is that -- it feels to me like there might be a mismatch there. And even if you've shown injury, that my ordering the Department to rehire, you know, hundreds of employees might be out of my lane.

MR. BURKE: Well, first we ask the Court to declare what -- that Defendants are violating these various statutes. And they're doing so because they lack the staff to collect and maintain this data. And we know with certainty that by failing to collect and maintain that data, there will be and are current harms to our clients and their members.

And so we ask the Court to order the Defendants to

begin to disseminate and collect and maintain that data per their statutory duties to do so. And they need the staff and contractors to do so.

And we're not asking the Court to, you know, set a level of -- specific level of staffing for them. We're only asking that they have a sufficient level of staffing in order to -- for them to meet their statutory mandates.

THE COURT: So in other words, you're not proposing a specific number of employees to be restored or anything like that? Would it be appropriate for me just to say, Defendants, you need to restore data room access; you need to continue publishing these studies; how you do that is up to you?

MR. BURKE: That is our position.

We just note that it might be logistically difficult for them to do so without going back to the previous status quo as, you know, preliminary injunctions are supposed to do, because many of the contractors that the Department has been relying on has this institutional knowledge to collect and maintain this data.

THE COURT: So I was reading through your declarations. I mean, it looked to me like a number of your affiants have contracts that they've lost with the Department.

Why isn't this kind of a Tucker Act problem that

they should be having handled through the Court of Federal Claims rather than some sort of, you know, APA case here?

MR. BURKE: Yeah. So we are not asking for the reinstatement of specific contracts to any of our specific Plaintiff's members or any specific contracts. That's not our claim here. Our claim is under certain federal statutes, including the APA.

And the Tucker Act is about, you know, specific contracts and seeking traditional contract remedies. And that's not at issue here.

THE COURT: I mean, I think the Circuit has warned about clever plaintiffs' attorneys repackaging what are essentially contract claims as APA claims. I think the Government is essentially arguing that that's what's happening here. Why are they wrong?

MR. BURKE: Well, first, the test under the Tucker Act is about, you know, where those -- where those claims -- the source of those claims -- right? -- as well as what the Plaintiffs seek to do. And the source of our claims is under the APA. And this -- and I will note that our Plaintiffs and their members do not have any specific -- don't have contracts with the Department that we are seeking to get reinstated.

If -- like a further remedy, for example, if your Honor ordered them to cure their statutory violation and

they did not specifically, you know, order one of the contracts for one of our members who previously had a contract with them, then that's okay with us, as long as they continue to disseminate the data sets and collect and maintain as they're supposed to do and give access to our members.

THE COURT: Isn't it correct that a number of these studies you're interested in, programs you point to, have due dates, you know, even years down the road? I think the National Postsecondary Student Aid Study happens every three years and was done in 2024. I mean, don't you have a ripeness problem as to kind of claiming injury for something that isn't due for another couple years?

MR. BURKE: No, your Honor, because I think in this context we uniquely know that injury will happen because Defendants are not doing the duties that they have to do in order for those data sets to be published in the future.

And we know that because they don't have enough staff to be doing that. Currently, the NCES has three people at it and IES has 20 people. IES previously had 180 people and NCES had 100 people at it. And so we know they are not enough staff. And that's in addition to the contracts that have been canceled, where we know that no one is doing that work.

And so let's take an example. Professor Barnett and Professor Reardon, who are in exhibits -- Professor Barnett's declaration is at Exhibit 6 and Professor Reardon's is at Exhibit 14 -- rely on the early childhood longitudinal study.

And so the first set of data for that study, for the kindergarten class of 2023 and 2024, which is about 15,000 students, is set to be released in early 2026. And in order to meet that deadline, there are specific actions that Defendants have to do in order to make sure that it is produced on this timeline. So NCES must clean the data; it must process it to ensure privacy standards are met; it must prepare the files; it must prepare the code as long as -- and instruction for understanding and using that data.

And we know that's currently not happening, because the contracts have been canceled. There is not enough staff to be doing that work. So we know -- and I think this is kind of a unique case, because we know that's going to end up harming our clients.

And then since this is a longitudinal study, using the same example, NCES was supposed to reassess those students in spring 2025 to measure how much they've learned since kindergarten. And those assessments are not happening because of the canceled contract.

And they should also -- in order for new questions

to come out, for new studies, because, again, it's a longitudinal study, they also have to prepare those questions. They have to do field testing. They have to finalize and improve those questions, which again they are not doing. And we know they're not doing that because they do not have the staff or the contracting to do that.

THE COURT: So wouldn't it be possible for them theoretically to ramp up this fall, maybe with more staff than normal, and catch up? Or are you saying that there's data that they either need to capture now or it could never be captured?

MR. BURKE: Yes. I think that's the nature of all of these studies, is that if it's not captured now, then that data will forever be lost. Like -- and this can't be remediated later, at a later stage in these proceedings, because no court can say, Go back in time and, you know, collect this data that you haven't been doing or do these actions in order to make these studies come out on time.

THE COURT: And what data are you thinking of in particular there?

MR. BURKE: I'm thinking about the longitudinal studies, which have to -- which are particularly important because they have to -- but this is also generally applicable to many of these data sets, because in order for them to be scientifically valid, which the statute requires,

in order for them to be useable, they have to be taken at particular points and they have to ensure the highest level of rigor in both training the people that are taking this data as well as to make sure that it's standardized so we're not having any confounding variables.

And this data is very, very sensitive to any time-related disruptions. And it's already being disrupted because of Defendants' actions months ago. And that -- we know that some of these data sets are already going to be harmed.

And so we're asking -- we're requesting a preliminary injunction so that that harm is stopped.

THE COURT: You said you're going to address irreparable harm; is that correct?

MR. BURKE: Yes, your Honor.

THE COURT: Why don't you go ahead and handle that now.

MR. BURKE: I'm sorry. I didn't hear what your Honor said.

THE COURT: Why don't you go ahead and handle that now.

MR. BURKE: Okay.

THE COURT: Then I can come back to Mr. Pulver.

MR. BURKE: Yes, your Honor.

So Plaintiffs, as I kind of just mentioned, are

being irreparably harmed now for a couple reasons. And one of those reasons is, for example, Professor Bastedo did not have -- was not able to receive his restricted data use license for the study that -- the high school longitudinal study that his research relies upon.

And second, as we were just discussing, the kind of imminent harm here is that all of these data sets rely on actions by Defendants that they are not doing currently and we know that they're not doing currently because they don't have the staff nor the contracting to do so.

And that will -- and part of the irreparable harm standard is to show remediation. And that cannot be remediated later on. Those actions cannot -- if they're not done now, then they will not be done; and they will either delay or make that data completely unusable, especially regarding data that is time-sensitive and -- yeah.

THE COURT: I wanted to -- I don't know if this is a better question for you or Mr. Pulver. But I guess I'm concerned about *Lujan*. Let me just read you a quote from there: Flaws in an entire program consisting principally of the many individual actions referenced in the complaint and presumably actions yet to be taken as well cannot be laid before the courts for the wholesale correction under the APA simply because one of them is ripe for review.

So, you know, it looks to me you've identified the

RIF, contract terminations, as ripe actions. And I mean, why shouldn't I see this as you using those to broadly challenge -- I think there's ten separate data collection programs -- implicating numerous statutes that require many individual actions to administer? Isn't this the type of programmatic challenge that *Lujan* prohibits?

MR. BURKE: I think my colleague will be better prepared to answer that. But I'm also happy to walk through our answer, if that's --

THE COURT: Why don't you give it a stab, and I can hear from Mr. Pulver in a minute.

MR. BURKE: Yeah. So what we're challenging right now is not any of these, you know, individual actions. We're challenging the Defendants' failure to have a -- to conduct their, like, mandatory duties under these statutes. They have to collect this data. They have to analyze it. And they have to maintain it and they have to publicize it. And we know that they're not doing that. That's the action that we're challenging here. And they're doing that through -- and they're failing to do that because they don't have enough staff.

And so we're not looking for -- to tell the agency what to do. We're not looking for setting a specific staffing number or how they go about, you know, collecting and maintaining and disseminating that data. But they are

not able -- they can't fail to do so, because that is against their statutory duty.

So in *Lujan*, they were telling the government how to fulfill that obligation under the statute. And the key difference is that we want them to fulfill their obligations. We're not telling them how to.

I think part of the purpose of, you know, not having these type of broad programmatic challenges is so that courts in the federal judiciary don't get into messy policy disagreements with the Department. That's not what we're asking them to do here. We're asking them simply to fulfill their statutory duties.

THE COURT: But I mean, I don't know. I'm looking at your proposed order. "Defendants stall reinstate and maintain all congressionally mandated data collection. Defendants shall within 30 days of this order reinstate any of IES's contracts canceled on or after February 9th. Will promptly rebid the contracts, soliciting new contracts to carry out the research and data activities. Defendants shall restore sufficient employee positions at IES."

I mean, isn't this exactly what you're doing, telling them how they're supposed to carry out their statutory duties?

MR. BURKE: No, your Honor, because we know that there have to be people at the Department to do this

work. We're not saying the number of people. We're not saying specific people that have to be at the agency or at the specific centers. But we are saying that they do have to -- there have to be people to do this work.

THE COURT: Yes. I hear you. But still, I mean, this feels to me like you're pointing to, you know, ten some different programs, numerous contracts, various statutes. I mean, to the extent that *Lujan* was saying that courts are supposed to handle discrete issues and if you have some sort of programmatic concern with how the government is operating, you need to go elsewhere, that's for Congress, that's for the halls of the executive branch, why don't you fall into that bucket here?

MR. BURKE: Because the discrete violations of the statute are those -- are failing to provide the data sets, failing to do that work.

Yeah. And I think in -- the problem in *Lujan* was also that it's not a challenge under specific statutes whereby they had to do something. It's that they were telling them how to fulfill their specific statute.

And that's not what we're asking here. We're saying that the statute's very clear that they shall collect this; they shall disseminate it. So we're requesting that the Court ask -- we're requesting that the Court order them to fulfill that statutory mandate.

And I think with the RIF and the contract cancellation, we're identifying the actions that -- of how they're failing to do so, is because they don't have the staff to do so. It's not that they -- that we're, as I said, specifically telling them which -- whether they should hire more staff or whether they should hire more contractors. That's up to the Department.

But what's not up to the Department and is within your Honor's power is to say that they're violating these statutes.

THE COURT: Okay. Thank you, Mr. Burke.

Mr. Pulver, do you want to pick up on that issue?

MR. PULVER: Sure.

THE COURT: And I mean, we've got *Lujan* on one side. Do you have a good case for me that's kind of somewhere close to what you're asking for me to do here?

MR. PULVER: Sure. So I think the best case from the D.C. Circuit explaining why *Lujan* and *Norton* should not be overread -- and I'd probably be pronouncing this wrong -- is *Meina Xie*, X-I-E, *versus Kerry*, where the D.C. Circuit said --

THE COURT: Do you have a cite?

MR. PULVER: 780 F.3d 405.

THE COURT: Okay.

MR. PULVER: That case says you don't -- it says

not to overread those statutes -- or those cases where you're actually challenging specific actions.

The other case would be *American Fuel versus EPA*, 937 F.3d 559. The pincite is 591. And that's from the D.C. Circuit in 2019.

And I think *American Fuel* in particular is illustrative of the kind of challenge here. The fact that there has been allegations, essentially, that this is part of some greater attempt to shut down the agency or to terminate its functioning isn't what's dispositive. In *American Fuel*, there were allegation of broader challenges, the motivations behind actions. But the Circuit said: But what the claims are actually challenging are specific actions.

And that's what's at issue here, because *Lujan* doesn't stand for the proposition that if an agency action is being challenged and it's really -- it was a big action that has lots of impacts on how the operations of the agency works, you can't bring it, nor does it say you can't challenge multiple agency actions in a single case.

I don't think there would be a question, had this case been a challenge to the termination solely of the National Postsecondary Student Aid Survey, that that would be, Oh, that's an agency action. That's challengeable.

The D.C. Circuit challenge is similar, the issue

in the *American Legion* case we cited. So the fact that we're challenging a single act, which by -- Defendants have called it a single act -- is Defendants who made this mass announcement of a cancellation of contracts. It is Defendants who have taken one action and slashed 90 percent of the staff. So those are discrete actions.

In *Lujan*, there weren't actually discrete actions. The discrete actions were kind of made up by the Plaintiffs. They're like, Well, if you look at the way they do this and you look at the way they do this, we're going to call it "the program." And the D.C. Circuit -- I'm sorry -- the Supreme Court said: You can't just call it "the program" and then have an action.

And here, there are actions that are being challenged.

THE COURT: And so what is the discrete action you're pointing to here? I mean, the Government has talked about the executive orders; and you've explicitly said that you're not challenging the executive orders. Why isn't it fair to describe what you're doing as challenging, you know, RIF here, cancellation of contracts there, cancellation of remote access here? Why isn't this that type of kind of wholesale programmatic change that *Lujan* warns against?

MR. PULVER: I don't think that's a wholesale programmatic change. I think you're challenging four

specific discrete agency actions.

THE COURT: And what are those?

MR. PULVER: Those are, one, the mass termination of contracts on -- I believe it was February 9th. That's when it was announced on X.

Two: the RIF, which was all announced on one date. It was announced by the secretary on a single date, which entailed the reorganization and elimination of offices within IES.

Three: the termination of the REL, the Regional Educational Laboratories program, which was announced by a press release by the secretary.

And then the last would be the termination of the remote restricted-use data access program.

Any one of those four items are -- would individually be challengeable in their own action. But the fact that they're being alleged separately here in one case doesn't make it an improper programmatic claim. And I think this goes to the relief. And I think there may be some daylight between the other Plaintiffs and our case on this --

THE COURT: Yes.

MR. PULVER: -- in that at the end of the day, what is a court's remedy under the APA is to set aside agency action. So it would be to set aside those specific

actions that were taken.

And those were the actions. We're not saying -- if the agency wanted to go back and then try it a different way, if they wanted to, you know, engage in statutory analysis as to whether something was required or not and try again, they would be able to do so.

So at the end of the case, certainly, that's the relief provided for under the APA.

We're in a little bit of a different situation now at the preliminary injunction stage, because the question -- we're seeking restoration of the status quo while this case can be litigated. And because of the broad actions that were taken by the Defendants, the only way to restore the status quo is to pause those actions while the case is litigated.

That doesn't mean that at the end of the day maybe they'll be able to show the termination of this contract was legal and the termination of that contract wasn't. But it doesn't mean that -- or -- I'm sorry -- the termination of that study was lawful and the termination of that study was not.

But now, given the record before the Court, which we have produced a record showing that specific studies were canceled, we have no reason to believe they're being restarted. We have contrary evidence, because Defendants

have said these are savings. They're not planning on spending the money to rebid them. And the reduction in force was grounded on the fact that we do not need staff. We're getting rid of these positions.

So it's not a situation where maybe they're actually going to hire in three weeks -- that would be speculative -- or three months, because the government said they are not planning on it. They're saying this is the right size.

So I think there are specific actions being challenged here.

I wanted to just briefly correct something. This is again -- it goes to confusion about how the Department titles studies. The Court referred to NPSAS 2024 having just been completed.

But NPSAS 2024 was actually one of the canceled studies. So it had collected data in 2024; but the analysis, which is what's required, not just the collection, and the report, never actually happened or it was terminated midstream, was never finished.

So that -- even though it was -- so it's not that the -- that they'll -- that the deadline isn't in four years. The deadline has happened. The collection was quadrennial.

THE COURT: And what about EDFacts? I think you

said it was canceled on February 10th, but reinstated on February 28th.

MR. PULVER: Right. So we are not bringing the claim based on -- and this may be the difference. We're not bringing a claim based on the cancellation of the EDFacts, because it was restored. But we do -- and we were pointing to this as evidence of the arbitrary and capricious way in which the agency went about canceling these contracts as part of a "Cut first, ask questions later" approach. And that is quintessential arbitrary and capricious decisionmaking.

THE COURT: Okay. Back on the remedy, though, I mean, isn't there a mismatch between the harm you're describing and the proposed relief? I mean, for me to order all RIF'd employees to be immediately reinstated and they can't be terminated again except for individual decisions, I mean, I think you're pointing to a case brought by the employees' union. Right? Isn't that the *Vought* case from Judge Jackson?

You're not in a similar situation. How do you have standing to say what employees should or should not be retained by the Education Department?

MR. PULVER: So in that case, it's a little confusing, because the lead Plaintiff was the union. Judge Jackson ended up deciding that she wasn't resolving the

claims on behalf of the union but based on the other Plaintiffs in that case who are similarly situated. So, for example, the National Consumer Law Center, the Virginia Poverty Law Center. So they are similarly situated.

And so that's why actually in that opinion the Court doesn't -- she did not address the Civil Service Reform Act channeling, because there were other Plaintiffs who had standing and therefore there was no need to address that.

So I don't think that that -- that there's a difference, actually, there.

I think the -- this goes to, I think -- it relates to the channeling under both the Tucker Act and the -- I'm not even going to try to say it -- the federal civil service laws.

The fact that the way the government has implemented its action is broad or via getting rid of all its staff doesn't mean that it hasn't violated the law and it doesn't mean that the harmed individuals have no relief.

Certainly if the Court were inclined to do a more targeted form of relief, if there was a way of doing that, you know, we certainly would be open to that. But it's difficult, given the lack of a record here and the broad way in which the government acted, to ascertain what the relief is.

It would be inequitable to say that because the government acted broadly in harming your rights, there's no relief available to you in remedying those rights.

Going to the Tucker Act, those are rights provided under -- not under any contract. Those are rights that our Plaintiffs have under the statute itself.

And as even in the *Widakuswara* case -- that's W-I-D-A-K-U-S-W-A-R-A, I believe --

THE COURT: Good job.

MR. PULVER: -- there was acknowledgement of all three judges that just because -- if there's a statutory obligation and the agency chooses to use a contract to fulfill it, that doesn't mean that the termination of fulfilling that duty becomes unreviewable because that was accomplished by the termination of a contract.

THE COURT: But why isn't the better course just to tell the government, You need to continue providing those studies; you need to continue providing remote access; and how you do that is up to you?

MR. PULVER: Your Honor, I think that would be fine. I'm not sure what the government's position would be on that and how feasible that is.

But -- and I think that was covered by -- I think Paragraph 2 of our revised proposed order, which doesn't refer to the contracts itself. I think the contracts were

further down in our proposed order.

So I think to the extent that the government wanted to order the restoration of the activities, I think that is certainly one that would clearly be within this Court's jurisdiction that isn't a Tucker Act problem at all. And certainly I think the remote restricted-use data access program, that is not connected to any contract or staff as far as we know.

I mean, the reasons the government may have acted, we don't know. And of course that would be up to the government to decide how to restore that program.

But it would not implicate any kind of channeling concern. And I think it's well within traditional relief, and I don't think it implicates, back where we started, *Norton* nor *Lujan* at all where there's a specific program that's terminated and you're challenging the termination of that specific program.

So even although it's called "program," but it's the government that acknowledges that's a program. It's not, you know, Plaintiffs making up that this is a program that exists. It would be well within traditional court authority.

THE COURT: Well, wasn't it Justice Scalia? He wasn't quibbling with the term. He's saying: Sure, there's a program, but really it is -- that is just pointing to a

host of specific actions that the government either took or didn't take. And I mean, that feels pretty similar to what's happening here. Right?

MR. PULVER: I would disagree, your Honor. I think Footnote 2 in that opinion makes clear that that is not a scope issue. I think -- Justice Scalia, I think, derided the ever-changing scope of the program that Plaintiffs were challenging. And ever -- you know, I'll get the quote. I think it was ever-changing -- this wasn't in Footnote 2; this was earlier in the case -- but there was an ever-expanding, continuing, evolving set of actions that was being challenged.

And I think the big difference there is, they are just as clearly pointing out there would be no -- the Plaintiffs there weren't actually injured by this collection of things. There were a bunch of individual actions that may or may not impact them in the future. And a lot of the opinion talks about ripeness.

Here, that's not what we have, because they've already been terminated. Right? The studies have been terminated already.

And I think -- and I won't pretend to -- I think it's clear what the current status is, given where *Widakuswara* is right now as to what exactly the Circuit's law is. I expect the Circuit will provide guidance more

quickly or at some point. But Judge Pillard in her panel -- motions panel dissent addressed -- explained, I think, in a way that doesn't actually conflict with anything in the other opinions, talked about the difference between a collection of individually challengeable actions when you're challenging them all versus challenging a bunch of things that wouldn't be individual actions.

And I think, going back to Justice Scalia's opinion, he talks about Section 551 of the APA and lists the kinds of actions that are defined as agency actions and said that in *Lujan*, that's not the kind of actions that were being challenged.

Here, those are. Terminations of licenses, deprivations of access, discontinuations of studies. Those are traditionally reviewable agency actions, which distinguishes this case from *Lujan*.

THE COURT: But I mean, I thought *Lujan* -- I mean, there were maybe a thousand, so certainly more than yours. But I thought *Lujan* was talking about individual permits for individual land. And I would have assumed that any one of those could have been challenged, but the problem was this -- was trying to challenge this wholesale government program.

MR. PULVER: So in *Lujan*, the Court talks about how the Plaintiffs there would not have been able to do so

because there was no ripe challenge to those permits, or I think it was the mechanism by which permits were granted. So it was kind of -- I think more contemporary D.C. Circuit cases have sometimes referred to it as a policy or practice claim where you're challenging the way in which the agency goes about granting permits. But in *Lujan*, they weren't actually harmed by any one of those permits.

I think the quote that is relevant from *Lujan* is -- it says a plaintiff must, quote, "direct its attack against some particular agency action that causes it harm."

And the problem there was, yes, the agency had granted a bunch of permits. But the Plaintiffs couldn't challenge those permits because they weren't causing them harm. So they were saying, Oh, but the way the agency goes about permitting generally, we're going to say this is some rule to discern that will then cause us harm. And I think there's a lot of discussion of ripeness in that part of the opinion that I think isn't really relevant here.

THE COURT: All right. Why don't we hear from the Government.

MR. PULVER: Sure.

THE COURT: I'll give you all the last word.

MR. PULVER: Thank you.

THE COURT: Ms. Oblea.

MS. OBLEA: Good morning, your Honor.

I will be addressing the threshold issues that, respectfully, are this Court's review of these cases. Should the Court nonetheless find that these claims are appropriate for its review, my colleague Dimitar will address why preliminary injunctive relief should nevertheless be denied.

Your Honor, these cases are simply not appropriate for this Court's review. At its core, as we've just been discussing, Plaintiffs bring these cases because they disagree with how the Department has managed the Institute.

But as the Supreme Court has held in *Lujan*, that is a mere programmatic challenge. That is not an agency action subject to this Court's review.

And I think, you know, as you were discussing earlier about a, you know, potential order that might just order the agency to reform its statutorily mandated duties, I think that kind of order would fall directly in contradiction to the Supreme Court's warning in *Norton*, which said specifically that would basically put the Court in a kind of management of the day-to-day operations of the agency, which is not necessarily appropriate here.

But even if this Court were to break down Plaintiffs' challenge into its parts, I think it becomes even clearer why this Court's review is not appropriate, respectfully.

You know, one of the actions we've been discussing is the cancellation of the contracts. And that is essentially a contract claim that belongs in the Court of Federal Claims.

If we're talking here about the reductions in force, then that's a federal employment matter that should be brought by the employees through the administrative employment schemes created by Congress.

And lastly, you know, Plaintiffs here do not have standing, as we've been discussing. They're largely relying on speculation of what may or may not happen with these studies. That's not appropriate to establish a concrete injury in this case.

THE COURT: So I mean, your Tucker Act and FLSA claims, I mean, obviously these Plaintiffs don't have standing on those. I just struggle to see why the Tucker Act would keep them from challenging their independent -- bringing their independent injuries just because you can imagine somebody else who might also have a claim that would be channeled in a different direction.

MS. OBLEA: I think the fact -- I think what the Court is trying to get at is they're not parties to the contract necessarily here.

THE COURT: Right.

MS. OBLEA: But I don't think that should bar

application of the Tucker Act here.

I mean, if Congress created a scheme by which the parties to the contract or party beneficiaries to the contract can bring their -- must bring their contract claims against the government in the Court of Federal Claims, it necessarily would preclude other people who are strangers to the contract to bring their -- to avoid that, you know, scheme just because they're not -- you know, they're bringing the same claims against the contract. So they're not parties to it.

THE COURT: But I mean, the statutory regime is really about helping people like Plaintiffs. It's not about helping -- I mean, these contractors, these employees, are essentially tools or ways for the Department to effectuate the statutory regime. But the statutory regime is actually meant to help people like Plaintiffs. Right?

MS. OBLEA: Are you talking about the Tucker Act or the ESRA?

THE COURT: Well, both.

MS. OBLEA: Okay.

THE COURT: I mean, your concern about the RIF, you know. The Department of Education does not exist to serve the Department of Education employees; it exists to serve the American public and people who look a lot more like the Plaintiffs. So the fact that Department employees

might have a different route to challenge their RIF, I don't see why that would prevent the actual beneficiaries of the Department and the statutory schemes from bringing an APA challenge.

MS. OBLEA: I think the Supreme Court's decision in *Block*, your Honor, is instructive here. You know, that -- in that situation, Congress created an administrative scheme by which, like, I think it was producers or manufacturers of the products could bring their claims, and they specifically excluded consumers from doing it.

And so in that case, the Supreme Court found that the consumers couldn't just avoid the administrative scheme by bringing it directly to District Court when Congress had created a specific scheme specifically for employees. And I think that's instructive here for the employees. Congress has created the CSRA and these other federal administrative employment schemes specifically for the federal employees to bring -- to challenge exactly what they're challenging here, the RIFs.

So it wouldn't be appropriate for, you know, them to -- for these people who were strangers to this federal employment relationship to just avoid that statutory -- the administrative scheme that Congress has laid out.

THE COURT: So you have a number of theories, kind

of threshold or procedural theories, for why the Plaintiffs can't get the relief that they're seeking. What do you think is your strongest?

MS. OBLEA: I think ultimately -- listening to Plaintiffs today, I think the target keeps changing. You know, on the one hand they're saying this is a broad challenge to the program. On the other hand, like, these are final agency actions.

And I think whichever way you look at it, it's -- this is not an appropriate forum -- these claims are not appropriate for this Court's review. If you're looking at it as a broad challenge, "We just want the agency to do its statutorily mandated duties," I think that kind of challenge is specifically precluded by *Lujan* and the Supreme Court's case in *Norton*.

If we're looking at it like, you know, breaking it down by its parts, the Tucker Act specifically precludes the contract claims. The CSRA precludes the challenges to the RIFs. And any other actions regarding the remote access program, that's -- those are actions that are very much -- well, Plaintiff hasn't demonstrated, you know, that's necessarily a final agency action that's subject to this Court's review.

And as at least I've been told by the Department of Education, appropriate access to data by qualified

researchers is being addressed by the Department of Education in connection with the restructuring of the contracts.

THE COURT: So are you disagreeing with Plaintiffs, like, on the remote access point, that they're not going to lose remote access on June 1st?

MS. OBLEA: What I can say, what I've been authorized to say by the Department of Education, is just what I said, is that they are -- that the appropriate access to the data is being addressed by the Department at this time.

THE COURT: So I have a lot of declarations over on this one side talking about harm that is or is about to be occurring to them. You don't have, I don't think, any declarations on your side. I mean, how am I supposed to weigh and say all of these harms that they're saying are happening are not in fact happening?

MS. OBLEA: I mean, that's right, your Honor. We haven't included a declaration. We don't dispute the facts as presented by Plaintiffs in the declarations.

That said, we do reserve the right at a later time to dispute any facts, should this proceed to merits briefing.

But, you know, at this point I think what's come out from Plaintiffs is that these are harms that largely are

speculative. They rely on kind of fears or speculation of what they believe may or may not happen to these studies.

THE COURT: But I mean, these declarations are full of people who have lost their peer review. They can't do peer review. They're supposed to be publishing papers but have reached out and get emails saying, We're not doing this. They've been told that in a matter of days, their remote access is going to be canceled. How is this speculative?

MS. OBLEA: Again, I'm not -- we're not necessarily disputing what the facts are or what -- the facts that have been presented by Plaintiffs in their declarations.

I can say -- what I've been authorized by the Department of Education to say is that they are committed to restructuring contracts in the Institute that are mission critical, which has involved a process of canceling certain contracts to review and rescope them to gain cost savings and efficiencies.

Like I said, appropriate access to data by qualified researchers is being addressed by the Department of Education in connection with their structuring of contracts.

THE COURT: So is it your position that the agency can still accomplish all of its statutory functions with the

current amount of staffing and contracts?

MS. OBLEA: Ultimately, your Honor, I think that's a merits question. We're not -- we're not disputing the facts as stated by the Plaintiffs. But we do believe that this Court -- this Court should -- that this -- at this stage, the preliminary injunction motion should be decided solely on the threshold issues that I've laid out today.

THE COURT: And so let's say they were just challenging the remote access point that they say and you're not disputing that on June 1st, in a couple weeks, they're going to lose access to all of the data through their remote licenses.

I mean, do you have any threshold objections or reasons why they wouldn't have standing on that basis?

MS. OBLEA: I think the Department's position is that, you know, it's Plaintiffs' burden ultimately to demonstrate that there's a final agency action regarding the remote access program. And I at least have been authorized by the Department to say as of now that they are -- that they are addressing that in connection with their restructuring of contracts.

THE COURT: I mean, but again, given the evidence that I have in front of me, how can I find that there hasn't been a final agency action?

MS. OBLEA: I mean, at this point we're not --

we're not going to be disputing the facts as laid out. But we do reserve our right to do that at a later time.

But I think it's our argument that it's ultimately Plaintiffs' burden to demonstrate the final agency action here.

THE COURT: How about the RIFs? Is your position those weren't final agency actions?

MS. OBLEA: I think our primary jurisdictional argument on that is that those types of challenges to the RIFs are -- should be channeled through the CSRA.

THE COURT: How about the cancellation of the contracts? Is your position that these are not final agency actions?

MS. OBLEA: Our primary jurisdictional argument for that is that there should -- those belong in the Court of Federal Claims via the Tucker Act.

THE COURT: So is it only the remote access that you're saying is not a final agency action?

MS. OBLEA: Well, I think the final agency action would apply to all -- would apply to the whole challenge here. I think if you were to ask me, you know, what our primary jurisdictional argument is, it'd be the ones I just laid out.

THE COURT: Okay. Is your position that the agency is currently satisfying all of its statutory

obligations?

MS. OBLEA: Your Honor, ultimately, that's a merits question.

THE COURT: Okay. So I should hear from your colleague.

MS. OBLEA: Yeah.

THE COURT: Anything else you want to say on the procedural points before I hear from Mr. Remmel?

MS. OBLEA: Nothing else from me.

THE COURT: Thank you, ma'am.

MS. OBLEA: Thank you.

MR. GEORGIEV-REMMEL: May it please the Court.

I think it's helpful to start with what the parties agree on based on the papers and the presentations this morning.

The parties agree that establishing injury in fact and irreparable harm are two separate standards that require independent review and analysis.

So even if the Court finds that the Plaintiffs do have standing, that doesn't mean that they have established irreparable harm.

The parties also agree that the Department has discretion on how to meet its statutory obligations. That was a concession from a little bit earlier this morning.

And, third, the parties agree that remote access

is not statutorily required. That was the concession this morning.

It is also helpful to note that in our discussion with my friends on the other side, trying to identify individual actions and say that they're actions that are being challenged separately. However, it's really a challenge to the reorganization of the Department.

And specifically, I will point the Court to the reply in Civil Action 25-1266. That's ECF No. 23 at Pages 7 and Pages 11, where the Plaintiffs say that this lawsuit is a broad challenge to policy and Plaintiffs challenge Defendants' policy of dismantling the Department.

And so it is not -- it goes precisely to your Honor's discussion with my friends on the other side about whether this is a programmatic challenge. In fact, it is. And the clues are in the papers.

THE COURT: Sir, can I go back to something you said about the remote access?

What I think I heard from Plaintiffs is that, yes, remote access per se is not statutorily required, but that Section 9575 requires that the information must be provided in the most technologically appropriate manner or something like that.

Is there any evidence that I can look to that would suggest that remote access is not the most

technologically appropriate manner?

MR. GEORGIEV-REMMEL: So ultimately, that is a -- at the preliminary injunction stage, that is a burden for the Plaintiffs to establish. But the statute specifically, 9575, leaves broad discretion to the Department how to deliver and when to deliver that data.

So, for example, 9575, Subsection (2), describes that -- disseminating information in a timely fashion. So again, that is an undefined term, "timely fashion." When that would occur and how that would occur is left to the Department.

Similarly, Subsection (c) speaks of delivering that information in an expeditious fashion. Again, that leaves broad discretion to the Department of when and how to do that.

There are other clues in the statute, in the statutory scheme, where Congress chose to set specific deadliness. Some of them were referenced by our friends on the other side. Clearly, Congress chose not to put those specific timelines or how the access will be granted.

THE COURT: Am I correct, though, in thinking that, assuming you're correct that you have discretion, that you still cannot act arbitrarily and capriciously?

MR. GEORGIEV-REMMEL: So that'll be the review under the APA. Yes, your Honor. My understanding from --

of the challenge is that they're not individual challenges to the RIFs. It's not individual challenges to the contracts. But it is a programmatic challenge.

And so the Court still needs to identify a final agency action before it proceeds with the arbitrary and capricious analysis.

THE COURT: So again, I'm focused for the moment on this remote access point.

MR. GEORGIEV-REMMEL: Sure.

THE COURT: Are you saying that this is not final agency action? Or are you saying that it is, but they haven't shown that -- you're not still providing it in the most technologically appropriate manner? What's your argument on that?

MR. GEORGIEV-REMMEL: Our primary argument is that it is not final agency action. But even if it is final agency action, the Department still has broad discretion on how to provide that access. And at this point, they have not established that the remote access is the most technologically advantageous way of doing so. So the burden -- again, at the preliminary injunction stage, the burden is on the Plaintiffs to make that showing.

If we proceed to the merits -- if the case survives and we proceed to merits and we need to brief the full merits based on the administrative record, that is for

a later stage in the proceedings.

THE COURT: I hear you. But I also, as I say, have hundreds of pages of declarations and whatnot from them on these things showing the injury, how this has worked apparently very well for some time and then apparently it has been arbitrarily yanked. It feels to me like that's a hard situation for you to say that this isn't final and it's not arbitrary and capricious.

MR. GEORGIEV-REMMEL: And even if that is true, your Honor, and you find that there's a likelihood of success on the merits, they still have to establish that the harm is irreparable. I still haven't -- don't understand exactly how the harm here will be irreparable.

So, for example, they pointed to receiving licenses for researchers. But they've conceded that granting those licenses is at the discretion of the Department.

They haven't established in the past how long it has taken to award those licenses, under what circumstances. It's just a conclusory suggestion that they've applied for a license and they haven't heard back. That is not sufficient to issue a preliminary injunction, the extraordinary relief of a preliminary injunction.

They also point to -- that certain studies are not being conducted. But in your questioning to my friends on

the other side, you asked what statutory provisions required those studies to be conducted. And I didn't hear a particular statutory citation. Again, the burden is on the Plaintiffs' side to establish that those studies are required by statute.

And then what I also haven't heard is how that data is being collected. Are the individuals at the Department of Education the ones that are going out to the individual schools and conducting surveys? What exactly -- what is the exact activity that these employees at the Department have been conducting previously that the Department is no longer able to do because it doesn't have the personnel that they say is required?

And those are all questions that Plaintiffs need to answer before the Court can issue a preliminary injunction.

THE COURT: So let's say I agreed with them that they have standing, that an injunction should issue. What in your mind is kind of the appropriately tailored injunction that addresses their harms without impermissibly kind of trampling on the secretary's authority?

MR. GEORGIEV-REMMEL: Could I have a moment to confer?

THE COURT: Sure.

MR. GEORGIEV-REMMEL: Okay.

(Confers with co-counsel privately.)

Thank you, your Honor.

So what we hear your Honor's concern to be is the access to information. And your Honor had suggested that providing -- issuing an injunction that requires the Department to provide access, but leaves the discretion to the Department how that would be achieved, will be an appropriate way.

That assumes, of course, that the Court narrowly tailors the injunction to the specific harm that the Court finds. And our primary position is that the Plaintiffs have not shown that they are suffering an irreparable harm that warrants an injunction in the first instance.

THE COURT: I mean, my impression is that their informational injury claims are pretty strong. What are they missing there?

MR. GEORGIEV-REMMEL: So the informational injury, that goes to the standing. So even if they've established standing, that doesn't mean that they have established irreparable harm such that warrants this Court's intervention before we have -- the parties have been able to develop the record and fully brief the issues.

THE COURT: Okay. So you believe that there's -- I guess -- and I hear you, and I think Plaintiffs also agree that there is daylight between showing injury for standing

purposes and showing irreparable harm. But nonetheless, what more do you think they need to show for irreparable harm that they have not already shown for informational injury?

MR. GEORGIEV-REMMEL: So they have argued that there are certain studies in the future that will not be completed. That is entirely speculative and cannot be the basis for an injunction.

The Court cannot tell the Department, Do this study in three or four years. That is required by a statute which, by the way, Plaintiffs have not pointed to the particular statutory provision that requires the particular studies.

So it's entirely speculative that some action in the future will occur.

THE COURT: But I think your colleagues have just been describing these various studies that require ongoing data collection. This longitudinal survey, for instance. Why isn't that evidence that it will never be completed if you're not collecting the data now?

MR. GEORGIEV-REMMEL: Because they haven't articulated to the Court and it's not evident from their papers how that study's conducted. How is the data collected? Who collects the data? Where do they store it? Who then analyzes the data? Is it the same individuals

collecting the data and then analyzing the data and publishing the data? Is it different individuals? We just don't know. The record doesn't reflect that.

And it is on -- it's Plaintiffs' burden to establish that all these activities that lead to the publishing of the study are no longer conducted. And they haven't done that.

THE COURT: All right. I guess I thought I saw a lot of evidence from them that these things are not going on anymore. But maybe I misread those.

What else do you have for me on the merits, sir?

MR. GEORGIEV-REMMEL: I think just on the balancing, the third element of the preliminary injunction, there are additional harms to the government. As I mentioned, it is not the role of the Court to arbitrate policy disagreements between the executive and private organizations.

As I pointed out, the statements in the reply, ECF 23, Pages 7 and 11, an injunction would also inhibit the Department from recalibrating the Institute to better serve the American people.

There is the administrative harm of micromanaging the Department and its resources in contravention to the statutory grant of discretion.

There is the monetary harm that the Department now

must spend funds on salaries and contracts that have been suspended or terminate -- and replace employees who have been terminated. And those funds cannot --

THE COURT: So on that, I mean, the Plaintiffs allege that Congress specifically earmarked funds for these programs. Are they incorrect about that?

MR. GEORGIEV-REMMEL: So the -- we're still in the current fiscal year. What Congress has appropriated funds for the specific purpose, I'm not certain whether Congress has appropriated specifically to specific individual positions or specific contracts.

However, we're still in the fiscal year, and those claims for the expending of funds do not become ripe until the end of the fiscal year, when the executive must spend those appropriated funds.

THE COURT: Well, aren't they then moot by the end of the fiscal year? It sounds like a "Heads I win, tails they lose" position.

MR. GEORGIEV-REMMEL: Of course, the executive -- Plaintiffs have not challenged the executive orders at issue here. But it's obvious that the executive has made a determination that this is the policy of the democratically elected president to proceed in this direction, that those actions are consistent with the president's directive. And so it would --

THE COURT: But the EO also repeatedly states it's to be done in compliance with the law, as you pointed out.

And I mean, again, the Plaintiffs are saying that these institutes, these programs, are statutorily required that you've more or less shuttered.

MR. GEORGIEV-REMMEL: And so to the extent -- if the Court finds that particular actions were not in compliance with the law, perhaps that would mitigate that particular harm.

But broadly, there's no question that an injunction from this Court at this time would inhibit the implementation of the Department's stated objective of recalibrating the institutes, which are consistent with the executive orders.

THE COURT: You argue that bond is appropriate. How much do you have in mind?

MR. GEORGIEV-REMMEL: A bond?

THE COURT: Yes.

MR. GEORGIEV-REMMEL: We have not put a particular number on that.

THE COURT: But you want me to put a particular number, right?

MR. GEORGIEV-REMMEL: Give me just one second.

THE COURT: All right.

MR. GEORGIEV-REMMEL: (Confers with co-counsel

privately.)

So the bond would be dependent on what the Court orders, the injunction that the Court orders. So if the Court orders for all employees to be restored, it will be their compensation or their salaries. If the Court orders for all contracts to be restored, the bond would necessarily need to be for the amounts that those contracts -- the value of those contracts. We cannot provide a particular sum because we don't know what the Court will order.

THE COURT: So you're envisioning that if I grant the Plaintiffs' motion for preliminary injunction that there would then be a subsequent round of briefing on bond? Because obviously, I don't know how much the employees cost, either.

MR. GEORGIEV-REMMEL: I would imagine that that would be the appropriate way to proceed. Yes.

THE COURT: Okay. Anything else, sir?

MR. GEORGIEV-REMMEL: Unless the Court has further questions, no.

THE COURT: I think I want to go back to Ms. Oblea.

Ma'am, if you could address -- on *Lujan*, Mr. Pulver cited to a few cases: *Xie versus Kerry*, *American Fuel versus EPA*. Have you looked at those?

MS. OBLEA: I'm going to confess I have not read

those cases beforehand.

THE COURT: Is *Lujan* your best case, I mean, on this issue? Or is there a D.C. Circuit case or a lower court case that I should be kind of most closely analogizing to the current situation?

MS. OBLEA: I think we're relying on *Lujan* and *Norton*, your Honor.

THE COURT: Okay. Thank you, ma'am.

MS. OBLEA: Thank you.

THE COURT: I'll give the Plaintiffs the last word.

MR. PULVER: Briefly, your Honor, I realize in our colloquy earlier we didn't directly get to one of the questions your Honor had sent to the parties, so I just wanted the opportunity to address --

THE COURT: Yes.

MR. PULVER: -- the specific statutory provisions that Plaintiffs allege are being violated. I will try to go slow --

THE COURT: Great.

MR. PULVER: -- as I read them off.

But to provide those citations -- and I do believe they're all provided in the papers as well:

One would be 20 USC 9622(b), which requires the, quote, "continuing review of the national assessment of

educational progress." That review has been halted. The contract by which that review was being conducted has been halted.

The next would be 20 USC 9564, which is the program -- the statutory provision establishing and mandating the Regional Educational Laboratories. That statute itself requires there to be five-year plans for each of those with annual reports on July 1st.

In addition, an appropriations rider contained -- and the parties agree this was incorporated by reference into the statute -- Senate Report 118-84 at 249 directed the continuation of the 2022 to 2027 Regional Educational Laboratory program. And that has already been terminated.

20 USC 9533, 9534, 9520 and 9576 all relate to the peer review program and require there to be a peer review program in place. That has been canceled.

Then 20 USC 9622(b)(2)(F) requires the long-term assessment for 17-year-olds as part of the national assessment of educational progress. That has been canceled.

20 USC 1015(a)(K) is the requirement for NPSAS and PSAS. The 2024 study has been canceled.

And the congressional rider is at 170 Congressional Record H1896, which directed that it be maintained for 2024 and 2026.

20 USC 2324(a)(3) mandates the Perkins V annual

study, which has been canceled.

20 USC 9545(b) is the Condition of Education report, which must be conducted annually on June 1st. Obviously, we will know soon whether that is exactly -- how that is managed to have been done.

And then 29 USC 3332(b)(3) is the statutorily mandated National Assessment of Adult Education, which has been canceled.

In addition, we referenced earlier 20 USC 9575. And I had paraphrased before, but I can give the exact quote, which is that the information must be disseminated, quote, "utilizing the most modern technology," is the language. And we think that is clearly at least arbitrary and capricious, to terminate all remote access without considering that statutory program.

THE COURT: And so that's the appropriate way for me to consider this, that you believe you have shown final agency action and that it's arbitrary and capricious?

MR. PULVER: Yes, your Honor. And I think we had pointed to a specific email announcing the termination of the program. It's not speculative that the program is ending on June 1st. And I think that's pretty clear.

That also violates 44 USC 3582(a), which is a statute that governs, I believe, six or -- I forget the exact number of specific statistical agencies, including the

National Center For Educational Statistics, which also says each statistical agency -- which this is one of them -- shall expand access to data assets. And this would be the opposite, as it would be contracting access to data.

And I think there's a number of other statutes that are cited in the papers.

Going just briefly to address the *Lujan* point, just to respond to something that was raised, just as Plaintiffs can't recast their claims about a contract into APA claims, individual specific claims under the APA can't be lumped together and made a programmatic challenge.

I think if you look at Paragraphs 92 through 99 of our complaint, we allege specific actions violate specific laws and statutory provisions. Each one of those could be their own lawsuit. And we recognize that.

It wouldn't be beneficial for the parties or for the Court if we had filed 100 separate lawsuits to challenge that. And I don't think anything in *Lujan* suggested that you have to do that.

And this is not a case where we are alleging that there is a failure to comply with statutory duties. We are alleging that specific actions that have been taken themselves are contrary to law and arbitrary and capricious. And that is a standard APA claim.

And I agree: The Defendants, after they produce

the administrative record, we can get into a back-and-forth. But if they are accepting our view of the facts that these programs have been canceled, the fact that the word "waste" cannot talismanically account for all the various factors that an agency must take into consideration when taking agency action -- and I think we have not talked about the April 4th email that is attached to the Voight declaration, where the agency concedes it has acted without taking into account how it can achieve its statutory responsibilities based on the resources that have been left with the agency.

And that's a surprising admission, to see an agency admit that they have acted without assessing how they can comply with their statutory responsibilities.

And I think that goes to show why broad relief is appropriate here, because the agency took a machete; and therefore, the response is to undo that machete.

THE COURT: Were there specific statutory deadlines that you haven't -- you just cited a couple.

MR. PULVER: Yes.

THE COURT: Any other specific statutory deadlines that have passed?

MR. PULVER: I don't believe so, your Honor. I think -- other than the ones I just mentioned when I was up here earlier.

THE COURT: Okay. Why isn't this more of kind of

an inaction situation? You're saying that these contracts should be getting issued, that the studies should be published, what have you. Why isn't this more of an agency inaction?

MR. PULVER: Well, I think -- and the APA in 551 is a little unclear in that it defines -- one of the words it uses to define "action" is "inaction." So I think to some extent any claim can be flipped into the two.

I think the difference here is we are challenging the specific act that was taken to terminate a study as opposed to not conduct it in the future. And I think that's also why the statutory deadline isn't dispositive or the lack of a statutory deadline is not dispositive.

If we were to bring a failure-to-act claim for something that was not statutorily mandated, we would necessarily -- not necessarily, but likely -- lose.

But when an agency has chosen to do something voluntarily, it can't reverse course without it being arbitrary and capricious. And that's what this is here. They have reversed course and they have taken the final step to terminate, for example, the 2024 NPSAS study. And that is itself an action, not an inaction.

So we're not saying -- and that's also, I think, what really distinguishes the case from *Norton*, where there was a broad statutory mandate and the Plaintiffs there were

saying, Well, you're not achieving those broad mandates.

It doesn't matter if the agency has had broad discretion on how to choose whether to conduct a particular act if it then takes an action that reverses course, even if it was not statutorily mandated. It still cannot be arbitrary and capricious. And I think that meets the distinction here.

THE COURT: Do you want to address the bond issue?

MR. PULVER: Sure.

So first, I think there's a timing issue. As to the employees, the employees are all actually still being paid. So there would be no financial injury until they stop being paid to the government, obviously. So they're still paying that money.

And it's unclear as to I think different employees. When they're going to stop getting money will range. So there could be no conceivable injury at all. The government has decided to pay them not to work. It won't be any harm to pay them to work.

Second, I think the public interest in this Court's discretion to not issue a bond at all would be appropriate in these circumstances, particularly since all the funds have been appropriated. They cannot be used for other purposes. Congress has allocated this money and said, Spend it on this. So to put the burden on the Plaintiffs

when the money is there and it won't cost the agency any -- require them to divert any resources to fulfill the statutory goals.

And then I think the traditional factors that we pointed to in our briefs, that -- where a bond would effectively nullify any right to judicial review is not -- were the Court in its discretion not to award any bond.

THE COURT: All right. Thank you, Mr. Pulver.

And I will take this under advisement and look to get back to you all shortly.

Anything else, Mr. Burke?

MR. BURKE: Yes, please.

THE COURT: All right.

MR. BURKE: Thank you.

I just wanted to go over some of the specific statutes that are specific to our case.

THE COURT: Okay.

MR. BURKE: And so 20 USC 1015(a)(3) requires IES to collect information regarding undergraduate tuition and fees and financial assistance annually. And those contracts necessary for the collection of that data have been canceled.

20 USC 9543 provides that the statistics center shall collect, report and disseminate data related to education, including acquiring and disseminating data on

educational activities and student achievement compared with foreign nations.

And then 20 USC 9543(a)(7): NCES shall collect, report, analyze and disseminate data and conduct longitudinal and special data collections necessary to report on the condition and progress of education. And those contracts have also been canceled.

And then 20 USC 9543(a)(3): NCES shall collect, report, analyze and disseminate statistical data related to education, including collecting, analyzing, cross-tabulating and reporting to the extent feasible information by gender, race, ethnicity, socioeconomic status and a variety of other things.

And Defendants have traditionally complied with that mandate through EDFacts, which is a database that it generally collects.

And then regarding deadlines, we just wanted to do a couple, which is regarding NPSAS. And so under 20 USC 1015, they're required to collect that data annually. And then under the student aid recipient survey, that's collected every -- shall be conducted on a regular cycle and not less often than once every four years. That's 20 USC 1015(k).

THE COURT: And when is that? Where are we on that ten-year cycle or that four-year cycle?

MR. BURKE: I don't have that information in front of you -- in front of me. But I'm happy to get that.

THE COURT: Okay. Anything else, sir?

MR. BURKE: I don't think so. But we also just wanted to underscore the lack of dispute of our facts. And those facts have shown that our clients are being irreparably harmed.

Thank you.

THE COURT: Thanks, folks. I appreciate your argument and briefing. I'll take it under advisement.

(Proceedings concluded at 11:25 a.m.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 20th day of May, 2025.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

## /

**/s** [1] - 76:12

## 1

**1** [1] - 19:4
**100** [2] - 24:22, 69:17
**10006** [1] - 2:4
**1015** [1] - 74:19
**1015(a)(3** [1] - 73:18
**1015(a)(K** [1] - 67:20
**1015(k)** [1] - 74:23
**1015b** [1] - 18:14
**10th** [1] - 38:1
**11** [2] - 55:10, 62:19
**118-84** [1] - 67:11
**11:25** [1] - 75:11
**14** [1] - 25:4
**15,000** [1] - 25:8
**16** [2] - 1:7, 1:15
**1620** [1] - 1:24
**17-year-olds** [1] - 67:18
**170** [1] - 67:22
**180** [1] - 24:21
**1st** [7] - 6:2, 11:5, 50:6, 52:10, 67:8, 68:3, 68:22

## 2

**2** [4] - 40:24, 42:5, 42:10, 56:7
**20** [18] - 10:10, 18:13, 18:14, 24:21, 66:24, 67:4, 67:14, 67:17, 67:20, 67:25, 68:2, 68:9, 73:18, 73:23, 74:3, 74:8, 74:18, 74:22
**20001** [2] - 2:13, 76:14
**20036** [1] - 1:25
**2019** [2] - 21:1, 33:5
**202** [2] - 2:14, 76:15
**2020** [1] - 7:13
**2022** [1] - 67:12
**2023** [1] - 25:7
**2023-2024** [1] - 7:24
**2024** [14] - 7:14, 7:22, 8:9, 8:10, 8:12, 14:17, 24:11, 25:7, 37:14, 37:16, 37:17, 67:21, 67:24, 71:21
**2025** [5] - 1:7, 1:15, 19:15, 25:22, 76:10
**2026** [3] - 8:9, 25:8, 67:24
**2027** [1] - 67:12
**20530** [1] - 2:9
**20th** [1] - 76:10
**23** [2] - 55:9, 62:19
**2324(a)(3** [1] - 67:25
**249** [1] - 67:11
**25-00999** [1] - 1:4
**25-01266** [1] - 1:12
**25-1266** [2] - 3:4, 55:9
**25-999** [2] - 3:2, 3:10
**28th** [1] - 38:2
**29** [1] - 68:6

## 3

**30** [1] - 30:16
**333** [2] - 2:12, 76:14
**3332(b)(3** [1] - 68:6
**354-3269** [2] - 2:14, 76:15
**3582(a** [1] - 68:23

## 4

**40** [1] - 2:3
**405** [1] - 32:23
**44** [1] - 68:23
**4th** [1] - 70:7

## 5

**551** [2] - 43:9, 71:5
**559** [1] - 33:4
**591** [1] - 33:4

## 6

**6** [1] - 25:3
**601** [1] - 2:8
**630** [1] - 1:25
**6706** [1] - 2:13

## 7

**7** [2] - 55:9, 62:19
**780** [1] - 32:23

## 9

**90** [2] - 19:17, 34:5
**92** [1] - 69:12
**937** [1] - 33:4
**9520** [1] - 67:14
**9533** [1] - 67:14
**9534** [1] - 67:14
**9543** [1] - 73:23
**9543(a)(3** [1] - 74:8
**9543(a)(7** [1] - 74:3
**9545(b** [1] - 68:2
**9564** [1] - 67:4
**9574** [1] - 18:13
**9575** [5] - 10:10, 55:21, 56:5, 56:7, 68:9
**9576** [1] - 67:14
**9622(b** [1] - 66:24
**9622(b)(2)(F** [1] - 67:17
**99** [1] - 69:12
**9:33** [2] - 1:8, 1:16
**9th** [2] - 30:17, 35:4

## A

**a.m** [3] - 1:8, 1:16, 75:11
**ability** [1] - 76:7
**able** [9] - 10:2, 14:3, 28:3, 30:1, 36:6, 36:17, 43:25, 59:12, 60:21
**academic** [1] - 19:13
**Academy** [3] - 3:4, 3:16, 16:11
**ACADEMY** [1] - 1:11
**academy** [4] - 18:8, 18:22, 19:7, 19:11
**academy's** [1] - 19:23
**accepting** [1] - 70:2
**access** [47] - 5:19, 6:3, 6:23, 7:6, 9:13, 9:22, 9:25, 10:4, 10:6, 10:18, 11:3, 11:14, 12:10, 16:21, 19:25, 21:12, 22:11, 24:5, 34:22, 35:14, 40:18, 41:6, 43:14, 49:19, 49:25, 50:5, 50:6, 50:9, 51:8, 51:20, 52:9, 52:11, 52:18, 53:17, 54:25, 55:18, 55:20, 55:25, 56:20, 57:8, 57:18, 57:19, 60:4, 60:6, 68:14, 69:3, 69:4
**accomplish** [1] - 51:25
**accomplished** [1] - 40:15
**account** [2] - 70:4, 70:9
**accurate** [1] - 76:4
**achieve** [1] - 70:9
**achieved** [1] - 60:7
**achievement** [1] - 74:1
**achieving** [1] - 72:1
**acknowledgement** [1] - 40:10
**acknowledges** [1] - 41:19
**acquiring** [1] - 73:25
**acronyms** [2] - 13:19, 14:16
**act** [6] - 34:2, 34:3, 56:23, 71:10, 71:14, 72:4
**Act** [13] - 22:25, 23:8, 23:17, 39:7, 39:13, 40:4, 41:5, 46:14, 46:17, 47:1, 47:17, 49:17, 53:16
**acted** [5] - 39:24, 40:2, 41:9, 70:8, 70:12
**action** [31] - 7:3, 11:25, 12:8, 29:18, 33:16, 33:17, 33:24, 34:5, 34:13, 34:16, 35:16, 35:25, 39:17, 44:10, 45:13, 49:22, 52:17, 52:24, 53:4, 53:18, 53:19, 57:5, 57:11, 57:16, 57:17, 61:14, 68:18, 70:6, 71:7, 71:22, 72:4
**Action** [3] - 1:3, 1:11, 55:9
**actions** [49] - 16:17, 17:4, 17:18, 25:9, 26:18, 27:8, 28:8, 28:13, 28:21, 28:22, 29:1, 29:5, 29:13, 32:2, 33:2, 33:12, 33:14, 33:20, 34:6, 34:7, 34:8, 34:14, 35:1, 36:1, 36:2, 36:12, 36:14, 37:10, 42:1, 42:11, 42:16, 43:5, 43:7, 43:10, 43:11, 43:15, 46:1, 49:8, 49:19, 49:20, 53:7, 53:13, 55:5, 63:24, 64:7, 69:13, 69:22
**active** [2] - 6:8, 6:17
**activities** [7] - 5:10, 17:20, 18:20, 30:19, 41:3, 62:5, 74:1
**activity** [1] - 59:10
**actual** [1] - 48:2
**ADAM** [1] - 1:23
**Adam** [1] - 3:8
**addition** [5] - 8:8, 15:7, 24:23, 67:9, 68:9
**additional** [2] - 14:2, 62:14
**address** [14] - 4:11, 4:13, 4:15, 10:15, 16:6, 16:13, 27:13, 39:6, 39:8, 45:5, 65:22, 66:15, 69:7, 72:8
**addressed** [4] - 43:2, 50:1, 50:10, 51:21
**addresses** [1] - 59:20
**addressing** [2] - 45:1, 52:20
**Adina** [1] - 3:10
**ADINA** [1] - 1:23
**administer** [1] - 29:5
**administrative** [8] - 46:7, 48:8, 48:13, 48:17, 48:24, 57:25, 62:22, 70:1
**admission** [1] - 70:11
**admit** [1] - 70:12
**Adult** [1] - 68:7
**advance** [1] - 19:23
**advanced** [1] - 10:9
**advancing** [1] - 20:2
**advantageous** [1] - 57:20
**advise** [1] - 19:18
**advisement** [2] - 73:9, 75:10
**AEFP** [4] - 11:12, 13:23, 14:25, 15:23
**AEFP/IHEP** [1] - 1:23
**affected** [1] - 6:25
**affiants** [1] - 22:23
**agencies** [1] - 68:25
**agency** [51] - 7:13, 10:23, 29:22, 31:2, 33:9, 33:16, 33:18, 33:20, 33:24, 35:1, 35:25, 36:3, 38:8, 40:12, 43:10, 43:15, 44:5, 44:10, 44:11, 44:14, 45:12, 45:16, 45:21, 49:8, 49:12, 49:22, 51:24, 52:17, 52:24, 53:4, 53:7, 53:12, 53:18, 53:19, 53:25, 57:5, 57:11, 57:16, 57:17, 68:18, 69:2, 70:5, 70:6, 70:8, 70:10, 70:12, 70:15, 71:3, 71:17, 72:2,

73:1
**ago** [1] - 27:8
**agree** [8] - 9:4, 54:14, 54:16, 54:22, 54:25, 60:24, 67:10, 69:25
**agreed** [1] - 59:17
**ahead** [3] - 9:2, 27:16, 27:20
**aid** [2] - 18:16, 74:20
**Aid** [5] - 5:13, 7:12, 18:17, 24:10, 33:23
**Akins** [1] - 13:5
**al** [8] - 1:4, 1:7, 1:12, 1:15, 3:3, 3:4, 3:5
**allegation** [1] - 33:11
**allegations** [1] - 33:8
**allege** [3] - 63:5, 66:18, 69:13
**alleged** [1] - 35:17
**alleging** [4] - 18:2, 18:4, 69:20, 69:22
**allocated** [1] - 72:24
**allocute** [1] - 4:8
**allows** [2] - 5:18, 17:15
**alone** [2] - 8:19, 9:6
**American** [8] - 17:11, 33:3, 33:6, 33:11, 34:1, 47:24, 62:21, 65:23
**amount** [1] - 52:1
**amounts** [1] - 65:7
**analogizing** [1] - 66:4
**analogous** [2] - 9:9, 9:16
**analyses** [2] - 5:2, 5:3
**analysis** [6] - 20:22, 20:23, 36:5, 37:18, 54:18, 57:6
**analyze** [4] - 8:2, 29:16, 74:4, 74:9
**analyzes** [1] - 61:25
**analyzing** [2] - 62:1, 74:10
**AND** [1] - 1:4
**Andrew** [1] - 19:10
**Animals** [1] - 21:8
**announced** [5] - 5:17, 35:5, 35:6, 35:7, 35:11
**announcement** [1] - 34:4
**announcements** [1] - 5:25
**announcing** [1] - 68:20
**annual** [2] - 67:8, 67:25
**annually** [3] - 68:3, 73:20, 74:19
**answer** [3] - 29:8, 29:9, 59:15
**APA** [15] - 20:11, 23:2, 23:7, 23:13, 23:20, 28:23, 35:24, 36:8, 43:9, 48:3, 56:25, 69:10, 69:24, 71:5
**aPPEARANCES** [1] - 1:21
**APPEARANCES** [1] - 2:1
**applicable** [1] - 26:24
**application** [1] - 47:1
**applications** [3] - 5:21, 15:22, 19:1
**applied** [3] - 18:24, 18:25, 58:20
**apply** [3] - 10:25, 53:20
**appreciate** [1] - 75:9
**approach** [2] - 3:6, 38:9
**appropriate** [21] - 22:10, 45:4, 45:7, 45:21, 45:24, 46:12, 48:21, 49:10, 49:11, 49:25, 50:9, 51:20, 55:22, 56:1, 57:13, 60:8, 64:15, 65:16, 68:16, 70:15, 72:22
**appropriated** [4] - 63:8, 63:10, 63:15, 72:23
**appropriately** [1] - 59:19
**appropriations** [2] - 8:8, 67:9
**approval** [1] - 6:24
**April** [2] - 19:1, 70:7
**arbitrarily** [2] - 56:23, 58:6
**arbitrary** [10] - 10:14, 38:7, 38:10, 57:5, 58:8, 68:13, 68:18, 69:23, 71:19, 72:6
**arbitrate** [1] - 62:15
**Archive** [1] - 17:15
**argue** [2] - 13:6, 64:15
**argued** [1] - 61:5
**arguing** [1] - 23:14
**argument** [7] - 53:3, 53:9, 53:14, 53:22, 57:14, 57:15, 75:10
**arguments** [1] - 4:8
**articulated** [1] - 61:22
**ascertain** [1] - 39:24
**aside** [3] - 13:7, 35:24, 35:25
**asserted** [1] - 20:5
**assessing** [1] - 70:12
**assessment** [3] - 66:25, 67:18, 67:19
**Assessment** [3] - 17:14, 19:12, 68:7
**assessments** [1] - 25:23
**assets** [1] - 69:3
**assistance** [1] - 73:20
**associated** [1] - 18:15
**association** [1] - 12:17
**ASSOCIATION** [1] - 1:3
**Association** [1] - 3:2
**associational** [5] - 13:23, 15:1, 18:6, 20:4, 20:14
**assume** [1] - 8:6
**assumed** [1] - 43:20
**assumes** [1] - 60:9
**assuming** [1] - 56:22
**attached** [1] - 70:7
**attack** [1] - 44:9
**attempt** [1] - 33:9
**attested** [1] - 15:14
**attests** [1] - 15:20
**ATTORNEY'S** [1] - 2:7
**attorneys** [1] - 23:12
**authority** [2] - 41:22, 59:21
**authorized** [3] - 50:8, 51:14, 52:18
**automatically** [1] - 8:17
**available** [5] - 5:4, 10:19, 15:10, 18:14, 40:3
**Avenue** [2] - 2:12, 76:14
**avoid** [4] - 13:19, 47:7, 48:13, 48:23
**award** [2] - 58:19, 73:7

**B**

**B-A-S-T-E-D-O** [1] - 19:5
**back-and-forth** [1] - 70:1
**balance** [1] - 16:24
**balancing** [1] - 62:13
**bar** [1] - 46:25
**Barnett** [1] - 25:1
**Barnett's** [1] - 25:3
**based** [6] - 38:4, 38:5, 39:1, 54:14, 57:25, 70:10
**basis** [3] - 9:22, 52:14, 61:8
**Bastedo** [3] - 18:21, 19:4, 28:2
**become** [1] - 63:13
**becomes** [2] - 40:14, 45:23
**BEFORE** [1] - 1:19
**beforehand** [1] - 66:1
**begin** [2] - 4:23, 22:1
**behalf** [1] - 39:1
**behind** [1] - 33:12
**belong** [1] - 53:15
**belongs** [1] - 46:3
**beneficial** [1] - 69:16
**beneficiaries** [2] - 47:3, 48:2
**best** [6] - 4:8, 11:20, 18:1, 32:17, 66:2, 76:7
**better** [4] - 28:18, 29:7, 40:16, 62:20
**between** [6] - 11:13, 35:20, 38:13, 43:4, 60:25, 62:16
**Beyond** [2] - 13:18, 14:20
**big** [2] - 33:17, 42:13
**Biological** [1] - 20:25
**bit** [3] - 21:10, 36:9, 54:24
**blanking** [1] - 14:19
**Block** [1] - 48:6
**bond** [9] - 64:15, 64:17, 65:2, 65:6, 65:12, 72:8, 72:21, 73:5, 73:7
**BPS** [1] - 14:19
**branch** [1] - 31:12
**break** [1] - 45:22
**breaking** [1] - 49:16
**brief** [2] - 57:24, 60:22
**briefing** [3] - 50:23, 65:12, 75:10
**briefly** [4] - 16:13, 37:12, 66:12, 69:7
**briefs** [2] - 13:11, 73:5
**bring** [8] - 33:19, 45:9, 47:4, 47:7, 48:9, 48:19, 71:14
**bringing** [6] - 38:3, 38:5, 46:18, 47:9, 48:3, 48:14
**brings** [1] - 21:4
**broad** [14] - 30:8, 36:12, 39:17, 39:23, 49:6, 49:12, 55:11, 56:5, 56:14, 57:17, 70:14, 71:25, 72:1, 72:2
**broader** [1] - 33:11
**broadly** [3] - 29:2, 40:2, 64:10
**broken** [1] - 15:15
**brought** [2] - 38:17, 46:7
**bucket** [1] - 31:13
**bunch** [3] - 42:16, 43:6, 44:12
**burden** [8] - 52:16, 53:4, 56:3, 57:21, 57:22, 59:3, 62:4, 72:25
**BURKE** [33] - 2:2, 3:14, 16:10, 17:2, 18:3, 18:8, 19:4, 19:7, 19:9, 20:16, 20:20, 20:23, 21:7, 21:18, 22:14, 23:3, 23:16, 24:14, 26:12, 26:21, 27:15, 27:18, 27:22, 27:24, 29:7, 29:12, 30:24, 31:14, 73:12, 73:14, 73:18, 75:1, 75:4
**Burke** [8] - 3:16, 3:19, 4:15, 16:9, 16:11, 20:13, 32:11, 73:11
**business** [2] - 7:2, 12:10
**BY** [1] - 2:10

**C**

**canceled** [20] - 13:25, 15:8, 15:12, 19:19, 24:24, 25:16, 25:24, 30:17, 36:24, 37:16, 38:1, 51:8, 67:16, 67:19, 67:21, 68:1, 68:8, 70:3, 73:22, 74:7
**canceling** [2] - 38:8, 51:17
**cancellation** [7] -

32:2, 34:4, 34:21, 38:5, 46:2, 53:11
**cannot** [15] - 6:20, 7:4, 10:14, 14:1, 28:12, 28:13, 28:22, 56:23, 61:7, 61:9, 63:3, 65:8, 70:4, 72:5, 72:23
**capricious** [10] - 10:14, 38:7, 38:10, 57:6, 58:8, 68:14, 68:18, 69:23, 71:19, 72:6
**capriciously** [1] - 56:23
**capture** [1] - 26:10
**captured** [2] - 26:11, 26:13
**carry** [3] - 5:6, 30:19, 30:22
**Case** [1] - 3:4
**case** [38] - 4:6, 8:22, 9:10, 9:20, 17:9, 20:25, 21:11, 23:2, 25:18, 32:15, 32:17, 32:25, 33:3, 33:20, 33:22, 34:1, 35:17, 35:20, 36:7, 36:11, 36:14, 38:17, 38:18, 38:23, 39:2, 40:7, 42:10, 43:16, 46:13, 48:12, 49:15, 57:23, 66:2, 66:3, 66:4, 69:20, 71:24, 73:16
**Cases** [1] - 3:2
**cases** [8] - 4:14, 33:1, 44:4, 45:2, 45:7, 45:9, 65:23, 66:1
**catch** [1] - 26:9
**causes** [1] - 44:10
**causing** [2] - 16:22, 44:13
**center** [1] - 73:23
**Center** [5] - 19:16, 20:25, 39:3, 39:4, 69:1
**centers** [1] - 31:3
**certain** [5] - 23:6, 51:17, 58:24, 61:6, 63:9
**certainly** [8] - 8:3, 8:22, 36:7, 39:20, 39:22, 41:4, 41:6, 43:18
**certainty** [1] - 21:22
**CERTIFICATE** [1] - 76:1
**certify** [1] - 76:4
**challenge** [27] - 29:3, 29:6, 31:18, 33:7, 33:20, 33:22, 33:25, 43:22, 44:1, 44:13, 45:12, 45:23, 48:1, 48:4, 48:19, 49:7, 49:12, 49:13, 53:20, 55:7, 55:11, 55:15, 57:1, 57:3, 69:11, 69:17
**challengeable** [3] - 33:24, 35:16, 43:5
**challenged** [8] - 33:17, 34:15, 37:11, 42:12, 43:12, 43:21, 55:6, 63:20
**challenges** [6] - 30:8, 33:11, 49:18, 53:9, 57:1, 57:2
**challenging** [20] - 11:25, 12:3, 29:12, 29:14, 29:19, 33:2, 33:13, 34:2, 34:19, 34:20, 34:25, 41:16, 42:8, 43:6, 44:5, 46:17, 48:19, 52:9, 71:9
**change** [2] - 34:23, 34:25
**changing** [3] - 42:7, 42:9, 49:5
**channeled** [2] - 46:20, 53:10
**channeling** [3] - 39:7, 39:13, 41:12
**chatted** [1] - 4:7
**childhood** [2] - 14:16, 25:4
**choose** [1] - 72:3
**chooses** [1] - 40:12
**chose** [2] - 56:17, 56:19
**chosen** [1] - 71:17
**Circuit** [13] - 9:10, 20:24, 21:8, 23:11, 32:18, 32:20, 33:5, 33:12, 33:25, 34:11, 42:25, 44:3, 66:3
**Circuit's** [3] - 8:16, 13:3, 42:24
**circumstances** [2] - 58:19, 72:22
**citation** [1] - 59:3
**citations** [1] - 66:22
**cite** [1] - 32:22
**cited** [5] - 14:21, 34:1, 65:23, 69:6, 70:18
**Citizen** [1] - 3:9
**Civil** [6] - 1:3, 1:11, 3:2, 3:4, 39:6, 55:9
**CIVIL** [1] - 2:8
**civil** [1] - 39:14
**claim** [15] - 11:22, 11:25, 20:5, 21:5, 23:6, 35:18, 38:4, 38:5, 44:5, 46:3, 46:19, 69:24, 71:8, 71:14
**claiming** [1] - 24:12
**claims** [21] - 12:23, 20:11, 23:13, 23:17, 23:18, 23:19, 33:13, 39:1, 45:3, 46:15, 47:4, 47:9, 48:10, 49:10, 49:18, 60:15, 63:13, 69:9, 69:10
**Claims** [4] - 23:2, 46:4, 47:5, 53:16
**class** [1] - 25:7
**classic** [2] - 12:9, 13:4
**clean** [1] - 25:11
**clear** [5] - 10:16, 31:22, 42:5, 42:23, 68:22
**clearer** [1] - 45:24
**Clearinghouse** [1] - 19:19
**clearly** [4] - 41:4, 42:14, 56:19, 68:13
**clever** [1] - 23:12
**clients** [8] - 4:12, 16:6, 16:22, 16:24, 17:2, 21:23, 25:19, 75:6
**clients'** [1] - 16:13
**close** [1] - 32:16
**closely** [1] - 66:4
**clues** [2] - 55:16, 56:16
**co** [2] - 60:1, 64:25
**co-counsel** [2] - 60:1, 64:25
**code** [1] - 25:13
**cold** [3] - 11:2, 11:8, 11:14
**COLIN** [1] - 2:2
**Colin** [2] - 3:16, 16:10
**colleague** [5] - 3:10, 16:6, 29:7, 45:4, 54:5
**colleagues** [1] - 61:16
**collect** [15] - 17:4, 17:7, 21:21, 21:22, 22:1, 22:20, 24:4, 26:17, 29:16, 31:22, 73:19, 73:24, 74:3, 74:8, 74:19
**collected** [4] - 37:17, 59:7, 61:24, 74:21
**collecting** [5] - 13:6, 29:24, 61:20, 62:1, 74:10
**collection** [10] - 7:10, 19:14, 29:3, 30:15, 37:18, 37:23, 42:15, 43:5, 61:18, 73:21
**collections** [3] - 5:2, 15:7, 74:5
**collects** [3] - 18:14, 61:24, 74:16
**colloquy** [1] - 66:13
**Columbia** [2] - 2:12, 76:13
**COLUMBIA** [2] - 1:1, 2:7
**committed** [1] - 51:15
**compared** [2] - 17:17, 74:1
**compensation** [1] - 65:5
**complaint** [2] - 28:21, 69:13
**complete** [1] - 76:6
**completed** [3] - 37:15, 61:7, 61:19
**completely** [3] - 8:5, 11:6, 28:15
**compliance** [2] - 64:2, 64:8
**complied** [2] - 15:9, 74:14
**comply** [2] - 69:21, 70:13
**computing** [1] - 11:13
**conceded** [1] - 58:15
**concedes** [1] - 70:8
**conceivable** [1] - 72:17
**concern** [4] - 31:10, 41:13, 47:21, 60:3
**concerned** [1] - 28:19
**concession** [2] - 54:24, 55:1
**concluded** [1] - 75:11
**conclusory** [1] - 58:20
**concrete** [1] - 46:12
**Condition** [1] - 68:2
**condition** [1] - 74:6
**conduct** [5] - 17:10, 29:15, 71:11, 72:3, 74:4
**conducted** [8] - 7:21, 58:25, 59:2, 61:23, 62:6, 67:2, 68:3, 74:21
**conducting** [2] - 59:9, 59:11
**confer** [1] - 59:23
**conferred** [1] - 4:10
**confers** [2] - 60:1, 64:25
**confess** [1] - 65:25
**confidential** [1] - 10:21
**conflict** [1] - 43:3
**confounding** [1] - 27:5
**confusing** [1] - 38:24
**confusion** [1] - 37:13
**Congress** [15] - 4:25, 5:5, 31:11, 46:8, 47:2, 48:7, 48:14, 48:16, 48:24, 56:17, 56:19, 63:5, 63:8, 63:9, 72:24
**congressional** [1] - 67:22
**Congressional** [1] - 67:23
**congressionally** [1] - 30:15
**connected** [1] - 41:7
**connection** [3] - 50:2, 51:22, 52:20
**consider** [1] - 68:17
**consideration** [2] - 6:9, 70:5
**considering** [2] - 9:23, 68:15
**consistent** [3] - 21:7, 63:24, 64:13
**consisting** [1] - 28:20
**constitutes** [1] - 76:4
**Constitution** [2] - 2:12, 76:14
**Consumer** [1] - 39:3
**consumers** [2] - 48:10, 48:13
**CONT'D** [1] - 2:1
**contained** [1] - 67:9
**contemporary** [1] - 44:3
**context** [1] - 24:15
**continuation** [1] - 67:12
**continue** [7] - 16:16, 17:3, 17:5, 22:12, 24:4, 40:17, 40:18
**continued** [2] - 13:2, 17:11
**continuing** [3] - 17:20, 42:11, 66:25

**contract** [24] - 15:16, 19:18, 23:9, 23:13, 24:3, 25:24, 29:1, 32:1, 36:17, 36:18, 40:5, 40:12, 40:15, 41:7, 46:3, 46:23, 47:3, 47:4, 47:7, 47:9, 49:18, 67:2, 69:9
**contracting** [3] - 26:6, 28:10, 69:4
**contractors** [4] - 22:3, 22:18, 32:7, 47:13
**contracts** [37] - 15:12, 19:13, 22:23, 23:4, 23:5, 23:9, 23:22, 24:2, 24:24, 25:16, 30:17, 30:18, 31:7, 34:4, 34:21, 35:4, 38:8, 40:25, 46:2, 50:3, 51:16, 51:18, 51:23, 52:1, 52:21, 53:12, 57:3, 63:1, 63:11, 65:6, 65:7, 65:8, 71:1, 73:20, 74:7
**contradiction** [1] - 45:18
**contrary** [2] - 36:25, 69:23
**contravention** [1] - 62:23
**conversation** [1] - 15:19
**core** [1] - 45:8
**correct** [9] - 9:7, 11:10, 15:3, 20:15, 24:7, 27:14, 37:12, 56:21, 56:22
**correction** [1] - 28:23
**cost** [3] - 51:18, 65:13, 73:1
**costs** [1] - 5:12
**Council** [2] - 3:17, 16:12
**council** [2] - 18:9, 19:11
**counsel** [4] - 3:11, 4:10, 60:1, 64:25
**couple** [6] - 11:19, 24:13, 28:1, 52:10, 70:18, 74:18
**course** [7] - 40:16, 41:10, 60:9, 63:19, 71:18, 71:20, 72:4
**Court** [53] - 2:11, 2:11, 4:19, 8:14, 8:15, 11:17, 16:4, 21:18, 21:25, 22:4, 23:1, 31:24, 34:12, 36:22, 37:14, 39:6, 39:20, 43:24, 45:3, 45:11, 45:19, 45:22, 46:3, 46:22, 47:5, 48:12, 48:14, 52:5, 53:15, 54:12, 54:19, 55:8, 57:4, 59:15, 60:9, 60:10, 61:9, 61:22, 62:15, 64:7, 64:11, 65:2, 65:3, 65:4, 65:5, 65:9, 65:18, 69:17, 73:7, 76:12, 76:13
**court** [4] - 3:15, 26:16, 41:21, 66:4
**COURT** [131] - 1:1, 3:13, 3:19, 3:22, 3:25, 4:4, 4:17, 4:20, 4:23, 5:22, 6:13, 6:15, 7:5, 7:16, 7:22, 8:13, 9:1, 9:4, 10:4, 11:7, 11:15, 11:18, 12:1, 12:14, 13:13, 14:2, 14:6, 14:10, 14:23, 15:1, 16:1, 16:3, 16:7, 16:9, 17:1, 17:25, 18:7, 19:3, 19:6, 19:8, 20:13, 20:17, 20:21, 21:6, 21:10, 22:8, 22:21, 23:11, 24:7, 26:7, 26:19, 27:13, 27:16, 27:20, 27:23, 28:17, 29:10, 30:13, 31:5, 32:11, 32:14, 32:22, 32:24, 34:16, 35:2, 35:22, 37:25, 38:12, 40:9, 40:16, 41:23, 43:17, 44:19, 44:22, 44:24, 46:14, 46:24, 47:11, 47:19, 47:21, 48:25, 50:4, 50:12, 51:3, 51:24, 52:8, 52:22, 53:6, 53:11, 53:17, 53:24, 54:4, 54:7, 54:10, 55:17, 56:21, 57:7, 57:10, 58:2, 59:17, 59:24, 60:14, 60:23, 61:16, 62:8, 63:4, 63:16, 64:1, 64:15, 64:18, 64:21, 64:24, 65:10, 65:17, 65:20, 66:2, 66:8, 66:10, 66:16, 66:20, 68:16, 70:17, 70:20, 70:25, 72:8, 73:8, 73:13, 73:17, 74:24, 75:3, 75:9
**court's** [1] - 35:24
**Court's** [12] - 41:5, 45:2, 45:8, 45:13, 45:18, 45:24, 48:5, 49:11, 49:14, 49:23, 60:20, 72:21
**COURTROOM** [1] - 3:1
**courts** [4] - 20:24, 28:23, 30:9, 31:8
**covered** [1] - 40:23
**create** [1] - 17:14
**created** [5] - 46:8, 47:2, 48:7, 48:15, 48:17
**critical** [2] - 17:11, 51:17
**cross** [1] - 74:10
**cross-tabulating** [1] - 74:10
**CRR** [3] - 2:10, 76:3, 76:12
**CSRA** [3] - 48:17, 49:18, 53:10
**cure** [1] - 23:25
**current** [5] - 21:23, 42:23, 52:1, 63:8, 66:5
**cut** [5] - 11:6, 12:11, 19:15, 19:17, 38:9
**cycle** [3] - 74:21, 74:25

## D

**D.C** [17] - 1:7, 1:15, 1:25, 2:9, 2:13, 8:16, 13:3, 20:24, 21:8, 32:18, 32:20, 33:4, 33:25, 34:11, 44:3, 66:3, 76:14
**damages** [1] - 20:10
**data** [86] - 5:2, 5:3, 5:20, 6:3, 6:24, 8:2, 9:25, 10:18, 10:24, 11:3, 12:4, 12:19, 12:23, 12:25, 13:6, 15:7, 15:8, 15:11, 16:18, 16:20, 16:21, 17:5, 17:7, 17:10, 18:12, 18:14, 18:15, 18:20, 18:22, 19:14, 20:1, 21:21, 21:22, 22:1, 22:11, 22:20, 24:4, 24:17, 25:6, 25:11, 25:14, 26:10, 26:14, 26:17, 26:19, 26:24, 27:4, 27:6, 27:9, 28:3, 28:7, 28:15, 28:16, 29:3, 29:16, 29:25, 30:15, 30:19, 31:15, 35:14, 37:17, 41:6, 49:25, 50:10, 51:20, 52:11, 56:6, 59:7, 61:18, 61:20, 61:23, 61:24, 61:25, 62:1, 62:2, 69:3, 69:4, 73:21, 73:24, 73:25, 74:4, 74:5, 74:9, 74:19
**Data** [1] - 17:15
**database** [1] - 74:15
**date** [3] - 7:8, 35:7
**Dated** [1] - 76:10
**dates** [3] - 7:9, 7:10, 24:9
**day-to-day** [2] - 9:14, 45:20
**daylight** [2] - 35:20, 60:25
**days** [3] - 7:2, 30:16, 51:7
**deadline** [8] - 7:16, 7:18, 7:20, 25:9, 37:22, 37:23, 71:12, 71:13
**deadlines** [3] - 70:18, 70:20, 74:17
**deadliness** [1] - 56:18
**decide** [1] - 41:11
**decided** [2] - 52:6, 72:18
**deciding** [1] - 38:25
**decision** [2] - 8:16, 48:5
**decisionmaking** [1] - 38:11
**decisions** [1] - 38:16
**declarant** [1] - 6:19
**declarants** [1] - 12:24
**declaration** [9] - 6:7, 11:12, 13:21, 14:15, 14:21, 15:20, 25:3, 50:19, 70:7
**declarations** [11] - 9:12, 13:11, 13:24, 15:14, 22:22, 50:12, 50:15, 50:20, 51:3, 51:13, 58:3
**declare** [1] - 21:19
**DEFENDANTS** [1] - 2:6
**Defendants** [25] - 1:8, 1:16, 5:9, 16:18, 16:21, 17:22, 17:23, 20:3, 21:19, 21:25, 22:11, 24:16, 25:10, 28:8, 30:14, 30:16, 30:19, 34:2, 34:3, 34:5, 36:13, 36:25, 69:25, 74:14
**Defendants'** [7] - 16:17, 17:4, 17:18, 18:11, 27:8, 29:14, 55:12
**DEFENSE** [1] - 2:2
**define** [1] - 71:7
**defined** [1] - 43:10
**defines** [1] - 71:6
**delay** [1] - 28:15
**deliver** [2] - 56:6
**delivering** [1] - 56:12
**democratically** [1] - 63:22
**demonstrate** [2] - 52:17, 53:4
**demonstrated** [1] - 49:21
**denied** [1] - 45:6
**denying** [1] - 16:21
**DEPARTMENT** [1] - 1:15
**Department** [42] - 3:5, 15:9, 21:16, 22:19, 22:24, 23:22, 30:10, 30:25, 32:7, 32:8, 37:13, 38:22, 45:10, 47:14, 47:22, 47:23, 47:25, 48:3, 49:24, 50:1, 50:8, 50:10, 51:15, 51:21, 52:19, 54:22, 55:7, 55:12, 56:5, 56:11, 56:14, 57:17, 58:17, 59:8, 59:11, 59:12, 60:6, 60:7, 61:9, 62:20, 62:23, 62:25
**Department's** [2] - 52:15, 64:12
**dependent** [1] - 65:2
**deprivations** [1] - 43:14
**DEPUTY** [1] - 3:1
**derided** [1] - 42:7
**describe** [1] - 34:20
**describes** [1] - 56:7
**describing** [2] - 38:14, 61:17
**determination** [1] - 63:22
**devastating** [1] - 9:13
**develop** [1] - 60:22
**difference** [6] - 30:5, 38:4, 39:11, 42:13, 43:4, 71:9
**different** [9] - 11:13, 14:6, 31:7, 36:3, 36:9, 46:20, 48:1, 62:2, 72:15

**difficult** [2] - 22:16, 39:23
**difficulties** [1] - 15:15
**Dimitar** [2] - 4:3, 45:4
**DIMITAR** [1] - 2:6
**direct** [2] - 12:7, 44:9
**directed** [2] - 67:11, 67:23
**direction** [2] - 46:20, 63:23
**directive** [1] - 63:24
**directly** [4] - 15:21, 45:17, 48:14, 66:13
**disagree** [2] - 42:4, 45:10
**disagreeing** [1] - 50:4
**disagreements** [2] - 30:10, 62:16
**discern** [1] - 44:16
**disclose** [1] - 18:11
**discontinuations** [1] - 43:14
**discrete** [7] - 31:9, 31:14, 34:6, 34:7, 34:8, 34:16, 35:1
**discretion** [11] - 54:23, 56:5, 56:14, 56:22, 57:17, 58:16, 60:6, 62:24, 72:3, 72:21, 73:7
**discussing** [5] - 28:6, 45:9, 45:14, 46:1, 46:10
**discussion** [3] - 44:17, 55:3, 55:14
**dismantling** [1] - 55:12
**dispositive** [3] - 33:10, 71:12, 71:13
**dispute** [4] - 20:4, 50:19, 50:22, 75:5
**disputing** [4] - 51:11, 52:3, 52:10, 53:1
**disrupted** [1] - 27:7
**disruptions** [1] - 27:7
**disseminate** [6] - 22:1, 24:4, 31:23, 73:24, 74:4, 74:9
**disseminated** [2] - 8:15, 68:11
**disseminating** [3] - 29:25, 56:8, 73:25
**dissent** [1] - 43:2
**distinction** [1] - 72:7
**distinguished** [1] - 21:1
**distinguishes** [2] - 43:16, 71:24
**DISTRICT** [4] - 1:1, 1:1, 1:19, 2:7
**District** [4] - 2:11, 2:12, 48:14, 76:13
**district** [1] - 76:13
**districts** [1] - 17:16
**diversion** [1] - 21:2
**Diversity** [1] - 20:25
**divert** [1] - 73:2
**DIVISION** [1] - 2:8
**doctor** [1] - 6:13
**done** [8] - 8:9, 8:12, 24:11, 28:14, 62:7, 64:2, 68:5
**doubt** [1] - 17:8
**down** [5] - 24:9, 33:9, 41:1, 45:22, 49:17
**Dr** [10] - 6:7, 11:11, 14:15, 15:4, 15:13, 15:20, 16:1, 16:2
**due** [3] - 7:22, 24:9, 24:13
**duties** [8] - 22:2, 24:16, 29:15, 30:12, 30:23, 45:16, 49:13, 69:21
**duty** [2] - 30:2, 40:14

## E

**E-C-L-S** [1] - 14:19
**early** [3] - 14:16, 25:4, 25:8
**earmarked** [1] - 63:5
**easier** [1] - 14:13
**ECF** [2] - 55:9, 62:18
**ECLS** [1] - 14:18
**ECLS-K** [1] - 14:18
**Economic** [1] - 19:16
**EDFacts** [4] - 19:12, 37:25, 38:5, 74:15
**EDUCATION** [3] - 1:3, 1:11, 1:15
**Education** [21] - 3:2, 3:4, 3:5, 3:17, 3:18, 5:1, 5:19, 16:11, 16:12, 17:15, 38:22, 47:22, 47:23, 49:25, 50:2, 50:8, 51:15, 51:22, 59:8, 68:2, 68:7
**education** [7] - 5:12, 13:17, 17:12, 19:24, 73:25, 74:6, 74:10
**educational** [4] - 20:3, 67:1, 67:19, 74:1
**Educational** [7] - 5:16, 17:14, 19:12, 35:11, 67:6, 67:12, 69:1
**EDUCATIONAL** [1] - 2:2
**Edwards** [1] - 76:12
**EDWARDS** [2] - 2:10, 76:3
**effect** [1] - 6:12
**effectively** [3] - 12:5, 15:22, 73:6
**effectuate** [1] - 47:14
**efficiencies** [1] - 51:19
**either** [5] - 11:1, 26:10, 28:14, 42:1, 65:14
**elected** [1] - 63:23
**element** [1] - 62:13
**elements** [1] - 9:7
**elimination** [1] - 35:8
**elsewhere** [1] - 31:11
**email** [2] - 68:20, 70:7
**emails** [1] - 51:6
**employee** [1] - 30:20
**employees** [19] - 11:9, 21:17, 22:9, 38:15, 38:21, 46:7, 47:13, 47:23, 47:25, 48:15, 48:16, 48:18, 59:10, 63:2, 65:4, 65:13, 72:11, 72:16
**employees'** [1] - 38:18
**employment** [4] - 46:6, 46:8, 48:18, 48:23
**end** [8] - 6:3, 9:20, 25:19, 35:23, 36:7, 36:16, 63:14, 63:16
**ended** [1] - 38:25
**ending** [2] - 17:24, 68:22
**engage** [1] - 36:4
**ensure** [2] - 25:12, 27:2
**entailed** [1] - 35:8
**entire** [2] - 9:21, 28:20
**entirely** [2] - 61:7, 61:14
**entitlement** [1] - 13:7
**entity** [1] - 9:15
**envisioning** [1] - 65:10
**EO** [1] - 64:1
**EPA** [2] - 33:3, 65:24
**equities** [1] - 16:24
**Erika** [2] - 3:20, 3:24
**ERIKA** [1] - 2:6
**especially** [1] - 28:15
**ESQ** [5] - 1:23, 1:23, 2:2, 2:6, 2:6
**ESRA** [1] - 47:18
**essentially** [5] - 23:13, 23:14, 33:8, 46:3, 47:14
**establish** [5] - 46:12, 56:4, 58:11, 59:4, 62:5
**established** [5] - 54:20, 57:19, 58:18, 60:18, 60:19
**establishing** [2] - 54:16, 67:5
**et** [8] - 1:4, 1:7, 1:12, 1:15, 3:3, 3:4, 3:5
**ethnicity** [1] - 74:12
**evaluation** [1] - 5:14
**Evans** [2] - 14:21, 14:23
**ever-changing** [2] - 42:7, 42:9
**ever-expanding** [1] - 42:11
**evidence** [9] - 5:7, 5:8, 36:25, 38:7, 52:22, 55:24, 61:19, 62:9
**evident** [1] - 61:22
**evolving** [1] - 42:11
**exact** [4] - 12:6, 59:10, 68:10, 68:25
**exactly** [6] - 30:21, 42:24, 48:19, 58:13, 59:9, 68:4
**example** [11] - 7:11, 9:20, 18:21, 23:24, 25:1, 25:21, 28:2, 39:3, 56:7, 58:14, 71:21
**except** [2] - 10:20, 38:16
**excluded** [1] - 48:10
**executive** [9] - 31:12, 34:18, 34:19, 62:16, 63:14, 63:19, 63:20, 63:21, 64:14
**Exhibit** [3] - 19:4, 25:3, 25:4
**exhibits** [1] - 25:2
**exist** [2] - 5:1, 47:22
**exists** [2] - 41:21, 47:23
**expand** [1] - 69:3
**expanding** [1] - 42:11
**expect** [1] - 42:25
**expeditious** [1] - 56:13
**expending** [1] - 63:13
**expensive** [1] - 11:8
**explained** [8] - 6:6, 6:7, 6:19, 11:13, 12:21, 12:23, 12:25, 43:2
**explaining** [4] - 9:13, 9:19, 10:17, 32:18
**explicitly** [2] - 13:10, 34:18
**extent** [7] - 4:14, 10:20, 31:8, 41:2, 64:6, 71:8, 74:11
**extraordinary** [1] - 58:22

## F

**F.3d** [2] - 32:23, 33:4
**fact** [14] - 9:24, 12:11, 13:5, 33:7, 34:1, 35:17, 37:3, 39:16, 46:21, 47:25, 50:17, 54:16, 55:15, 70:3
**factor** [1] - 9:2
**factors** [3] - 4:15, 70:4, 73:4
**facts** [12] - 9:8, 9:9, 50:19, 50:22, 51:11, 51:12, 52:4, 53:1, 70:2, 75:5, 75:6
**fail** [1] - 30:1
**failing** [6] - 17:4, 21:22, 29:20, 31:15, 31:16, 32:3
**failure** [6] - 17:6, 18:11, 29:14, 69:21, 71:14
**failure-to-act** [1] - 71:14
**fair** [2] - 7:8, 34:20
**fall** [3] - 26:8, 31:13, 45:17
**falls** [1] - 13:18
**far** [2] - 17:6, 41:8
**fashion** [3] - 56:8, 56:9, 56:13
**favors** [2] - 16:24, 17:9
**fears** [1] - 51:1
**feasible** [2] - 40:22, 74:11
**February** [7] - 7:1,

18:25, 19:15, 30:17, 35:4, 38:1, 38:2
**FEC** [1] - 13:4
**Federal** [4] - 23:1, 46:4, 47:5, 53:16
**federal** [7] - 23:6, 30:9, 39:14, 46:6, 48:17, 48:18, 48:22
**fees** [1] - 73:20
**felt** [1] - 6:1
**few** [1] - 65:23
**field** [1] - 26:3
**fields** [1] - 18:24
**Fifth** [1] - 2:4
**filed** [1] - 69:17
**files** [1] - 25:13
**final** [16] - 49:8, 49:22, 52:17, 52:24, 53:4, 53:7, 53:12, 53:18, 53:19, 57:4, 57:10, 57:16, 58:7, 68:17, 71:20
**finalize** [1] - 26:4
**finally** [1] - 17:22
**FINANCE** [1] - 1:3
**Finance** [1] - 3:3
**financial** [3] - 18:16, 72:12, 73:20
**fine** [2] - 4:21, 40:21
**finished** [1] - 37:20
**first** [9] - 12:2, 18:8, 18:13, 21:18, 23:16, 25:6, 38:9, 60:13, 72:10
**fiscal** [4] - 63:8, 63:12, 63:14, 63:17
**five** [2] - 7:2, 67:7
**five-year** [1] - 67:7
**flaws** [1] - 28:20
**flick** [1] - 10:3
**flip** [1] - 14:12
**flipped** [1] - 71:8
**Floor** [1] - 2:4
**FLSA** [1] - 46:14
**focused** [2] - 13:17, 57:7
**folks** [2] - 3:13, 75:9
**Footnote** [2] - 42:5, 42:10
**FOR** [6] - 1:1, 1:3, 1:23, 2:2, 2:6, 2:7
**force** [2] - 37:3, 46:6
**foregoing** [1] - 76:4
**foreign** [1] - 74:2
**forever** [2] - 17:7, 26:14
**forget** [1] - 68:24
**form** [3] - 18:16, 21:2, 39:21
**forth** [1] - 70:1
**forum** [1] - 49:10
**four** [8] - 7:19, 7:21, 34:25, 35:15, 37:22, 61:10, 74:22, 74:25
**four-year** [1] - 74:25
**Friends** [1] - 21:8
**friends** [4] - 55:4, 55:14, 56:18, 58:25
**front** [3] - 52:23, 75:1, 75:2
**Fuel** [4] - 33:3, 33:6, 33:11, 65:24
**fulfill** [7] - 30:4, 30:5, 30:12, 31:20, 31:25, 40:13, 73:2
**fulfilling** [1] - 40:14
**full** [3] - 51:4, 57:25, 76:5
**fully** [1] - 60:22
**functioning** [1] - 33:10
**functions** [1] - 51:25
**FUND** [1] - 2:3
**funding** [1] - 21:14
**funds** [8] - 5:5, 63:1, 63:3, 63:5, 63:8, 63:13, 63:15, 72:23
**future** [6] - 17:6, 24:18, 42:17, 61:6, 61:15, 71:11

**G**

**G-E-E** [1] - 6:14
**gain** [1] - 51:18
**GEE** [1] - 14:15
**Gee** [4] - 6:7, 14:23, 15:20, 16:2
**gee** [2] - 6:14, 14:15
**gender** [1] - 74:11
**general** [1] - 11:1
**generally** [4] - 16:19, 26:23, 44:15, 74:16
**GEORGIEV** [23] - 2:6, 4:2, 54:12, 56:2, 56:24, 57:9, 57:15, 58:9, 59:22, 59:25, 60:17, 61:5, 61:21, 62:12, 63:7, 63:19, 64:6, 64:17, 64:19, 64:23, 64:25, 65:15, 65:18
**Georgiev** [1] - 4:3
**GEORGIEV-REMMEL** [23] - 2:6, 4:2, 54:12, 56:2, 56:24, 57:9, 57:15, 58:9, 59:22, 59:25, 60:17, 61:5, 61:21, 62:12, 63:7, 63:19, 64:6, 64:17, 64:19, 64:23, 64:25, 65:15, 65:18
**germane** [2] - 19:22, 20:1
**given** [5] - 6:10, 36:22, 39:23, 42:23, 52:22
**goals** [1] - 73:3
**government** [20] - 10:1, 13:5, 13:12, 30:3, 31:10, 37:7, 39:16, 39:24, 40:2, 40:17, 41:2, 41:9, 41:11, 41:19, 42:1, 43:22, 47:5, 62:14, 72:13, 72:18
**Government** [5] - 3:21, 14:18, 23:14, 34:17, 44:20
**government's** [2] - 12:8, 40:21
**Government's** [1] - 9:5
**governs** [1] - 68:24
**grant** [5] - 6:8, 6:10, 6:16, 62:24, 65:10
**granted** [3] - 44:2, 44:12, 56:20
**granting** [2] - 44:6, 58:16
**grants** [1] - 5:15
**great** [2] - 16:7, 66:20
**greater** [1] - 33:9
**grounded** [1] - 37:3
**Group** [1] - 3:9
**guess** [4] - 9:1, 28:18, 60:24, 62:8
**guidance** [1] - 42:25

**H**

**H1896** [1] - 67:23
**halls** [1] - 31:12
**halted** [7] - 5:9, 6:6, 6:22, 15:22, 15:24, 67:1, 67:3
**hand** [2] - 49:6, 49:7
**handle** [3] - 27:16, 27:20, 31:9
**handled** [1] - 23:1
**happy** [3] - 4:18, 29:8, 75:2
**hard** [2] - 8:4, 58:7
**harm** [33] - 8:5, 8:22, 9:6, 9:11, 13:2, 16:14, 16:22, 17:5, 17:23, 18:4, 21:3, 27:12, 27:14, 28:7, 28:11, 38:13, 44:10, 44:14, 44:16, 50:13, 54:17, 54:21, 58:12, 58:13, 60:10, 60:12, 60:20, 61:1, 61:3, 62:22, 62:25, 64:9, 72:19
**harmed** [10] - 15:21, 17:2, 17:3, 17:22, 18:10, 27:10, 28:1, 39:19, 44:7, 75:7
**harming** [2] - 25:19, 40:2
**harms** [8] - 9:19, 15:19, 18:1, 21:23, 50:16, 50:25, 59:20, 62:14
**Harris** [1] - 15:13
**heads** [1] - 63:17
**hear** [10] - 27:18, 29:11, 31:5, 44:19, 54:4, 54:8, 58:2, 59:2, 60:3, 60:24
**heard** [3] - 55:19, 58:21, 59:6
**hearing** [1] - 4:5
**HEARING** [1] - 1:18
**held** [1] - 45:11
**help** [1] - 47:16
**helpful** [2] - 54:13, 55:3
**helping** [2] - 47:12, 47:13
**hereby** [1] - 76:3
**high** [5] - 18:23, 19:23, 20:1, 20:2, 28:4
**High** [1] - 13:18
**high-quality** [3] - 19:23, 20:1, 20:2
**Higher** [1] - 5:19
**higher** [1] - 13:17
**highest** [1] - 27:2
**hire** [3] - 32:6, 37:6
**Ho** [3] - 17:13, 17:19, 19:10
**Honor** [33] - 3:1, 3:8, 3:14, 3:20, 4:3, 4:9, 4:22, 18:3, 20:16, 20:20, 23:25, 24:14, 27:15, 27:19, 27:24, 30:24, 40:20, 42:4, 44:25, 45:7, 48:6, 50:18, 52:2, 54:2, 56:25, 58:10, 60:2, 60:4, 66:7, 66:12, 66:14, 68:19, 70:22
**Honor's** [3] - 32:9, 55:14, 60:3
**HONORABLE** [1] - 1:19
**host** [1] - 42:1
**hundreds** [2] - 21:17, 58:3

**I**

**identifiable** [1] - 10:21
**identified** [1] - 28:25
**identify** [4] - 3:7, 13:25, 55:4, 57:4
**identifying** [1] - 32:2
**IES** [7] - 5:5, 17:10, 24:21, 30:20, 35:9, 73:18
**IES's** [2] - 19:25, 30:17
**IHEP** [14] - 5:18, 9:14, 9:20, 11:5, 11:7, 12:4, 12:17, 12:24, 13:14, 13:16, 13:17, 13:21, 15:5
**illegal** [1] - 17:24
**illustrative** [1] - 33:7
**imagine** [3] - 9:4, 46:19, 65:15
**immediately** [1] - 38:15
**imminence** [1] - 8:21
**imminent** [1] - 28:7
**impact** [4] - 5:25, 6:2, 9:13, 42:17
**impacts** [1] - 33:18
**impermissibly** [1] - 59:20
**implementation** [1] - 64:12
**implemented** [1] - 39:17
**implicate** [1] - 41:12
**implicates** [1] - 41:14
**implicating** [1] - 29:4
**important** [1] - 26:22
**impossible** [1] - 11:9
**impression** [1] - 60:14
**improper** [1] - 35:18
**improve** [3] - 19:24, 20:2, 26:4
**improvement** [2] - 17:11, 19:19
**inability** [3] - 6:11, 6:23, 8:21
**inaction** [4] - 71:1, 71:4, 71:7, 71:22
**INC** [2] - 1:4, 2:3

**inclined** [1] - 39:20
**included** [1] - 50:19
**includes** [1] - 5:11
**including** [9] - 10:19, 13:4, 16:19, 20:25, 21:8, 23:7, 68:25, 73:25, 74:10
**incorporated** [1] - 67:10
**incorrect** [1] - 63:6
**indefinitely** [1] - 5:20
**independent** [3] - 46:17, 46:18, 54:18
**individual** [19] - 10:25, 13:24, 20:6, 20:9, 20:12, 28:21, 29:5, 29:13, 38:16, 42:16, 43:7, 43:19, 43:20, 55:5, 57:1, 57:2, 59:9, 63:10, 69:10
**individually** [2] - 35:16, 43:5
**individuals** [5] - 20:18, 39:19, 59:7, 61:25, 62:2
**inequitable** [1] - 40:1
**information** [12] - 9:22, 10:7, 10:21, 15:10, 55:21, 56:8, 56:13, 60:4, 68:11, 73:19, 74:11, 75:1
**informational** [13] - 13:3, 13:4, 16:16, 16:22, 18:4, 20:14, 20:17, 20:18, 21:3, 21:5, 60:15, 60:17, 61:3
**informed** [2] - 18:25, 19:1
**inhibit** [2] - 62:19, 64:11
**INJUNCTION** [1] - 1:18
**injunction** [23] - 4:6, 4:16, 17:9, 17:23, 27:12, 36:10, 52:6, 56:3, 57:21, 58:22, 58:23, 59:16, 59:18, 59:20, 60:5, 60:10, 60:13, 61:8, 62:13, 62:19, 64:11, 65:3, 65:11
**injunctions** [1] - 22:17
**injunctive** [2] - 20:8, 45:5
**injured** [1] - 42:15
**injuries** [2] - 21:11, 46:18
**injury** [25] - 4:12, 8:17, 8:18, 8:23, 12:9, 13:3, 13:4, 16:5, 16:16, 20:14, 20:17, 20:18, 21:5, 21:16, 24:12, 24:15, 46:13, 54:16, 58:4, 60:15, 60:17, 60:25, 61:4, 72:12, 72:17
**installing** [1] - 11:8
**instance** [3] - 17:13, 60:13, 61:18
**Institute** [6] - 5:1, 5:19, 18:13, 45:10, 51:16, 62:20
**institutes** [2] - 64:4, 64:13
**institutional** [1] - 22:19
**instruction** [1] - 25:14
**instructive** [2] - 48:6, 48:16
**interest** [3] - 16:14, 17:8, 72:20
**interested** [1] - 24:8
**interests** [1] - 19:21
**internet** [1] - 15:10
**interrupted** [1] - 7:6
**intervention** [1] - 60:21
**involved** [1] - 51:17
**irreparable** [16] - 4:12, 8:18, 9:6, 9:18, 16:5, 16:14, 27:14, 28:11, 54:17, 54:21, 58:12, 58:13, 60:12, 60:20, 61:1, 61:2
**irreparably** [2] - 28:1, 75:7
**irreplaceable** [1] - 12:25
**issue** [14] - 9:16, 23:10, 32:12, 33:15, 33:25, 42:6, 58:22, 59:15, 59:18, 63:20, 66:3, 72:8, 72:10, 72:21
**issued** [1] - 71:2
**issues** [6] - 4:19, 9:23, 31:9, 45:1, 52:7, 60:22
**issuing** [1] - 60:5
**it'd** [1] - 53:22
**items** [1] - 35:15
**itself** [6] - 12:20, 15:10, 40:6, 40:25, 67:7, 71:22

## J

**Jackson** [2] - 38:19, 38:25
**jewell** [1] - 21:9
**job** [1] - 40:9
**joined** [1] - 3:10
**Judge** [3] - 38:19, 38:24, 43:1
**JUDGE** [1] - 1:19
**judges** [1] - 40:11
**judicial** [1] - 73:6
**judiciary** [1] - 30:9
**July** [1] - 67:8
**June** [6] - 6:2, 11:5, 50:6, 52:10, 68:3, 68:22
**jurisdiction** [1] - 41:5
**jurisdictional** [3] - 53:8, 53:14, 53:22
**Justice** [3] - 41:23, 42:6, 43:8
**JUSTICE** [1] - 1:24

## K

**keep** [1] - 46:17
**keeps** [1] - 49:5
**Kerry** [2] - 32:20, 65:23
**key** [1] - 30:4
**kind** [24] - 5:24, 9:18, 20:21, 22:25, 24:12, 25:18, 27:25, 28:6, 32:15, 33:7, 34:8, 34:22, 41:12, 43:11, 44:3, 45:17, 45:20, 48:25, 49:13, 51:1, 59:19, 59:21, 66:4, 70:25
**kindergarten** [3] - 14:17, 25:7, 25:23
**kinds** [1] - 43:10
**knowledge** [1] - 22:20
**Kurlaender** [1] - 15:13
**KURLAENDER** [1] - 15:14

## L

**lab** [2] - 15:8, 15:11
**Laboratories** [3] - 5:16, 35:11, 67:6
**Laboratory** [1] - 67:13
**lack** [4] - 21:20, 39:23, 71:13, 75:5
**laid** [5] - 28:22, 48:24, 52:7, 53:1, 53:23
**land** [1] - 43:20
**lane** [1] - 21:17
**language** [1] - 68:13
**largely** [2] - 46:10, 50:25
**last** [7] - 3:23, 7:13, 7:19, 19:3, 35:13, 44:22, 66:10
**lastly** [1] - 46:9
**late** [1] - 8:4
**Law** [2] - 39:3, 39:4
**law** [5] - 39:18, 42:25, 64:2, 64:8, 69:23
**lawful** [1] - 36:20
**laws** [3] - 4:25, 39:15, 69:14
**lawsuit** [2] - 55:10, 69:15
**lawsuits** [1] - 69:17
**lead** [2] - 38:24, 62:5
**League** [1] - 9:16
**learned** [1] - 25:22
**least** [4] - 6:25, 49:24, 52:18, 68:13
**leaves** [3] - 56:5, 56:14, 60:6
**leaving** [1] - 19:20
**left** [2] - 56:10, 70:10
**legal** [1] - 36:18
**LEGAL** [1] - 2:2
**Legion** [1] - 34:1
**less** [2] - 64:5, 74:22
**level** [4] - 22:5, 22:6, 27:2
**license** [15] - 6:20, 6:21, 11:1, 11:2, 11:4, 11:5, 12:4, 12:5, 12:10, 15:21, 18:24, 18:25, 28:4, 58:21
**licenses** [8] - 5:21, 6:11, 10:25, 43:13, 52:12, 58:15, 58:16, 58:19
**licensing** [1] - 10:24
**likelihood** [2] - 4:13, 58:10
**likely** [2] - 10:2, 71:16
**LINDA** [1] - 1:7
**Lisa** [1] - 76:12
**LISA** [2] - 2:10, 76:3
**list** [1] - 14:13
**listening** [1] - 49:4
**lists** [1] - 43:9
**litigated** [2] - 36:12, 36:15
**Litigation** [1] - 3:9
**logistically** [1] - 22:15
**long-term** [1] - 67:17
**longitudinal** [9] - 14:17, 18:23, 25:5, 25:20, 26:2, 26:21, 28:4, 61:18, 74:5
**look** [7] - 34:9, 34:10, 47:24, 49:9, 55:24, 69:12, 73:9
**looked** [3] - 11:18, 22:22, 65:24
**looking** [7] - 13:13, 21:13, 29:22, 29:23, 30:13, 49:11, 49:16
**looks** [1] - 28:25
**lose** [4] - 50:6, 52:11, 63:18, 71:16
**loss** [1] - 9:13
**lost** [4] - 17:7, 22:23, 26:14, 51:4
**lower** [1] - 66:3
**Lujan** [25] - 28:19, 29:6, 30:3, 31:8, 31:17, 32:14, 32:18, 33:15, 34:7, 34:23, 41:15, 43:11, 43:16, 43:17, 43:19, 43:24, 44:6, 44:8, 45:11, 49:14, 65:22, 66:2, 66:6, 69:7, 69:18
**lumped** [1] - 69:11

## M

**ma'am** [3] - 54:10, 65:22, 66:8
**machete** [2] - 70:15, 70:16
**maintain** [9] - 15:16, 17:4, 21:21, 21:22, 22:1, 22:20, 24:5, 29:17, 30:15
**maintained** [1] - 67:24
**maintaining** [1] - 29:25
**maintenance** [1] - 19:14
**managed** [2] - 45:10, 68:5
**management** [1] - 45:20
**mandate** [3] - 31:25, 71:25, 74:15
**mandated** [10] -

4:25, 5:11, 18:12, 20:1, 30:15, 45:16, 49:13, 68:7, 71:15, 72:5
**mandates** [3] - 22:7, 67:25, 72:1
**mandating** [1] - 67:6
**mandatory** [1] - 29:15
**manner** [3] - 55:22, 56:1, 57:13
**manufacturers** [1] - 48:9
**map** [1] - 14:3
**March** [1] - 19:15
**mass** [2] - 34:3, 35:3
**material** [1] - 9:24
**matter** [4] - 12:12, 46:6, 51:7, 72:2
**McFADDEN** [1] - 1:19
**McMahon** [2] - 1:7, 3:3
**mean** [42] - 11:18, 21:14, 22:22, 23:11, 24:11, 29:1, 30:13, 30:21, 31:5, 31:8, 32:14, 34:17, 36:16, 36:19, 38:13, 38:14, 38:17, 39:18, 39:19, 40:13, 41:9, 42:2, 43:17, 46:14, 46:15, 47:2, 47:11, 47:13, 47:21, 50:15, 50:18, 51:3, 52:13, 52:22, 52:25, 54:20, 60:14, 60:19, 63:4, 64:3, 66:2
**means** [2] - 15:8, 17:7
**meant** [2] - 6:7, 47:16
**measure** [1] - 25:22
**Measurement** [2] - 3:17, 16:12
**mechanism** [1] - 44:2
**meet** [6] - 8:24, 9:10, 9:16, 22:7, 25:9, 54:23
**meets** [1] - 72:6
**Meina** [1] - 32:20
**member** [7] - 11:12, 15:23, 18:21, 19:6, 19:7, 19:10, 20:12
**members** [18] - 6:25, 12:24, 14:23, 16:15, 16:23, 17:6, 17:10, 17:19, 18:5, 18:9, 18:19, 20:7, 20:10, 21:24, 23:5, 23:21, 24:2, 24:6
**members'** [2] - 13:24, 19:25
**mentioned** [5] - 5:22, 13:20, 27:25, 62:15, 70:23
**mere** [1] - 45:12
**merge** [1] - 21:4
**merits** [11] - 4:14, 10:12, 13:7, 50:22, 52:3, 54:3, 57:23, 57:24, 57:25, 58:11, 62:11
**messy** [1] - 30:9
**met** [2] - 9:8, 25:12
**Michael** [1] - 18:21
**micromanaging** [1] - 62:22
**midstream** [1] - 37:20
**might** [6] - 21:15, 21:17, 22:15, 45:15, 46:19, 48:1
**mind** [2] - 59:19, 64:16
**minute** [1] - 29:11
**mismatch** [2] - 21:15, 38:13
**misread** [1] - 62:10
**missing** [1] - 60:16
**mission** [3] - 19:23, 20:2, 51:16
**mitigate** [1] - 64:8
**modern** [1] - 68:12
**moment** [2] - 57:7, 59:22
**monetary** [1] - 62:25
**money** [6] - 20:10, 37:2, 72:14, 72:16, 72:24, 73:1
**months** [4] - 5:6, 15:23, 27:8, 37:7
**moot** [1] - 63:16
**morning** [16] - 3:8, 3:13, 3:14, 3:15, 3:19, 3:20, 3:22, 3:25, 4:2, 4:4, 4:24, 16:10, 44:25, 54:15, 54:24, 55:2
**most** [9] - 4:19, 10:8, 10:9, 55:22, 55:25, 57:13, 57:19, 66:4, 68:12
**motion** [3] - 4:5, 52:6, 65:11
**motions** [1] - 43:2
**motivations** [1] - 33:12
**MR** [106] - 3:8, 3:14, 4:2, 4:9, 4:18, 4:22, 4:24, 6:2, 6:14, 6:16, 7:9, 7:18, 7:24, 8:14, 9:3, 9:7, 10:6, 11:10, 11:16, 11:24, 12:2, 12:16, 13:16, 14:5, 14:9, 14:12, 14:25, 15:3, 16:2, 16:4, 16:8, 16:10, 17:2, 18:3, 18:8, 19:4, 19:7, 19:9, 20:16, 20:20, 20:23, 21:7, 21:18, 22:14, 23:3, 23:16, 24:14, 26:12, 26:21, 27:15, 27:18, 27:22, 27:24, 29:7, 29:12, 30:24, 31:14, 32:13, 32:17, 32:23, 32:25, 34:24, 35:3, 35:23, 38:3, 38:23, 40:10, 40:20, 42:4, 43:24, 44:21, 44:23, 54:12, 56:2, 56:24, 57:9, 57:15, 58:9, 59:22, 59:25, 60:17, 61:5, 61:21, 62:12, 63:7, 63:19, 64:6, 64:17, 64:19, 64:23, 64:25, 65:15, 65:18, 66:12, 66:17, 66:21, 68:19, 70:19, 70:22, 71:5, 72:9, 73:12, 73:14, 73:18, 75:1, 75:4
**MS** [25] - 3:20, 3:24, 44:25, 46:21, 46:25, 47:17, 47:20, 48:5, 49:4, 50:7, 50:18, 51:10, 52:2, 52:15, 52:25, 53:8, 53:14, 53:19, 54:2, 54:6, 54:9, 54:11, 65:25, 66:6, 66:9
**multiple** [1] - 33:20
**must** [15] - 7:21, 8:20, 9:8, 25:11, 25:12, 25:13, 44:9, 47:4, 55:21, 63:1, 63:14, 68:3, 68:11, 70:5

## N

**NAACP** [1] - 2:2
**NAE/NCME** [1] - 2:2
**name** [2] - 3:23, 19:3
**narrowly** [1] - 60:9
**national** [3] - 17:17, 66:25, 67:18
**NATIONAL** [1] - 1:11
**National** [16] - 3:4, 3:16, 3:17, 5:13, 7:11, 16:11, 16:12, 17:13, 18:17, 19:11, 19:16, 24:10, 33:23, 39:3, 68:7, 69:1
**nations** [1] - 74:2
**nature** [2] - 9:19, 26:12
**NCES** [7] - 19:16, 24:20, 24:22, 25:11, 25:21, 74:3, 74:8
**necessarily** [8] - 45:21, 46:23, 47:6, 49:22, 51:11, 65:6, 71:16
**necessary** [4] - 5:5, 19:14, 73:21, 74:5
**need** [19] - 10:22, 11:21, 12:25, 14:3, 14:10, 15:6, 22:2, 22:11, 22:12, 26:10, 31:11, 37:3, 39:8, 40:17, 40:18, 57:24, 59:14, 61:2, 65:7
**needs** [1] - 57:4
**network** [1] - 5:16
**never** [4] - 26:10, 37:19, 37:20, 61:19
**nevertheless** [1] - 45:6
**New** [2] - 2:4
**new** [7] - 5:21, 6:11, 6:20, 15:21, 25:25, 26:1, 30:18
**Newby** [4] - 8:16, 8:17, 9:8, 9:9
**next** [2] - 18:19, 67:4
**nonetheless** [2] - 45:3, 61:1
**nonpartisan** [1] - 9:22
**nonprofit** [1] - 12:11
**normal** [1] - 26:9
**Northwest** [4] - 1:24, 2:8, 2:12, 76:14
**Norton** [6] - 32:18, 41:15, 45:18, 49:15, 66:7, 71:24
**note** [3] - 22:15, 23:20, 55:3
**notes** [1] - 76:5
**nothing** [1] - 54:9
**notice** [1] - 19:2
**NPSAS** [11] - 5:12, 7:11, 12:23, 13:19, 15:4, 18:18, 37:14, 37:16, 67:20, 71:21, 74:18
**nullify** [1] - 73:6
**number** [12] - 5:23, 13:9, 22:9, 22:22, 24:7, 29:24, 31:1, 48:25, 64:20, 64:22, 68:25, 69:5
**numerous** [3] - 13:25, 29:4, 31:7

## O

**O-B-L-E-A** [1] - 3:24
**object** [1] - 12:7
**objections** [1] - 52:13
**objective** [1] - 64:12
**Oblea** [7] - 3:20, 3:22, 3:24, 3:25, 4:1, 44:24, 65:21
**OBLEA** [26] - 2:6, 3:20, 3:24, 44:25, 46:21, 46:25, 47:17, 47:20, 48:5, 49:4, 50:7, 50:18, 51:10, 52:2, 52:15, 52:25, 53:8, 53:14, 53:19, 54:2, 54:6, 54:9, 54:11, 65:25, 66:6, 66:9
**obligation** [3] - 15:9, 30:4, 40:12
**obligations** [3] - 30:6, 54:1, 54:23
**obvious** [1] - 63:21
**obviously** [7] - 9:8, 10:12, 15:5, 46:15, 65:13, 68:4, 72:13
**occur** [3] - 56:10, 61:15
**occurring** [2] - 15:20, 50:14
**OF** [5] - 1:1, 1:11, 1:15, 1:18, 2:7
**OFFICE** [1] - 2:7
**offices** [1] - 35:8
**Official** [1] - 2:11
**official** [1] - 76:12
**often** [1] - 74:22
**once** [1] - 74:22
**one** [33] - 3:23, 6:25, 7:13, 7:20, 8:21, 9:20, 11:7, 14:4, 15:5, 24:1, 24:2, 24:24, 28:1, 28:24, 32:14, 34:5, 35:3, 35:6, 35:15, 35:17, 37:16, 41:4, 43:20, 44:7, 46:1, 49:6, 50:13, 64:23, 66:13, 66:24, 69:2, 69:14, 71:6
**ones** [3] - 53:22,

59:8, 70:23
**ongoing** [1] - 61:17
**open** [1] - 39:22
**operating** [1] - 31:11
**operations** [3] - 9:14, 33:18, 45:20
**opinion** [5] - 39:5, 42:5, 42:18, 43:9, 44:18
**opinions** [1] - 43:4
**opportunity** [1] - 66:15
**opposed** [2] - 20:10, 71:11
**opposite** [1] - 69:4
**order** [22] - 4:19, 21:25, 22:7, 24:1, 24:17, 25:9, 25:10, 25:25, 26:18, 26:24, 27:1, 30:14, 30:16, 31:24, 38:14, 40:24, 41:1, 41:3, 45:15, 45:16, 45:17, 65:9
**ordered** [1] - 23:25
**ordering** [1] - 21:16
**orders** [8] - 34:18, 34:19, 63:20, 64:14, 65:3, 65:4, 65:5
**organization** [4] - 9:21, 12:16, 18:5, 21:4
**organizational** [8] - 8:17, 8:23, 9:5, 9:15, 12:14, 12:18, 13:14, 21:2
**organizations** [4] - 10:25, 19:21, 20:19, 62:17
**organizations'** [1] - 19:22
**otherwise** [2] - 18:9, 18:17
**overlap** [1] - 4:14
**overlaps** [1] - 15:5
**overread** [2] - 32:19, 33:1
**own** [3] - 18:10, 35:16, 69:15

**P**

**P.C** [1] - 1:24
**Pages** [3] - 55:9, 55:10, 62:19
**pages** [1] - 58:3
**paid** [2] - 72:12, 72:13
**panel** [2] - 43:1, 43:2
**papers** [6] - 51:5, 54:14, 55:16, 61:23, 66:23, 69:6
**Paragraph** [1] - 40:24
**Paragraphs** [1] - 69:12
**paraphrased** [1] - 68:10
**part** [6] - 28:11, 30:7, 33:8, 38:9, 44:17, 67:18
**participation** [2] - 20:6, 20:9
**particular** [16] - 4:12, 9:25, 13:17, 26:20, 27:2, 33:6, 44:10, 59:3, 61:12, 64:7, 64:9, 64:19, 64:21, 65:8, 72:3
**particularly** [3] - 5:18, 26:22, 72:22
**parties** [13] - 5:12, 14:17, 46:22, 47:3, 47:10, 54:14, 54:16, 54:22, 54:25, 60:21, 66:14, 67:10, 69:16
**parts** [2] - 45:23, 49:17
**party** [1] - 47:3
**pass** [1] - 10:25
**passed** [1] - 70:21
**past** [2] - 5:6, 58:18
**pause** [2] - 15:21, 36:14
**paused** [2] - 5:20, 19:2
**pay** [2] - 72:18, 72:19
**paying** [1] - 72:14
**peer** [9] - 5:14, 6:5, 6:9, 6:18, 15:24, 51:4, 51:5, 67:15
**pending** [3] - 6:16, 6:17, 7:1
**people** [17] - 14:7, 24:21, 24:22, 27:3, 30:25, 31:1, 31:2, 31:4, 47:6, 47:12, 47:16, 47:24, 48:22, 51:4, 62:21
**per** [4] - 11:22, 11:25, 22:1, 55:20
**percent** [2] - 19:17, 34:5
**perform** [3] - 5:2, 17:17, 19:20
**performance** [2] - 5:10, 19:13
**perhaps** [1] - 64:8
**Perkins** [1] - 67:25
**permits** [7] - 43:19, 44:1, 44:2, 44:6, 44:7, 44:12, 44:13
**permitting** [1] - 44:15
**personal** [1] - 10:21
**personnel** [1] - 59:13
**pick** [1] - 32:12
**Pillard** [1] - 43:1
**pincite** [1] - 33:4
**place** [2] - 10:22, 67:16
**Plaintiff** [2] - 38:24, 49:21
**plaintiff** [2] - 8:20, 44:9
**Plaintiff's** [1] - 23:5
**Plaintiffs** [65] - 1:5, 1:13, 3:6, 3:10, 3:16, 4:7, 5:7, 5:18, 6:25, 8:4, 11:19, 16:11, 16:15, 16:19, 17:5, 17:9, 17:19, 18:5, 18:19, 20:8, 23:19, 23:21, 27:25, 34:8, 35:20, 39:2, 39:7, 40:6, 41:20, 42:8, 42:15, 43:25, 44:12, 45:9, 46:9, 46:15, 47:12, 47:16, 47:25, 49:1, 49:5, 50:5, 50:20, 50:25, 51:12, 52:4, 54:19, 55:10, 55:11, 55:19, 56:4, 57:22, 59:14, 60:11, 60:24, 61:11, 63:4, 63:20, 64:3, 66:10, 66:18, 69:9, 71:25, 72:25
**PLAINTIFFS** [2] - 1:23, 2:2
**Plaintiffs'** [8] - 4:10, 5:8, 45:23, 52:16, 53:4, 59:4, 62:4, 65:11
**plaintiffs'** [1] - 23:12
**planning** [2] - 37:1, 37:8
**plans** [1] - 67:7
**point** [13] - 10:12, 14:14, 24:8, 43:1, 50:5, 50:24, 52:9, 52:25, 55:8, 57:8, 57:18, 58:24, 69:7
**pointed** [6] - 58:14, 61:11, 62:18, 64:2, 68:20, 73:5
**pointing** [6] - 31:6, 34:17, 38:6, 38:17, 41:25, 42:14
**points** [3] - 15:16, 27:2, 54:8
**POLICY** [1] - 1:4
**Policy** [2] - 3:3, 5:19
**policy** [9] - 9:23, 19:24, 20:3, 30:10, 44:4, 55:11, 55:12, 62:16, 63:22
**policymakers** [2] - 9:22, 17:16
**position** [11] - 8:19, 9:5, 22:14, 40:21, 51:24, 52:15, 53:6, 53:12, 53:24, 60:11, 63:18
**positions** [3] - 30:20, 37:4, 63:11
**possible** [3] - 10:9, 13:19, 26:7
**postsecondary** [2] - 5:12, 18:15
**Postsecondary** [6] - 5:13, 7:12, 14:20, 18:17, 24:10, 33:23
**potential** [1] - 45:15
**Poverty** [1] - 39:4
**power** [2] - 11:13, 32:9
**practice** [4] - 17:24, 19:24, 20:3, 44:4
**practitioners** [1] - 17:16
**precedence** [1] - 13:3
**precedent** [1] - 21:8
**precisely** [1] - 55:13
**preclude** [1] - 47:6
**precluded** [1] - 49:14
**precludes** [2] - 49:17, 49:18
**preliminary** [16] - 4:6, 4:16, 17:3, 17:18, 22:17, 27:12, 36:10, 45:5, 52:6, 56:3, 57:21, 58:22, 58:23, 59:15, 62:13, 65:11
**PRELIMINARY** [1] - 1:18
**prepare** [3] - 25:13, 26:2
**prepared** [1] - 29:8
**presentations** [1] - 54:14
**presented** [2] - 50:20, 51:12
**president** [1] - 63:23
**president's** [1] - 63:24
**press** [1] - 35:12
**pressed** [1] - 8:4
**presumably** [1] - 28:22
**pretend** [1] - 42:22
**pretty** [3] - 42:2, 60:15, 68:22
**prevent** [2] - 17:19, 48:2
**previous** [1] - 22:17
**previously** [3] - 24:2, 24:21, 59:11
**primarily** [1] - 4:13
**primary** [5] - 53:8, 53:14, 53:22, 57:15, 60:11
**principally** [1] - 28:20
**privacy** [1] - 25:12
**private** [1] - 62:16
**privately** [2] - 60:1, 65:1
**problem** [6] - 22:25, 24:12, 31:17, 41:5, 43:21, 44:11
**procedural** [2] - 49:1, 54:8
**proceed** [5] - 50:22, 57:23, 57:24, 63:23, 65:16
**proceedings** [3] - 26:15, 58:1, 76:6
**Proceedings** [1] - 75:11
**proceeds** [1] - 57:5
**process** [4] - 10:24, 12:6, 25:12, 51:17
**produce** [1] - 69:25
**produced** [5] - 5:7, 25:11, 36:23, 76:6
**producers** [1] - 48:9
**producing** [1] - 7:20
**products** [1] - 48:9
**Professor** [8] - 17:13, 17:19, 18:21, 19:10, 25:2, 25:3, 28:2
**professor** [1] - 25:1
**professor's** [1] - 19:3
**program** [41] - 5:14, 5:18, 6:5, 6:10, 6:18, 6:21, 9:25, 10:2, 10:13, 10:18, 12:4, 12:5, 12:10, 12:19, 15:8, 15:24, 28:20, 34:11, 34:12, 35:11, 35:14, 41:7, 41:11, 41:15, 41:17, 41:18, 41:19, 41:20, 41:25, 42:7, 43:23, 49:7, 49:20, 52:18, 67:5, 67:13, 67:15, 67:16,

68:15, 68:21
**programmatic** [10] - 29:6, 30:8, 31:10, 34:23, 34:25, 35:18, 45:12, 55:15, 57:3, 69:11
**programs** [9] - 5:23, 13:15, 21:12, 24:8, 29:4, 31:7, 63:6, 64:4, 70:3
**Progress** [2] - 17:14, 19:12
**progress** [3] - 67:1, 67:19, 74:6
**prohibits** [1] - 29:6
**project** [1] - 19:20
**promptly** [1] - 30:18
**pronouncing** [1] - 32:19
**propose** [1] - 4:11
**proposed** [4] - 30:14, 38:14, 40:24, 41:1
**proposing** [1] - 22:9
**proposition** [2] - 8:20, 33:16
**prospective** [1] - 20:8
**protect** [1] - 19:22
**protecting** [1] - 19:25
**provide** [8] - 9:21, 9:24, 31:15, 42:25, 57:18, 60:6, 65:8, 66:22
**provided** [7] - 5:5, 10:8, 13:24, 36:8, 40:4, 55:21, 66:23
**provides** [1] - 73:23
**providing** [4] - 40:17, 40:18, 57:12, 60:5
**provision** [2] - 61:12, 67:5
**provisions** [3] - 59:1, 66:17, 69:14
**PSAS** [1] - 67:21
**PUBLIC** [1] - 1:24
**Public** [1] - 3:9
**public** [6] - 10:19, 16:14, 16:19, 17:8, 47:24, 72:20
**publication** [1] - 7:9
**publicize** [3] - 16:18, 17:5, 29:17
**publicly** [2] - 5:4, 18:14
**published** [7] - 7:7, 7:8, 8:1, 8:6, 24:17, 71:3
**publishing** [4] - 22:12, 51:5, 62:2, 62:6
**PULVER** [53] - 1:23, 3:8, 4:9, 4:18, 4:22, 4:24, 6:2, 6:14, 6:16, 7:9, 7:18, 7:24, 8:14, 9:3, 9:7, 10:6, 11:10, 11:16, 11:24, 12:2, 12:16, 13:16, 14:5, 14:9, 14:12, 14:25, 15:3, 16:2, 16:4, 16:8, 32:13, 32:17, 32:23, 32:25, 34:24, 35:3, 35:23, 38:3, 38:23, 40:10, 40:20, 42:4, 43:24, 44:21, 44:23, 66:12, 66:17, 66:21, 68:19, 70:19, 70:22, 71:5, 72:9
**Pulver** [7] - 3:9, 27:23, 28:18, 29:11, 32:12, 65:23, 73:8
**purpose** [4] - 9:21, 19:22, 30:7, 63:9
**purposes** [3] - 8:24, 61:1, 72:24
**put** [5] - 45:19, 56:19, 64:19, 64:21, 72:25
**putting** [1] - 13:7

## Q

**quadrennial** [2] - 5:11, 37:24
**quadrennially** [3] - 7:12, 7:19, 8:1
**qualified** [2] - 49:25, 51:21
**qualifies** [1] - 8:23
**quality** [3] - 19:23, 20:1, 20:2
**questioning** [1] - 58:25
**questions** [10] - 8:14, 11:17, 16:5, 25:25, 26:3, 26:4, 38:9, 59:14, 65:19, 66:14
**quibbling** [1] - 41:24
**quickly** [1] - 43:1
**quintessential** [1] - 38:10
**quo** [3] - 22:17, 36:11, 36:14
**quote** [7] - 28:19, 42:9, 44:8, 44:9, 66:25, 68:11, 68:12

## R

**race** [1] - 74:12
**raised** [1] - 69:8
**ramp** [1] - 26:8
**range** [1] - 72:17
**rather** [1] - 23:2
**RDR** [3] - 2:10, 76:3, 76:12
**reached** [1] - 51:6
**read** [4] - 14:14, 28:19, 65:25, 66:21
**reading** [1] - 22:21
**realize** [1] - 66:12
**really** [8] - 12:11, 12:12, 33:17, 41:25, 44:18, 47:12, 55:6, 71:24
**Reardon** [1] - 25:2
**Reardon's** [1] - 25:4
**reason** [1] - 36:24
**reasonable** [2] - 8:6, 14:8
**reasons** [4] - 28:1, 28:2, 41:9, 52:14
**reassess** [1] - 25:21
**rebid** [2] - 30:18, 37:2
**recalibrating** [2] - 62:20, 64:13
**recast** [1] - 69:9
**receive** [1] - 28:3
**receiving** [1] - 58:14
**recipient** [1] - 74:20
**recognize** [1] - 69:15
**recognized** [1] - 20:24
**record** [10] - 3:2, 3:7, 20:11, 36:22, 36:23, 39:23, 57:25, 60:22, 62:3, 70:1
**Record** [1] - 67:23
**Rector** [1] - 2:3
**reduction** [1] - 37:2
**reductions** [1] - 46:5
**refer** [2] - 14:18, 40:25
**reference** [1] - 67:10
**referenced** [3] - 28:21, 56:18, 68:9
**referred** [5] - 5:13, 14:18, 18:18, 37:14, 44:4
**refers** [1] - 14:15
**reflect** [1] - 62:3
**Reform** [1] - 39:7
**reform** [1] - 45:16
**regarding** [6] - 28:16, 49:19, 52:17, 73:19, 74:17, 74:18
**regime** [3] - 47:11, 47:15
**Regional** [4] - 5:16, 35:10, 67:6, 67:12
**regular** [1] - 74:21
**rehire** [1] - 21:16
**reinstate** [2] - 30:14, 30:16
**reinstated** [3] - 23:23, 38:1, 38:15
**reinstatement** [1] - 23:4
**REL** [1] - 35:10
**relate** [1] - 67:14
**related** [3] - 27:7, 73:24, 74:9
**relates** [2] - 15:18, 39:12
**relationship** [1] - 48:23
**release** [2] - 18:15, 35:12
**released** [1] - 25:8
**relevant** [2] - 44:8, 44:18
**relief** [16] - 17:3, 17:18, 20:6, 20:9, 35:19, 36:8, 38:14, 39:19, 39:21, 39:24, 40:3, 41:13, 45:5, 49:2, 58:22, 70:14
**relies** [5] - 13:17, 13:21, 15:4, 18:22, 28:5
**RELs** [1] - 5:16
**rely** [6] - 16:20, 17:10, 18:19, 25:4, 28:7, 51:1
**relying** [5] - 14:1, 20:13, 22:19, 46:10, 66:6
**remediate** [1] - 8:21
**remediated** [2] - 26:15, 28:13
**remediation** [1] - 28:12
**remedied** [1] - 9:19
**remedies** [1] - 23:9
**remedy** [4] - 21:12, 23:24, 35:24, 38:12
**remedying** [1] - 40:3
**REMMEL** [23] - 2:6, 4:2, 54:12, 56:2, 56:24, 57:9, 57:15, 58:9, 59:22, 59:25, 60:17, 61:5, 61:21, 62:12, 63:7, 63:19, 64:6, 64:17, 64:19, 64:23, 64:25, 65:15, 65:18
**Remmel** [1] - 54:8
**remote** [30] - 6:3, 9:25, 10:4, 10:6, 10:17, 11:2, 11:3, 11:5, 11:14, 12:3, 34:22, 35:14, 40:18, 41:6, 49:19, 50:5, 50:6, 51:8, 52:9, 52:11, 52:18, 53:17, 54:25, 55:18, 55:20, 55:25, 57:8, 57:19, 68:14
**remote-only** [2] - 11:2, 11:5
**remotely** [2] - 5:20, 11:9
**reorganization** [2] - 35:8, 55:7
**repackaging** [1] - 23:12
**repeatedly** [1] - 64:1
**replace** [1] - 63:2
**reply** [2] - 55:9, 62:18
**report** [9] - 7:9, 7:10, 7:25, 37:19, 68:3, 73:24, 74:4, 74:6, 74:9
**Report** [1] - 67:11
**REPORTED** [1] - 2:10
**Reporter** [2] - 2:11, 76:12
**reporting** [1] - 74:11
**reports** [2] - 7:7, 67:8
**request** [3] - 6:25, 7:3, 20:8
**requested** [1] - 20:6
**requesting** [3] - 27:11, 31:23, 31:24
**requests** [1] - 7:3
**require** [7] - 10:7, 20:9, 29:4, 54:17, 61:17, 67:15, 73:2
**required** [20] - 5:15, 6:5, 7:12, 7:25, 8:9, 10:5, 10:7, 10:14, 15:25, 16:18, 36:5, 37:18, 55:1, 55:20, 59:1, 59:5, 59:13, 61:10, 64:4, 74:19
**requirement** [3] - 8:11, 15:11, 67:20
**requirements** [1] - 8:25
**requires** [13] - 6:9, 10:18, 18:13, 18:15, 20:6, 26:25, 55:21,

60:5, 61:12, 66:24, 67:7, 67:17, 73:18
**rescope** [1] - 51:18
**research** [9] - 16:20, 17:10, 18:20, 18:23, 19:13, 19:23, 20:2, 28:5, 30:19
**researchers** [5] - 10:19, 17:15, 50:1, 51:21, 58:15
**researching** [1] - 17:21
**reserve** [2] - 50:21, 53:2
**resolving** [1] - 38:25
**resources** [4] - 21:3, 62:23, 70:10, 73:2
**respectfully** [2] - 45:2, 45:25
**respond** [1] - 69:8
**response** [1] - 70:16
**responsibilities** [2] - 70:9, 70:13
**restarted** [1] - 36:25
**restoration** [2] - 36:11, 41:3
**restore** [4] - 22:11, 30:20, 36:13, 41:11
**restored** [4] - 22:9, 38:6, 65:4, 65:6
**restricted** [12] - 5:20, 6:3, 6:24, 10:24, 12:4, 12:19, 18:22, 19:1, 21:12, 28:3, 35:14, 41:6
**restricted-use** [9] - 5:20, 6:24, 10:24, 12:4, 12:19, 18:22, 19:1, 35:14, 41:6
**restructuring** [3] - 50:2, 51:16, 52:21
**retained** [1] - 38:22
**return** [1] - 21:14
**reverse** [1] - 71:18
**reversed** [1] - 71:20
**reverses** [1] - 72:4
**review** [24] - 5:14, 6:5, 6:9, 6:18, 15:24, 28:24, 45:2, 45:4, 45:8, 45:13, 45:24, 49:11, 49:23, 51:4, 51:5, 51:18, 54:18, 56:24, 66:25, 67:1, 67:2, 67:15, 73:6
**reviewable** [1] - 43:15
**revised** [1] - 40:24
**rid** [2] - 37:4, 39:17
**rider** [4] - 8:8, 8:11, 67:9, 67:22
**RIF** [7] - 21:13, 29:1, 32:1, 34:21, 35:6, 47:21, 48:1
**RIF'd** [1] - 38:15
**RIFs** [5] - 48:20, 49:19, 53:6, 53:10, 57:2
**rights** [4] - 40:2, 40:3, 40:4, 40:5
**rigor** [1] - 27:3
**ripe** [4] - 28:24, 29:1, 44:1, 63:13
**ripeness** [3] - 24:12, 42:18, 44:17
**road** [1] - 24:9
**role** [1] - 62:15
**Room** [1] - 2:13
**room** [4] - 11:2, 11:8, 11:14, 22:11
**Rosenbaum** [1] - 3:11
**ROSENBAUM** [1] - 1:23
**round** [1] - 65:12
**route** [2] - 11:20, 48:1
**routine** [2] - 17:20, 18:20
**rule** [1] - 44:16
**run** [1] - 17:25

**S**

**safeguards** [2] - 10:22, 10:23
**salaries** [2] - 63:1, 65:5
**satisfying** [1] - 53:25
**savings** [2] - 37:1, 51:18
**saw** [1] - 62:8
**Scalia** [2] - 41:23, 42:6
**Scalia's** [1] - 43:8
**scheme** [7] - 47:2, 47:8, 48:8, 48:13, 48:15, 48:24, 56:17
**schemes** [3] - 46:8, 48:3, 48:18
**School** [1] - 13:18
**school** [5] - 7:25, 17:16, 18:16, 18:23, 28:4
**schools** [1] - 59:9
**Sciences** [1] - 5:1
**scientifically** [1] - 26:25
**scope** [2] - 42:6, 42:7
**se** [2] - 11:25, 55:20
**second** [6] - 8:11, 9:2, 19:21, 28:6, 64:23, 72:20
**secretary** [2] - 35:7, 35:12
**secretary's** [1] - 59:21
**Section** [2] - 43:9, 55:21
**see** [5] - 17:16, 29:2, 46:16, 48:2, 70:11
**seek** [2] - 19:22, 23:19
**seeking** [4] - 23:9, 23:22, 36:11, 49:2
**Senate** [1] - 67:11
**sensitive** [2] - 27:6, 28:16
**sent** [1] - 66:14
**separate** [3] - 29:3, 54:17, 69:17
**separately** [2] - 35:17, 55:6
**serve** [3] - 47:23, 47:24, 62:20
**Service** [1] - 39:6
**service** [1] - 39:14
**set** [8] - 10:23, 22:4, 25:6, 25:8, 35:24, 35:25, 42:11, 56:17
**sets** [9] - 16:18, 16:21, 19:15, 24:4, 24:17, 26:24, 27:9, 28:7, 31:15
**setting** [1] - 29:23
**several** [4] - 7:2, 11:19, 12:24, 15:16
**shall** [9] - 30:16, 30:20, 31:22, 31:23, 69:3, 73:24, 74:3, 74:8, 74:21
**shortly** [1] - 73:10
**show** [9] - 8:18, 8:21, 11:21, 14:3, 14:11, 28:12, 36:17, 61:2, 70:14
**showing** [5] - 36:23, 57:22, 58:4, 60:25, 61:1
**shown** [6] - 21:15, 57:12, 60:12, 61:3, 68:17, 75:6
**shut** [1] - 33:9
**shuttered** [1] - 64:5
**side** [9] - 4:8, 32:15, 50:13, 50:15, 55:4, 55:14, 56:19, 59:1, 59:4
**similar** [3] - 33:25, 38:20, 42:2
**similarly** [3] - 39:2, 39:4, 56:12
**simply** [3] - 28:24, 30:11, 45:7
**single** [4] - 33:20, 34:2, 34:3, 35:7
**situated** [2] - 39:2, 39:4
**situation** [7] - 36:9, 37:5, 38:20, 48:7, 58:7, 66:5, 71:1
**six** [1] - 68:24
**size** [1] - 37:9
**slashed** [1] - 34:5
**slow** [1] - 66:19
**slower** [1] - 6:4
**socioeconomic** [1] - 74:12
**solely** [2] - 33:22, 52:7
**soliciting** [1] - 30:18
**sometime** [1] - 8:1
**sometimes** [1] - 44:4
**somewhere** [1] - 32:16
**soon** [1] - 68:4
**sorry** [4] - 6:4, 27:18, 34:11, 36:19
**sort** [3] - 14:8, 23:2, 31:9
**sought** [1] - 6:20
**sounds** [3] - 4:20, 7:5, 63:17
**source** [2] - 23:18, 23:19
**speaks** [1] - 56:12
**special** [1] - 74:5
**specific** [45] - 5:2, 5:3, 5:10, 7:10, 22:5, 22:9, 23:4, 23:5, 23:8, 23:21, 25:9, 29:23, 31:2, 31:3, 31:18, 31:20, 33:2, 33:13, 35:1, 35:25, 36:23, 37:10, 41:15, 41:17, 42:1, 48:15, 56:17, 56:20, 60:10, 63:9, 63:10, 63:11, 66:17, 68:20, 68:25, 69:10, 69:13, 69:22, 70:17, 70:20, 71:10, 73:15, 73:16
**specifically** [16] - 8:9, 10:6, 10:20, 21:1, 24:1, 32:5, 45:19, 48:10, 48:15, 48:18, 49:14, 49:17, 55:8, 56:4, 63:5, 63:10
**specified** [1] - 7:11
**speculation** [2] - 46:11, 51:1
**speculative** [6] - 37:7, 51:1, 51:9, 61:7, 61:14, 68:21
**spend** [2] - 63:1, 63:14
**Spend** [1] - 72:25
**spending** [1] - 37:2
**spring** [1] - 25:22
**stab** [1] - 29:10
**staff** [17] - 3:15, 19:15, 21:20, 22:2, 24:20, 24:23, 25:17, 26:6, 26:8, 28:10, 29:21, 32:4, 32:6, 34:6, 37:3, 39:18, 41:7
**staffing** [4] - 22:5, 22:6, 29:24, 52:1
**stage** [6] - 26:15, 36:10, 52:6, 56:3, 57:21, 58:1
**stall** [1] - 30:14
**stand** [2] - 8:20, 33:16
**standard** [2] - 28:12, 69:24
**standardized** [1] - 27:4
**standards** [2] - 25:12, 54:17
**standing** [35] - 4:11, 8:24, 9:5, 11:17, 11:20, 11:21, 11:22, 12:9, 12:15, 12:17, 13:8, 13:14, 13:23, 14:4, 14:11, 15:2, 15:6, 16:5, 16:13, 18:1, 18:6, 18:9, 20:4, 20:14, 21:2, 38:21, 39:8, 46:10, 46:16, 52:14, 54:20, 59:18, 60:18, 60:19, 60:25
**stands** [1] - 14:20
**Stanford** [1] - 17:14
**Stange** [4] - 11:11, 15:4, 15:13, 16:1
**STANGE** [1] - 11:12
**start** [2] - 18:6, 54:13
**started** [1] - 41:14
**starting** [1] - 3:6
**state** [2] - 6:17, 17:17
**statements** [1] - 62:18
**states** [1] - 64:1
**States** [3] - 2:11, 4:3, 76:13
**STATES** [3] - 1:1,

1:19, 2:7
**statistical** [3] - 68:25, 69:2, 74:9
**statistics** [1] - 73:23
**Statistics** [2] - 19:16, 69:1
**status** [5] - 22:17, 36:11, 36:14, 42:23, 74:12
**statute** [18] - 5:15, 6:6, 6:9, 10:7, 10:18, 15:25, 26:25, 30:4, 31:15, 31:20, 40:6, 56:4, 56:16, 59:5, 61:10, 67:7, 67:11, 68:24
**statute's** [1] - 31:22
**statutes** [12] - 7:10, 12:22, 21:20, 23:7, 29:4, 29:15, 31:7, 31:18, 32:10, 33:1, 69:5, 73:16
**statutorily** [13] - 10:5, 10:7, 10:13, 18:11, 20:1, 45:16, 49:13, 55:1, 55:20, 64:4, 68:6, 71:15, 72:5
**statutory** [39] - 7:16, 12:23, 13:6, 15:11, 22:2, 22:7, 23:25, 30:2, 30:12, 30:23, 31:25, 36:4, 40:11, 47:11, 47:15, 48:3, 48:23, 51:25, 53:25, 54:23, 56:17, 59:1, 59:3, 61:12, 62:24, 66:17, 67:5, 68:15, 69:14, 69:21, 70:9, 70:13, 70:17, 70:20, 71:12, 71:13, 71:25, 73:3
**STEM** [1] - 18:24
**stenographic** [1] - 76:5
**step** [2] - 10:17, 71:20
**still** [15] - 7:3, 8:20, 31:5, 51:25, 56:23, 57:4, 57:12, 57:17, 58:11, 58:12, 63:7, 63:12, 72:5, 72:11, 72:13
**stop** [2] - 72:12, 72:16
**stopped** [1] - 27:12
**store** [1] - 61:24
**strangers** [2] - 47:6, 48:22
**Street** [3] - 1:24, 2:3, 2:8
**strong** [1] - 60:15
**strongest** [1] - 49:3
**structuring** [1] - 51:22
**struggle** [1] - 46:16
**Student** [5] - 5:13, 7:12, 18:17, 24:10, 33:23
**student** [4] - 18:23, 19:13, 74:1, 74:20
**students** [2] - 25:8, 25:22
**studies** [24] - 13:10, 13:20, 13:25, 22:12, 24:8, 26:1, 26:13, 26:18, 26:22, 36:23, 37:14, 37:17, 40:18, 42:20, 43:14, 46:12, 51:2, 58:24, 59:2, 59:4, 61:6, 61:13, 61:17, 71:2
**study** [23] - 5:11, 7:14, 7:20, 7:24, 13:1, 13:18, 14:19, 14:21, 18:23, 25:5, 25:6, 25:20, 26:2, 28:4, 28:5, 36:20, 61:10, 62:6, 67:21, 68:1, 71:10, 71:21
**Study** [2] - 18:17, 24:10
**study's** [1] - 61:23
**subject** [2] - 45:13, 49:22
**submitted** [2] - 5:9, 9:12
**Subsection** [2] - 56:7, 56:12
**subsequent** [1] - 65:12
**success** [3] - 4:13, 18:24, 58:11
**sue** [1] - 18:9
**suffer** [2] - 13:2, 16:16
**suffering** [2] - 16:15, 60:12
**suffices** [1] - 8:17
**sufficient** [5] - 9:10, 13:7, 22:6, 30:20, 58:21
**suggest** [1] - 55:25
**suggested** [3] - 4:20, 60:4, 69:18
**suggestion** [1] - 58:20
**Suite** [1] - 1:25
**sum** [1] - 65:8
**support** [1] - 15:11
**supposed** [8] - 7:7, 22:18, 24:5, 25:21, 30:22, 31:9, 50:15, 51:5
**Supreme** [6] - 34:12, 45:11, 45:18, 48:5, 48:12, 49:14
**surprising** [1] - 70:11
**survey** [4] - 14:17, 15:6, 61:18, 74:20
**Survey** [3] - 5:14, 7:12, 33:23
**surveys** [1] - 59:9
**survives** [1] - 57:24
**suspended** [1] - 63:2
**switch** [1] - 10:3
**system** [3] - 11:3, 11:4, 17:12

## T

**table** [1] - 3:11
**tabulating** [1] - 74:10
**tailored** [1] - 59:19
**tailors** [1] - 60:10
**tails** [1] - 63:17
**talismanically** [1] - 70:4
**talks** [3] - 42:18, 43:9, 43:24
**target** [1] - 49:5
**targeted** [1] - 39:21
**tasks** [1] - 5:6
**teaching** [3] - 16:20, 17:20, 18:20
**technologically** [6] - 10:8, 10:9, 55:22, 56:1, 57:13, 57:20
**technology** [1] - 68:12
**ten** [4] - 7:2, 29:3, 31:6, 74:25
**ten-year** [1] - 74:25
**term** [5] - 10:9, 10:10, 41:24, 56:9, 67:17
**terminate** [5] - 33:10, 63:2, 68:14, 71:10, 71:21
**terminated** [16] - 7:14, 8:5, 8:7, 12:6, 12:10, 13:11, 14:22, 15:17, 37:19, 38:16, 41:16, 42:20, 42:21, 63:3, 67:13
**terminating** [1] - 10:1
**termination** [15] - 5:17, 10:13, 12:3, 33:22, 35:3, 35:10, 35:13, 36:17, 36:18, 36:19, 36:20, 40:13, 40:15, 41:16, 68:20
**terminations** [2] - 29:1, 43:13
**terrific** [1] - 4:17
**test** [2] - 11:1, 23:16
**testing** [1] - 26:3
**tests** [1] - 21:4
**that'll** [1] - 56:24
**THE** [137] - 1:1, 1:19, 1:23, 2:2, 2:6, 2:7, 3:1, 3:13, 3:19, 3:22, 3:25, 4:4, 4:17, 4:20, 4:23, 5:22, 6:13, 6:15, 7:5, 7:16, 7:22, 8:13, 9:1, 9:4, 10:4, 11:7, 11:15, 11:18, 12:1, 12:14, 13:13, 14:2, 14:6, 14:10, 14:23, 15:1, 16:1, 16:3, 16:7, 16:9, 17:1, 17:25, 18:7, 19:3, 19:6, 19:8, 20:13, 20:17, 20:21, 21:6, 21:10, 22:8, 22:21, 23:11, 24:7, 26:7, 26:19, 27:13, 27:16, 27:20, 27:23, 28:17, 29:10, 30:13, 31:5, 32:11, 32:14, 32:22, 32:24, 34:16, 35:2, 35:22, 37:25, 38:12, 40:9, 40:16, 41:23, 43:17, 44:19, 44:22, 44:24, 46:14, 46:24, 47:11, 47:19, 47:21, 48:25, 50:4, 50:12, 51:3, 51:24, 52:8, 52:22, 53:6, 53:11, 53:17, 53:24, 54:4, 54:7, 54:10, 55:17, 56:21, 57:7, 57:10, 58:2, 59:17, 59:24, 60:14, 60:23, 61:16, 62:8, 63:4, 63:16, 64:1, 64:15, 64:18, 64:21, 64:24, 65:10, 65:17, 65:20, 66:2, 66:8, 66:10, 66:16, 66:20, 68:16, 70:17, 70:20, 70:25, 72:8, 73:8, 73:13, 73:17, 74:24, 75:3, 75:9
**themselves** [1] - 69:23
**theoretically** [1] - 26:8
**theories** [4] - 11:20, 14:6, 48:25, 49:1
**theory** [1] - 18:1
**therefore** [2] - 39:8, 70:16
**they've** [10] - 5:17, 5:25, 12:21, 22:23, 25:22, 42:19, 51:7, 58:15, 58:20, 60:18
**thinking** [4] - 11:23, 26:19, 26:21, 56:21
**third** [3] - 20:5, 54:25, 62:13
**thousand** [1] - 43:18
**three** [9] - 5:6, 15:22, 24:11, 24:20, 35:10, 37:6, 37:7, 40:11, 61:10
**threshold** [4] - 45:1, 49:1, 52:7, 52:13
**time-related** [1] - 27:7
**time-sensitive** [1] - 28:16
**timeframe** [1] - 14:8
**timeline** [1] - 25:11
**timelines** [1] - 56:20
**timely** [2] - 56:8, 56:9
**timing** [1] - 72:10
**titles** [1] - 37:14
**today** [3] - 5:24, 49:5, 52:7
**together** [1] - 69:11
**took** [2] - 42:1, 70:15
**tools** [1] - 47:14
**topics** [1] - 5:3
**traditional** [5] - 21:2, 23:9, 41:13, 41:21, 73:4
**traditionally** [3] - 7:1, 43:15, 74:14
**training** [1] - 27:3
**trampling** [1] - 59:21
**TRANSCRIPT** [1] - 1:18
**transcript** [2] - 76:5, 76:6
**trends** [1] - 17:17
**TREVOR** [1] - 1:19
**true** [3] - 58:9, 76:4, 76:5
**try** [5] - 6:4, 36:3, 36:5, 39:14, 66:18
**trying** [5] - 13:19, 14:3, 43:22, 46:22, 55:4
**Tucker** [12] - 22:25, 23:8, 23:16, 39:13, 40:4, 41:5, 46:14,

46:16, 47:1, 47:17, 49:17, 53:16
**tuition** [1] - 73:19
**turn** [4] - 16:6, 16:14, 20:11, 21:13
**turned** [1] - 10:2
**two** [7] - 8:21, 8:24, 10:3, 21:4, 35:6, 54:17, 71:8
**type** [3] - 29:5, 30:8, 34:22
**types** [1] - 53:9

## U

**ultimately** [6] - 49:4, 52:2, 52:16, 53:3, 54:2, 56:2
**unable** [2] - 6:21, 19:20
**unclear** [3] - 10:1, 71:6, 72:15
**undefined** [1] - 56:9
**under** [25] - 6:8, 8:16, 9:9, 13:2, 13:4, 23:6, 23:16, 23:20, 28:23, 29:15, 30:4, 31:18, 35:24, 36:8, 39:13, 40:5, 40:6, 56:25, 58:19, 69:10, 73:9, 74:18, 74:20, 75:10
**undergraduate** [1] - 73:19
**underscore** [1] - 75:5
**undo** [1] - 70:16
**union** [3] - 38:18, 38:24, 39:1
**unique** [1] - 25:18
**uniquely** [1] - 24:15
**united** [1] - 2:11
**UNITED** [3] - 1:1, 1:19, 2:7
**United** [2] - 4:3, 76:13
**unless** [4] - 11:16, 16:4, 65:18
**unrebutted** [1] - 5:8
**unreviewable** [1] - 40:14
**unusable** [1] - 28:15
**unusual** [1] - 21:11
**up** [13] - 22:13, 25:19, 26:8, 26:9, 32:7, 32:8, 32:12, 34:8, 38:25, 40:19, 41:10, 41:20, 70:23
**USC** [19] - 10:10, 18:13, 18:14, 66:24, 67:4, 67:14, 67:17, 67:20, 67:25, 68:2, 68:6, 68:9, 68:23, 73:18, 73:23, 74:3, 74:8, 74:18, 74:22
**useable** [1] - 27:1
**useful** [1] - 4:19
**useless** [1] - 12:7
**uses** [3] - 17:13, 19:11, 71:7
**utilizing** [1] - 68:12

## V

**V-O-I-G-H-T** [1] - 13:21
**valid** [1] - 26:25
**value** [1] - 65:7
**variables** [1] - 27:5
**variety** [1] - 74:12
**various** [8] - 4:25, 11:19, 13:14, 21:11, 21:19, 31:7, 61:17, 70:4
**versus** [9] - 3:3, 3:5, 11:25, 13:5, 32:20, 33:3, 43:6, 65:23, 65:24
**via** [2] - 39:17, 53:16
**view** [1] - 70:2
**violate** [1] - 69:13
**violated** [2] - 39:18, 66:18
**violates** [1] - 68:23
**violating** [2] - 21:19, 32:9
**violation** [1] - 23:25
**violations** [1] - 31:14
**Virginia** [1] - 39:3
**Voight** [2] - 13:20, 70:7
**voluntarily** [1] - 71:18
**Voters** [1] - 9:17
**Vought** [1] - 38:18
**vs** [2] - 1:6, 1:14

## W

**walk** [1] - 29:8
**warned** [1] - 23:11
**warning** [1] - 45:18
**warns** [1] - 34:23
**warrants** [2] - 60:13, 60:20
**Washington** [6] - 1:7, 1:15, 1:25, 2:9, 2:13, 76:14
**waste** [1] - 70:3
**ways** [1] - 47:14
**website** [1] - 15:15
**week** [1] - 8:3
**weeks** [2] - 37:6, 52:10
**weigh** [1] - 50:16
**whatnot** [1] - 58:3
**whereby** [2] - 10:24, 31:19
**whichever** [1] - 49:9
**whole** [1] - 53:20
**wholesale** [4] - 28:23, 34:23, 34:24, 43:22
**Widakuswara** [2] - 40:7, 42:24
**WIDAKUSWARA** [1] - 40:8
**win** [1] - 63:17
**Women** [1] - 9:17
**word** [3] - 44:22, 66:11, 70:3
**words** [2] - 22:8, 71:6
**works** [2] - 10:18, 33:19
**Works** [1] - 19:19

## X

**Xie** [2] - 32:20, 65:23
**XIE** [1] - 32:20

## Y

**yanked** [1] - 58:6
**year** [10] - 7:25, 8:2, 8:7, 63:8, 63:12, 63:14, 63:17, 67:7, 74:25
**years** [9] - 7:19, 7:21, 10:3, 24:9, 24:11, 24:13, 37:23, 61:10, 74:22
**York** [2] - 2:4
**yourself** [1] - 9:2
**yourselves** [2] - 3:7, 4:7