UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC., et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of Education, et al.,<br><br>        Defendants. | Civil Action No. 25-0999 (TNM) |

**DEFENDANTS' MOTION TO DISMISS AND MOTION FOR RELIEF FROM LOCAL RULE 7(N)(1)'S REQUIREMENTS AND MEMORANDUM IN SUPPORT THEREOF**

## TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................ iii

Introduction ........................................................................................................ 1

Background ......................................................................................................... 2

    I.     Statutory Background .......................................................................... 2

    II.    Factual Background ............................................................................. 3

    III.   Procedural Background........................................................................ 5

Legal Standards................................................................................................... 6

    I.     Rule 12(b)(1).......................................................................................... 6

    II.    Rule 12(b)(6).......................................................................................... 7

Argument ............................................................................................................ 9

    I.     Plaintiffs Lack Standing...................................................................... 9

         A.    Plaintiffs Fail to Demonstrate Associational Standing. ........... 10

         B.    Plaintiffs Fail to Demonstrate Informational Standing........... 11

         C.    Plaintiffs Fail to Demonstrate Organizational Standing. ........ 12

    II.    The Court Lacks Jurisdiction Over Plaintiffs' Challenge to the Cancellation of the Institute's Contracts. ................................................................................... 14

    III.   Plaintiffs Fail to Sufficiently Allege Claims Under the APA............................. 17

         A.    Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action..... 18

         B.    Plaintiffs Do Not Identify a Final Agency Action. ................... 20

         C.    There Are Adequate Alternative Remedies Available.............. 21

         D.    The Department's Programmatic Implementation Decisions Are Committed to Agency Discretion. .......................................... 22

    IV.   Plaintiff IHEP Fails to Allege Unreasonable Delay under the APA. .................. 25

         A.    *TRAC* Factors 1 and 2 ............................................................. 26

B.    *TRAC* Factor 4.................................................................................................. 27

C.    *TRAC* Factors 3 and 5 ...................................................................................... 30

D.    *TRAC* Factor 6.................................................................................................. 30

V.    Defendants Should Be Relieved of Their Obligation to File a Certified List of the
Administrative Record and Serve the Administrative Record Simultaneously with
this Motion. ......................................................................................................... 31

Conclusion ...................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
789 F.2d 931 (D.C. Cir. 1986) ................................................................... 14

*Alabama-Coushatta Tribe of Tex. v. United States*,
757 F.3d 484 (5th Cir. 2014) ..................................................................... 18

*Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ..................................................................... 16

*Am. Chemistry Council v. Dep't of Transp.*,
468 F.3d 810 (D.C. Cir. 2006) ................................................................... 10

*Am. Farm Bureau v. EPA*,
121 F. Supp. 2d 84 (D.D.C. 2000) ................................................................ 7

\* *Architects & Eng'rs for 9/11 Truth v. Raimondo*,
Civ. A. No. 21-2365 (TNM), 2022 WL 3042181 (D.D.C. Aug. 2, 2022) .............................. 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 8

*Ass'n of Battery Recyclers, Inc. v. EPA*,
716 F.3d 667 (D.C. Cir. 2013) ................................................................... 32

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ..................................................................... 6

*Bagherian v. Pompeo*,
442 F. Supp. 3d 87 (D.D.C. 2020) .............................................................. 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................. 7, 8

\* *Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................ 20

*Bowen v. Massachusetts*,
487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) .................................. 15, 22

*Cannon v. District of Columbia*,
717 F.3d 200 (D.C. Cir. 2013) ..................................................................... 9

*Carroll v. Office of Fed. Contract Compliance Programs, U.S. Dep't of Labor*,
   235 F. Supp. 3d 79 (D.D.C. 2017) ............................................................................ 32

\*  *Chamber of Com. of U.S. v. EPA*,
   642 F.3d 192 (D.C. Cir. 2011) ................................................................................. 10

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ................................................................................................ 21

*City of Olmsted Falls v. Fed. Aviation Admin.*,
   292 F.3d 261 (D.C. Cir. 2002) ................................................................................. 23

\*  *Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*,
   Civ. A. No. 25-0943 (TNM), 2025 WL 1078776 (D.D.C. Apr. 10, 2025) ................... 9, 12, 14

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ................................................................................. 18

*Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*,
   313 F. Supp. 3d 285 (D.D.C. 2018) .......................................................................... 10

*Connecticut v. U.S. Dep't of Interior*,
   344 F. Supp. 3d 279 (D.D.C. 2018) .......................................................................... 32

\*  *Ctr. for Biological Diversity v. Nishida*,
   Civ. A. No. 21-119 (RDM), 2021 WL 827189 (D.D.C. Mar. 4, 2021) ....................... 10

*Dallas Safari Club v. Bernhardt*,
   Civ. A. No. 19-3696 (APM), 2021 WL 495078 (D.D.C. Feb. 9, 2021) ...................... 33

*Dastagir v. Blinken*,
   557 F. Supp. 3d 160 (D.D.C. 2021) .................................................................... 26, 29

\*  *Dep't of Educ. v. California*,
   145 S. Ct. 966 (2025) ......................................................................................... 15, 17

*Didban v. Pompeo*,
   435 F. Supp. 3d 168 (D.D.C. 2020) .......................................................................... 27

*Drake v. FAA*,
   291 F.3d 59 (D.C. Cir. 2002) ................................................................................... 23

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................................................ 22

*FEC v. Akins*,
   524 U.S. 11 (1998) ............................................................................................ 10, 11

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
 423 U.S. 326 (1976) ........................................................................................ 23

*Fla. Power & Light Co. v. Lorion*,
 470 U.S. 729 (1985) ........................................................................................ 25

*Food & Drug Admin. v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024) .......................................................................................... 9

*Food & Water Watch, Inc. v. Vilsack*,
 808 F.3d 905 (D.C. Cir. 2015) ................................................................. 12, 13

*Friends of Animals v. Jewell*,
 828 F.3d 989 (D.C. Cir. 2016) ................................................................. 10, 11

*Garcia v. Vilsack*,
 563 F.3d 519 (D.C. Cir. 2009) ...................................................................... 22

*Ghadami v. Dep't of Homeland Sec.*,
 Civ. A. No. 19-0397 (ABJ), 2020 WL 1308376 (D.D.C. Mar. 19, 2020) ......... 27, 28

*Gong v. Duke*,
 282 F. Supp. 3d 566 (E.D.N.Y. 2017) .......................................................... 29

*Great-West Life & Annuity Ins. Co. v. Knudson*,
 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ................................ 15

\* *Heckler v. Chaney*,
 470 U.S. 821 (1985) ........................................................................................ 24

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977) ........................................................................................ 10

*Hurd v. District of Columbia*,
 864 F.3d 671 (D.C. Cir. 2017) ........................................................................ 8

*In re Am. Rivers & Idaho Rivers United*,
 372 F.3d 413 (D.C. Cir. 2004) ...................................................................... 26

*In re Barr Labs.*,
 930 F.2d 72 (D.C. Cir. 1991) ................................................................... 28, 30

*In re Core Commc'ns, Inc.*,
 531 F.3d 849 (D.C. Cir. 2008) ...................................................................... 25

*In re United Mine Workers of Am. Int'l Union*,
 190 F.3d 545 (D.C. Cir. 1999) ...................................................................... 25

*Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) ................................................................. 12, 13

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ..................................................................... 17

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
    937 F. Supp. 2d 18 (D.D.C. 2013) .............................................................. 8

*Jerome Stevens Pharm., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ................................................................... 7

*LaShawn A. v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996) .................................................................. 20

*Liberty Fund v. Chao*,
    394 F. Supp. 2d 105 (D.D.C. 2005) ............................................... 28, 29, 30

\* *Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................................. 22, 24

*Littlefield v. Dep't of the Interior*,
    85 F.4th 635 (1st Cir. 2023) ...................................................................... 22

*Liu v. Blinken*,
    544 F. Supp. 3d 1 (D.D.C. 2021) ......................................................... 26, 29

*Lujan v. Defs. Of Wildlife*,
    504 U.S. 555 (1992) .................................................................................. 10

\* *Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990) ..................................................................... 12, 18, 19

*Markowicz v. Johnson*,
    206 F. Supp. 3d 158 (D.D.C. 2016) ............................................................ 8

*Mashpee Wampanoag Tribal Council v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) ..................................................... 26, 27, 28

*McCarthy v. United States*,
    850 F.2d 558 (9th Cir. 1988) ...................................................................... 6

*Mdewakanton Sioux Indians of Minn. v. Zinke*,
    264 F. Supp. 3d 116 (D.D.C. 2017) .......................................................... 32

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) .................................................................. 16

*Milligan v. Pompeo*,
   502 F. Supp. 3d 302 (D.D.C. 2020) ................................................................. 26, 29

*Mohammad v. Blinken*,
   548 F. Supp. 3d 159 (D.D.C. 2021) ................................................................. 26, 29

\* *Nat'l Law Ctr. on Homelessness & Poverty v. Dep't of Veterans,*
   *Affs.*, 842 F. Supp. 2d 127 (D.D.C. 2012) .......................................................... 33

\* *Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .................................................................................... 12, 18, 19

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
   *(PETA)*, 797 F.3d 1087 (D.C. Cir. 2015) ........................................................ 10, 13

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ........................................................................... 22

\* *PETA v. U.S. Fish & Wildlife Serv.*,
   59 F. Supp. 3d 91 (D.D.C. 2014) ....................................................................... 32

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.*,
   43 F. Supp. 3d 28 (D.D.C. 2014) ......................................................................... 8

*Pub. Citizen v. U.S. Dist. Court for the Dist. of Columbia*,
   486 F.3d 1342 (D.C. Cir. 2007) ......................................................................... 32

*Sarlak v. Pompeo*, Civ. A.,
   No. 20-0035 (BAH), 2020 WL 3082018 (D.D.C. June 10, 2020) .............. 26, 27, 28

*Shen v. Pompeo*,
   Civ. A. No. 20-1263 (ABJ), 2021 WL 1246025 (D.D.C. Mar. 24, 2021) ......... 26, 29

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ........................................................................... 10

*Skalka v. Kelly*,
   246 F. Supp. 3d 147 (D.D.C. 2017) ............................................................... 27, 30

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ........................................................................... 17

\* *Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ............................................................................................. 32

*Talal Al-Zahrani v. Rodriguez*,
   669 F.3d 315 (D.C. Cir. 2012) ........................................................................... 32

*Tate v. Pompeo*,
    513 F. Supp. 3d 132 (D.D.C. 2021) ........................................................ 26, 28, 29, 31

\* *Telecomm'cns Rsch.& Action Ctr. ("TRAC") v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ........................................................................ 25, 31

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
    761 F. Supp. 3d 97 (D.D.C. 2025) ......................................................................... 6

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) .............................................................................. 7

*Turlock Irrigation Dist. v. FERC*,
    786 F.3d 18 (D.C. Cir. 2015) ............................................................................... 13

\* *U.S. Conf. of Catholic Bishops v. Dep't of State*,
    Civ. A. No. 25-465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ..................... 15, 16, 17

*United States v. Texas*,
    599 U.S. 670 (2023) ............................................................................................. 9

*Varol v. Radel*,
    420 F. Supp. 3d 1089 (S.D. Cal. 2019) .............................................................. 29

*Veg-Mix, Inc. v. U.S. Dep't of Agric.*,
    832 F.2d 601 (D.C. Cir. 1987) .............................................................................. 9

*Versata Dev. Corp. v. Rea*,
    959 F. Supp. 2d 912 (E.D. Va. 2013) ................................................................. 22

*Vico Prods. Co. v. Nat'l Lab. Rels. Bd.*,
    333 F.3d 198 (D.C. Cir. 2003) .............................................................................. 7

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) .............................................................................. 18

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ....................................................................................... 23, 24

*Wardrick v. Fed. Bureau of Prisons*,
    Civ. A. No. 19-0184, 2020 WL 1821133 (D.D.C. Apr. 10, 2020) ............................ 8

*Wright v. Foreign Serv. Griev. Bd.*,
    503 F. Supp. 2d 163 (D.D.C. 2007) ...................................................................... 7

*Xu v. Cissna*,
    434 F. Supp. 3d 43 (S.D.N.Y. 2020) ............................................................. 27, 28

*Yavari v. Pompeo*,
  Civ. A. No. 19-02524, 2019 WL 6720995 (C.D. Cal. Oct. 10, 2019) ..................................... 27

*Yee v. Jewell*,
  228 F. Supp. 3d 48 (D.D.C. 2017) .............................................................................. 7

**Statutes**

20 U.S.C. § 3402 ..................................................................................................... 2

20 U.S.C. § 9511 .............................................................................................. 2, 3

20 U.S.C. § 9512 ..................................................................................................... 16

28 U.S.C. § 1491 ..................................................................................................... 15

5 U.S.C. § 702 ........................................................................................................ 15

5 U.S.C. § 704 ................................................................................................. 20, 21

Pub. L. No. 96-88, 93 Stat. 668 (1979) .............................................................. 2

**Executive Orders**

Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) ...................... 4

Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) ...................... 4

**Rules**

Fed. R. Civ. P. 12 .............................................................................................. 7, 8

**Other Authorities**

John Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219 (1993) ..................... 9

Defendants Linda McMahon, in her official capacity as Secretary of Education (the "Secretary") and the Department of Education (the "Department"), through their undersigned counsel, respectfully move to dismiss Plaintiffs' Amended Complaint (ECF No. 28) in full pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6).

## INTRODUCTION

Plaintiffs Association for Education Finance and Policy ("AEFP") and the Institute for Higher Education Policy ("IHEP") are membership-based associations, essentially seeking to micromanage the Department's Institute of Education Sciences (the "Institute"). Plaintiffs bring claims under the Administrative Procedure Act ("APA") seeking to set aside the Institute's termination of contracts and other programmatic considerations, under the guise that those decisions may impact the data and information upon which Plaintiffs' members rely.

Such micromanagement would be judicial overreach—there is no legal basis for Plaintiffs' APA claims. If these claims were otherwise allowed to proceed, the Court would be engaged in judicial review that would eliminate the discretion entrusted to the Secretary to run the Department's day-to-day operations as they relate to the Institute. Instead of the Executive Branch faithfully executing the laws of Congress, substantial aspects of a cabinet-level agency's operations would instead be put under the control of this Court.

This Court should dismiss the Amended Complaint in full. As a threshold matter, Plaintiffs lack Article III standing, and Plaintiffs' contract claims cannot be brought in this Court under the Tucker Act. Plaintiffs also fail to challenge any discrete agency action or any agency action that is final. Moreover, while the Department is required by Congress to perform research and disseminate the findings of that research, the statutes are silent as to any particular study or research plan that has to be performed. These choices, and others made by the Department, are therefore within the discretion of the Executive. And finally, Plaintiff IHEP cannot demonstrate as a matter

of law that the Institute has engaged in unreasonable delay in not yet processing the three disclosure

risk review requests it submitted in February and March 2025.

## BACKGROUND

### I.    Statutory Background

The Department was established as part of the Department of Education Organization Act.

Pub. L. No. 96-88, 93 Stat. 668 (1979). The purpose of the Department is principally

> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual; (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education; (3) to encourage the increased involvement of the public, parents, and students in Federal education programs; (4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information; (5) to improve the coordination of Federal education programs; (6) to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and (7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

Under the Education Sciences Reform Act, 20 U.S.C. §§ 9501-9584 (the "Act"), Congress

established an Institute of Education Sciences (the "Institute") within the Department to:

> compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute and ensure that such activities-- (A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. § 9511(b)(2). The Act also established within the Institute four centers: the National

Center for Education Research, the National Center for Education Statistics ("NCES"), the

National Center for Education Evaluation and Regional Assistance, and the National Center for Special Education Research and delineated the duties for each center. *Id.* §§ 9511-9567.

Additionally, the Act states that the Institute shall "[d]isseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public" and "[u]tiliz[e] the most modern technology and other methods available, including arrangements to use data collected electronically by States and local educational agencies, to ensure the efficient collection and timely distribution of information, including data and reports," and "[m]ak[e] information available to the public in an expeditious fashion." *Id.* § 9575(2), (3), (6). Moreover, "data collected by the Institute, including any office, board, committee, or center of the Institute, in carrying out the priorities and mission of the Institute, shall be made available to the public, including through use of the Internet." *Id.* § 9574.

## II.    **Factual Background**

On February 26, 2025, the President signed the "Implementing the Presidents 'Department of Government Efficiency' Cost Efficiency Initiative" Executive Order. Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) (the "Contract Executive Order"). The purpose of this order was to "commence[] a transformation in Federal spending on contracts, grants, and loans to ensure Government spending is transparent and Government employees are accountable to the American public." *Id.* § 1. Accordingly, this Executive Order instructed "[e]ach Agency Head, in consultation with the agency's DOGE Team Lead, [to] review all existing covered contracts and grants and, where appropriate and consistent with applicable law," "terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the President's] Administration." *Id.* § 3(b). Covered contracts are defined as among other things, "discretionary spending through Federal contracts," but excludes "direct assistance to individuals; expenditures

related to immigration enforcement, law enforcement, the military, public safety, and the intelligence community; and other critical, acute, or emergency spending, as determined by the relevant Agency Head." *Id.* § 2(d). The Contract Executive Order instructed the process to "commence immediately" and to "prioritize the review of funds disbursed under covered contracts and grants to educational institutions . . . for waste, fraud, and abuse." *Id.*

On March 20, 2025, President Trump signed the "Improving Education Outcomes by Empowering Parents, States, and Communities" Executive Order. Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) (the "Department Executive Order"). The Department Executive Order found that the "Department of Education has entrenched the education bureaucracy" that "is not working." *Id.* § 1. For example, the Order identified the Department's "public relations office that includes over 80 staffers at a cost of more than $10 million per year." *Id.* Ultimately, the Order contemplates that the "[c]losure of the Department of Education would drastically improve program implementation in higher education" and "would provide children and their families the opportunity to escape a system that is failing them." *Id.*

Under the Department Executive Order, the Secretary of Education was ordered "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679. The "Secretary of Education shall ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law." *Id.* § 2(b). And the Department Executive Order states that it should "be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b). Accordingly, the Secretary has stated she intends to do "an overhaul" of the Department. U.S. Dep't of Educ., *Secretary McMahon: Our*

*Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

### III.    <u>Procedural Background</u>

On April 4, 2025, Plaintiffs Association for Education Finance and Policy, Inc. ("AEFP") and the Institute for Higher Education Policy ("IEHP") filed suit bringing an *ultra vires* claim and claims under the Administrative Procedure Act ("APA"). On April 17, 2025, Plaintiffs moved for a preliminary injunction generally seeking to reinstate Institute employees, programs, and contracts to their pre-February 9, 2025, status. Pls.' Mot. for Prelim. Inj. at 1, ECF No. 6. The Court denied Plaintiffs' motion by concluding that Plaintiffs were not likely to succeed on the merits of their claims. ECF Nos. 25, 26.

Thereafter, on June 18, 2025, Plaintiffs filed an Amended Complaint. ECF No. 28. Plaintiffs' Amended Complaint challenges the Institute's alleged termination of the contracts for the National Postsecondary Student Aid Study of 2024 ("NPSAS 2024"), the 2025 data collection for the Beginning Postsecondary Students Longitudinal Study ("BPS:20/25"), the High School Longitudinal Study of 2009 ("HSLS:09"), the High School and Beyond Longitudinal Study of 2022 ("HS&B:22"), the Early Childhood Longitudinal Study, Kindergarten Class of 2010-11 ("ECLS-K:2011"), and the peer review program, as well as the alleged termination of the remote access program and processing of restricted-use data licenses. Am. Compl. ¶¶ 30-87. Plaintiff IHEP further alleges that the Institute has not yet acted on its three disclosure risk review requests from February 7, 2025, March 4, 2025, and March 14, 2025. *Id.* ¶¶ 91-93. Plaintiff IHEP, a restricted-use data license holder, alleges that it must obtain permission from the Institute through a disclosure risk review before sharing with a third party any research or analysis that is based on restricted data. *Id.* ¶ 88.

Plaintiffs' Amended Complaint now raises thirteen claims under the APA. *Id.* First, Plaintiffs allege the termination of the contracts for the NPSAS 2024 study and the peer review program were both contrary to law and arbitrary and capricious (Counts I-II, VII-VIII). *Id.* ¶¶ 94-100, 116-22. Second, Plaintiffs allege the termination of the contracts for the BPS:20/25, HSLS:09, HS&B:22, and ECLS-K:2024 studies were arbitrary and capricious (Counts III-VI). *Id.* ¶¶ 101-15. Third, Plaintiffs allege that the termination of the remote access to restricted-use data and restricted-use data application processing was both contrary to law and arbitrary and capricious (Counts IX-XII). *Id.* ¶¶ 123-39. Finally, Plaintiff IHEP alleges that the Department has engaged in unreasonable delay in not yet issuing decisions on their February 7, 2025, March 4, 2025, and March 14, 2025, disclosure risk review submissions (Count XIII). *Id.* ¶¶ 140-41.

Accordingly, Plaintiffs request the Court set aside these terminations and order Defendants to resume these studies, the peer review program, the remote access program, and the processing of restricted-use data licenses. Am. Compl. at 30-31. Plaintiff IHEP additionally requests that its disclosure risk review submissions be processed within fourteen days of the Court's order. *Id.* at 31.

## LEGAL STANDARDS

### I.    Rule 12(b)(1)

"One necessary condition for a case to come within this Court's limited subject-matter jurisdiction is that the plaintiff must have standing to pursue the case in federal court." *Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 109 (D.D.C. 2025) (citing *Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017)). Additionally, "[t]he question of whether the United States has waived its sovereign immunity against suit[] . . . is, in the first instance, a question of subject matter jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.

1988); *Yee v. Jewell*, 228 F. Supp. 3d 48, 53 (D.D.C. 2017) (subject matter jurisdiction turns on whether "Congress has waived the United States' immunity to suit").

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1). To determine whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Vico Prods. Co. v. Nat'l Lab. Rels. Bd.*, 333 F.3d 198, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").

It is the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Griev. Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted). A court need not accept as true "a legal conclusion couched as a factual allegation" or an inference "unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal citation and quotation marks omitted).

## II.     Rule 12(b)(6)

A motion under Rule 12(b)(6) tests whether a complaint has successfully "state[d] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While detailed factual allegations are not necessary to withstand a Rule 12(b)(6) challenge, a plaintiff must nonetheless provide "more than labels or conclusions" or "a formulaic" recitation of the elements of a cause of action." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim is facially plausible only when a plaintiff pleads factual content that enables the Court to "draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While the Court must assume that any "well-pleaded factual allegations" in a complaint are accurate, conclusory allegations "are not entitled to the assumption of truth." *Id.* at 679. Furthermore, the Court "need not accept inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint. Moreover, the court is not bound to accept as true a legal conclusion couched as a factual allegation." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 937 F. Supp. 2d 18, 27 (D.D.C. 2013) (internal quotation marks and citations omitted). A complaint that "pleads facts that are merely consistent with a defendant's liability, [] stops short of the line between possibility and plausibility of entitlement to relief," and is insufficient to withstand a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In considering a Rule 12(b)(6) motion, a court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *Wardrick v. Fed. Bureau of Prisons*, Civ. A. No. 19-0184, 2020 WL 1821133, at *4 (D.D.C. Apr. 10, 2020) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)). In particular, the Court may take judicial notice of information posted on official public websites of government agencies, *see, e.g., Markowicz v. Johnson*, 206 F. Supp. 3d 158, 161 n.2 (D.D.C. 2016) (Contreras, J.) (citing *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (Contreras, J.) ("Courts in this

jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.") (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on D.C. public website)))), as well as court records, *Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987) (holding that "[c]ourts may take judicial notice of official court records").

## ARGUMENT

### I.    <u>Plaintiffs Lack Standing.</u>

Plaintiffs lack Article III standing. Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80. The standing doctrine further ensures that "'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society' is vindicated, by ensuring decisions meant for the political process are left to the political process." *Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*, Civ. A. No. 25-0943 (TNM), 2025 WL 1078776, at *4 (D.D.C. Apr. 10, 2025) (quoting John Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1220 (1993)).

Under any theory of standing, "the irreducible constitutional minimum" requires that, (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative,

that the injury will be redressed by a favorable decision." *Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Membership-based associations like Plaintiffs can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). Plaintiffs can also demonstrate informational standing. *FEC v. Akins*, 524 U.S. 11, 25 (1998). However, Plaintiffs here fail to sufficiently allege any kind of standing.

### A.    Plaintiffs Fail to Demonstrate Associational Standing.

Plaintiffs fail to demonstrate associational standing. To show associational standing, an organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

"When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). "Rather, the petitioner must specifically 'identify members who have suffered the requisite harm.'" *Id.* (quoting *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815,820 (D.C. Cir. 2006); *Ctr. for Biological Diversity v. Nishida*, Civ. A. No. 21-119 (RDM), 2021 WL 827189, at *2 (D.D.C. Mar. 4, 2021) (finding "[t]he associational-standing doctrine demands more" where organizational plaintiff failed to identify "who specifically will suffer harm–and when, how, or why they will suffer it"); *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 299 (D.D.C. 2018) ("[Plaintiff] fails to identify in its complaint which

particular member of the organization has been harmed. . . . In this way, the complaint runs afoul of the baseline requirement to identify a particular member of the organization that was injured.").

Here, Plaintiffs have not identified in their Amended Complaint any specific members who have been allegedly harmed by Defendants' actions. *See* Am. Compl. As a result, Plaintiffs have failed to allege any associational standing.

### B.    Plaintiffs Fail to Demonstrate Informational Standing.

To show informational standing, Plaintiffs have the burden of proving two elements: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals*, 828 F.3d at 992 (cleaned up). Nonetheless, "[a]ny informational injury still must meet the traceability and redressability prongs of the traditional standing analysis." *Architects & Eng'rs for 9/11 Truth v. Raimondo*, Civ. A. No. 21-2365 (TNM), 2022 WL 3042181, at *3 (D.D.C. Aug. 2, 2022) (citing *Akins*, 524 U.S. at 25), *aff'd*, No. 22-5267, 2023 WL 6439491 (D.C. Cir. Oct. 3, 2023).

Here, Plaintiffs fail to sufficiently allege any informational standing. Plaintiffs have not alleged that they currently lack access to the data or information that they seek from the Institute. For instance, neither AEFP nor IHEP even alleges that it uses or relies on the data from the ECLS-K:2024 study. *See* Am. Compl. ¶¶ 63-69. IHEP also does not allege that it uses or relies on the data from the HS&B:22 or HSLS:09 studies. *See id.* ¶ 62. But even so, as to all of the studies whose contracts Plaintiffs allege were terminated, both AEFP and IHEP's allegations are grounded in mere speculation that they will not have access to the same or similar data or information in the future. *See id.* ¶¶ 35, 40-41, 49-50, 60-62, 67-68. Plaintiffs also merely speculate that they will not have such remote access to the data or new restricted-use data licenses in the future. *See id.* ¶¶ 79-83 (incorporating by reference May 28, 2025, Email, ECF No. 23-1) (merely speculating that

remote access will end after June 30, 2025, even though Institute stated it was "actively working on a long-term solution to transition all users to remote access."); *id.* ¶¶ 85-86 (noting that pending applications for restricted-use licenses were only "paused until further notice").

But even if Plaintiffs could show an informational injury from the cancellation of the contracts for the other studies—only one part of the chain they must show for standing—in many cases they cannot connect it to a statutory violation rather than an exercise of proper discretion. Any programmatic decisions regarding the Institute's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Yet Plaintiffs ask this Court to insert itself into this process, and, in the name of equity, issue a programmatic injunction freezing in place the Institute's programmatic structure. And Plaintiffs ask this Court to do so notwithstanding the Secretary's differing judgment about how the Institute should operate. Having crossed—in Plaintiffs' mind—some threshold for programmatic change that is as unarticulated as it is inarticulable, Plaintiffs ask this Court to step in and manage the Department's day-to-day operations. That is not the law.

### C.    Plaintiffs Fail to Demonstrate Organizational Standing.

To establish organizational standing, a plaintiff must demonstrate "that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Elec. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (cleaned up). "For an organizational plaintiff to demonstrate that it has suffered an injury in fact, it must show 'more than a frustration of its purpose,' since mere hindrance to a nonprofit's mission 'is the type of abstract concern that does not impart standing.'" *Coal. for Humane Immigrant Rts*, 2025 WL 1078776, at *4 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C.

Cir. 2015) (cleaned up)). Thus, to determine whether a plaintiff's allegations are sufficient to convey organizational standing, a court must find that the plaintiff satisfied two prongs: (1) the defendants' "action or omission . . . injured [the plaintiff's] interest;" and (2) that the plaintiff "used its resources to counteract that harm." *Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (quoting *PETA*, 797 F.3d at 1094).

Critically, here, neither AEFP nor IHEP posit any allegations in support of the second prong of the test. *See* Am. Compl. Specifically, neither Plaintiff alleges that it "use[s] its resources to counteract" their identified harm, the purported loss of access to Institute data or information, restricted-use data licenses, remote access privileges, or disclosure risk reviews. *See id.*

If the second prong were not already fatal to Plaintiffs' organizational standing, AEFP and IHEP also fail the first prong. "To allege an injury to its interest, an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services in order to establish injury in fact." *Food & Water Watch*, 808 F.3d at 919 (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)) (cleaned up). "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an inhibition of [the organization's] daily operations." *Id.* (cleaned up).

Here, AEFP alleges its mission is "to provide a forum for discussion and debate as to what drives effective education and related services for children, youth, and adults, while promoting research and development, and encouraging and supporting experimentation and reform which will make the field of educational finance responsive to emerging needs." Am. Compl. ¶ 8. To support this mission, AEFP states it publishes an online Live Handbook and *Education Finance and Policy*, holds an annual conference, and operates other programs. *Id.* ¶¶ 8, 35, 62, 73, 84, 87.

IHEP alleges that its mission is to "promot[e] postsecondary access and success for all students" and does so by conducting and publishing research on education issues. *Id.* ¶¶ 9, 35, 83, 90.

Plaintiffs cannot demonstrate that the Defendants' alleged actions "perceptibly impaired" their ability to fulfill their stated missions. As to the alleged delayed disclosure risk reviews, IHEP fails to allege any specific harm, if any, it has suffered to its daily operations from the three-to-four-month delay in responding to its three disclosure risk review requests. *See* Am. Compl. ¶¶ 90-93, 140-41. As to the alleged cancellation of the contract for the peer review program, AEFP and IHEP merely speculate that their grant applications may not be acted upon. *See id.* ¶¶ 72-73. But they do not identify what specific grant applications requiring peer review that their organizations have applied for, and which remain pending, or indeed why such pending applications have even affected their organizations' daily operations. *See id.*

In this way, AEFP and IHEP fall far short of alleging how Defendant's actions will "inhibit[] [their] daily operations." *Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986). And ultimately, the mere fact that the Institute's status may make it "more difficult" for some but not necessarily all their operations does not meet either AEFP's or IHEP's burden to establish organizational standing. *See Coal. For Humane Immigrant Rts.*, 2025 WL 1078776, at *6 (organizational standing not satisfied where challenged government action merely "has made [] advocacy efforts more difficult to achieve" (cleaned up)). Thus, Plaintiffs fail to allege organizational standing.

## II.    The Court Lacks Jurisdiction Over Plaintiffs' Challenge to the Cancellation of the Institute's Contracts.

Insofar as Plaintiffs seek reinstatement of any Institute contracts for any of the Institute studies or programs, the proper course would be for the parties to those contracts to seek appropriate recourse under the terms of the contracts—not for Plaintiffs, as nonparties, to seek

such relief through this suit. Any challenges to the cancellation of the Institute's contracts are not subject to this Court's jurisdiction. Indeed, in denying Plaintiffs' motion for preliminary injunctive relief, this Court has already stated: "But the Court would likely lack jurisdiction to hear any individual contract challenge brought by the organizations or their members if it resembled a traditional contract claim." Mem. Op. at 23-24, ECF No. 25. Plaintiffs' claims are exactly those traditional contract claims that this Court is precluded from reviewing.

Under the Tucker Act, any claim based on "an express or implied contract with the United States" must be brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). The Supreme Court recently reaffirmed this jurisdictional line in *California*:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." *Ibid*. True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

*Dep't of Educ. v. California*, 145 S. Ct. 966, 967 (2025); *see also U.S. Conf. of Catholic Bishops v. Dep't of State*, Civ. A. No. 25-465 (TNM), 2025 WL 763738, at *4 (D.D.C. Mar. 11, 2025) (explaining that the D.C. Circuit has long "interpreted the Tucker Act as providing the exclusive remedy for contract claims against the government" (cleaned up)), *appeal docketed* No. 25-5066 (D.C. Cir.).[1] Since *California*, courts have been reacting by withholding or staying orders that would have required the types of remedies sought here. *See, e.g.*, *Am. Ass'n of Colleges for Teacher*

---

[1]    On March 28, 2025, the D.C. Circuit denied plaintiffs' motion for an injunction pending appeal and set a schedule for briefing and oral argument for September 2025.

*Ed., v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025) (granting the Government's motion to stay a preliminary injunction because of *California*); *Mass. Fair Housing Cent. et al v. HUD*, Civ. A. No. 25-30041 (D. Mass Apr. 14, 2025) (dissolving temporary restraining order considering the Supreme Court's decision in *California*).

To determine whether an action is "at its essence a contract action," this Court looks at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (cleaned up). In this case, both of those considerations make clear that this Court lacks jurisdiction over any claims challenging the cancellation of the Institute's contracts.

Plaintiffs cannot point to the Act and the APA as sources of the rights to the continuation of the contracts cancelled by the Institute. The Act permits the Institute to perform its delineated functions "directly *or* through grants, contracts, or cooperative agreements." 20 U.S.C. § 9512 (emphasis added). To the extent the Act requires any of the Institute's centers to enter contracts to perform their duties, Plaintiff provides no suggestion that the Act requires the Institute to maintain the particular contracts that were terminated. Given Plaintiffs essentially seek to set aside the termination of those specific contracts that were cancelled, *see* Compl. at 30-31, the source of Plaintiffs' challenge lies within those specific contracts themselves. Moreover, citation to the APA is irrelevant, as the APA itself will not grant jurisdiction where another statutory scheme, here the Tucker Act, applies. *See Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) ("the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA (cleaned up)).

In any event, the latter *Megapulse*, 672 F.2d at 968, factor is dispositive here. The nature of relief Plaintiffs seek sounds in contract. *See Conf. of Catholic Bishops*, 2025 WL 763738, at *7-

8. It asks the Court to "set [] aside" the Institute's termination of the NPSAS 2024, BPS:2/25, HSLS:09, HS&B:22, ECLS-K:2024 studies (which had allegedly been performed through contracts) and "enjoin Defendants to resume" those studies. Compl. at 30-31. Thus, Plaintiffs "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). But this Court cannot order the Government to continue to perform under a contract. *Id*. Such a request for an order that the government "must perform" on its contract is one that "must be resolved by the Claims Court." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985); *see also California*, 145 S. Ct. at 967 (the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," and "as we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'") (cleaned up). Indeed, this Court has already held that there was no jurisdiction to hear a claim by a federal grantee seeking specific performance on a federal grant agreement. *Conf. of Catholic Bishops*, 2025 WL 763738, at **6-7. As to the D.C. Circuit precedent, *Ingersoll-Rand Co.*, this Court has written: "[t]he Court squints in vain to see any daylight. Like those plaintiffs, the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. *Id*. That is something this Court lacks the power to do." The same is true here.

In sum, this Court lacks jurisdiction over the claims challenging the Departments' cancellation of the contracts for the NPSAS 2024, BPS:20/25, HSLS:09, HS&B:22, ECLS-K:2024 studies, and peer review program (Counts I-VI).

### III.    **Plaintiffs Fail to Sufficiently Allege Claims Under the APA.**

Plaintiffs fail to sufficiently allege any claims under the APA. First, Plaintiffs fail to seek judicial review of a discrete agency action. Second, Plaintiffs fail to allege any final agency action as to the remote access program and restricted-use data application processing. Third, there are

adequate alternative remedies available as to any challenges to the termination of contracts, thus precluding Plaintiffs' APA challenges. Finally, the Department's actions are committed to agency discretion.

### A.    Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action

As a threshold matter, Plaintiffs' Amended Complaint still does not identify a discrete and circumscribed agency action that the Department has taken and that could specifically be redressed by a federal court. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891, 899; *Norton*, 542 U.S. at 62 (APA limits judicial review to "circumscribed, discrete agency actions"). These final agency actions must be "circumscribed [and] discrete." *Norton*, 542 U.S. at 62. The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Plaintiffs' claims and requested relief present exactly the type of wholesale challenge that the APA forbids. Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of the Department's management of the Institute's programs. Instead of presenting the court with a "narrow question to resolve," *Cobell*, 455 F.3d at 307, Plaintiffs challenge a host of individual actions—the cancellation of

- 18 -

Institute contracts, the Institute's continuing evaluation of the remote access program, and the current status of its restricted-use data license application processing, *see, e.g.*, Compl. ¶ 3 (stating Plaintiffs bring suit because Defendants "have terminated many of the programs by which [the Institute] carries out its statutory duties—without replacing them and without any plans as to how the agency would do so"); *id.* at 30-31 (seeking wholesale reinstatement of the challenged contracts, the remote access program, the peer review program, and processing of restricted-use data license applications).

Addressing this type of claim would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily-mandated function—an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *See* 497 U.S. at 892-93. Such a claim would completely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66-67.

Indeed, in denying Plaintiffs' motion for a preliminary injunction, the Court noted "the APA was never meant to be a bureaucratic windbreak insulating agencies from political gales. It cannot comprehensively undo multifaceted agency transformations wrought by political decisions." Mem. Op. at 1, ECF No. 25. This Court further observed "[i]t is not this Court's place to breathe life back into wide swathes of the Institute's cancelled programs and then monitor the agency's day-to-day statutory compliance; essentially what Plaintiffs seek." *Id.* As a result, because Plaintiffs continue to "bundle together broad lists of grievances and seek wholesale modifications to agency operations writ large," *id.* at 2, the Court must reach the same resolution here and dismiss Plaintiffs' Amended Complaint for failure to identify discrete agency actions.

*See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("Inconsistency is the antithesis of the rule of law. For judges, the most basic principle of jurisprudence is that we must act alike in all cases of like nature," thus noting that under the law-of-the-case doctrine, "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*" (emphasis in original) (cleaned up)).

### B.    Plaintiffs Do Not Identify a Final Agency Action.

Even assuming Plaintiffs have identified discrete agency actions, Plaintiffs have not sufficiently alleged any final agency action as to the remote access program and restricted-use data application processing are final. "Final agency action" has two components. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action[.]" 5 U.S.C. § 704. Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).

Plaintiffs fail to allege that the Department's actions "mark the consummation" of its decision-making process regarding the remote access program and restricted-use-data license application processing. Rather, all Plaintiffs allege is that the Institute is continuing to evaluate how to proceed with the remote access program and restricted-use data licensing processing.

According to the February 10, 2025, email incorporated by reference in the Amended Complaint, the Institute told restricted-use data licensees that the "NCES staff has been working for some time on a plan to transition our secure remote access program from the Coleridge Initiative's Administrative Data Research Facility (ADRF) to a new platform." Am. Compl. ¶ 79 (incorporating by reference Voight Decl. Ex. 1, ECF No. 6-10 at 11). Then, as part of its transitioning process, the Institute reached out to restricted-use data license holders for information

that would help NCES "assess the level of program support required to continue this vital service and comply with applicable law." Am. Compl. ¶ 80 (incorporating by reference Voight Decl. Ex. 2, ECF No. 6-10 at 13). Later, on May 28, 2025, the Institute told restricted-use data licensees that that it had secured remote access until June 30, 2025, and is "actively working on a long-term solution to transition all users to remote access." Am. Comp. ¶ 81-82 (incorporating by reference May 28, 2025, Email, ECF No. 23-1). Plaintiffs further allege that as of the date of the Amended Complaint, the Institute had not yet released a decision on the status of the remote access program. Am. Compl. ¶¶ 81-82. And as to the restricted-use data license application processing, Plaintiffs themselves allege that while NCES has not accepted new applications, the review of pending applications merely remains "paused until further notice." *Id*. ¶ 85.

In this way, all Plaintiffs' allegations show are "preliminary" decisions about the status of the remote access program and restricted-use data licensing processing and are thus "not directly reviewable." *See* 5 U.S.C. § 704. "It may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make these preliminary steps the "consummation of the administrative process" as to the eventual status of the remote access program or the restricted-use data licensing processing. *Id*. at 113.

### C.    There Are Adequate Alternative Remedies Available.

Furthermore, there are adequate alternative remedies available to foreclose Plaintiffs' APA challenges to the cancellation of the contracts for certain studies and the peer review access program.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id*., reflects that "Congress did not intend the general grant of review in the APA to duplicate

existing procedures for review of agency action," *Bowen*, 487 U.S. at 903. As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit). As explained above, all of Plaintiffs' challenges to the termination of the contracts for certain studies and the peer review program are at essence contract claims, and therefore the Court of Federal Claims provides an adequate alternative under the Tucker Act.

> **D.    The Department's Programmatic Implementation Decisions Are Committed to Agency Discretion.**

"Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id.* "[T]he standard of review is highly deferential" in determining whether an action is arbitrary and capricious, *Littlefield v. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 1117 (2024), and agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").

As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department. This waste impacted the ability of the Department to perform its underlying mission, which is to support the States and localities in providing education to their citizens. Based on these findings, the Secretary has taken the first steps in right-sizing the Department through contract cancellations and programmatic decisions, such as the continued evaluation of the remote access program and pause of restricted-use data licenses.

Plaintiffs bear the burden of alleging that these actions are arbitrary and capricious. *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quotations omitted). They come nowhere close to meeting their pleading burden. Their allegations contesting whether shutting down the Institute or ending the remote access program will bring savings, efficiency, or its policy aims (Am. Compl. ¶¶ 99, 106, 110, 114, 121, 129, 138) reflect a fundamental "lack of understanding" of "the nature" of the Department's actions, *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). The Department is required under the executive orders to perform its statutory obligations. Ultimately, Courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee*, 435 U.S. at 545 (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and enjoin agency leadership from exercising control over the implementation of any statutorily mandated programs would be an extraordinary violation of the separation of powers.

"In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291

F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, decisions on how to implement a program fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (citation omitted). After all, the point of the Department's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. Similarly, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The decisions on program implementation reflect the Administration's effort to realign the Department to provide better service to the American people. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*. at 831-32.

Second, Plaintiffs cannot point to a particular statute limiting the Department's inherent discretion to maintain the same contracts as before or to have the exact programming that was previously in place. Again, agencies generally have broad discretion to determine how to implement a statute. *See Vt. Yankee*, 435 U.S. at 543.

But even if this Court were to conclude that the Department's explanations for cancelling contracts or implementing any of the Institute's programs is insufficient to withstand judicial review, that would in no way justify the injunctive relief that Plaintiffs seek. *See* Am. Compl. at 3 (seeking relief to enjoin Defendants to resume studies and license-application processing or enjoin the termination of the remote access program). Rather, "the proper course" would be "to remand

to the [Department] for additional . . . explanation," not any type of injunction. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## IV.    <u>Plaintiff IHEP Fails to Allege Unreasonable Delay under the APA.</u>

The Department has not engaged in unreasonable delay by not issuing a decision on the disclosure risk review requests that Plaintiff IHEP submitted approximately three to four months before they filed the Amended Complaint. *See* Am. Compl. ¶¶ 88-93, 140-41. Any alleged delay here is not unreasonable as a matter of law. "The central question in evaluating 'a claim of unreasonable delay' is 'whether the agency's delay is so egregious as to warrant mandamus.'" *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *Telecomm'cns Rsch. & Action Ctr. ("TRAC") v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984)). Courts in this Circuit apply a six-factor test to determine whether agency action has been unreasonably delayed:

(1)    the time agencies take to make decisions must be governed by a rule of reason;

(2)    where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3)    delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4)    the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5)    the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6)    the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80) (citations and quotation marks omitted). Applying these factors here makes clear that any delay is not unreasonable.

A.    *TRAC* Factors 1 and 2

The first and second *TRAC* factors weigh in Defendants' favor. *See Dastagir v. Blinken*, 557 F. Supp. 3d 160, 164-67 (D.D.C. 2021); *Mohammad v. Blinken*, 548 F. Supp. 3d 159, 164-67 (D.D.C. 2021); *Liu v. Blinken*, 544 F. Supp. 3d 1, 11-13 (D.D.C. 2021); *Shen v. Pompeo*, Civ. A. No. 20-1263 (ABJ), 2021 WL 1246025, at \*8 (D.D.C. Mar. 24, 2021); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 318-19 (D.D.C. 2020). These factors ask whether the length of time for the agency to act is governed by a "rule of reason" as informed by any specific timetable established by Congress. *Id.* "Whether a 'rule of reason' exists for agency action . . . depend[s] in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 148 (D.D.C. 2021) (quoting *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)). Nevertheless, the Circuit has concluded that "a reasonable time for agency action is typically counted in weeks or months[.]" *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004).

Relevant to this case, IHEP does not allege that there is any statutory or regulatory timeframe within which the Institute must complete a requested disclosure risk review. Thus, because Congress has established no firm timetable for the Institute to issue a final decision on IHEP's disclosure risk review requests, the Court must determine whether the application has been pending for an unreasonable amount of time as established by case law. *See Sarlak v. Pompeo*, Civ. A. No. 20-0035 (BAH), 2020 WL 3082018, at \*6 (D.D.C. June 10, 2020) ("Absent a congressionally supplied yardstick, courts typically turn to case law as a guide" to determine whether a delay is reasonable.).

Here, IHEP alleges that it submitted disclosure risk review requests on February 7, 2025, March 4, 2025, and March 14, 2025, and all three requests remain pending as of the date of their

Amended Complaint. Am. Compl. ¶¶ 91-93. Thus, at the time of the Amended Complaint on June 18, 2025, IHEP's disclosure risk review requests have been pending for approximately three to four months.

A delay of three to four months is not unreasonable as matter of law. Indeed, courts in this District and elsewhere have routinely concluded that delays in contexts such as the approval of immigration applications far longer than the delay here do not constitute unreasonable delay. *See Ghadami v. Dep't of Homeland Sec.*, Civ. A. No. 19-0397 (ABJ), 2020 WL 1308376, at *8 (D.D.C. Mar. 19, 2020) ("[M]any courts evaluating similar delays have declined to find a two-year period to be unreasonable as a matter of law."); *Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 94 (D.D.C. 2020) (Bates, J.) (finding that "the roughly twenty-five-month delay to this point in adjudicating [plaintiff's] waiver eligibility is not unreasonable"); *Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 (D.D.C. 2020) (Cooper, J.) (holding that the plaintiffs had "failed to establish that the two-year delay in processing [a] waiver application is unreasonable"); *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153-54 (D.D.C. 2017) (citing case law that even a five- to ten-year delay in the immigration context may be reasonable); *Xu v. Cissna*, 434 F. Supp. 3d 43, 55 (S.D.N.Y. 2020) (finding a three-year delay in adjudicating an asylum application to not be unreasonable under the APA); *Yavari v. Pompeo*, Civ. A. No. 19-02524, 2019 WL 6720995, at *8 (C.D. Cal. Oct. 10, 2019) ("District courts have generally found that immigration delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable."). Using this "case law as a guide," these initial *TRAC* factors weigh in Defendants' favor. *See Sarlak*, 2020 WL 3082018, at *6.

**B.    *TRAC* Factor 4**

The fourth *TRAC* factor—the effect of granting relief on the Institute's competing priorities—carries significant weight, *see Mashpee Wampanoag*, 336 F.3d at 1100, and weighs

heavily in Defendants' favor as IHEP asks this Court to move its disclosure risk review requests ahead of other requests, *see* Compl. at 31. Indeed, "[r]elief that would simply 'reorder' a queue of applicants seeking adjudication is generally viewed as inappropriate when 'no net gain' in such adjudications is achieved." *Tate*, 513 F. Supp. 3d at 149-50 (quoting *Sarlak*, 2020 WL 3082018, at *6).

Compelling an Institute decision in IHEP's disclosure risk review requests by fourteen days of a court order would simply reorder the queue and push IHEP's requests to the front of the line. However, under this Circuit's precedent, a court will not compel agency action where the result would be merely to expedite the consideration of a plaintiff's request ahead of others. *See Liberty Fund v. Chao*, 394 F. Supp. 2d 105, 117 (D.D.C. 2005) (Bates, J.) (courts will not compel agency action where result "would mean putting [plaintiff] at the head of the queue at the expense of others"); *Mashpee Wampanoag*, 336 F.3d at 1101 ("We agree with the Secretary that the district court erred by disregarding the importance of there being 'competing priorities' for limited resources. The district court offered no legal justification for precluding the Secretary from relying upon her 'first-come' procedure, and we can conjure none."); *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."); *Sarlak*, 2020 WL 3082018, at *6 (finding that the fourth factor weighed in the government's favor because expediting the plaintiff's waiver would harm other agency activities of equal or greater priority); *Ghadami*, 2020 WL 1308376, at *9 (finding that "expediting review in [plaintiff's] case would merely direct government resources from the adjudication of other waiver applications"); *Fangfang Xu v. Cissna*, 434 F. Supp. 3d 43, 55 (S.D.N.Y. 2020) ("The effect of leapfrogging Plaintiff's application to the front of the line would do nothing to cure the deficiencies of the

asylum application process; it would only harm other applicants, who are equally deserving of prompt adjudication."). Mandamus relief is inappropriate in this context. *See Liberty Fund*, 394 F. Supp. 2d at 117; *see also Gong v. Duke*, 282 F. Supp. 3d 566, 569 (E.D.N.Y. 2017) ("There are many other applicants who have waited even longer than plaintiff; to grant him priority is to push them further back in line when the only difference between them is that plaintiff has brought a federal lawsuit. That factor should not give him any advantage."); *Varol v. Radel*, 420 F. Supp. 3d 1089, 1098 (S.D. Cal. 2019) ("[G]ranting relief to the Plaintiff simply moves her to the front of the line at the expense of all other applicants who may not have filed an application for mandamus relief.").

To be sure, IHEP may argue that this case presents only three disclosure risk review requests, which would not fundamentally reorder the pending processing queue if the Court were to grant IHEP's requested relief. But the Court should not struggle to cast this argument aside. As the *Tate* Court explained when rejecting a similar argument, this *TRAC* factor nonetheless favors the Government because "[w]hile the effect of an individual case would be minimal, the accumulation of such individual cases being pushed by judicial fiat to the front of the line would erode the ability of agencies to determine their priorities." *Tate*, 513 F. Supp. 3d at 150. This is especially true here where the Secretary is engaging in an overhaul of the Department pursuant to the President's Executive Orders and its "'reduction reductions in resources.'" Am. Compl. ¶ 89. Thus, "[t]his factor heavily favors defendants' position." *Id.*; *see also Dastagir*, 557 F. Supp. 3d at 164-69; *Mohammad*, 548 F. Supp. 3d at 167-68; *Liu*, 544 F. Supp. 3d at 13-14; *Shen*, 2021 WL 1246025, at *9; *Milligan*, 502 F. Supp. 3d at 319.

### C.    *TRAC* Factors 3 and 5

"The third and fifth [*TRAC*] factors overlap—the impact on human health and welfare and economic harm, and the nature and extent of the interests prejudiced by the delay." *Liberty Fund*, 394 F. Supp. 2d at 118. These factors also weigh in Defendants' favor.

Here, IHEP does not specifically allege what impact or prejudice the delay has had on it. Rather, IHEP only generally alleges that before a restricted-use data license holder can share research or analysis based on restricted data with a third party, it must obtain a disclosure risk review from the Institute. Am. Compl. ¶ 88. Without such allegations of the delay's impact on IHEP, this factor weighs in Defendants' favor.

Again, advancing IHEP's requests to the front of the queue would simply benefit IHEP to the detriment of other licensees with pending requests, who may have experienced the same or worse impacts from a delay. Indeed, expediting review in this case over the requests of other licensees would direct resources away from the decisions that the Institute may have identified as more urgent or those pending for a far longer time, requiring this Court to overrule the Institute's prioritization decisions and place Plaintiff at the front of the line. *See Barr Labs*, 930 F.2d at 75-76 (observing that "a judicial order putting [the petitioner] at the head of the queue [would] simply move[ ] all others back one space and produce[ ] no net gain[,]" and that agencies are in the best position to allocate their own resources); *Skalka*, 246 F. Supp. 3d at 154 (noting that courts step outside of their "limited role" where they require "agencies to invest the high degree of resources that would be necessary to accurately investigate plaintiffs' visa petitions," because such a requirement "would presumably delay other adjudications" and make others "suffer in response").

### D.    *TRAC* Factor 6

The sixth and final *TRAC* factor provides that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC*, 750 F.2d at 80. In the Amended Complaint, IHEP does not allege bad faith on the part of the Institute and merely alleges the Institute has not addressed its requests or otherwise provided timely relief. *See* Am. Compl. ¶¶ 88-93, 140-41. While a lack of information on the status of their requests may be frustrating, it is not proof of impropriety or bad faith. Instead, it is consistent with the "'recent reductions in resources'" that the Institute has conveyed to IHEP, Am. Compl. ¶ 89, as well as the reorganization that the Department is currently undergoing pursuant to the President's Executive Orders. This factor thus weighs in Defendants' favor. *See Tate*, 513 F. Supp. 3d at 150 ("the good faith of the agency in addressing the delay weighs against relief") (quotation marks omitted).

In sum, the *TRAC* factors weigh in Defendants' favor, and IHEP has failed to allege any unreasonable delay as matter of law by the three-to-four-month delay in the Institute's processing of its disclosure risk review requests.

## V.  Defendants Should Be Relieved of Their Obligation to File a Certified List of the Administrative Record and Serve the Administrative Record Simultaneously with this Motion.

Defendants should be excused from Local Civil Rule 7(n)(1)'s requirement that Defendants file a certified list of an administrative record and serve an administrative record simultaneously with this dispositive motion. Pursuant to Local Rule 7(m), counsel for Defendants conferred with counsel for Plaintiffs about this requested relief. Plaintiffs oppose.

An administrative record is not necessary to resolve this motion, which argues that judicial review is not available in this case—a threshold legal issue that does not require review of the administrative record. Moreover, even if judicial review were available, Defendants have moved to dismiss by relying entirely on the facts alleged in the Amended Complaint, documents incorporated by reference in the Amended Complaint, or facts upon which the Court make take

judicial notice. Finally, an administrative record is not proper for the unreasonable delay claim, which does not involve final agency action.

Indeed, courts in this district routinely grant the government's requests to defer the filing of a certified list of the contents of the administrative record when it is unnecessary in deciding a dispositive motion. *See, e.g.*, *Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018) (Court granted Federal Defendants' motion to waive compliance with Local Civil Rule 7(n) because the Court did not need to consider the administrative record in evaluating the motions before it); *Mdewakanton Sioux Indians of Minn. v. Zinke*, 264 F. Supp. 3d 116, 123 n.12 (D.D.C. 2017) (same); *Carroll v. Office of Fed. Contract Compliance Programs, U.S. Dep't of Labor*, 235 F. Supp. 3d 79, 81 n.1 (D.D.C. 2017); *PETA v. U.S. Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 94 n.2 (D.D.C. 2014) (waiving compliance with Local Civil Rule 7(n) and dismissing complaint).

Further, this Court should determine whether it has jurisdiction over this case before requiring Defendants to compile and certify the administrative record. The Court must determine that it has jurisdiction before proceeding to the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.") (citation omitted); *see also Talal Al-Zahrani v. Rodriguez*, 669 F.3d 315, 318 (D.C. Cir. 2012) ("Because a federal court without jurisdiction cannot perform a law-declaring function in a controversy, 'the Supreme Court [has] held "that Article III jurisdiction is always an antecedent question" to be answered prior to any merits inquiry.'") (quoting *Pub. Citizen v. U.S. Dist. Court for the Dist. of Columbia*, 486 F.3d 1342, 1346 (D.C. Cir. 2007)); *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 674 (D.C. Cir. 2013) ("this Circuit treats prudential standing as a jurisdictional issue which cannot be waived or conceded" (citations and quotations omitted)).

Thus, the Court must first determine whether it has jurisdiction given that Defendants have argued in the first instance that no judicial review is available here.

Finally, the basis for IHEP's unreasonable delay claim does not involve final agency action, but rather agency inaction. As a result, the requirement of the local rules to produce an administrative record with the filing of the dispositive motion does not apply. *See* Local Civ. R. 7(n)(1) (requirement applies "[i]n cases involving the judicial review of administrative agency *actions*" (emphasis added)); *Dallas Safari Club v. Bernhardt*, Civ. A. No. 19-3696 (APM), 2021 WL 495078, at *3 (D.D.C. Feb. 9, 2021) (noting the two flavors of APA review—review of agency action and agency inaction—concluding both are considered on an administrative, not discovery record, on summary judgment); *see also generally Nat'l Law Ctr. on Homelessness & Poverty v. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (Lamberth, J.) (noting that often "if an agency fails to act, there is no 'administrative record' for a federal court to review.").

As a result, waiving the requirement to file a certified list of the administrative record and serve the administrative record at this juncture would promote judicial economy and conserve resources.

*     *     *

**CONCLUSION**

For these reasons, Plaintiffs' Amended Complaint should be dismissed. Defendants should also be relieved of their obligation to file a certified list of the administrative record and serve the administrative record simultaneously with their Motion to Dismiss.


Dated: July 2, 2025                    Respectfully submitted,

                                       JEANINE FERRIS PIRRO
                                       United States Attorney


                                       By: _____/s/ Erika Oblea_____
                                           ERIKA OBLEA, D.C. Bar #1034393
                                           DIMITAR P. GEORGIEV, D.C. Bar #1735756
                                           Assistant United States Attorneys
                                           601 D Street, NW
                                           Washington, DC 20530
                                           (202) 252-2500 (main)
                                           Erika.oblea@usdoj.gov
                                           dimitar.georgiev-remmel@usdoj.gov

                                       *Attorneys for the United States of America*