### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC., <br><br> and <br><br> THE INSTITUTE FOR HIGHER EDUCATION POLICY, <br><br> *Plaintiffs*, <br><br> v. <br><br> LINDA MCMAHON, in her official capacity as Secretary of Education, <br><br> and <br><br> U.S. DEPARTMENT OF EDUCATION, <br><br> *Defendants*. | No. 25-999 (TNM) |

### SECOND AMENDED COMPLAINT
### FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      In 2002, Congress enacted, and the President signed, the Education Sciences Reform Act of 2002, Pub. L. No. 107-279 (ESRA). As then-Secretary of Education Rod Paige remarked, the bipartisan legislation recognized the need for "an invigorated research agency that is capable of carrying out a coordinated, focused agenda of high-quality research, statistics, and evaluation that is relevant to the educational challenges of the nation." To accomplish this goal, the statute reorganized existing research initiatives at the Department of Education (ED)—some of which had been underway since the 1860s—and established the Institute of Education Sciences (IES) and four National Centers of Research within it. Congress directed IES to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities" to

"expand[] fundamental knowledge and understanding of education from early childhood through postsecondary study," and to provide "reliable information" to "parents, educators, students, researchers, policymakers, and the general public." 20 U.S.C. §§ 9511(b)(1)–(2); *see also* 20 U.S.C. § 3419. The statute also transferred to IES the duties to undertake several existing research initiatives.

2.      Over the past two decades, IES, both directly and through contractors, has carried out these statutory obligations by conducting data collections and analyses, issuing grants to fund external research, publishing reports and materials to aid researchers and practitioners, and making data available to researchers and the public in a variety of electronic forms. Congress has appropriated billions of dollars for IES to continue this work, including $793,106,000 for the current fiscal year.

3.      Since February 2025, Defendants, Secretary of Education Linda McMahon and ED, have terminated many of the programs by which IES carries out its statutory duties—without replacing them and without any plans as to how the agency would do so. This action challenges six of those terminations as contrary to law and/or arbitrary and capricious under the Administrative Procedure Act (APA). Those terminations are: (1) the termination of the 2020/25 Beginning Postsecondary Students Longitudinal Study (BPS:20/25); (2) the termination of the High School Longitudinal Study of 2009 (HSLS:09); (3) the termination of the High School and Beyond Longitudinal Study of 2022 (HS&B:22); (4) the termination of the Early Childhood Longitudinal Study-Kindergarten: 2024 (ECLS-K:2024); (5) the termination of IES's peer review program for new grant funding; and (6) the termination of processing applications for access to restricted-use data.

4.    Plaintiff Association for Education Finance and Policy (AEFP), an association of scholars and practitioners working on education finance and policy issues, is harmed by and challenges each of these terminations. AEFP and its members rely upon each of the four terminated studies and had planned on using them in their work. In addition, AEFP members have been deprived of the ability to obtain grant funding as a result of the termination of the peer review program. And AEFP members are unable to obtain access to restricted-use data as a result of the termination of processing applications for restricted-use data.

5.    Plaintiff the Institute for Higher Education Policy (IHEP), a nonprofit research organization dedicated to providing evidence-based and data-driven analyses to policymakers and institutions in order to expand access to and success in higher education, is harmed by and challenges the termination of BPS:20/25, the data from which it was expecting to use in its work. In addition, IHEP challenges Defendants' unreasonable delay in processing its requests for approval to publish certain documents using restricted-use data.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely, the United States Constitution and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706.

7.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because Defendants are officers and agencies of the United States and because at least one defendant resides in Washington, D.C.

## PARTIES

8.    Plaintiff Association for Education Finance and Policy (AEFP) is a nonprofit membership organization incorporated under Florida law, with a principal place of business in

Sparks, Nevada. Its mission is to provide a forum for discussion and debate as to what drives effective education and related services for children, youth, and adults, while promoting research and development, and encouraging and supporting experimentation and reform which will make the field of educational finance responsive to emerging needs. AEFP has approximately 1,000 scholar and practitioner members who work in a range of settings—including at institutions of higher education, in public K-12 schools, and in state and local governments—all of whom share a common interest in the advancement of knowledge and its application to the improvement of education finance and policy. AEFP offers opportunities for members to engage with one another around rigorous research that can inform education finance and policy decisions. AEFP operates the Live Handbook, a digital hub for education policy research and informed decision-making. AEFP publishes *Education Finance and Policy*, a quarterly journal of research papers and policy briefs concerning education finance, policy, and practice. It holds an annual conference for discussion and collaboration regarding research in school finance and education policy. AEFP also operates programs designed to connect education researchers with one another and with professional resources, including community groups, a fellowship program, and a mentorship program.

9.     Plaintiff the Institute for Higher Education Policy (IHEP) is a nonpartisan, nonprofit research, policy, and advocacy organization that is committed to promoting postsecondary access and success for all students. Since its founding more than thirty years ago, IHEP has provided timely, evidence-based, and student-centered research to inform policy decisions and address the nation's most pressing higher education challenges. To accomplish this, IHEP employs a team of professionals who, themselves and in coordination with third parties, conduct and publish research on issues relating to college access, affordability, success and post-

college outcomes. IHEP makes its work publicly available on its website and also provides its research and analysis directly to policymakers and higher education institutions.

10.    Defendant Linda McMahon is the Secretary of Education and is sued in her official capacity.

11.    Defendant U.S. Department of Education is an agency of the United States, headquartered in Washington, D.C.

## FACTS

### The Establishment and Statutory Functions of IES and its Centers

12.    In enacting ESRA in 2002, Congress sought to reorganize ED's existing research initiatives, largely operated out of the Office of Educational Research and Improvement (OERI), "to provide the mechanism for valid research that would be cumulative and inform education practices at the State and local levels with well-documented findings." H.R. Rep. 107-404, at 30–31 (2002).

13.    Finding "restructuring coupled with serious reform" necessary, Congress replaced OERI with the Institute of Education Sciences, "initiat[ing] a new chapter in high-quality research." *Id.* at 31. While placed within ED, Congress intended for IES to function semi-independently, under the direction of a Director appointed by the President for a six-year term, 20 U.S.C. § 9514, who is in turn advised by the National Board for Education Sciences, *id.* § 9516. As part of this semi-independence, the statute limits the ability of the Secretary to assign IES tasks other than those specified in the statute. *Id.* § 9513(b).

14.    Congress also reorganized existing research centers into four separate "National Education Centers" within IES—the National Center for Education Research (NCER), the National Center for Education Statistics (NCES), the National Center for Education Evaluation

and Regional Assistance (NCEE), and the National Center for Special Education Research (NCSER). *Id*. § 9511. ESRA charged each Center with specific obligations to obtain and share information with policymakers, researchers, educational institutions, students, and members of the public. *Id*. §§ 9511(c)(3), 9531–9567b. ESRA also assigned the responsibility for several pre-existing statutorily mandated studies to IES and its components.

15.     As specified in the statute, IES's mission is to "provide national leadership in expanding fundamental knowledge and understanding of education from early childhood through postsecondary study, in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about" the state of education in the United States, educational practices, and the effectiveness of education programs. *Id*. § 9511(b)(1). To carry out this mission, the statute states that IES "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute." *Id.* § 9511(b)(2).

16.     ESRA further requires IES to use appropriated funds, either directly or through grants and contracts, to, among other things, "conduct and support scientifically valid research activities," "widely disseminate the findings and results of scientifically valid research in education," and "strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education." *Id*. § 9512. Any grants or contracts are required to be awarded on a competitive basis "and, when practicable, through a process of peer review." *Id*. § 9520. The results of any research conducted or supported by IES must also "be subjected to rigorous peer review" before publication or dissemination. *Id*. § 9576(c).

17.    The Education Sciences Reform Act includes several requirements related to access to data and information. For one, any data collected by IES and its subsidiaries "shall be made available to the public, including through use of the internet." *Id*. § 9574. In addition, the statute requires IES to "make customer service a priority," by, among other things, "establishing and improving feedback mechanisms," "disseminating information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," and "utilizing the most modern technology and other methods." *Id.* § 9575.

18.    In addition to the responsibilities assigned in ESRA, Congress tasked IES with conducting and disseminating research and evaluation related to implementation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1464, and to the condition of career and technical education (CTE) and effectiveness of federally funded CTE programs under the Perkins Act, 29 U.S.C. § 2324. Congress also assigned IES duties related to various grant programs, requiring IES to evaluate program activities and provide resources to grant recipients. *See, e.g.*, *id*. § 6645 (Comprehensive Literacy State Development Grants), § 6633(c) (Teacher and School Leader Incentive Program), § 7275(f) (Full-Service Community Schools Program).

19.    Each of the four National Education Centers also has specific statutory obligations. NCES, which has existed in some form since the 1860s, has responsibilities impacting all aspects of education in America, including, for example, the conduct and dissemination of the National Assessment of Educational Progress, 20 U.S.C. § 9622; the maintenance of the Integrated Postsecondary Education Data System (IPEDS), *id*. § 1015a(i)(4); the regular conduct and dissemination of national surveys of federal student aid recipients as to the costs of postsecondary education, *id*. § 1015a(k); the regular collection and report of information on career and technical

education, *id.* § 2324(a)(3); and the collection of data on the education of migratory children, *id.* § 6398(e).

20.     Pursuant to the Higher Education Opportunity Act of 2008, NCES is also required to collect, analyze, and disseminate additional data about postsecondary education costs. Pub. L. No. 110-315, §§ 111, 1188 (2008) (codified at 20 U.S.C. §§ 1015 and 1015a).

21.     NCES is also required to generate data and information used by other parts of ED, and other federal agencies. For example, costs calculated by NCES are used to determine the amounts of educational assistance provided to veterans under 38 U.S.C. § 3015, to determine the amounts of assistance provided to states for Indian education, 25 U.S.C. § 5348(b)(1)(B)(i), and to determine the amounts of funds for career and technical education assistance provided to local educational agencies, 20 U.S.C. § 2351(a)(1)(B).

22.     NCER's statutory mission is "to sponsor sustained research" on a variety of topics, "to support the synthesis and, as appropriate, the integration of education research," "to promote quality and integrity through the use of accepted practices of scientific inquiry to obtain knowledge and understanding of the validity of education theories, practices, or conditions," and "to promote scientifically valid research findings that can provide the basis for improving academic instruction and lifelong learning." *Id.* § 9531. To carry out this mission, NCER is required to, among other things, "maintain published peer-review standards"; propose and implement a plan "to carry out scientifically valid research" consistent with IES's mission, including on the topics of "successful State and local education reform activities," "the impact of technology," and methods of mathematics and science teaching that may be used in low-performing schools to improve achievement, as required by the Elementary and Secondary Education Act of 1965 (20 U.S.C. §§ 6301 et seq.); "synthesize and disseminate, through [NCEE], the findings and results of

education research conducted or supported by [NCER]"; and assist in the preparation of the biennial report on education required by 20 U.S.C. § 9519. *Id.* § 9533.

23.     In addition to disseminating research, NCEE's mission is to provide technical assistance, evaluate Federal education programs, support the "synthesis and wide dissemination" of its own work, and "encourage the use of scientifically valid education research and evaluation throughout the United States." *Id.* § 9561. In furtherance of this mission, Congress has required NCEE to "widely disseminate information on scientifically valid research, statistics, and evaluation on education, particularly to State educational agencies and local educational agencies, to institutions of higher education, to the public, the media, voluntary organizations, professional associations, and other constituencies" on specified topics, including by making information "accessible in a user-friendly, timely and efficient manner (including through use of a searchable Internet-based online database)." *Id.* § 9562(a).

24.     ESRA also requires NCEE to establish and maintain various information clearinghouses and to respond "to inquiries from schools, educators, parents, administrators, policymakers, researchers, [and] public and private entities." *Id.* §§ 9562(a)(7), 9562(b).

25.     NCEE also has the responsibility to establish and maintain "a networked system of 10 regional educational laboratories," which are in turn required to, among other things, conduct research; provide training and technical assistance to state and local educational institutions and agencies; and develop and widely disseminate "research, information, reports, and publications that are usable for improving academic achievement, closing achievement gaps, and encouraging and sustaining school improvement" to schools, parents, policymakers, and the public. *Id.* § 9564.

26.     The National Library of Education is also a part of NCEE, and it is required to collect and archive a wide range of products, publications, and research, and to provide services to federal employees, contractors, grantees, and members of the public. *Id.* § 9562(d).

27.     Finally, NCSER is the smallest of the four national centers, and it is dedicated to sponsoring research related to "the needs of infants, toddlers, and children with disabilities," to improving services provided under, and supporting the implementation of, the IDEA, and to, in coordination with NCEE, conducting evaluation activities regarding IDEA implementation. *Id.* § 9567. The statute identifies 17 specific topics as to which NCSER "shall carry out research activities," the results of which must be synthesized and disseminated through NCEE. *Id.* §§ 9567b(a), (e).

28.     In 2024, Congress appropriated $793,106,000 for IES to conduct its work. *See* Department of Education Appropriations Act, 2024, Div. D, Title III of the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 690 (Mar. 23, 2024). This includes appropriations of $121,500,000 for NCES, $53,733,000 for the Regional Educational Laboratories, and $193,300,000 for the National Assessment of Educational Progress. Congress has continued funding at these levels for 2025. *See* S. Rept. 118-84 at 247 (incorporated into statute by Pub. L. No. 118-47, § 4, and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024); Sec. 1101(a)(8), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4).

29.     Approximately 90% of IES's data collection and reporting is performed by contractors. In addition, IES relies on contractors to perform a wide range of tasks that support that work, and that allow IES to operate.

**The Beginning Postsecondary Students Longitudinal Studies**

30.    Since 1987, NCES has conducted a data collection called the National Postsecondary Student Aid Study (NPSAS)—which compiles a comprehensive research dataset, based on student-level records, that "[e]xamines the characteristics of students in postsecondary education, with a special focus on how they finance their education." NCES, National Postsecondary Student Aid Study (NPSAS), https://nces.ed.gov/surveys/npsas/. Because NPSAS relies on a large, nationally representative sample of institutions and students, NCES has also historically used NPSAS to identify samples of student populations to follow in subsequent longitudinal studies, including the Beginning Postsecondary Students Longitudinal Study (BPS). *See* NCES, About NPSAS, https://nces.ed.gov/surveys/npsas/about.asp.

31.    BPS "tracks first-time students' pathways through postsecondary education over the course of six years, focusing on persistence and degree attainment, transition to employment, and school and work experiences." NCES, Beginning Postsecondary Students (BPS), https://nces.ed.gov/surveys/bps/. As NCES explained in October 2024, "Because BPS traces a student's path throughout the postsecondary education system over a number of years, it provides a much more complete picture of postsecondary persistence and success than studies that cannot track students once they leave a particular institution." NCES, 2020/25 Beginning Postsecondary Students (BPS:20/25) Full-Scale Study, Supporting Statement Part A, OMB #1850-0631 v.21, Oct. 2024, at 1, https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202410-1850-005,

32.    The cohort for BPS consists of students beginning their postsecondary education during the NPSAS year. So, for example, BPS:12/17 tracked first-time students who began

postsecondary education during the 2011-12 academic year. NPSAS 2012 data collected that year provided the base-year sample, and follow-up surveys were conducted in 2014 and 2017.

33.     In connection with the NPSAS data collection in 2020 (known as NPSAS 2020), NCES launched a new set of BPS follow-up studies. The cohort for those studies consisted of first-time students who began postsecondary education in the 2019-20 academic year. NPSAS 2020 provided the base-year sample. Follow-up studies were scheduled for 2022 and 2025.

34.     The 2022 follow-up study is referred to as the 2020/22 Beginning Postsecondary Students Longitudinal Study (BPS:20/22). Data collection for BPS:20/22 has been completed and NCES published its "First Look" report for that follow-up study in September 2024. NCES, *Persistence and Attainment of 2019–20 First-Time Postsecondary Students After 3 Years, First Look* (2024), https://nces.ed.gov/pubs2024/2024401.pdf. There, NCES noted that "[t]he student- and institution-level factors in this report are just a few of the several hundred that will be available in the BPS:20/22 data." *Id.* at 2. That full complement of data, along with further analyses, were scheduled to be made available to researchers like Plaintiffs and AEFP's members. However, the data for BPS:20/22 have not yet been made available to researchers, either via DataLab, a public web-based platform managed by NCES, or as a data file available to restricted-use data license holders. On February 10, 2025, Defendants terminated the contract that included BPS:20/22, without any plans to replace it. *See* Contract Summary, PIID 91990018C0039, https://www.usaspending.gov/award/CONT_AWD_91990018C0039_9100_-NONE-_-NONE-. Defendants have made no public statement about whether and when they will release the data collected as part of BPS:20/22.

35.     The 2025 data collection and analysis was referred to as the 2020/25 Beginning Postsecondary Students Longitudinal Study (BPS:20/25). BPS:20/25 was particularly important

for a number of reasons. As NCES explained, "BPS:20/25 is uniquely positioned to provide longitudinal data on the experiences of students from year one of the pandemic through six years later, to enable researchers to examine enrollment, persistence, attainment, educational experiences, and employment outcomes for a cohort of students whose postsecondary education began during an unprecedented and far-reaching event." BPS:20/25 Supporting Statement, *supra* at 3. *See also* First Look, *supra*, at 2 (recognizing that BPS:20/25 "will provide more comprehensive data about postsecondary attainment" than would be available from BPS:20/22).

36.    While planning for BPS:20/25 had been ongoing for several years, survey data collection was scheduled to begin in February 2025 and end in October 2025. *See* BPS:20/25 Supporting Statement, *supra* at 14. Data processing was scheduled to be completed in November 2025, with publication of reports and data files to follow. *Id.* On February 10, 2025, though, Defendants terminated the contract that included BPS:20/25, without any plans to replace it. *See* Contract    Summary,    PIID    91990018C0039,    https://www.usaspending.gov/award/ CONT_AWD_91990018C0039_9100_-NONE-_-NONE-. All remaining work relating to BPS:20/25 has been canceled. Defendants did not offer any explanation for terminating BPS:20/25.

37.    Plaintiffs AEFP and IHEP both rely on data collected and disseminated as part of BPS in doing their work. For example, BPS data provide the foundation for much of the content in AEFP's regularly updated Live Handbook relating to higher education finance. AEFP's researcher members also rely on data collected and disseminated as part of BPS in doing their own work. And IHEP relies on data from BPS to analyze the needs and experiences of college students and to make evidence-based recommendations to policymakers. Plaintiffs and AEFP members have relied on BPS data in the past, and they were planning to rely on the data that IES would have

collected and published this year as part of BPS:20/25 to inform their work going forward and ensure that it is based on the most up-to-date information.

**NCES's High School Longitudinal Studies**

38.    Since 1972, NCES has conducted six longitudinal studies following cohorts of high school students. These longitudinal studies collect data from high school students in a baseline year and then track their progress through high school and in the decades afterwards. These surveys have taken place once a decade.

39.    These longitudinal studies have fulfilled NCES's statutory obligations to collect and disseminate data relating to "the condition and progress of education, at the … secondary, postsecondary, and adult levels," 20 U.S.C. § 9543(a)(1), and to "conduct[] longitudinal and special data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7).

40.    NCES's last such longitudinal study, the High School Longitudinal Study of 2009 (HSLS:09), tracked students who were ninth graders in 2009. That study has produced a wealth of data and reports. *See* NCES, High School Longitudinal Study of 2009 (HSLS:09), https://nces.ed.gov/surveys/hsls09.

41.    NCES had scheduled a third follow-up data collection for that study for 2025. In December 2024, NCES explained the importance of this collection and that other existing datasets did not provide comparable information. *See* NCES, High School Longitudinal Study of 2009 (HSLS:09), Third Follow-Up, OMB #1850-0852 v.30, Dec. 2024, https://downloads.regulations.gov/ED-2024-SCC-0145-0002/attachment_1.docx.

42.     On February 10, 2025, Defendants terminated the scheduled 2025 data collection. Contract     Summary,     PIID     91990024F0321,     https://www.usaspending.gov/award/CONT_AWD_91990024F0321_9100_91990023D0042_9100.

43.     In addition, NCES was scheduled to begin its next longitudinal study of secondary students in 2020, but that study was delayed as a result of the COVID-19 pandemic. In 2022, after more than four years of planning, NCES launched the High School and Beyond Longitudinal Study of 2022 (HS&B:22). HS&B:22 was designed to follow students who were in 9th and 12th grade in 2022 as they advanced in, and after, high school.

44.     As NCES explained when the study began, "HS&B:22 will help educators, parents, researchers, and policymakers better understand the factors that contribute to student success. Information collected through the study also can be used to improve high school educational experiences     for     this     generation     and     beyond."     NCES,     About     HS&B:22, https://surveys.nces.ed.gov/hsb22/Home/About.

45.     NCES has explained that "HS&B:22 and its predecessor studies offer an extraordinary opportunity to study trends in students' high school experiences and education outcomes. By maintaining linkages with NCES's previous high school longitudinal studies, HS&B:22 data can be used to examine changes over time and shed light on the effects of various policies, demographic shifts, and school practices on student achievement, growth, and education attainment." NCES, High School & Beyond Longitudinal Study of 2022, Why should I participate?, https://surveys.nces.ed.gov/hsb22/Home/Participate.

46.     NCES had already begun publishing data from HS&B:22, and planned to produce additional reports, tables, and infographics. NCES, High School & Beyond Longitudinal Study of 2022, Why should I participate?, https://surveys.nces.ed.gov/hsb22/Home/Findings.

47.    On February 10, 2025, Defendants terminated the contract by which HS&B:22 was being conducted, which it had entered into in May 2018. Contract Summary, PIID 91990018F0018, https://www.usaspending.gov/award/ CONT_AWD_91990018F0018_9100_GS00Q14OADU217_4732.

48.    NCES has posted on its website that "study operations for HS&B:22 have been suspended." NCES, High School & Beyond Longitudinal Study of 2022, https://surveys.nces.ed.gov/hsb22.

49.    Plaintiff AEFP relies on data collected and disseminated as part of NCES's high school longitudinal studies, including HSLS:09 and HS&B:22, in doing its work. In addition, AEFP members rely on data collected and disseminated as part of NCES's high school longitudinal studies, including HSLS:09 and HS&B:22 in doing their work. AEFP and its members had planned to use the results of HSLS:09 and HS&B:22 in conducting further research.

**The Early Childhood Longitudinal Study-Kindergarten (ECLS-K:2024)**

50.    NCES has created the Early Childhood Longitudinal Studies (ECLS) program to fulfill its statutory mandates to collect, analyze, and disseminate data related to early childhood education. *See* 20 U.S.C. §§ 9543(a)(1)(B), (L).

51.    The ECLS program includes four longitudinal studies. Prior to 2023, the most recent study was the Early Childhood Longitudinal Study, Kindergarten Class of 2010-11 (ECLS-K:2011), which followed students for six years.

52.    Keeping with its pattern of launching a new ECLS survey approximately every decade, ED had planned to launch a new ECLS study with the Kindergarten class of 2022-23. ED contracted for work on that study to begin in 2019. Contract Summary, PIID 91990019C0002, https://www.usaspending.gov/award/CONT_AWD_91990019C0002_9100_-NONE-_-NONE-.

Due to the COVID-19 pandemic, that study was delayed, and rescheduled to begin in 2023 under the name Early Childhood Longitudinal Study-Kindergarten: 2024 (ECLS-K:2024). Defendants planned four national study data rounds—in 2023, 2024, 2025, and 2027.

53.    In 2024, one year into the study, NCES explained that ECLS-K:2024 was valuable because it would "provide[] the statistics policymakers need to make data-driven decisions to improve education for all; contribute[] data that researchers need to answer today's most pressing questions related to early childhood and early childhood education; and allow[] [NCES] to produce resources for parents, families, teachers, and schools to better inform the public at large about children's education and development." NCES, Celebrating the ECLS-K:2024: Providing key National Data on Our Country's Youngest Learners, Mar. 11, 2024, https://ies.ed.gov/learn/blog/celebrating-ecls-k2024-providing-key-national-data-our-countrys-youngest-learners. Further, NCES stated that ECLS-K:2024 was uniquely valuable as it would be "the first of [NCES]'s early childhood studies to provide data on a cohort of students who experienced the coronavirus pandemic" and would "provide information on a variety of topics not fully examined in previous national early childhood studies." *Id.*

54.    On February 10, 2025, Defendants terminated the contract for ECLS-K:2024, and ended both the collection of new data and analysis of data already collected. *See* Contract Summary, PIID 91990019C0002.

55.    Although NCES's website states "The ECLS-K:2024 is happening now!," https://nces.ed.gov/ecls/, the link accompanying that text leads to a site that has been inoperable since February 2025, https://myecls.ed.gov/.

56. NCES had planned to release the first restricted-use data file for researchers in early 2026. *See* https://nces.ed.gov/ecls/datainformation2024.asp. As a result of the halting of the ECLS-K: 2024 program, that data will not be released.

57. Plaintiff AEFP relies on data collected and disseminated as part of ECLS-K:2024, in doing its work. In addition, AEFP members rely on data collected and disseminated as part of ECLS-K:2024 in doing their work. AEFP and its members had planned to use the results of ECLS-K:2024 in conducting further research.

**The Peer Review Program for New Grant Funding**

58. By statute, IES is required to establish a peer review system for evaluating and assessing applications for both grants and cooperative agreements that exceed $100,000, and for evaluating and assessing the products of research by all recipients of grants and cooperative agreements. 20 U.S.C. § 9534(b)(1). 20 U.S.C. § 9520 further requires grants, contracts, and cooperative agreements to be awarded "when practicable, through a process of peer review."

59. IES has complied with these statutory requirements via contractual arrangements. The most recent contract was entered into in 2022. *See* Contract Summary, PIID 91990022C0066, https://www.usaspending.gov/keyword_search/91990022C0066.

60. On February 10, 2025, Defendants terminated the contract for the peer review system, without arranging for a replacement. *Id.* The peer review program for new grant funding was therefore terminated.

61. As a result of the termination of the peer review program for new grant funding, grant applications submitted by researchers, including by AEFP members, have not been, and cannot be, acted upon.

**Access to Restricted-Use Data**

62.     IES is required to make all data that it collects publicly available "including through use of the internet." 20 U.S.C § 9574.

63.     IES is also required to "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," and by "utilizing the most modern technology and other methods." *Id.* § 9575.

64.     Because some data collected by IES contains individually identifiable information, 20 U.S.C. § 9573(c) requires IES to develop and enforce confidentiality standards regarding access to and use of that data, which IES refers to as "restricted-use data." Access to restricted-use data is limited to qualified organizations and provided through a strict licensing process, administered by NCES.

65.     IES, via NCES, grants both "physical" and "remote" restricted-use data licenses. A holder of a physical restricted-use data license is provided data in a CD-ROM form, and must use that data on a standalone, desktop computer not connected to the internet and contained in a secure facility referred to as a "cold room." A holder of a remote restricted-use data license, on the other hand, may access data through a specific secure web-based application.

66.     At some point in February 2025, NCES announced that it would not be accepting new applications for access to data (remote or physical), and that review of pending applications was "paused until further notice."

67.     Defendants did not provide any explanation for this "pause." Nor have Defendants identified any alternative method by which researchers like AEFP members can obtain access to restricted-use data.

68.     Five months later, the pause remains in place.

69.     The halt of processing new applications has harmed AEFP members, who cannot obtain access to restricted-use data they need for their research until their applications are approved.

**Disclosure Risk Review**

70.     Before a restricted-use data license holder may share research or analysis based on restricted data with a third party—be it in a conference presentation, journal article, dissertation, or blog post—the license holder must obtain permission from IES through a disclosure risk review. Typically, such reviews are completed within five to ten business days.

71.     On February 14, 2025, IES emailed data license holders stating that disclosure risk reviews may be delayed "[d]ue to recent reductions in resources."

72.     Plaintiff IHEP and AEFP members have been unable to obtain disclosure risk reviews of materials that they sought to publish.

73.     On February 7, 2025, IHEP staff submitted a request for review of an analysis using data from the Beginning Postsecondary Students 12/17 (BPS:12/17) longitudinal study. That request remains pending.

74.     On March 4, 2025, IHEP staff submitted a request for review of an analysis of student income and wealth using NPSAS 2020 data. That request remains pending.

75.     On March 14, 2025, IHEP staff submitted a request for review of analyses around wealth, race/ethnicity, student outcomes, and basic needs insecurity, using NPSAS and BPS data. That request remains pending.

## COUNT I
### BPS:20/25 Termination – Arbitrary and Capricious
### (brought by all Plaintiffs)

76.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

77.    Defendants' termination of BPS:20/25 is a final agency action.

78.    In deciding to terminate BPS:20/25, Defendants failed to consider all relevant factors, including how BPS:20/25 fulfilled statutory duties, the benefits of the study, the waste associated with terminating the study midstream, and stakeholder interests, including researchers' reliance interests. Defendants did not acknowledge that their termination of BPS:20/25 was contrary to their previous positions or explain their departure from those previous positions.

## COUNT II
### HSLS:09 Termination – Arbitrary and Capricious
### (brought solely by Plaintiff AEFP)

79.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

80.    Defendants' termination of HSLS:09 is a final agency action.

81.    In deciding to terminate HSLS:09, Defendants failed to consider all relevant factors, including how HSLS:09 fulfilled statutory duties, the benefits of the study, the waste associated with terminating the study midstream, and stakeholder interests, including researchers' reliance interests. Defendants did not acknowledge that their termination of HSLS:09 was contrary to their previous positions or explain their departure from those previous positions.

82.    Defendants' termination of HSLS:09 was not the product of reasoned decisionmaking and was arbitrary and capricious.

## COUNT III
### HS&B:22 Termination – Arbitrary and Capricious
### (brought solely by Plaintiff AEFP)

83.     The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

84.     Defendants' termination of HS&B:22 is a final agency action.

85.     In deciding to terminate HS&B:22, Defendants failed to consider all relevant factors, including how HS&B:22 fulfilled statutory duties, the benefits of the study, the waste associated with terminating the study midstream, and stakeholder interests, including researchers' reliance interests. Defendants did not recognize that their termination of HS&B:22 was contrary to their previous positions or explain their departure from those previous positions.

86.     Defendants' termination of HS&B:22 was not the product of reasoned decisionmaking and was arbitrary and capricious.

## COUNT IV
### ECLS-K:2024 Termination – Arbitrary and Capricious
### (brought solely by Plaintiff AEFP)

87.     The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

88.     Defendants' termination of ECLS-K:2024 is a final agency action.

89.     In deciding to terminate ECLS-K:2024, Defendants failed to consider all relevant factors, including IES's statutory mandates regarding early childhood education, the benefits of the study, the waste associated with terminating the study midstream, and stakeholder interests, including researchers' reliance interests. Defendants did not recognize that their termination of ECLS-K:2024 was contrary to their previous positions or explain their departure from those previous positions.

90.    Defendants' termination of ECLS-K:2024 was not the product of reasoned decisionmaking and was arbitrary and capricious.

## COUNT V
### Termination of Peer Review Program for New Grants – Contrary to Law
### (brought solely by Plaintiff AEFP)

91.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

92.    Defendants' termination of the peer review program for new grants is a final agency action.

93.    By terminating the peer review program for new grants without instituting a replacement, Defendants acted contrary to 20 U.S.C. § 9534(b)(1) and § 9520.

## COUNT VI
### Termination of Peer Review Program for New Grants – Arbitrary and Capricious
### (brought solely by Plaintiff AEFP)

94.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

95.    Defendants' termination of the peer review program for new grants is a final agency action.

96.    In deciding to terminate the peer review program for new grants, Defendants failed to consider all relevant factors, including how the program was necessary to comply with statutory mandates and appropriations laws, the impact on pending grant applications, the impact on IES's ability to consider future grant applications, and the impact on researchers and other stakeholders.

97.    Defendants' termination of the peer review program for new grants was not the product of reasoned decisionmaking and was arbitrary and capricious.

## COUNT VII
### Termination of Restricted-Use Data Application Processing – Contrary to Law
### (brought solely by Plaintiff AEFP)

98.     The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

99.     Defendants' termination of the processing of applications for access to restricted-use data is a final agency action.

100.    Defendants' termination of the processing of applications for access to restricted-use data is contrary to 20 U.S.C. § 9574, which requires Defendants to make all data collected by IES publicly available, subject to IES's own standards for protecting confidentiality.

101.    Defendants' termination of the processing of applications for access to restricted-use data is contrary to 20 U.S.C. §§ 9575(2)–(3), which require Defendants to "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers," and "utiliz[e] the most modern technology and other methods available … to ensure the … timely distribution of information, including data and reports."

102.    Defendants' termination of the processing of applications for access to restricted-use data is contrary to 20 U.S.C. § 9546(e)(2), which requires NCES to provide "all interested parties … direct access, in the most appropriate form (including, where possible, electronically), to data collected by [NCES] for the purposes of research and acquiring statistical information."

## COUNT VIII
### Termination of Restricted-Use Data Application Processing – Arbitrary and Capricious
### (brought solely by Plaintiff AEFP)

103.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

104.    Defendants' termination of the processing of applications for access to restricted-use data is a final agency action.

105.    In deciding to terminate processing of applications for access to restricted-use data, Defendants failed to consider all relevant factors, including statutory enactments and appropriations, and the impacts on researchers.

106.    Defendants' termination of the processing of applications for access to restricted-use data was not the product of reasoned decisionmaking and was arbitrary and capricious.

## COUNT IX
### Disclosure Risk Review – Unreasonable Delay
### (brought solely by Plaintiff IHEP)

107.    The APA directs courts to compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

108.    Defendants have unlawfully withheld or unreasonably delayed processing of IHEP's February 7, March 4, and March 14, 2025, disclosure risk review submissions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A)    Declare the termination of BPS:20/25 arbitrary and capricious, set it aside, and enjoin Defendants to resume the study;

(B)    Declare the termination of HSLS:09 arbitrary and capricious, set it aside, and enjoin Defendants to resume the study;

(C)    Declare the termination of HS&B:22 arbitrary and capricious, set it aside, and enjoin Defendants to resume the study;

(D)    Declare the termination of ECLS-K:2024 arbitrary and capricious, set it aside, and enjoin Defendants to resume the study;

(E)    Declare the termination of the Peer Review Program arbitrary, capricious, and

contrary to law, set it aside, and enjoin Defendants to resume the program;

(F)     Declare the termination of the processing of restricted-use access applications arbitrary, capricious, and contrary to law, set it aside, and enjoin Defendants to resume processing applications;

(G)     Declare Defendants' delay in processing IHEP's February 7, March 4, and March 14, 2025, Disclosure Risk Review submissions unreasonable, and enjoin Defendants to process those submissions within 14 days;

(H)     Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

(I)     Grant such other relief as the Court deems necessary, just, and proper.

Dated: July 16, 2025                                    Respectfully submitted,

                                                        /s/ Adam R. Pulver
                                                        Adam R. Pulver (DC Bar No. 1020475)
                                                        Karla Gilbride (DC Bar No. 1005886)
                                                        Public Citizen Litigation Group
                                                        1600 20th Street NW
                                                        Washington, DC 20009
                                                        (202) 588-1000
                                                        apulver@citizen.org

                                                        *Attorneys for Plaintiffs*