# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ASSOCIATION FOR EDUCATION
FINANCE AND POLICY, INC.; THE
INSTITUTE FOR HIGHER
EDUCATION POLICY,

    *Plaintiffs*,

    v.

LINDA MCMAHON, in her official
capacity as Secretary of Education; U.S.
DEPARTMENT OF EDUCATION,

    *Defendants*.

Civil Action No. 1:25-cv-999-TNM

## MEMORANDUM IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS AND MOTION FOR RELIEF FROM LOCAL RULE 7(N)

Adam R. Pulver (DC Bar No. 1020475)
Karla Gilbride (DC Bar No. 1005886)
Cormac A. Early (DC Bar No. 1033835)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

*Counsel for Plaintiffs*

September 18, 2025

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

I.    Statutory Background ............................................................................................... 3

II.   The Challenged Agency Actions ............................................................................. 5

III.  Procedural History .................................................................................................. 9

LEGAL STANDARDS ...................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I.    This Court has subject-matter jurisdiction. ............................................................ 11

      A.    Plaintiffs have adequately alleged standing. ............................................... 11

      B.    The Tucker Act does not apply here. ........................................................... 22

II.   Plaintiffs challenge final agency actions that are reviewable under the APA. .................. 24

      A.    Plaintiffs challenge discrete agency actions. ............................................... 25

      B.    The decision to halt processing of restricted-use data license applications is final. 28

      C.    Plaintiffs lack adequate alternative remedies. ............................................. 30

      D.    The challenged actions are not committed to agency discretion by law ................. 31

III.  Plaintiffs adequately allege that the challenged agency actions are arbitrary and capricious
      and contrary to law ................................................................................................. 33

IV.   Defendants' request for relief from Local Civil Rule 7(n) should be denied. ..................... 35

CONCLUSION .................................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration*,
41 F.4th 586 (D.C. Cir. 2022) ................................................................................................. 19

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) ................................................................................................. 11

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ................................................................................................ 35

*Allina Health Services v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) .............................................................................................. 34

*American Legion v. Derwinski*,
54 F.3d 789 (D.C. Cir. 1995) .................................................................................................. 25

*American Society for the Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) .................................................................................................. 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................ 11

*Association for Education Finance & Policy, Inc. v. McMahon*,
2025 WL 1568301 (D.D.C. June 3, 2025) .............................................................................. 25

*AvMed, Inc. v. Becerra*,
2021 WL 2209406 (D.D.C. June 1, 2021) .............................................................................. 25

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................ 11

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................................ 28

*Biden v. Nebraska*,
600 U.S. 477 (2023) ................................................................................................................ 11

*\* Byrd v. U.S. Environmental Protection Agency*,
174 F.3d 239 (D.C. Cir. 1999) .......................................................................................... 12, 14

*\* Campaign Legal Center v. Federal Election Commission*,
952 F.3d 352 (D.C. Cir. 2020) ................................................................................................ 32

*CC Distribution, Inc. v. United States*,
  883 F.2d 146 (D.C. Cir. 1989) ................................................................................. 20

*Center for Biological Diversity v. Environmental Protection Agency*,
  56 F.4th 55 (D.C. Cir. 2022) .................................................................................... 16

*Center for Biological Diversity v. U.S. Department of the Interior*,
  144 F.4th 296 (D.C. Cir. 2025) .......................................................................... 11, 25

*\* Center for Biological Diversity v. U.S. International Development Finance Corp.*,
  77 F.4th 679 (D.C. Cir. 2023) .................................................................................. 13

*Center for Biological Diversity v. U.S. International Development Finance Corp.*,
  585 F. Supp. 3d 63 (D.D.C. 2022) ........................................................................... 10

*Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*,
  333 U.S. 103 (1948) .......................................................................................... 28, 29

*\* Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .......................................................................................... 32, 34

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ................................................................................. 27

*Cody v. Cox*,
  509 F.3d 606 (D.C. Cir. 2007) ................................................................................. 32

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
  603 U.S. 799 (2024) ................................................................................................ 34

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*,
  365 F. Supp. 3d 28 (D.D.C. 2019) ........................................................................... 15

*\* Department of Commerce v. New York*,
  588 U.S. 752 (2019) ................................................................................................ 25

*Department of Homeland Security v. Regents of the University of California*,
  591 U.S. 1 (2020) .................................................................................................... 34

*El Rio Santa Cruz Neighborhood Health Center, Inc. v. U.S. Department of Health & Human Services*,
  396 F.3d 1265 (D.C. Cir. 2005) ............................................................................... 31

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*,

878 F.3d 371 (D.C. Cir. 2017) .................................................................................... 12

*Environmental Defense Fund v. Environmental Protection Agency,*
922 F.3d 446 (D.C. Cir. 2019) ................................................................................... 15

\* *Federal Election Commission v. Akins,*
524 U.S. 11 (1998) ...................................................................................................... 12

*First Union National Bank v. Pictet Overseas Trust Corp.,*
477 F.3d 616 (8th Cir. 2007) ...................................................................................... 28

*Flexlab, LLC v. United States,*
424 F.3d 1254 (Fed. Cir. 2005) .................................................................................. 31

*Friends of Animals v Jewell,*
824 F.3d 1033 (D.C. Cir. 2016) .................................................................................. 15

*Garcia v. Vilsack,*
563 F.3d 519 (D.C. Cir. 2009) ................................................................................... 31

*Hamal v. U.S. Department of Homeland Security,*
2020 WL 2934954 (D.D.C. June 3, 2020) .................................................................. 35

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) .................................................................................................... 12

*Hettinga v. United States,*
677 F.3d 471 (D.C. Cir. 2012) ................................................................................... 11

*Hotel & Restaurant Employees Union, Local 25 v. Smith,*
846 F.2d 1499 (D.C. Cir. 1988) .................................................................................. 19

\* *Huron v. Cobert,*
809 F.3d 1274 (D.C. Cir. 2016) .................................................................................. 14

*Indigenous People of Biafra v. Blinken,*
639 F. Supp. 3d 79 (D.D.C. 2022) .............................................................................. 11

*Industrial Energy Consumers of America v. Federal Energy Regulatory Commission,*
125 F.4th 1156 (D.C. Cir. 2025) ................................................................................. 12

*Keepseagle v. Perdue,*
856 F.3d 1039 (D.C. Cir. 2017) .................................................................................. 28

*Kingman Park Civic Association v. Bowser,*
815 F.3d 36 (D.C. Cir. 2016) ..................................................................................... 12

*Langeman v. Garland*,
  88 F.4th 289 (D.C. Cir. 2023) .................................................................. 11, 30

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) ............................................................ 29

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) .................................................................................. 26

*Marks v. United States*,
  430 U.S. 188 (1977) .................................................................................. 24

*Megapulse, Inc. v. Lewis*,
  672 F.3d 959 (D.C. Cir. 1982) .................................................................... 22

*Motor Vehicle Manufacturers Association of U.S. v. State Farm Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983) .................................................................................... 33

*National Council of Nonprofits v. Office of Management & Budget*,
  763 F. Supp. 3d 36 (D.D.C. 2025) ............................................................... 29

*National Treasury Employees Union v. Vought*,
  --- F.4th ---, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) .............................. 27, 30

*National Women's Law Center v. Office of Management & Budget*,
  358 F. Supp. 3d 66 (D.D.C. 2019) ............................................................... 26

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) .................................................................................... 26

*Pacito v. Trump*,
  768 F. Supp. 3d 1199 (W.D. Wash. 2025) ..................................................... 29

*Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic*,
  400 U.S. 62 (1970) .................................................................................... 28

*Powder River Basin Resource Council v. U.S. Department of Interior*,
  749 F. Supp. 3d 151 (D.D.C. 2024) .............................................................. 19

*Schmidt v. U.S. Capitol Police Board*,
  826 F. Supp. 2d 59 (D.D.C. 2011) ............................................................... 10

*SSM Litigation Group v. Environmental Protection Agency*,
  --- F.4th ---, 2025 WL 2552531 (D.C. Cir. Sept. 5, 2025) ................................ 19

*Swedish American Hospital v. Sebelius,*
    691 F. Supp. 2d 80 (D.D.C. 2010) ................................................................... 35

*Teton Historic Aviation Foundation v. U.S. Department of Defense,*
    785 F.3d 719 (D.C. Cir. 2015) ......................................................................... 20

*\* Tootle v. Secretary of the Navy,*
    446 F.3d 167 (D.C. Cir. 2006) ......................................................................... 31

*Town of Chester v. Laroe Estates, Inc.,*
    581 U.S. 433 (2017) ......................................................................................... 11

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ......................................................................................... 12

*Vassiliades v. Rubio,*
    2025 WL 1905654 (D.D.C. July 10, 2025) ....................................................... 35

*Waterkeeper Alliance, Inc. v. Regan,*
    41 F.4th 654 (D.C. Cir. 2022) .......................................................................... 11

*Widakuswara v. Lake,*
    779 F. Supp. 3d 10 (D.D.C. 2025) ................................................................... 25

**Statutes**

5 U.S.C. § 704 ...................................................................................... 25, 28, 30

20 U.S.C. § 9511 ........................................................................................... 4

20 U.S.C. § 9511(b)(1) ................................................................................. 32

20 U.S.C. § 9511(b)(2) ................................................................................. 33

20 U.S.C. § 9512 ........................................................................ 4, 13, 20, 23, 24

20 U.S.C. § 9513 ........................................................................................... 4

20 U.S.C. § 9520 ......................................................................................... 20

20 U.S.C. § 9534(b)(1) ................................................................... 4, 8, 20, 34

20 U.S.C. § 9543(a)(1) ................................................................................... 4

20 U.S.C. § 9543(a)(7) ................................................................................... 4

20 U.S.C. § 9546(e) ................................................................................................ 14

20 U.S.C. § 9546(e)(2) .............................................................................................. 5

20 U.S.C. § 9573(c) ................................................................................................... 9

20 U.S.C. § 9574 ............................................................................................. 5, 9, 13

20 U.S.C. § 9575 ................................................................................................ 13, 34

20 U.S.C. §§ 9501–9584 ........................................................................................... 3

20 U.S.C. § 9543(a)(1) .......................................................................................... 4, 7

43 U.S.C. § 1782(c) ................................................................................................. 27

44 U.S.C. 3582(a) ................................................................................................... 34

Pub. L. 107-110 ......................................................................................................... 3

Pub. L. 107-279 ......................................................................................................... 3

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ................................................................ 10

Federal Rule of Civil Procedure 12(b)(6) .......................................................... 10, 11

Local Civil Rule 7(n) ....................................................................................... 2, 35, 36

**Other Authorities**

Congressional Research Service, K-12 Education: Highlights of the No Child Left Behind
  Act of 2001 (P.L. 107-110), Jan. 7, 2008, https://www.congress.gov/crs-product/RL31284 ..... 3

H.R. Rep. 107-404 (2002) ........................................................................................... 3

Benjamin Michael Superfine, *New Directions in School Funding and Governance: Moving
  from Politics to Evidence*,
  98 Ky. L.J. 653 (2010) .............................................................................................. 3

ResearchDataGov, http://www.researchdatagov.org .................................................. 9

## INTRODUCTION

Since 2002, the Institute of Education Sciences (IES) at the United States Department of Education (ED) has been tasked by statute with conducting research on all aspects of education in America, and with making its research and data widely available to scholars and to the public at large. Plaintiffs the Association for Education Finance and Policy (AEFP), a membership association of 1,000 education researchers and practitioners, and the Institute for Higher Education Policy (IHEP), a research, policy, and advocacy organization, rely on IES's timely collection and dissemination of up-to-date data on education. In addition, AEFP's members rely on access to IES data and IES grants, which can be issued only after a statutorily required peer review program for new grants to carry out their work. Since February 2025, Defendant Linda McMahon, the Secretary of Education, has been engaged in an effort to dismantle ED, and IES with it. Plaintiffs initially brought suit to try to preserve IES and its irreplaceable research and grant-making functions, challenging contract cancellations, a mass reduction-in-force that left only one in ten of IES's staff in place, and disruptions to remote access to IES data.

That suit, however, is no longer the one before the Court. Since this Court denied Plaintiffs' motion for a preliminary injunction, Plaintiffs have trimmed their complaint twice and now seek only targeted relief for discrete unlawful actions. Specifically, Plaintiffs challenge the termination of four major longitudinal studies, the halt of IES's peer-review of grant applications, and the decision to no longer process applications for restricted-use data licenses. The relief that Plaintiffs seek is correspondingly modest: They ask this Court to set aside the unlawful cancellations of the four studies, to restore the peer-review program, and to set aside the freeze on restricted-use data license processing.

Defendants have moved to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. That motion should be denied. Plaintiffs have standing to bring these limited claims, because, as detailed below, each Plaintiff and AEFP's members have been injured by the specific unlawful agency actions they challenge, and those injuries can be redressed by this Court. And this Court, not the Court of Federal Claims, is the correct forum for this case, because none of Plaintiffs' claims sound in contract.

On the merits, Plaintiffs have adequately alleged that all of the challenged actions were arbitrary and capricious, and the terminations of the peer-review program and restricted-use data license processing were also contrary to law. Ignoring that the complaint before the Court is radically different than the one first filed, and attempting to recharacterize the factual allegations in the complaint in their own favor, Defendants largely confine their arguments to threshold issues about whether the challenged actions are reviewable under the APA. They are. Plaintiffs have challenged six discrete final agency actions, and Plaintiffs have no adequate alternative to relief under the APA. Nor have Defendants rebutted the presumption of reviewability and shown they have unfettered discretion to take the challenged actions without any judicial scrutiny. When they glancingly address the actual merits of Plaintiffs' claims, Defendants point only to generalized, unsubstantiated, post-hoc claims of waste and inefficiency—claims that are impossible to address at this juncture given Defendants' refusal to produce the administrative record.

This Court should therefore deny Defendants' motion to dismiss. Moreover, because Plaintiffs cannot proceed expeditiously on their claims without access to the administrative record and Defendants' own arguments rely on propositions that cannot be examined without that record, this Court should deny Defendants' request to be excused from Local Civil Rule 7(n) and order them to produce the administrative record without further delay.

# BACKGROUND

## I.    Statutory Background

The turn of the century saw the passage of several landmark pieces of education-related legislation at the federal level, all of which emphasized scientifically based research and accountability. Perhaps most well-known is the No Child Left Behind Act of 2001, Pub. L. 107-110, enacted in January 2002, which amended the Elementary and Secondary Education Act of 1962 (ESEA) and "extensively amended and reauthorized most federal elementary and secondary education aid programs."[1] In conjunction with that law, Congress also reorganized the federal government's educational research functions, which had previously been mostly located within the Office of Educational Research and Improvement. That office "ha[d] been attacked for supporting fragmented, short-term, and overly politicized research, and funding for educational research ha[d] long been limited."[2] To address those criticisms, Congress enacted the Education Sciences Reform Act of 2002 (ESRA), Pub. L. 107-279, "to provide the mechanism for valid research that would be cumulative and inform education practices at the State and local levels with well-documented findings." H.R. Rep. 107-404, at 30–31 (2002). ESRA established IES as a new, semi-independent division of ED, and vested IES with responsibilities both for continuing to conduct existing studies like the National Assessment of Educational Progress (NAEP), and for undertaking or sponsoring new research, along with responsibilities to make research and data widely available to researchers and the public. *See* 20 U.S.C. §§ 9501–9584. ESRA specifies that the duties created by ESRA may not be delegated by the Secretary of Education to entities other

---

[1] Cong. Rsch. Serv., K-12 Education: Highlights of the No Child Left Behind Act of 2001 (P.L. 107-110), Jan. 7, 2008, https://www.congress.gov/crs-product/RL31284.

[2] Benjamin Michael Superfine, *New Directions in School Funding and Governance: Moving from Politics to Evidence*, 98 Ky. L.J. 653, 686 (2010).

than IES, and limits the additional responsibilities that the Secretary may impose on IES. *See id.* §
9513.

Within IES are four separate "National Education Centers": the National Center for
Education Research (NCER), the National Center for Education Statistics (NCES), the National
Center for Education Evaluation and Regional Assistance (NCEE), and the National Center for
Special Education Research (NCSER). *Id.* § 9511. In ESRA, Congress prescribed duties for both
IES as a whole and for each of the centers—duties that include the conduct of research and
evaluation on dozens of topics, and the dissemination of the results of that research and evaluation
in specific ways. *See, e.g.*, *id.* § 9512 (requiring IES to "conduct and support scientifically valid
research activities," and "widely disseminate the findings and results of scientifically valid
research in education"). Relevant to this action, Congress mandated that NCES collect and
disseminate data relating to "the condition and progress of education, at the … secondary,
postsecondary, and adult levels," 20 U.S.C. § 9543(a)(1), to "conduct[] longitudinal and special
data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7),
and to collect, analyze, and disseminate data related to early childhood education, *id.*
§§ 9543(a)(1)(B), (L).

The statute also contains requirements as to how research is to be conducted, and how the
results of that research must be shared. The statute requires IES to establish a peer review system
for evaluating and assessing applications for both grants and cooperative agreements that exceed
$100,000, and for evaluating and assessing the products of research by all recipients of grants and
cooperative agreements. 20 U.S.C. § 9534(b)(1). Section 9520 further requires grants, contracts,
and cooperative agreements to be awarded "when practicable, through a process of peer review."
Further, Congress required that any data collected by IES and its subsidiaries "shall be made

available to the public, including through use of the internet," *id.* § 9574, and that IES "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," "utilizing the most modern technology and other methods," *id.* § 9575. As to NCES, specifically, it required that interested parties be provided "direct access, in the most appropriate form (including, where possible, electronically), to data collected … for the purposes of research and acquiring statistical information." 20 U.S.C. § 9546(e)(2).

IES, and the studies and data collections it oversees, have been vital to educational research in America over the past several decades. "IES, its data sets, and the principles and demands that it has placed on educational researchers have led to more methodologically sound studies." Decl. of Douglas N. Harris ¶ 10, ECF 6-6 at 4. It has "provid[ed] the education research infrastructure in this country." Decl. of Cara Jackson ¶ 14, ECF 6-5 at 5.

## II.    The Challenged Agency Actions

Since February 2025, Defendants Secretary of Education Linda McMahon and ED have terminated many of the programs by which IES carries out its statutory duties—without replacing them and without any plans as to how the agency would do so. This action challenges six of those terminations as contrary to law or arbitrary and capricious under the Administrative Procedure Act (APA). Those terminations are: (1) the termination of the 2020/25 Beginning Postsecondary Students Longitudinal Study (BPS:20/25); (2) the termination of the High School Longitudinal Study (HSLS:09); (3) the termination of the High School and Beyond Longitudinal Study of 2022 (HS&B:22); (4) the termination of the Early Childhood Longitudinal Study-Kindergarten:2024

(ECLS-K:2024); (5) the termination of IES's peer review program for new grant funding; and (6) the termination of processing applications for access to restricted-use data.[3]

A.    BPS is a longitudinal study that tracks first-time students' pathways through postsecondary education over the course of six years, focusing on persistence and degree attainment, transition to employment, and school and work experiences. Second Amended Complaint (SAC) ¶ 31. Because BPS tracks students throughout postsecondary education over several years, it provides a much more complete picture of postsecondary persistence and success than studies that cannot track students once they leave a particular institution. *Id.*

BPS:20/25 was to be the second of two follow-up studies to the 2020 National Postsecondary Student Aid Study (NPSAS). *Id.* ¶ 33–35. The first follow-up study, BPS:20/22, completed data collection in 2022, and published a "First Look" report in September 2024. *Id.* ¶ 34. The full data from that study, along with further analyses, were scheduled to be made available to researchers, but on February 10, 2025, Defendants cancelled the contract that included work to support BPS:20/22. *Id.* Defendants have made no statement about whether and when they will release the data collected as part of BPS:20/22.

BPS:20/25 was scheduled to collect data from February 2025 to October 2025. *Id.* ¶ 36. But on February 10, 2025, Defendants cancelled the contract that included work to support and carry out the BPS:20/25 data collection. *Id.* All remaining work related to BPS:20/25 has been cancelled. *Id.* Defendants have offered no explanation for the cancellation of the study. *Id.* Had the BPS:20/25 data collection been carried out as planned, it would have provided unique insight into

---

[3] Count IX of the Second Amended Complaint also challenged Defendants' unreasonable delay in processing three "disclosure risk review" submissions from Plaintiff IHEP. SAC ¶¶ 107–08. IES subsequently approved two of the submissions, and IHEP withdrew the third. *See* Second Declaration of Mamie Voight ¶ 8. Accordingly, Plaintiffs are no longer pursuing Count IX of the Second Amended Complaint and do not object to its dismissal without prejudice as moot.

the experiences of a cohort of students that entered higher education during the first year of the COVID-19 pandemic, and would have enabled researchers to study enrollment, persistence, attainment, educational experiences, and employment outcomes for a cohort of students subject to unprecedented disruptions. *Id.* ¶ 35.

      **B.**    The High School Longitudinal Study of 2009 is the latest of six longitudinal studies following cohorts of students through high school and in the decades afterwards. *Id.* ¶ 38. HSLS:09 tracked students who were in ninth grade in 2009. *Id.* ¶ 40. IES was scheduled to conduct a third follow-up data collection for HSLS:09 in 2025, but on February 10, 2025, terminated the scheduled data collection without explanation, despite previously recognizing its importance and that other existing data sets did not provide comparable information. *Id.* ¶¶ 41–42.

      **C.**    The High School and Beyond Longitudinal Study of 2022 was designed to follow students who were in ninth and twelfth grade in 2022 as they advanced in, and after, high school. *Id.* ¶ 43. Because it maintains linkages with IES's previous high school longitudinal studies, it is particularly valuable for shedding light on changes over time and the effects of various policies, demographic shifts, and school practices on student achievement, growth, and education attainment. *Id.* ¶ 45. IES had already begun publishing data from HS&B:22, and had planned to produce additional reports, tables, and infographics, but on February 10, 2025, Defendants terminated the contract for HS&B:22. *Id.* ¶ 47. IES's website states that "study operations for HS&B:22 have been suspended," without any further explanation. *Id.* ¶ 48

      **D.**    NCES created the Early Childhood Longitudinal Studies (ECLS) program to fulfill its statutory mandates to collect, analyze, and disseminate data related to early childhood education. *See* 20 U.S.C. §§ 9543(a)(1)(B), (L). *Id.* ¶ 50. Prior to 2023, the most recent study was the Early Childhood Longitudinal Study, Kindergarten Class of 2010-11 (ECLS-K:2011), which

followed students for six years. *Id.* ¶ 51. Keeping with its pattern of launching a new ECLS survey approximately every decade, ED had planned to launch a new ECLS study with the kindergarten class of 2022-23. *Id.* ¶ 52. Due to the COVID-19 pandemic, that study was delayed, and rescheduled to begin in 2023 under the name Early Childhood Longitudinal Study-Kindergarten: 2024 (ECLS-K:2024). *Id.* There were four national rounds of data-collection scheduled for ECLS-K:2024, in 2023, 2024, 2025, and 2027, following the kindergarten class of 2022-23. *Id.* ¶ 52. According to IES in 2024, ECLS-K:2024 was uniquely valuable because it was the first IES early childhood study to provide data on a cohort of students who experienced the COVID-19 pandemic, and it would provide information on a variety of topics not fully examined in previous national early childhood education studies. *Id.* ¶ 53.

On February 10, 2025, Defendants terminated the contract for ECLS-K:2024, and ended both the collection of new data and analysis of data already collected. *Id.* ¶ 54. IES's website states that "The ECLS-K:2024 is happening now!," but the link accompanying that text leads to a site that has been inoperable since February 2025. *Id.* ¶ 55. IES had planned to release the first restricted-use data file from ECLS-K:2024 to researchers in early 2026, but the data will not be released due to the termination of the study. *Id.* ¶ 56.

**E.**      By statute, IES is required to establish a peer-review system for evaluating and assessing applications for both grants and cooperative agreements that exceed $100,000, and for evaluating and assessing the products of research by all recipients of grants and cooperative agreements. 20 U.S.C. § 9534(b)(1). IES is also statutorily required to award grants, contracts, and cooperative agreements "when practicable, through a process of peer review." *Id.* § 9520.

IES has historically operated its peer-review system via contractual arrangements, with the most recent contract having been awarded in 2022. SAC ¶ 59. On February 10, 2025, Defendants

terminated the contract for the peer-review system, without arranging for a replacement, thereby terminating the peer-review system for new grant funding. *Id.* ¶ 60.

F.      IES is required by statute to make all data that it collects publicly available "including through use of the internet." 20 U.S.C. § 9574. It is also required to "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," by "utilizing the most modern technology and other methods." *Id.* ¶ 62–63. Because some data collected by IES contains individually identifiable information, 20 U.S.C. § 9573(c) requires IES to develop and enforce confidentiality standards regarding access to and use of that data, which IES refers to as "restricted-use data." *Id.* ¶ 64. Access to restricted-use data is limited to qualified organizations and provided through a strict licensing process, administered by IES. *Id.*

In February 2025, IES announced that it would not be accepting new applications for access to restricted-use data, and that review of pending applications was "paused until further notice." *Id.* ¶ 66. Defendants did not provide any explanation for this "pause," nor have they identified any alternative method for researchers to obtain access to restricted-use data. *Id.* ¶ 67. The "pause" remains in effect. *See id.* ¶ 68; ResearchDataGov, http://www.researchdatagov.org (last accessed Sept. 18, 2025).

III.    **Procedural History**

Plaintiffs filed the initial complaint in this action on April 4, 2025, seeking to challenge a range of actions taken by Defendants that Plaintiffs alleged were intended to terminate IES's work, including mass cancellation of contracts, a "reduction in force" that eliminated approximately 90 percent of IES's staff, and the termination of outside researchers' remote access to data. *See* ECF 1 at 2. Plaintiffs subsequently moved for a preliminary injunction on April 17, 2025. *See* ECF 6. The Court held a hearing on the motion on May 16, 2025, and later issued an opinion and order

denying the preliminary injunction motion on June 3, 2025. *See* ECF 25, 26. The Court concluded that Plaintiffs' claims constituted an impermissible programmatic challenge to Defendants' operation of IES, and that the remedies Plaintiffs sought amounted to "wholesale modifications to agency operations writ large." ECF 25 at 2.

Plaintiffs filed a First Amended Complaint on June 18, 2025, *see* ECF 28, which was followed by a motion to dismiss on July 2, 2025, *see* ECF 29. After Defendants took certain actions that mooted some of the claims in the First Amended Complaint, Plaintiffs filed the currently operative Second Amended Complaint on July 16, 2025. *See* ECF 32. Defendants again moved to dismiss. ECF 33.

## LEGAL STANDARDS

Defendants have moved to dismiss the complaint for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). When reviewing such a motion, the Court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff, and it may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case. *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). It is "well established" that the Court may consider "additional declarations or affidavits provided by a plaintiff to support standing." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 70 (D.D.C. 2022).

As for Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the Court asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In assessing Defendants' Rule 12(b)(6) motion, this Court "must construe the complaint 'in favor of [Plaintiffs], who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023) (quoting *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam)).

## ARGUMENT

### I. This Court has subject-matter jurisdiction.

#### A. Plaintiffs have adequately alleged standing.

At the pleading stage, Plaintiffs' burden is to "plausibly allege standing." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 305 (D.C. Cir. 2025). Specifically, Plaintiffs must plausibly allege that they "suffered or [are] imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (citation omitted). Because standing "is a claim-specific inquiry," *Waterkeeper Alliance, Inc. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022), "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint," *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017); *see also Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (requiring only one plaintiff with standing as to each claim).

"An organization can establish standing 'by showing either an injury to itself' (organizational standing) or 'a cognizable injury to one or more of its members' (associational standing)." *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 84 (D.D.C. 2022) (quoting *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016)). AEFP and IHEP both have organizational standing based on informational injuries, and AEFP has associational standing based on informational injuries to its members.  Specifically, Defendants' actions have deprived,

and continue to deprive, IHEP, AEFP, and AEFP's members of "information [that] would help [them] (and others to whom [the organizations] would communicate it)." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 441–42 (2021) (recognizing that a plaintiff suffers a concrete injury where they are denied information required to be disclosed by law, and that denial has "downstream consequences"); *Byrd v. U.S. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) (recognizing denial of "timely access" to documents constituted "informational injury.")

In their motion to dismiss, Defendants break down their discussion of standing into three categories: informational, organizational, and associational. *See* ECF 33 10–14. That categorization misunderstands the nature of Plaintiffs' standing in this case. What Defendants label as "organizational standing" is a specific theory of standing—often referred to as *Havens* standing—that an organization may rely on: an injury to the organization's interests that causes the organization to divert resources to counteract the injury. *See, e.g.*, *Am. Soc. for the Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). But organizations are not required to rely on a *Havens* theory of standing. Organizational standing is "the label assigned to the *capacity* in which the organization contends it has been harmed; it is not a separate *type* of injury." *EPIC v. Pres. Adv. Comm'n on Election Integrity*, 878 F.3d 371, 381 (D.C. Cir. 2017) (Williams, J., concurring). "If an organization *qua* organization is injured, it has a right to redress thereof just like a natural plaintiff." *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1167 (D.C. Cir. 2025) (Henderson, J., concurring). The right of an organization to seek vindication for direct injuries to the organization itself "has a pedigree going back to the founding." *Id.* Here, both Plaintiffs seek

redress for informational injuries they suffered in their own right, and AEFP separately seeks to vindicate the informational rights of its members.

Several provisions of ESRA require IES to provide information to IHEP and to AEFP and its members. The statute requires IES both to conduct research and to "widely disseminate the findings and results of scientifically valid research in education." 20 U.S.C. § 9512. It requires that all data collected by IES "be made available to the public," subject to privacy protections. *Id.* § 9574. And it requires IES to "[d]isseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," to "utilize the most modern technology and other methods available … to ensure the efficient collection and timely distribution of information," and to "mak[e] information available to the public in an expeditious fashion." *Id.* § 9575. Those provisions reflect a "clear command" for IES "to provide robust public information," and thus "there can be no doubt that these provisions create a right to information sufficient for [Plaintiffs'] injury." *Ctr. for Bio. Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023).

Defendants raise two arguments against Plaintiffs' informational standing. First, they claim that "Plaintiffs have not alleged that they or their members currently lack access to the data or information that they seek" from IES, and they dismiss any inference "that they or their members will not have access to the same or similar data," or "new restricted-use data licenses" in the future as "mere speculation." ECF 33 at 21. That argument fails as a factual matter because the Second Amended Complaint alleges that each of the cancelled studies has in fact been cancelled. *See* SAC ¶¶ 36–37 (BPS); 42 & 49 (HSLS:09); 47–49 (HS&B:22), 54–57 (ECLS-K:2024). And at this stage in the litigation, the Court must draw the obvious inference in Plaintiffs' favor that they lack access to data from studies that never happened or were terminated prematurely. The Second Amended

13

Complaint likewise alleges that review of pending applications for restricted-use data licenses has been "paused until further notice," that the pause has remained in place for five months, and that AEFP members cannot obtain access to restricted-use data until their applications are approved. *Id.* ¶¶ 66–69. Defendants' argument also fails as a matter of law, because they misstate Plaintiffs' burden to establish informational standing. Far from needing to show that they will never again have access to "the same or similar data in the future," as Defendants assert without citation to any authority, Plaintiffs need only plausibly allege that they have been denied "timely access" to information. *Byrd*, 174 F.3d at 243. The Second Amended Complaint's allegations that the studies have been cancelled, and that restricted-use data license processing has been paused indefinitely, easily clear that bar. To the extent that Defendants ask the Court to infer that some other unidentified data may exist that completely duplicates the data that the canceled studies would produce, such an inference is not warranted.

Second, Defendants argue that "in many cases" (which they do not specify) Plaintiffs cannot connect their informational injuries "to a statutory violation rather than an exercise of proper discretion." ECF 33 at 22. That argument improperly conflates the standing inquiry with the merits. In evaluating standing, the Court must "assume that the complaint states a valid legal claim" on the merits. *Huron v. Cobert*, 809 F.3d 1274, 1278 (D.C. Cir. 2016). The Court must thus assume, for purposes of standing, that IES is required to continue the studies because its efforts to cancel them were arbitrary and capricious, and that the ESRA requires IES to make its data available to interested parties like Plaintiffs and AEFP's members for "the purposes of research and acquiring statistical information," subject to confidentiality safeguards, *see* 20 U.S.C. § 9546(e)—something it is alleged not to be doing. Defendants' blanket assertion that some of the

challenged actions may not have amounted to statutory violations is an argument on the merits; it does not defeat this Court's jurisdiction to consider the merits in the first place.

### 1. Plaintiffs have organizational standing to challenge the terminations of the BPS:20/25 (Plaintiff IHEP) and ECLS-K:2024 (Plaintiff AEFP) studies.

Both Plaintiffs have been harmed in their own right by Defendants' illegal actions cancelling specific studies—BPS:20/25 in the case of Plaintiff IHEP, and ECLS-K:2024 in the case of Plaintiff AEFP—and both Plaintiffs thus have organizational standing to challenge those actions. "The law is settled that 'a denial of access to information' qualifies as an injury in fact 'where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (quoting *Friends of Animals v Jewell*, 824 F.3d 1033, 1040–41 (D.C. Cir. 2016)); *see Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 39–45 (D.D.C. 2019) (finding organization had standing based on delayed production of other ED data).

IHEP has been injured in its own right by the cancellation of the BPS:20/25 study. As the Second Declaration of Mary Voight explains, IHEP has used BPS data to inform policy recommendations in a variety of areas, and that work would not have been possible without BPS data. Second Voight Decl. ¶ 3. IHEP had planned to use data from the 2020/25 longitudinal study to inform its policy recommendations and support its mission, for example in analyzing the student impact of future changes to financial aid programs such as the Pell Grant, including assessment of restrictions on eligibility or benefits. *Id.* ¶ 6. IHEP had also planned to use BPS data to examine the noneconomic value students receive from pursuing particular educational pathways and working in those fields, because BPS includes unique data on a student's field of study, occupation, and measures of noneconomic employment benefits, such as job satisfaction and ability to balance

work and family. *Id.* ¶ 5. The most recent available data from BPS is from the 2012/17 study, which is now out of date, particularly in light of the unique impacts of the COVID-19 pandemic on higher education. *Id.* ¶ 4. There is no comparable data that can substitute for what would have been produced by the now-cancelled BPS:20/25 study, and IHEP will be unable to conduct a wide range of timely research analyses on student experiences and outcomes, or analyze the impact of proposed changes to financial aid policies, without that data. *Id.* ¶ 7.

AEFP has likewise been injured in its own right by the cancellation of the ECLS-K:2024 study. As Daphna Bassok's declaration explains, AEFP will be unable to update chapters on early childhood achievement gaps in its *Live Handbook* without the data that study would have produced. Bassok Decl. ¶ 12. The predecessor to *Live Handbook*, *Handbook of Research in Education Finance and Policy*, relied on data from prior ECLS iterations, and is no longer relevant. *Id.* ¶¶ 11–12. There is no substitute for new ECLS data, because no other studies provide a national representative view of children's early learning experiences with direct assessments of their skills. *Id.* ¶ 13. AEFP is thus "flying blind" on early childhood trends, and unable to provide evidence-based policy recommendations on topics such as pre-kindergarten, childcare subsidies, and other early interventions, which directly impairs AEFP's mission to inform education policy. *Id.* ¶¶ 10, 14.

### 2. AEFP has associational standing to challenge the terminations of the BPS:20/25, HSLS:09, HS&B:22, and ECLS-K:2024 studies.

AEFP also has associational standing to challenge all four study terminations on behalf of its members. A membership organization may assert associational standing if "(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires

individual members to participate in the litigation." *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022). Each of those requirements is satisfied.

First, the accompanying declarations of Kevin Stange, Brent J. Evans, Jordan Matsudaira, and Daphna Bassok show that AEFP members will suffer, or have suffered, harm from cancellation of the BPS:20/25, HSLS:09, HS&B:22, and ECLS-K:2024 studies. Kevin Stange is a member of AEFP and has relied on data from multiple waves of BPS studies in his research, and had planned to use data from the BPS:20/25 study to make comparisons between college enrollment, persistence and completion patterns between Michigan and the United States overall, which would shed light on whether patterns seen in Michigan are generalizable beyond that state. Second Stange Decl. ¶¶ 1–3. There is no adequate alternative to the BPS:20/25 study, because the available alternatives either are not nationally representative, or do not follow students longitudinally over time to measure persistence or degree attainment. *Id.* ¶ 4.

Brent J. Evans is a member of AEFP and has previously relied on earlier waves of BPS, HSLS, and HS&B data in his work. Second Evans Decl. ¶¶ 2, 5. He had planned to use data from the BPS:20/25 study to research education policy questions including whether baccalaureate degree attainment rates increased in line with college access rates for different populations across the country relative to prior decades, and how the relationship between postsecondary experience, educational outcomes, and student loan borrowing have changed relative to prior decades. *Id.* ¶ 2. There is no readily available alternative data source that duplicates the data that would have been gathered and disseminated as part of BPS:20/25. *Id.* ¶ 4. He had also planned to use data from the 2025 data collection for HSLS in both teaching and research, as he has done with previous data collection years from that study, but will now be unable to do the work that he had planned because of the cancellation of the HSLS data collection, which cannot be replaced by any other source. *Id.*

¶¶ 5–6. And he had planned to use future data from the now-cancelled HS&B:22 data collection to study topics such as changes in educational trajectories over time in different decades and how patterns of two-year to four-year college transfer rates across student income levels have changed relative to prior decades. *Id.* ¶ 7.

Jordan Matsudaira is a member of AEFP, and had planned to use data from the BPS:20/25 data collection to study topics such as the root causes of the growing debt burden faced by postsecondary students, the impacts of federal loan limits for graduate students, and the impacts of online learning during the COVID-19 pandemic. Matsudaira Decl. ¶¶ 5–6, 12. Without the BPS:20/25 data collection, Matsudaira and his colleagues will have to rely on less comprehensive, older, or less reliable data sets. *Id.* ¶ 12.

Daphna Bassok is a member of AEFP and serves as its President-Elect. Bassok Decl. ¶ 3. She had relied on previous waves of ECLS data in her research, and had planned to use data from the ECLS-K:2024 data collection to study the "school readiness" skills of a more recent cohort of children. *Id.* ¶ 9. She had also planned to use data from the ECLS-K:2024 data collection to revisit her paper "*Is Kindergarten the New First Grade?*," which garnered significant public interest, with more recent observations. *Id.* She can no longer do so because IES has cancelled ECLS-K:2024. *Id.*

Kevin Gee is a member of AEFP. Gee Decl. (ECF 6-8) ¶ 2. He had planned to use ECLS-K:2024 data to conduct a study comparing absenteeism between sets of students, pre- and post-COVID-19, building off a previous paper he published based on 2011 data. *Id.* ¶ 13. His plans have halted due to the termination of ECLS-K:2024. *Id.*

The other elements of associational standing are also easily met. This action is plainly germane to AEFP's mission of promoting research and partnerships that inform education policy

and finance and improve educational outcomes. *See* Bassok Decl. ¶ 10; Kurlaender Decl. (ECF 6-11) ¶¶ 5–7. And individual member participation is not necessary in this case because of the nature of Plaintiffs' claims, which "seek prospective and injunctive relief, not damages for its members." *Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151, 163 (D.D.C. 2024).

Defendants' sole argument on associational standing is that the Second Amended Complaint does not identify injured members by name. ECF 33 at 25. The D.C. Circuit, however, has repeatedly affirmed that naming individual injured members is not required to establish associational standing, because "'[n]aming [association] members adds no essential information bearing on the injury component of standing.'" *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (quoting *Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1506 (D.C. Cir. 1988) (Mikva, J., separate opinion)); *SSM Litigation Grp. v. EPA*, --- F.4th ---, 2025 WL 2552531, at *4 (D.C. Cir. Sept. 5, 2025) (same). In any case, the detailed declarations from named members of AEFP that accompany this memorandum provide the information that Defendants seek.

### 3. AEFP has associational standing to challenge the termination of the peer-review program.

AEFP also has associational standing to challenge the termination of the peer-review program for new grant funding. AEFP member Bassok has a pending application for grant funding from IES that would support a project studying teacher turnover in early care and education settings and its impact on young children, which would provide a first-of-its-kind look at the extent to which teacher instability in early childhood education relates to children's readiness across a broad set of domains. Bassok Decl. ¶ 15. She submitted the grant proposal in September 2024, but as of September 2, 2025, the IES grant system lists the status of the application as "pending," and

notes that the application has been "forwarded for peer review." *Id.* ¶ 16. Because IES cancelled the contract for its previous peer review system and has not arranged any replacement, peer review is not occurring. SAC ¶¶ 60–61; Bassok Decl. ¶ 16. As a result, IES cannot act upon Bassok's grant application, and Bassok will not be able to move forward with her proposed research. Bassok Decl. ¶ 17.

AEFP member Kevin Gee is in a similar situation. He submitted a proposal to conduct a multi-year research project on student absenteeism in California in September 2024, in response to a grant competition announcement. Gee Decl. (ECF 6-8) ¶ 8. Like Bassok, that proposal remains stuck in peer review limbo, *id.* ¶ 10, and, as a result, he has delayed his project, *id.* ¶ 11.

As for the other associational standing factors, challenging the termination of IES's peer-review process is plainly germane to AEFP's mission of promoting research into educational policy and improving educational outcomes, and it does not require the participation of individual AEFP members because AEFP seeks only prospective relief.

Defendants notably do not raise any specific challenge to AEFP's standing to challenge the termination of the peer-review program, and their arguments on informational injury do not apply to this claim. The termination of peer review has injured AEFP members' procedural right to apply for IES grants and to have those applications acted on in accordance with statutory requirements, rather than their right to receive information. *See* 20 U.S.C. §§ 9534(b)(1), 9520. As the D.C. Circuit has explained, "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* … even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)). It is thus sufficient for AEFP's standing

that Bassok and Gee have lost the opportunity to pursue an IES grant and to have their applications evaluated in accordance with statutory requirements, even if it is uncertain whether IES would ultimately award the grants to them.

### 4. AEFP has associational standing to challenge the halt of restricted-use data application processing.

AEFP also has associational standing to challenge Defendants' decision to halt processing for restricted-use data applications, a decision which has inflicted informational injury on its members. AEFP member Jordan Matsudaira needs access to restricted-use data to conduct his research because the statistical analysis he intends to perform can only be done using individual-level data that is only available on a restricted-use basis. Matsudaira Decl. ¶ 7. Additionally, the restricted-use datasets that Matsudaira seeks to access allow for the use of statistical software to conduct data analysis, which is not possible with the public versions of the relevant datasets. *Id.* Matsudaira began the process of applying for a restricted-use license in early 2025, and completed the application on or about May 21, 2025. *Id.* ¶ 8. On May 29, 2025, Matsudaira received an email from IES Data Security stating that "IES is pausing the issuance of new Restricted Use Data Licenses and activities associated with the issuance of new licenses, until further notice." *Id.* Matsudaira has received no further communications from IES on the restricted-data license application since that time, and as a result has been unable to begin the research he had planned into the factors influencing student postsecondary education borrowing over time. *Id.* ¶ 10.

AEFP member Kirsten Slungaard Mumma needs access to restricted-use IES data to conduct research on broad trends in the adult education sector over time for a paper that is under submission at the journal *Education Finance and Policy*. Mumma Decl. ¶¶ 3, 5–7. Mumma submitted an application for a restricted-use data license in December 2024, and received an email from IES on January 14, 2025, acknowledging receipt of the application and stating that "the

review process for new applications is typically around 4 weeks." *Id.* ¶ 8. On April 25, 2025, Mumma received another email from IES, stating that "IES is pausing the issuance of new Restricted Use Data Licenses and activities associated with the issuance of new licenses, until further notice." *Id.* ¶ 9. She has since heard nothing further from IES on the status of her application. *Id.* ¶ 10. The IES website continues to list her application as being "under review," as it has since January 2025. *Id.* Mumma's need for a restricted-use data license is particularly time-sensitive because she is on the tenure track and her position at Columbia University is up for reappointment this year. Thus, the prospect of having a paper published in the *Education and Finance Policy* journal this year, as opposed to next year, makes a significant difference at this stage in her career, and the delay in processing her application has harmed her professionally. *Id.* ¶ 11.

As for the other associational standing factors, challenging the termination of processing for restricted-use data licenses is plainly germane to AEFP's mission of promoting research into educational policy and improving educational outcomes, and it does not require the participation of individual AEFP members because AEFP seeks only prospective relief.

### B.    The Tucker Act does not apply here.

Defendants next argue that the Tucker Act forecloses this Court's jurisdiction over Plaintiffs' challenges to the study terminations and the termination of the peer-review program (but not over the restricted-use data challenge). ECF 33 at 29. Whether the Tucker Act bars district court jurisdiction over an APA claim turns on two considerations: (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.3d 959, 968 (D.C. Cir. 1982). Both considerations support this Court's jurisdiction over this case.

As to the first factor, Plaintiffs' claims are based on the ESRA and the APA, not upon any of the cancelled contracts. Defendants' contrary argument is based on a mischaracterization of the claims in the operative complaint as "claims challenging the cancellation of the Institute's contracts." ECF 33 at 27. Plaintiffs do not challenge Defendants' termination of contracts relating to the conduct and dissemination of particular data collections, or for peer review of grant applications, but their decision to halt those data collections and to cease peer review of grant applications entirely. *See, e.g.*, SAC ¶ 78 (challenging Defendants' "termination of BPS:20/25"); ¶ 82 (challenging Defendants' "termination of HSLS:09"); ¶ 86 (challenging "Defendants' termination of HS&B:22); ¶ 90 (challenging Defendants' "termination of ECLS-K:2024"); ¶ 92 (challenging "Defendants' termination of the peer review program for new grants"). Defendants' attempt to rewrite the allegations of the complaint to convert them into challenges to the termination of specific contracts is improper, particularly at the motion to dismiss stage. The complaint alleges that IES decided to cease the studies and peer-review program entirely. *See, e.g.*, SAC ¶ 36 (alleging Defendants "canceled" all work on BPS:20/25 and "terminat[ed] BPS:20/25"); ¶ 48 (noting NCES statement that "study operations for HS&B:22 have been suspended"); ¶ 56 (referring to "the halting of the ECLS-K:2024 program"); ¶ 60 (alleging that "The peer review program for new grant funding was…terminated"). If Defendants dispute those allegations as a factual matter, and instead claim that only contracts were canceled and the programs remain operational, they must produce an administrative record substantiating their assertion. As they have not done so, Plaintiffs' allegations and all reasonable inferences in their favor control.

These claims that Plaintiffs do bring do not hinge on the maintenance of any particular contract, or any contract at all. *See* 20 U.S.C. § 9512 (authorizing IES to perform its functions "directly or through grants, contracts, or cooperative agreements"). Contrary to Defendants'

suggestion, Plaintiffs do not argue that the ESRA requires IES to maintain the particular contracts that were terminated. ECF 33. at 27. Nor do Plaintiffs allege any contractual violation by IES, or seek to enforce any provision of any contract. Defendants' only argument on the first *Megapulse* factor is that "Plaintiffs seek to set aside the termination of those specific contracts that were cancelled." *Id.* Not only is that incorrect factually, that argument merely underscores the absence of any real dispute on the first factor, because it turns entirely on the relief sought—that is, the second *Megapulse* factor.

On the second factor, Defendants argue that "the nature of the relief Plaintiffs seek sounds in contract" because, they claim, Plaintiffs seek "specific performance on a federal grant agreement." *Id.* at 28. Not so. Plaintiffs ask the Court to declare that the cancellations of the studies and the peer review program were arbitrary and capricious, to set aside those cancellations, and to enjoin Defendants to resume the studies and the peer review program. *See* SAC, Prayer for Relief. None of that relief requires the reinstatement or performance of any contract. Defendants *could* choose to resume the terminated functions through new contracts, but they also could choose to operate the studies and the peer-review program in-house or through grants or cooperative agreements. *See* 20 U.S.C. § 9512. Because those options would remedy Plaintiffs' injuries from the terminations of the studies, the nature of the relief Plaintiffs seek does not require the Court of Federal Claims to hear this case. *Cf. NIH v. Am. Pub. Health Ass'n*, 606 U.S. ___ No. 25A103, 2025 WL 2415669, at *2 (Aug. 21, 2025) (Barrett, J., concurring) (in opinion that controls under *Marks v. United States*, 430 U.S. 188, 193 (1977), reasoning that challenge to agency action that would not itself result in the reinstatement of terminated grants is within district court's jurisdiction).

## II.    Plaintiffs challenge final agency actions that are reviewable under the APA.

The APA provides for judicial review of "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. Plaintiffs' claims target precisely such actions. Defendants

nonetheless raise several threshold arguments that their actions—even if arbitrary and capricious or contrary to law—are not reviewable under the APA. These arguments lack merit.

### A.    Plaintiffs challenge discrete agency actions.

Defendants first contend that the Second Amended Complaint "does not identify a discrete and circumscribed agency action that the Department has taken and that could be redressed by a federal court." ECF 33 at 29. But as Defendants admit, "Plaintiffs challenge a host of individual actions." *Id.* at 30. Each of those discrete actions is reviewable under the APA. The APA's "'discrete' requirement does not mean that if an agency takes a slew of actions quickly, the Court loses its ability to review each of them under the APA." *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 32 (D.D.C. 2025); *see also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 310 (D.C. Cir. 2025) (recognizing that plaintiffs may challenge "multiple agency actions" in a single suit). Plaintiffs have heeded this Court's admonition in its preliminary injunction opinion, and now seek "incremental correction by fixing specific erroneous decisions," rather than "seek[ing] to dictate large-scale alterations in day-to-day agency operations." *Ass'n for Ed. Fin. & Policy, Inc. v. McMahon*, --- F. Supp. 3d ---, 2025 WL 1568301, at *6 (D.D.C. June 3, 2025).

Courts commonly review agency actions of the kind challenged here under the APA, including decisions about data collection and research studies. *See, e.g.*, *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019) (applying the APA's arbitrary and capricious standard to the decision to include a question on the Census); *Am. Legion v. Derwinski*, 54 F.3d 789, 795–801 (D.C. Cir. 1995) (reviewing a decision to halt a study); *AvMed, Inc. v. Becerra*, No. CV 20-3385 (JDB), 2021 WL 2209406, at *6–17 (D.D.C. June 1, 2021) (reviewing a decision to halt data collection); *Nat'l Women's Law Ctr. v. OMB*, 358 F. Supp. 3d 66, 84 (D.D.C. 2019) (holding that a stay of the collection of pay data was a final agency action).

Moreover, the targeted relief that Plaintiffs request—specifically, setting aside Defendants' unlawful decisions to terminate *in their entirety* four particular studies, the peer-review program, and processing of restricted-use data licenses—belies Defendants' claim that Plaintiffs raise a programmatic attack on IES's "day-to-day operations." ECF 33 at 29 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 899 (1990)). In *Lujan*, the Supreme Court held that an affidavit challenging an agency's failure to "provide adequate information and opportunities for public participation" in connection with a particular project was insufficiently specific to identify an agency action subject to review. *Lujan*, 497 U.S. at 899. Because no "particular … decision could be identified as the source of the grievance," the Court held that the affidavit failed to "set forth the specific facts necessary" to survive summary judgment. *Id.* Here, in contrast, Plaintiffs have plausibly alleged that Defendants have taken discrete, reviewable actions to terminate particular studies and agency programs. While reversing those actions will of course affect IES's day-to-day operations in the sense that, should Plaintiffs prevail, IES will continue to conduct the studies and the peer-review program and to issue restricted-use data licenses (unless and until it takes lawful action to terminate or modify those programs), *Lujan* does not hold that all actions that affect agency operations are insulated from review. Rather, it holds that an APA challenge must target "an identifiable action or event." *Id*. Plaintiffs have done just that.

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) (*SUWA*), on which Defendants also rely, *see* ECF 33 at 29, is similarly inapposite. Citing *Lujan*, the Supreme Court in *SUWA* observed that "[t]he limitation" of the APA's judicial-review provision "to discrete agency action precludes [a] … broad programmatic attack" against an agency's general operations. *SUWA*, 524 U.S. at 64. The Court went on to hold that an APA claim asserting that an agency had failed to manage certain wilderness areas "in a manner so as not to impair the suitability of such

areas for preservation as wilderness," *id.* at 65 (quoting 43 U.S.C. § 1782(c)), challenged "[g]eneral deficiencies in [the agency's] compliance" with its statutory mandate and "lack[ed] the specificity requisite for agency action," *id.* at 66. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (explaining that the APA does not contemplate review of "generalized complaints about agency behavior" in running an ongoing program). Unlike in *SUWA*, Plaintiffs here do not challenge the general manner in which IES carries out its statutory functions. Rather, they present "a narrow question to resolve," *Cobell*, 455 F.3d at 307, by challenging specific agency actions that Defendants have taken to terminate certain statutory functions altogether, and to terminate major studies without reasoned decisionmaking.

Indeed, the recent D.C. Circuit precedent on which Defendants primarily rely, *National Treasury Employees Union v. Vought* (*NTEU*), --- F.4th ---, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025), strongly suggests that individual agency actions of the kind challenged here are reviewable. As Defendants note, ECF 33 at 30, the plaintiffs in *NTEU* had identified "a constellation of … [agency] actions." *NTEU*, 2025 WL 2371608, at *13. The court, however, did not hold that those actions were unreviewable. Rather, it observed that the plaintiffs had not "challenge[d] any of these discrete decisions" but instead presented them "as a single decision in order to challenge all of them at once." *Id.* As for the one subsidiary action that the court understood the plaintiffs to be presenting for its review—an email from the agency head—the court deemed it unreviewable, *not* because it was insufficiently discrete but because it was not final. *Id.* at *10–11.

Defendants' invocation of the law-of-the-case doctrine is similarly unavailing. As an initial matter, Defendants are "simply mistaken" to invoke that doctrine in a case that has never been appealed because it "does not apply to interlocutory orders" which "can always be reconsidered

and modified by the district court prior to entry of final judgment." *Keepseagle v. Perdue*, 856 F.3d 1039, 1048 (D.C. Cir. 2017) (quoting *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 620 (8th Cir. 2007)). In any event, law-of-the-case principles have no application here, because the Second Amended Complaint does not advance the same claims or prayers for relief as the initial Complaint and the preliminary injunction motion. Plaintiffs have carefully cabined their claims and requested relief in the Second Amended Complaint in light of this Court's guidance. While Defendants' arguments appear to have remained static throughout the case, the operative complaint has not.

### B.    The decision to terminate processing of restricted-use data license applications is final.

Defendants next argue that one of the challenged actions, the decision to terminate processing of restricted-use data license applications, is not "final" within the meaning of the APA. ECF 33 at 32 (citing 5 U.S.C. § 704). To constitute final agency action, a challenged action must "mark the 'consummation' of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)), and must "be one by which 'rights and obligations have been determined,' or from which 'legal consequences will flow,'" *id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Plaintiffs have adequately alleged both requirements with respect to the actions at issue.

Defendants do not argue that the termination of restricted-use data license processing has not produced legal consequences. But challenging the first prong of the finality analysis, Defendants argue that "all Plaintiffs allege is that [IES] is continuing to evaluate how to proceed with the restricted-use data license processing," and that "the review of pending applications merely remains 'paused until further notice.'" ECF 33 at 32 (quoting SAC ¶ 85). That argument

28

fails both as to the law and the facts. As to the law, Defendants misidentify the relevant decisionmaking process. The relevant decision is the specific decision to proceed with a "pause" in processing applications, not the agency's overarching decision about how to manage applications in general. "[T]he fact that the challenged actions are ostensibly temporary is immaterial—for, as Plaintiffs point out, '*all* agency actions are subject to future change.'" *Pacito v. Trump*, 768 F. Supp. 3d 1199, 1228 (W.D. Wash. 2025); *see Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (collecting cases where ostensibly temporary stops and pauses were held to constitute final agency action); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025) (holding that an order that agencies "*must temporarily pause* all activities related to" specific disbursements "constituted final agency action").

The cases that Defendants cite are not to the contrary. *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948), involved a challenge to an order of the Civil Aeronautics Board that required Presidential approval to take effect. *Id.* at 104. The challenged order "grant[ed] no privilege and den[ied] no right," and "c[ould] give nothing and c[ould] take nothing away from the applicant or a competitor." *Id.* at 112. In that context, the Court observed that the challenged order "may be a step, which if erroneous will mature into a prejudicial result[.]" *Id.* Here, in contrast, Defendants' decision to terminate restricted-use data license processing has already had prejudicial effect, because researchers have no means of accessing restricted-use data. Likewise, although the D.C. Circuit's recent decision in *NTEU*, on which Defendants rely, held that a staff-wide email requiring approval before performing any work did not constitute final agency action, 2025 WL 2371608, at *18, that email on its own terms expressly exempted legally required work, and expressly contemplated further agency decisionmaking over whether to conduct any particular activity. *Id.* Here, there are no exceptions to the termination of license

29

application processing, and there is no further decision making needed to prevent researchers from working with restricted-access data.

Defendants' position also fails on the facts alleged here. At this stage of the litigation, the Court must draw all reasonable inferences in favor of Plaintiffs. *Langeman*, 88 F.4th at 294. The Second Amended Complaint alleges—and Defendants do not contradict—that IES announced in February 2025 that it would not accept any new applications for access to data (remote or physical), and that review of pending applications was "paused until further notice"; that IES did not provide any explanation for the so-called "pause" or identify any alternative means by which researchers can access restricted-use data; and that the "pause" remains in place. SAC ¶¶ 66–68. Regardless of whether Defendants' preferred inference—that IES is merely considering how to administer the license application process, rather than having made a final decision to indefinitely suspend license processing—may be *available*, it is not required based on the facts alleged. At the motion to dismiss stage, Defendants' argument therefore must be rejected.

### C.  Plaintiffs lack adequate alternative remedies.

Defendants briefly argue that Plaintiffs lack an APA cause of action because they have adequate alternative remedies under the Tucker Act. ECF 33 at 33; *see* 5 U.S.C. § 704 (providing that agency action is reviewable under the APA if "there is no other adequate remedy in a court"). As explained above, however, Plaintiffs do not raise contract claims. *See supra*, Part I.B. Consequently, the Tucker Act does not afford Plaintiffs an adequate alternative to APA relief on their claims.

"An alternative remedy will not be adequate under § 704 if the remedy offers only doubtful and limited relief," and "the court must give the APA a hospitable interpretation such that only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Garcia v. Vilsack*, 563 F.3d 519, 522–23 (D.C. Cir. 2009)

(internal citations and quotation marks omitted). To displace APA review, an alternative remedy must be "of the same genre" as that sought by the plaintiffs. *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1275 (D.C. Cir. 2005). The Tucker Act does not authorize any injunctive relief that would require the resumption of the halted activities.

Indeed, Defendants' proposed alternative offers Plaintiffs no prospect of relief whatsoever. Defendants concede that Plaintiffs are not parties to any of the relevant contracts. *See* ECF 33 at 26. Nor is there any realistic possibility that Plaintiffs could avail themselves of the "exceptional privilege," "not [to] be granted liberally," of suing in the Court of Claims as third party beneficiaries of the contracts (which, again, Plaintiffs do not allege have been breached). *Flexlab, LLC v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005). Defendants notably fail to cite any authority dismissing a case under § 704 and the Tucker Act where the plaintiff had neither a claim nor any prospect of relief in the Court of Federal Claims. To the contrary, the D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction [under the APA] by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).

### D.    The challenged actions are not committed to agency discretion by law.

Defendants' final threshold argument is that the challenged actions are not reviewable because "decisions on how to implement a program" are committed to agency discretion by law, and not reviewable by courts. ECF 33 at 35. But they have come nowhere close to meeting their burden to establish this "very narrow exception" to the strong presumption of reviewability, an exception that "applies only 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Campaign Legal Ctr. v. FEC*, 952 F.3d 352, 359 (D.C. Cir. 2020) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)); *see Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (recognizing that the agency bears the

burden). Courts, moreover, "have generally limited the exception to certain categories of administrative decisions that courts traditionally regarded as 'committed to agency discretion' … such as a decision not to institute enforcement proceedings … or a decision by an intelligence agency to terminate an employee in the name of national security." *Dep't of Commerce*, 588 U.S. at 772 (internal citations and quotation marks omitted).

Defendants do not identify any statute that commits the challenged actions to agency discretion, as is their burden. And the ESRA provides ample "law to apply" in evaluating the reasonableness of the challenged actions. Congress specified that IES's "mission … is to provide national leadership in expanding fundamental knowledge and understanding of education from early childhood through postsecondary study, in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information" about "the condition and progress of education in the United States, including early childhood education and special education," "educational practices that support learning and improve academic achievement and access to educational opportunities for all students," and "the effectiveness of Federal and other education programs." 20 U.S.C. § 9511(b)(1). And Congress directed that, in carrying out that mission, IES "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute and ensure that such activities … conform to high standards of quality, integrity, and accuracy" and "are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." *Id.* § 9511(b)(2). Congress further specified that IES must "make customer service a priority" in "all activities," and must "ensure a high level of customer satisfaction" by, among other things, "[d]isseminating information in a timely fashion and in

formats that are easily accessible and usable by researchers, practitioners, and the general public," "[u]tilizing the most modern technology and other methods available, including arrangements to use data collected electronically by States and local educational agencies, to ensure efficient collection and timely distribution of information, including data and reports," and "[m]aking information available to the public in an expeditious fashion." *Id.* § 9575.

Defendants do not even bother to cite the ESRA in arguing that there is "no law to apply" to the challenged decisions. But as the detailed Congressional direction quoted above demonstrates, that argument does not pass the laugh test.

## III. Plaintiffs adequately allege that the challenged agency actions are arbitrary, capricious, and contrary to law.

On the merits, Defendants briefly argue that the challenged actions were not arbitrary and capricious because "President Trump and Secretary McMahon have articulated the presence of inefficiency and waste at the Department." ECF 33 at 34. Regardless of what deference any such articulation would be owed, that argument cannot possibly succeed at this stage in the litigation. There is no allegation in the Second Amended Complaint that combatting waste or inefficiency was the justification for the challenged actions, and even within the limited scope of arbitrary-and-capricious review, "courts may not accept … counsel's post hoc rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Moreover, even if the Secretary considers a program wasteful or inefficient, the Secretary cannot terminate it without considering whether it is required by law. And a Secretarial determination that an existing program is inefficient does not obviate the requirement that agencies consider reliance interests before acting. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020).

Plaintiffs have alleged that Defendants terminated major longitudinal studies midstream without considering the reliance interests of researchers relying on those studies, the wastefulness of their actions, or whether their policy goals could be achieved through less harmful means. SAC ¶¶ 78, 81–82, 85–86, 89–90. Plaintiffs have alleged that Defendants terminated processing of restricted-use data license applications without considering the reliance interests of applicants or how their actions fit with the statutory mandates of 44 U.S.C. § 3582(a) and 20 U.S.C. § 9575. SAC ¶ 108. And Plaintiffs have alleged that Defendants likewise terminated the peer-review program without considering reliance interests or the statutory mandates of 20 U.S.C. §§ 9534(b)(1) and 9520. SAC ¶¶ 96–97. Judicial review of Defendants' actions must "be based on the full administrative record that was before the [Defendants] at the time [they] made [their] decision[s]." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971). Such review is not possible at this stage of the litigation, and Defendants' motion to dismiss on the merits should be denied.

Finally, Defendants' remedial argument that Plaintiffs are not entitled to have Defendants' actions set aside but are entitled only to additional explanation, ECF 33 at 36, is premature. The availability of remand without vacatur in an APA case is "the subject of some debate," *Corner Post, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 603 U.S. 799, 837 n.6 (2024) (Kavanaugh, J., concurring), and it is in any event not "the normal remedy," *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Whether to grant this unusual form of relief depends on "the 'seriousness of the [agency action's] deficiencies' and the likely 'disruptive consequences' of vacatur." *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Defendants do not address either of these factors, and it would not be

34

advisable for this Court to do so at this early stage of litigation, before the administrative record has been produced and before the Court has considered summary judgment motions.

## IV.    Defendants' request for relief from Local Civil Rule 7(n) should be denied.

Local Civil Rule 7(n) provides that, absent an order of the court, "[i]n cases involving the judicial review of administrative agency actions, … the agency must file a certified list of the contents of the administrative record with the Court … simultaneously with the filing of a dispositive motion" if an answer has not yet been filed. Defendants admit that they have not complied with this rule, but they argue that they should not have to do so. ECF 33 at 44–45. Defendants' justification—that their motion "rel[ies] entirely on the facts alleged in the Second Amended Complaint or facts upon which the Court may take judicial notice," *id.* at 44—is factually incorrect. As discussed above, Defendants' motion includes several unsupported factual assertions as to what Defendants have done and why. While, at the motion to dismiss stage, the Court must simply disregard such assertions and read the allegations of the complaint in the light most favorable to Plaintiffs, Defendants' refusal to produce the administrative record precludes Plaintiffs from preparing a motion for summary judgment. *See, e.g.*, *Vassiliades v. Rubio*, 2025 WL 1905654, at *12 (D.D.C. July 10, 2025) (ruling that, because the defendants had not produced the administrative record, the court could not evaluate whether agency action was arbitrary and capricious); *Swedish Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 88 (D.D.C. 2010) (denying motion to dismiss and compelling production of the administrative record because, "[w]ithout the administrative record, the court is unable" to perform arbitrary-and-capricious review); *Hamal v. DHS*, 2020 WL 2934954, at *4 (D.D.C. June 3, 2020) (denying motion to dismiss because, "without fully reviewing the entire administrative record, it would be premature to declare that the agency acted reasonably"). Accordingly, this Court should deny Defendants' request to be excused from complying with Rule 7(n) and require the production of the administrative record forthwith.

## CONCLUSION

This Court should deny Defendants' motion to dismiss the Second Amended Complaint and order Defendants promptly to produce the administrative record by a date certain.

Dated: September 18, 2025

Respectfully submitted,

/s/ Adam R. Pulver
Adam R. Pulver (DC Bar No. 1020475)
Karla Gilbride (DC Bar No. 1005886)
Cormac A. Early (DC Bar No. 1033835)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

*Attorneys for Plaintiffs*