**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC.**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **LINDA MCMAHON, in her official capacity as Secretary of Education**, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00999 (TNM) |
| **NATIONAL ACADEMY OF EDUCATION**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **DEPARTMENT OF EDUCATION**, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-01266 (TNM) |

<u>**MEMORANDUM OPINION**</u>

For years, the Department of Education has conducted a wide range of research programs to collect and share data about American education.  But with new presidential administrations come with new priorities, and this one has left little doubt about its intention to limit the Department's scope.  In line with that aim, the Department has curtailed several studies and data collection programs.  That change drove multiple education advocacy groups who rely on the Department's data to this Court.  As they see it, the research terminations violated the Department's statutory obligations.  They bring many challenges along those lines under the Administrative Procedure Act ("APA").

The Department moves to dismiss these claims for either jurisdictional deficiencies or shortcomings on the merits. But Plaintiffs have alleged enough to surmount the pleading stage's low bar on both scores. So aside from one claim one Plaintiff voluntarily dismisses, the Court will deny these motions.[1]

## I.

The federal government has played a role in education-related research since the 1860s and formalized that activity with the creation of the Department of Education in the 1970s. *See* Acad. Am. Compl. ¶¶ 15–16, ECF No. 31; Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–510). Transformation to the Department's research functions came again in 2002 with the enactment of the Education Sciences Reform Act ("the Act"). Pub. L. No. 107-279, 116 Stat. 1941 (2002) (codified at 20 U.S.C. §§ 9501–84). The Act aimed to improve the nation's collection, analysis, and dissemination of education-related data. Assoc. 2d. Am. Compl.¶ 1, ECF No. 32. To reach that goal, the Act established the Institute of Education Sciences ("the Institute") as a Department component, whose mission it is to "provide national leadership in expanding fundamental knowledge and understanding of education . . . in the United States . . . ." 20 U.S.C. § 9511(b)(1).

The Institute carries out its mission in various ways. Either "directly or through grants, contracts, or cooperative agreements," *id.* § 9512, the Act instructs the Institute to "compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities

---

[1] The Court collectively refers to Plaintiffs in case number 25-cv-999 as "the Association" and Plaintiffs in case number 25-cv-1266 as "the Academy." The Court also uses the abbreviations "Assoc." and "Acad." in record citations to distinguish between the two sets of filings. Citations are to CM/ECF pagination where possible.

in areas of demonstrated national need (including in technology areas)." *Id.* § 9511(b)(2); *see also id.* § 9512 (directing the Institute to "widely disseminate the findings and results of scientifically valid research in education" and "strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education"). When the Institute chooses to award grants or contracts for these purposes, it must award them on a competitive basis "and, when practicable, through a process of peer review." *Id.* § 9520.

To carry out all these functions, the Institute houses four national research centers. There is the National Center for Education Research, the National Center for Education Statistics, the National Center for Education Evaluation and Regional Assistance, and the National Center for Special Education Research. *Id.* § 9511(c)(3). Like the Institute itself, each center has its own structure, mission, and statutory obligations. *See* 20 U.S.C. §§ 9531–67b.[2]

The Institute's work has resulted in numerous studies and a vast amount of data on American education. Describing a few initiatives sets the table for Plaintiffs' challenges. The National Postsecondary Student Aid Study, for instance, compiles data about students in higher education with a specific focus on how they finance their education. Assoc. 2d. Am. Compl. ¶ 30; Acad. Am. Compl. ¶ 55. Relatedly, the Beginning Postsecondary Students Longitudinal Study tracks students' higher education experience over several years. Assoc. 2d. Am. Compl. ¶ 31. When a cohort for the finance-focused study begins higher education, that group often also serves as a cohort for the longitudinal higher education study. *Id.* ¶¶ 33, 36.

Then there are longitudinal studies following cohorts of high school students. *Id.* ¶ 38. One began following a group of ninth graders in 2009 and has since produced "a wealth of data

---

[2] While a particular center carries out each study Plaintiffs challenge, the difference between centers does not affect the motion at hand, so the Court refers to their actions collectively as those of "the Institute" or "the Department."

and reports" through periodic follow-up data collections. *Id.* ¶ 40; Acad. Am Compl. ¶ 84. The

Institute launched another cohort study in 2022. Assoc. 2d. Am. Compl. ¶ 43. Similar

longitudinal studies track early childhood education, too. *Id.* ¶ 50; Acad. Am. Compl. ¶ 70.

The Department also runs short-term data collection projects. The National Assessment

of Educational Progress, for instance, measures student achievement through assessments that

take place each year. Acad. Am. Compl. ¶¶ 40–41. That study in turn relies on a pool of data

called the Common Core of Data, which is "the only comprehensive national database on public

elementary and secondary schools that collects" the right data for the annual assessment. Acad.

*Id.* ¶¶ 46, 48. Collectively, these research endeavors generate massive amounts of data and paint

a detailed picture of the American educational landscape.

The federal government has its own uses for this data, but so do nonprofit organizations

and individual researchers. The Act recognizes as much by ensuring the Institute "provide[s]

parents, educators, students, researchers, policymakers, and the general public with reliable

information" about American education. 20 U.S.C. § 9511(b)(1). In the same vein, the Act

obliges the Institute to make its research and data "available to the public." *Id.* § 9574. Of

course, that requirement has limits for sensitive information. Researchers looking to access data

with individually identifiable information, must obtain a "restricted-use" data license from the

Institute. Assoc. 2d. Am. Compl. ¶ 4; 20 U.S.C. § 9573(c).

This all changed in early 2025. In February, the Department terminated swaths of studies

and programs set up through Institute contracts and grants. Assoc. 2d. Am. Compl. ¶¶ 34, 36, 42,

47, 54; Acad. Am. Compl. ¶¶ 30, 51, 60, 67. More, it cancelled the peer-review program it had

used before to evaluate grant applications, and the restricted-data licensing system that granted

some access to especially sensitive data. Assoc. 2d. Am. Compl. ¶¶ 58–66. As Plaintiffs allege,

the Department cancelled these programs "without replacing them and without any plans" to do so. *Id.* ¶ 3; *see* Acad. Am. Compl. ¶¶ 130–32.

This litigation followed in April. Two cases, each with two Plaintiffs, were filed against the Department of Education and its Secretary, Linda McMahon (collectively, "the Department"). Plaintiffs in the first case (No. 25-cv-999) are the Association for Education Finance and Policy and the Institute for Higher Education Policy (collectively, "the Association"). The first organization strives to "provide a forum for discussion and debate as to what drives effective education and related services" for people of all ages, "while promoting research and development." Assoc. 2d. Am. Compl. ¶ 8. The second focuses on "research, policy, and advocacy" surrounding access to postsecondary education. *Id.* ¶ 9. Both organizations and their members rely on Institute-produced data for these activities. *See e.g.*, *id.* ¶¶ 37, 49, 57.

Plaintiffs in the second case (No. 25-cv-1266) are the National Academy of Education and the National Council on Measurement in Education (collectively, "the Academy"). The former works to "advance[] high-quality research to improve education policy and practice." Acad. Am. Compl. ¶ 8. The latter is a professional organization that promotes advancement in "assessment, evaluation, testing, and other aspects of educational measurement." *Id.* ¶ 9. These Plaintiffs and their members also rely on data from the Institute in their activities. *See id.* ¶¶ 8–9.

In both cases, Plaintiffs sought a preliminary injunction granting programmatic relief. *See Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13, 22 (D.D.C. 2025). This Court denied that motion, and both sets of Plaintiffs have since amended their Complaints. *See generally* Assoc. 2d. Am. Compl.; Acad. Am. Compl. Now, each Complaint challenges the termination of several specific studies and related functions under the Administrative Procedure

Act as either arbitrary and capricious or contrary to law. The Association points to four cancelled studies, and the Academy points to ten. Assoc. 2d. Am. Compl. ¶¶ 76–90; Acad. Am. Compl. ¶¶ 137–226. The Association also challenges the cancellation of the peer-review program and the restricted-data application process as arbitrary and capricious and contrary to law. Assoc. 2d. Am. Compl. ¶¶ 91–106.

The Department moves to dismiss both cases under Rules 12(b)(1) and 12(b)(6). *See* Assoc. Mot. to Dismiss, ECF No. 33; Acad. Mot. to Dismiss, ECF No. 32. These motions also ask the Court to excuse the Government's obligation to file a certified list of the Administrative Record contents. Assoc. Mot. to Dismiss at 44; Acad. Mot. to Dismiss at 32; *see* LCvR 7(n)(1). Plaintiffs oppose and ask the Court to compel Administrative Record production. Assoc. Opp'n at 43, ECF No. 35; Acad. Opp'n at 46, ECF No. 33. These motions are now ripe. Given the substantial overlap in factual and legal issues, the Court addresses both cases in this opinion, but it separately analyzes the distinct issues raised by the two cases when necessary. *Accord Ctr. for Biological Diversity v. Trump,* 453 F. Supp. 3d 11, 21 n.1 (D.D.C. 2020).[3]

## II.

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must show that the Court has subject matter jurisdiction over his claims. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). The Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up). But those factual

---

[3] The Association brought one additional claim for unreasonable delay in processing three of its "disclosure risk review" submissions. Assoc. 2d. Am. Compl. ¶¶ 107–08. Because the Institute later approved two of those submissions and the Association withdrew the third, the Association is "no longer pursuing" this count and does "not object to its dismissal without prejudice." Assoc. Opp'n. at 14. The Court thus dismisses the claim without prejudice as moot.

allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Schilling v. Pelosi*, 633 F. Supp. 3d 272, 274–75 (D.D.C. 2022), *aff'd sub nom. Schilling v. U.S. House of Reps.*, 102 F.4th 503 (D.C. Cir. 2024) (cleaned up). If the Court determines that it lacks jurisdiction, it must dismiss the claim or action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts the complaint's factual allegations as true and grants plaintiffs "all inferences that can be derived from the facts alleged." *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up). The Court considers "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice." *Hurd*, 864 F.3d at 678 (cleaned up).

### III.

The Court begins, as it must, with its jurisdiction over these cases. The core issue on this score is whether Plaintiffs have standing to bring their claims.

Article III of the Constitution grants this Court authority to adjudicate legal disputes only in "Cases" or "Controversies." U.S. Const. art. III § 2. In line with this limitation, litigants must show a personal stake, or "standing," in the dispute at hand. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (cleaned up). Groups like Plaintiffs can establish standing in two ways. First, they can invoke "organizational standing" to sue on their own behalf. *See People for*

*Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). Under this avenue, Plaintiffs must plausibly allege they suffered an "actual or threatened injury in fact" to their *own* interests that is "fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

Second, they can assert "associational standing" on behalf of their members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*[4]

Under either avenue, the Constitution demands "an injury that is actual, imminent, or certainly impending." *Viasat, Inc. v. FCC*, 47 F.4th 769, 778 (D.C. Cir. 2022). At the motion-to-dismiss stage, Plaintiffs must "clearly . . . allege . . . facts demonstrating" that injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). Plaintiffs' burden to demonstrate standing grows heavier throughout the litigation. *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019).

## A.

The Court separately addresses standing for each group of claims Plaintiffs bring: those challenging (1) the cancellation of studies; (2) the termination of application processing for

---

[4] As this Court has observed before, scholars and jurists have questioned the doctrinal soundness of associational standing. *See, e.g.*, *Coal. for Humane Immigrant Rts. v. DHS*, 780 F. Supp. 3d 79, 91 n.3 (D.D.C. 2025); *Cape Cod Charter Boat Ass'n v. Burgum*, ---F. Supp. 3d---, 2025 WL 3182686, at *5 n.3 (D.D.C., 2025). Precedent nevertheless requires the Court to consider the doctrine here.

restricted-use data licenses; and (3) the halt in the peer-review program.  At this early litigation

stage, where a low bar stands before Plaintiffs, they have alleged enough to establish standing for

each of these claims.

*Termination of studies.*  Consider first standing for the bulk of claims—those challenging

the Department's cancellation of studies.  For these, Plaintiffs plausibly allege an informational

injury that the challenged actions caused and which the Court can remedy.  They thus satisfy

Article III.

"To carry its burden of demonstrating a sufficiently concrete and particularized

informational injury, a plaintiff must show that (1) it has been deprived of information that, on its

interpretation, a statute requires the government or a third party to disclose to it, and (2) it

suffers, by being denied access to that information, the type of harm Congress sought to prevent

by requiring disclosure."  *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election

Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (cleaned up); *see TransUnion LLC v. Ramirez*, 594

U.S. 413, 442 (2021) ("An asserted informational injury that causes no adverse effects cannot

satisfy Article III." (cleaned up)).  Then it must plausibly allege that the challenged action caused

its injury and that the Court can redress that harm.  *See FEC v. Akins*, 524 U.S. 11, 25 (1998).

Plaintiffs' cancelled-study claims surmount these hurdles.  To start, Plaintiffs point to

several laws they say entitle them to the Institute's research and data.  *See Elec. Priv. Info. Ctr.*,

878 F.3d at 378; *see, e.g.*, Acad. Am. Compl. ¶ 20 (referring to the Institute's obligation to

"widely disseminate the findings and results of scientifically valid research in education" under

20 U.S.C. § 9512); Assoc. 2d. Am. Comp. ¶ 17 (noting that 20 U.S.C. § 9574 requires the

Institute's data to "be made available to the public" subject to privacy protections and invoking

20 U.S.C. § 9575's call to "[d]isseminat[e] information in a timely fashion and in formats that

are easily accessible and usable by researchers, practitioners, and the general public").  They do

so for the individual studies they challenge too.  *See e.g.*, Assoc. 2d. Am. Compl. ¶ 50

(describing 20 U.S.C. §§ 9543(a)(1)(B), (L) as imposing "statutory mandates to . . . disseminate

data related to early childhood education"); Acad. Am. Compl. ¶ 100 (same).  And for now, the

Court must credit Plaintiffs' plausible interpretation that those statutes require information

disclosure.  *See Elec. Priv. Info. Ctr.*, 878 F.3d at 378.

      Next, Plaintiffs adequately allege that the Department deprived them of that information.

Plaintiffs do so by alleging the cancellation and failure to replace *every* research endeavor—and

resulting dissemination of data—they challenge.

      Take the early childhood longitudinal study.  The Department funded this study through

contracts.  Assoc. 2d. Am. Compl. ¶¶ 52, 54.  (Recall that the Institute can fulfill its statutory

obligations either "directly or through grants, contracts, or cooperative agreements."  20 U.S.C.

§ 9512.)  Plaintiffs allege that the Department cancelled those contracts and have "not secured

alternate funding" through different contracts, grants, or other means, "to support the operation"

of the early childhood longitudinal study.  Acad. Am. Compl. ¶ 79.  The cancellation thus "ended

both the collection of new data and analysis of data already collected."  Assoc. 2d. Am. Compl.

¶ 54; Acad. Am. Compl. ¶ 79  Now, "that data will not be released."  Assoc. 2d. Am. Compl.

¶ 56.

      So too for the high school and post-high school longitudinal studies, whose contracts the

Department also terminated.  *Id.* ¶¶ 36, 42, 47; Acad. Am. Compl. ¶¶ 83–86, 91–92, 98–99.

Ending their contracts resulted in the "suspen[sion]" of those studies.  Assoc. 2d. Am. Compl.

¶ 48; *see also id.* ¶¶ 36, 42.  And "without any plans to replace" them, "remaining work," such as

disseminating data from the studies, "has been canceled." *Id.* ¶¶ 36, 42; Acad. Am. Compl. ¶¶ 87, 91, 98.

The Association ends its challenges to studies there, but the Academy continues. Recall the National Assessment of Education Progress—the study of student achievement measured through annual tests. Acad. Am. Compl. ¶¶ 40–41. The Academy details the ways the Department has prepared for the Assessment in the past, and the "several actions" the Department recently took to "disrupt the collection, maintenance analysis, and dissemination" of its data. Acad. Am. Compl. ¶¶ 40–42. Those actions include the Department's issuance of a "stop order" to the groups in charge of the Assessment and the Department's failure to release the prior year's results. *Id.* ¶¶ 43–44.

The Department has likewise cancelled the supporting contract for the Common Core of Data—the dataset on which the Assessment relies. *Id.* ¶ 51. Because the Department terminated it and "no valid and reliable alternative" data exists, the Department has not "perform[ed] the collection, maintenance, analysis, and dissemination" of the Common Core of Data. *Id.* ¶¶ 48, 52. Indeed, the Academy had expected the Department to "produce[] data for Fiscal Year 2023," make "expenditure data available," and "disseminate[] multiple data files and reports." *Id.* ¶ 52. Now that the program is cancelled, though, the Academy is left without this research and the underlying data the Department allegedly owes the public. *Id.* ¶¶ 48, 52.

And the National Household Education Survey, the Academy explains, serves as "the only nationally representative data on home-learning environments." *Id.* ¶ 103. No "comparable datasets collect and measure the same metrics." *Id.* Now that the contracts supporting that study have been terminated, the Department has stopped its review of that study's data, preventing its dissemination. *Id.* ¶¶ 107–08. Once more, the Academy faces informational deprivation.

Finally, the same is true for the Academy's claim about the Trends in International Mathematics and Science Study.  This study had provided "reliable and timely trend data" on American students' math and science achievements since 1995.  Acad. Am. Compl. ¶ 115 (quoting Nat'l Ctr. for Educ. Stat., TIMSS, https://perma.cc/SG6T-T643).  By cancelling the study's supporting contracts without securing alternative funding, Acad. Am. Compl. ¶ 117, the Department has "hindered its ability" to, among other things, disseminate this study's data to groups like the Academy.  *Id.* ¶ 119.

All of this means that Plaintiffs have alleged the Department owed and deprived them of "information" that "would help them (and others to whom they would communicate it)."  *Akins*, 524 U.S. at 21; *see also TransUnion*, 594 U.S. at 441–42.  What is left to show an informational injury, then, are allegations that Plaintiffs suffered the "type of harm" these governing statutes "envisioned" resulting from these deprivations.  *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023).

Plaintiffs have done that too.  Starting with the Association's case, one of the two organizational Plaintiffs in that suit "rel[ies] on Institute of Education Sciences (IES) data collections on a daily basis."  Voight Decl. ¶ 2, Assoc., ECF No. 35-6.  Institute studies "inform [its] policy recommendations and would not [be] possible" without that data.  *Id.* ¶ 3.  And for the other organizational Plaintiff in that case, the early-childhood Institute "studies were [its] main way of tracking educational outcomes for young children"  and its source for "evidence-based research" for education policy.  Bassok Decl. ¶¶ 10–11, Assoc., ECF No. 35-2.  This Plaintiff also "relies on data collected and disseminated as part of" the "high school longitudinal studies" in "doing its work."  Assoc. 2d. Am. Compl. ¶ 49.  So too for both Plaintiffs in the Academy case.  Both "rely on the ten datasets" they sue over "to perform educational research."

Acad. Am. Compl. ¶ 129.[5]  Unable to complete research and craft education policy without the Department's dissemination of data, Plaintiffs "suffer[]" from these deprivations.  *Akins*, 524 U.S. at 21.

Plaintiffs likewise plausibly allege causation and redressability.  Again, Plaintiffs' theory is that *the Department* stopped the programs that previously produced the data to which Plaintiffs are entitled.  *See, e.g.*, Assoc. 2d. Am. Compl. ¶ 77–78.  As a result, *the Department* curbed Plaintiffs' research and policy abilities.  *See e.g.*, Acad. Am. Compl. ¶ 129.  Plaintiffs' injuries, in other words, "follow[] inexorably from the decision" to cancel various agency functions.  *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).  That more than suffices for causation.  And the Court can redress Plaintiffs' injuries by "declar[ing]" that canceling the studies was "arbitrary and capricious" and ordering "Defendants to resume the stud[ies]."  *See* Assoc. 2d. Am. Comp. at 25–26; Acad. Am. Compl. at 44–45.  This allegedly available relief satisfies redressability for now.  *See Severino v. Biden*, 71 F.4th 1038, 1043 (D.C. Cir. 2023).  Plaintiffs thus clear Article III.

*Termination of application processing for restricted-use data licenses.*  This is all also true for the Association's challenge to the Department's halt in processing restricted-use data applications.  Recall that researchers need special licenses from the Institute to access data with

---

[5]  Because Plaintiffs have adequately alleged organizational standing, the Court need not consider associational standing for the cancelled-study claims.  That said, the Court questions whether the Academy could have succeeded on its associational standing theory without identifying injured members by name.  Whether a plaintiff-association must identify an injured member by name at the motion-to-dismiss stage is an unsettled question.  *See Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA*, 573 F. Supp. 3d 324, 334 (D.D.C. 2021) (collecting cases); *see also Coal. for Humane Immigrant Rights*, 780 F. Supp. at 91–92 (denying preliminary injunction motion based on pseudonymous hearsay claims of harm to members).  But down the litigation road, verifiable facts will be required.  *See Cal. Cattlemen's Assoc.*, 369 F. Supp. at 145.

sensitive personally identifying information.  *See* Assoc. 2d. Am. Compl. ¶ 4; 20 U.S.C.
§ 9573(c).

Again, informational injury shows the way, but this time, the injury belongs to an
Association member, not the organization itself.  This difference triggers the guideposts for
associational standing, so (1) a member must have standing in his own right, (2) the interest the
Association seeks to protect must relate to its purpose, and (3) nothing requires individual
members' participation in the lawsuit.  *See Hunt*, 432 U.S. at 343.

Standing for this claim once more begins with the Association's allegations that the
Institute is statutorily required to disseminate information to the public, including its members.
*See supra* at 9–10.  To show that information deprivation harmed a member, the Association
points to its member, Jordan Matsudaira.  Matsudaira stated that he "can only" conduct his
research with data collected on a restricted-use basis.  Matsudaira Decl. ¶ 7, Assoc., ECF No. 35-
7.  Other data will not suffice because "restricted-use data" includes "more detailed versions" of
the publicly available equivalent, and Matsudaira's "statistical software" can "analyze[]" the
former but not the latter.  *Id.*  The difference is why Matsudaira applied for a restricted-use
license in early 2025.  *Id.* ¶ 8.  But all he received in response was an email stating that the
Institute had paused the issuance of new restricted-use data licenses.  *Id.* ¶ 9.  He never heard
anything else.  *Id.* ¶ 10.  As a result, he never obtained the data he sought, and his research has
languished.  *Id.*

Moving to the other requirements for associational standing, Matsudaira's interest in
research, which the Association "seeks to protect," is "germane" to its own purpose—researching
and improving education policy.  *See Hunt*, 432 U.S. at 343; Assoc. 2d. Am. Compl. ¶ 4
(describing the Association's focus on "education finance and policy issues").  And, finally,

nothing about the Association's claim, which sounds in legal arguments unparticular to Matsudaira, requires his "participation" in the lawsuit. *See Hunt*, 432 U.S. at 343. Associational standing gets this claim in the door.

*Termination of the peer-review program.* Last, the Association has adequately alleged associational standing for its challenge to the Department's cancellation of the peer-review program. The Association alleged that the Institute, when it awards contracts and grants, must use a "process of peer review" when "practicable." Assoc. 2d. Am. Compl. ¶ 58; 20 U.S.C. § 9520. Its member Daphna Bassok has a pending application for grant funding from the Institute to sponsor her early education study. Bassok Decl. ¶ 15. She submitted the proposal in 2024, and as of fall 2025, the Institute's grant system lists her application as "pending," noting that it has been "forwarded for peer review." *Id.* ¶ 16. But because the Institute stopped its peer review program, it cannot move forward on Bassok's grant application. *Id.* By losing the chance to apply for grant money, Bassok has a "constitutionally cognizable injury"—the deprivation "of an opportunity to pursue a benefit." *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (cleaned up) (emphasis omitted). That is so even if Bassok "may not be able to show that [she] was certain to receive that benefit had [she] been accorded the lost opportunity." *Id.* (cleaned up) (emphasis omitted). Once more, an order from this Court setting aside that termination could redress the injury. And once more, the Association's interest in improving educational outcomes is germane to Bassok's interest in studying education.

\*    \*    \*

Of course, this standing analysis may come out differently at the case's future stages. To launch a lawsuit, Plaintiffs only needed "to state a *plausible* claim that each of the standing elements is present." *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (cleaned up). As the

case progresses, they must support their standing theory with additional proof.  *See id.*  That includes the premise underlying many of Plaintiffs' claims—that the Department has not provided the research and data they seek.  *See, e.g.*, Assoc. 2d. Am. Compl. ¶¶ 3, 34, 60.

**B.**

The Department challenges this Court's jurisdiction several ways, but none of its arguments carry the day.

First, the Department claims that Plaintiffs needed to allege they "used [their] resources to counteract" the relevant harms.  *Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (cleaned up); Assoc. Mot. to Dismiss at 23.  But that is only true for certain injuries.  When an organization claims a defendant's actions injured an organization's "interest in promoting its mission," it must show that it "used its resources to counteract that injury."  *Am. Soc. for the Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25–26 (D.C. Cir. 2011) (applying standing doctrine when a plaintiff claimed injury from conduct that "undermine[d] its advocacy and public education efforts," which required it to "spend resources on public education"); *Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 90 (D.D.C. 2025) (rejecting standing where an organizational injury resulted from staff having "to reallocate their time to addressing" new "concerns," and the organization made insufficiently "broad claims" about diverting resources) (cleaned up).

When, in contrast, "an organization *qua* organization is injured, it has a right to redress thereof just like a natural plaintiff."  *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1167 (D.C. Cir. 2025) (Henderson, J., concurring).  Plaintiffs base their organizational standing claims on informational injuries they suffered directly.  The crux of their case is that they rely on information that no longer exists.  Resource expenditures cannot fill this hole and so have little to

16

do with Plaintiffs' theory of injury. *Elec. Priv. Info. Ctr.*, 878 F.3d at 381 ("Where an organization's only asserted injury is an informational one, we have not engaged in a separate analysis of informational and organizational injury.") (Williams, J., concurring). The requirement the Department cites thus does not apply.

Next, the Department contends that Plaintiffs' informational injury is too speculative to support standing. It argues that Plaintiffs needed to allege that their members "will not have access" to similar data or new restricted-use licenses "in the future" and failed to do so. Assoc. Mot. to Dismiss at 21–22; Acad. Mot. to Dismiss at 21. This theory asks too much of Plaintiffs, especially at the pleading stage. Standing doctrine does not require—in fact, it avoids—engaging in "hypothetical chain[s] of events" to make out injuries. *Cf. Union of Concerned Scientists v. Dep't of Energy*, 998 F.3d 926, 931 (D.C. Cir. 2021) (rejecting informational standing where an agency action *might* hinder access to information and thus "rests on speculation"); *Cross v. EEOC*, --- F. Supp. 3d ---, 2025 WL 3280764, at *8 (D.D.C. 2025) (concluding that plaintiff lacked standing, where her allegations involved "speculation beyond what standing doctrine permits") (cleaned up). Plaintiffs needed only to allege the denial of "timely access" to information. *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999). They did so by alleging that the cancelled programs they challenge have in fact been cancelled, leaving them without data and thus unable to move forward on their research and policy goals. *See supra* at 10–11.

The Department's other tack fares no better. It argues that at bottom, Plaintiffs' challenges amount to contract claims that belong in the Court of Federal Claims, not here. True, under the Tucker Act, claims based on "an express or implied contract with the United States" must be brought in the Claims Court. 28 U.S.C. § 1491(a)(1). But unlike the cases the

Department cites, this dispute concerns statutory constraints, not contracts. *Cf. U.S. Conf. of Cath. Bishops v. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) (concluding the Tucker Act barred this Court's jurisdiction where Plaintiffs were parties to the challenged contract and asked the Court to "order the Government to pay money due on [that] contract"). Plaintiffs here are not parties to any cancelled contract. They challenge the Department's alleged failure to meet its statutory obligations to perform studies and produce data. *See* Assoc. 2d. Am. Compl. at 25 (asking the Court to "[d]eclare the termination" of every study and program the Association challenges "arbitrary and capricious, set it aside, and enjoin Defendants to resume" the halted activity); Acad. Am. Compl. at 44 (asking the Court to stop the Department "from hindering the collection, maintenance, analysis, and dissemination of data" and order it to resume the challenged studies).

Whether contracts funded these programs is beside the point. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1108 (D.C. Cir. 2022) (explaining that the right a plaintiff "seeks to vindicate is not a contract right" even if the case "requires some reference to or incorporation of the contract") (cleaned up). As Plaintiffs emphasize, the Department "*could*" resume these functions "through new contracts, but they also could choose to operate the studies and the peer-review program in-house or through grants or cooperative agreements." Assoc. Opp'n at 32, ECF No 35 (emphasis in original); Acad. Opp'n at 35, ECF No. 33 (Plaintiffs "challenge Defendants' failure to comply (by whatever means) with statutory mandates . . . ."). Any of these options would redress Plaintiffs' injuries, so their challenge amounts to more than a contract claim and thus does not require the Court of Claims. Mischaracterizing Plaintiffs' challenge will not defeat this Court's jurisdiction.

Last, and only for the Academy's suit, the Department contends that several claims are moot.  It provides a bulky list of links to contracts that appear ongoing to prove that many of the challenged "programs continue[]."  Acad. Mot. to Dismiss at 19.  And because the programs continue, the Department says, no "actual, ongoing controvers[y]" exists.  *See Daimler Trucks N. Am. LLC v. EPA*, 745 F.3d 1212, 1216 (D.C. Cir. 2013) (cleaned up).  This argument hurts the Department more than helps.  The Court must take the Complaint as it finds it.  *See DeVillier v. Texas*, 601 U.S. 285, 288, n.1 (2024).  The Academy clearly and repeatedly alleges that the Department cancelled relevant programs, and the Court "assume[s] the truth" of those facts regardless of what swaths of contracts outside the Complaint suggest.  *Id.*  In fact, citing contracts that supposedly disprove Plaintiffs' claims underscores the very thrust of *Plaintiffs*' arguments—dismissal is inappropriate because factual disputes abound.  What contracts exist, which programs they cover, and whether they adequately fulfill various statutory obligations are questions that require an administrative record, not a smattering of links in a motion to dismiss.

The upshot of all this is that Plaintiffs clear Article III's hurdle for now.

## IV.

Turning at last to merits, the Court considers whether Plaintiffs have stated a claim under the APA.  At this early stage of litigation, they have done enough.  Plaintiffs allege that the Department's cancellation of various studies and two related programs was arbitrary and capricious for some claims and contrary to law for others.  *See* 5 U.S.C. § 706(2).  They claim the Department acted arbitrarily and capriciously by cancelling studies without considering "relevant factors" including how studies "fulfilled statutory duties, the benefits of the study, the waste associated with terminating the study midstream, and stakeholder interests, including researchers' reliance interests."  *See, e.g.*, Assoc. 2d. Am. Compl. ¶¶ 78, 81, 85, 89, 96, 105.

They add that the Department failed to "explain [its] departure" from its "previous positions" too. *See, e.g.*, *id.* ¶ 78; Acad. Am. Compl. ¶¶ 142, 151, 160.  And, as already discussed, they claim the Department acted contrary to law by failing to meet statutory obligations to gather and share data, and to run a peer review and restricted-access program.  *See, e.g.*, Assoc. 2d. Am. Compl. ¶¶ 93, 100; Acad. Am. Compl. ¶ 229.  Those allegations meet the low bar now before Plaintiffs.  This is especially true because the Department has not produced "a complete administrative record," so the Court "cannot properly evaluate" Plaintiffs' "claims that" the Department "acted arbitrarily and capriciously" at this point.  *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 69 (D.D.C. 2018); *see Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001).

Sidestepping those issues, the Department offers a bevy of reasons why Plaintiffs' APA claims fail at the threshold.  None persuades.  The Department first contends that Plaintiffs impermissibly bring programmatic challenges instead of claims over discrete agency actions.[6] That may have been true at the preliminary injunction stage, as the Department points out, *see McMahon*, 786 F. Supp. at 25–26 (denying Plaintiffs' requested preliminary injunction based on their "programmatic focus"), but Plaintiffs have since narrowed their Complaints.  The Association now challenges the termination of four studies, the peer-review program and restricted-use application processing. Assoc. 2d. Am. Compl. ¶¶ 76–106.  The Academy, meanwhile, challenges the cancellation of ten studies.  Acad. Am. Compl. ¶¶ 231–43.  Each of these is an "identifiable action."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).  And

---

[6]  The Department cites the D.C. Circuit's rejection of a programmatic challenge in *National Treasury Employees Union v. Vought*, 149 F.4th 762, 790 (D.C. Cir. 2025).  But the Circuit has since vacated the opinion and granted an en banc rehearing of the case.  *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 3659406, at *1 (D.C. Cir. Dec. 17, 2025).  So even if that opinion supported the Department's arguments, it does not govern.

though Plaintiffs target several at a time, they ultimately seek "incremental correction" by focusing on "specific erroneous decisions," not "large-scale alterations in day-to-day agency operations" as they did on their first go before this Court. *McMahon*, 786 F. Supp. 3d at 25; *see Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 310 (D.C. Cir. 2025) (recognizing that litigants may challenge "multiple agency actions" at once) (cleaned up).

The Department next argues that its decision to stop the restricted-use data application program was not final and is thus not subject to this Court's review. *See* 5 U.S.C. § 704. But the Association's Complaint alleges that the Department imposed a "halt" in processing new applications, pointing to an email describing application review as "paused until further notice." Assoc. 2d. Am. Compl. ¶¶ 66–67, 69. And the decision to institute a pause is itself final when, as alleged here, nothing suggests the Department "condition[ed] any such pause" on further consideration. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025). Indeed, the case the Department cites as the kind of "preliminary" decision that is "not directly reviewable," *see* Assoc. Mot. to Dismiss at 32; 5 U.S.C. § 704, proves the same point. The Department looks to *Chicago & Southern Air Lines v. Waterman S. S. Corp.*, but there, the "unreviewable" preliminary action was an agency's board decision that still had to undergo "Presidential approval" before taking effect. 333 U.S. 103, 112–13 (1948). In contrast here, Plaintiffs allege that the Department halted review of new applications with no indication that some other authority would later bless or reject that decision. *Cf. id.* at 114 (explaining that the board's decisions are "not susceptible of judicial review at anytime before they are finalized by Presidential approval."). While the administrative record may tell a different story about the application program's fate, that is a question for another day.

The Department also adds that Plaintiffs cannot pursue an APA claim because they have an adequate alternative remedy through a contract claim in the Court of Federal Claims. *See* 5 U.S.C. § 704; *see Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017) (noting that no cause of action exists under the APA where there are alternative adequate remedies). But as the Court already explained, *see supra*, Plaintiffs do not seek contractual relief. Indeed, Plaintiffs are not parties to any contracts relevant to the studies they challenge and thus could not challenge them in the Claims Court. *See Crowley*, 38 F.4th at 1109. APA review is an appropriate remedy for these claims.

The Department's final go—presenting the relevant agency actions as committed to agency discretion—does not carry the day. In general, the APA precludes judicial review of agency actions "committed to agency discretion by law." 5 U.S.C. § 701(a). Zeroing in on that barrier, the Department faults Plaintiffs for failing to "point to a particular statute limiting the Department's inherent discretion to maintain the same contracts as before or to have the exact programming that was previously in place." Assoc. Mot. to Dismiss at 35–36; *see also* Acad. Mot. to Dismiss at 31. But nothing required Plaintiffs to make such a specific showing. In fact, courts *presume* they may review claims under the APA. *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) ("There is a strong presumption of reviewability under the Administrative Procedure Act."). They read exceptions to that presumption "quite narrowly." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (cleaned up). The Department's theory gets the burden backwards.

The Department also asserts that cancelling various research functions qualifies as the kind of "administrative decision[] that courts traditionally have regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (cleaned up); *see Heckler v. Chaney*, 470

U.S. 821 (1985).  But the Department barely gets this theory off the ground.  It gestures at the notion that agencies can meet their "statutory responsibilities" in what it "sees as the most effective or desirable way," *Lincoln*, 508 U.S. at 192, but ignores *all* of Plaintiffs' citations to laws they allege impose a wealth of obligations on the Department, *see* Assoc. Mot. to Dismiss at 33–34; Acad. Mot. to Dismiss at 30.  And the Department half-heartedly analogizes to agencies' prosecutorial non-enforcement decisions (which are typically committed to agency discretion, *see Heckler*, 470 U.S. at 831), but it never explains why cancelling education-related research functions present a similar circumstance.  These high-level assertions fall short of what it takes to deprive this Court of reviewability.  *See Steenholdt*, 314 F.3d at 638.  If the Government wants to further develop these arguments, it may do so at summary judgment with the benefit of the administrative record.

## V.

Finally, the Court arrives at the arguments related to the Administrative Record.  In an APA case, the agency must ordinarily "file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint or simultaneously with the filing of a dispositive motion, whichever occurs first."  *See* LCvR 7(n)(1).  This Court's standing order, however, permits an exception.  If the agency believes that the Administrative Record contents "would not be helpful" for resolving a motion to dismiss, it may request an exemption from Rule 7(n) simultaneously with its dismissal motion.  *See* Standing Order, Assoc., ECF No. 5; Standing Order, Acad., ECF No. 5.  The Department invoked that exception here.  *See* Assoc. Mot. to Dismiss at 44–46; Acad. Mot. to Dismiss at 32–33.  Plaintiffs oppose their request.  *See* Assoc. Opp'n at 43–44; Acad. Opp'n at 46–47.

Because the Court resolved much of the motion to dismiss without the Administrative Record contents, the Court will grant the Department's request.  Because this case will progress, however, the Government now must provide Plaintiffs with the Administrative Record.  *See generally* LCvR 7(n)(1).  The Court will therefore order the parties to confer and agree upon a proposed scheduling order to govern future proceedings.

## VI.

To recap, all but one voluntarily dismissed claim survive dismissal.  The Department may, however, continue to develop its arguments against these claims at summary judgment.  At that point, the Court, and the parties will be able to evaluate the validity of those claims with the benefit of the Administrative Record.

For all these reasons, the Department's motions to dismiss will be denied.

_____

Dated:  February 25, 2026                    TREVOR N. McFADDEN, U.S.D.J.