**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC., and THE INSTITUTE FOR HIGHER EDUCATION POLICY,

    *Plaintiffs*,

      v.

LINDA MCMAHON, in her official capacity as Secretary of Education, and U.S. DEPARTMENT OF EDUCATION,

    *Defendants*.

---

Civil Action No. 1:25-cv-999-TNM

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

Cormac A. Early (DC Bar No. 1033835)
Adina H. Rosenbaum (DC Bar No. 490928)
Adam R. Pulver (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
cearly@citizen.org

*Attorneys for Plaintiffs*

June 26, 2026

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................. ii

Introduction........................................................................................................................... 1

Background ............................................................................................................................ 2

    I.     Statutory background ............................................................................................ 3

    II.    The challenged agency actions .......................................................................... 4

    III.  Procedural history ............................................................................................. 15

Legal Standard ................................................................................................................... 16

Argument ............................................................................................................................ 16

    I.     Plaintiffs have standing..................................................................................... 16

        A.   Plaintiffs have organizational standing to challenge the terminations of the BPS:20/25 (Plaintiff IHEP) and ECLS-K:24 (Plaintiff AEFP) studies .................................................. 18

        B.   AEFP has associational standing to challenge the termination of the BPS:20/25, HSLS:09, HS&B:22, and ECLS-K:24 studies. .................................................. 22

        C.   AEFP has associational standing to challenge the termination of the peer-review program ............................................................................................................................. 25

        D.   AEFP has associational standing to challenge the halt of restricted-use data application processing .................................................................................................................... 26

    II.    Plaintiffs challenge final agency actions that are reviewable under the APA. ................. 28

    III.  The challenged agency actions were arbitrary and capricious......................................... 30

    IV.  The terminations of IES's peer-review program for new grants and IES's processing of new applications for restricted-use data licenses were contrary to law. .................................. 36

    V.    The appropriate remedy is vacatur.................................................................................... 37

Conclusion ......................................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) ........................................................................................ 17

*Al-Eryani v. Immigrant Investor Program Officer*,
754 F. Supp. 3d 101 (D.D.C. 2024) ................................................................................ 16

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................................ 29

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........................................................................................................ 17

*Byrd v. U.S. EPA*,
174 F.3d 239 (D.C. Cir. 1999) ........................................................................................ 18

*Center for Biological Diversity v. EPA*,
56 F.4th 55 (D.C. Cir. 2022) .......................................................................................... 22

*Center for Biological Diversity v. U.S. International Development Finance Corp.*,
77 F.4th 679 (D.C. Cir. 2023) ........................................................................................ 19

*Chicago & Southern Airlines, Inc. v. Waterman Steamship Corp.*,
333 U.S. 103 (1948) ........................................................................................................ 29

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................................................................ 28

*Cook v. U.S. Food & Drug Admin.*,
733 F.3d 1 (D.C. Cir. 2013) ............................................................................................ 28

*Corner Post, Inc. v. Board of Governors of Federal Reserve System*,
603 U.S. 799 (2024) ........................................................................................................ 37

*DHS v. Regents of University of California*,
591 U.S. 1 (2020) ............................................................................................................ 30

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ........................................................................................ 17

ii

*Encino Motorcars, LLC v. Navarro*,
　　579 U.S. 211 (2016)..................................................................................... 30

*Environmental Defense Fund v. Leavitt*,
　　329 F. Supp. 2d 55 (D.D.C. 2004)............................................................... 37

*Environmental Defense Fund, Inc. v. Costle*,
　　657 F.2d 275 (D.C. Cir. 1981)..................................................................... 35

*Esch v. Yeutter*,
　　876 F.2d 976 (D.C. Cir. 1989)..................................................................... 12

*FCC v. Fox Television Stations, Inc.*,
　　556 U.S. 502 (2009)............................................................................... 19, 30

*Indigenous People of Biafra v. Blinken*,
　　639 F. Supp. 3d 79 (D.D.C. 2022)............................................................... 17

*James Madison Ltd. by Hecht v. Ludwig*,
　　82 F.3d 1085 (D.C. Cir. 1996)..................................................................... 35

*Kingman Park Civic Ass'n v. Bowser*,
　　815 F.3d 36 (D.C. Cir. 2016)....................................................................... 17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
　　572 U.S. 118 (2014)..................................................................................... 17

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555 (1992)..................................................................................... 17

*Lujan v. National Wildlife Federation*,
　　497 U.S. 871 (1990)..................................................................................... 28

*Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*,
　　463 U.S. 29 (1983)....................................................................................... 30

*National Council of Nonprofits v. Office of Management & Budget*,
　　763 F. Supp. 3d 36 (D.D.C. 2025)............................................................... 29

*National Mining Ass'n v. U.S. Army Corps of Engineers*,
　　145 F.3d 1399 (D.C. Cir. 1998)................................................................... 37

*Parker v. District of Columbia,*
　　478 F.3d 370 (D.C. Cir. 2007)..................................................................... 17

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,*
    400 U.S. 62 (1970) ................................................................................... 29

*Powder River Basin Resource Council v. Department of Interior,*
    749 F. Supp. 3d 151 (D.D.C. 2024) ......................................................... 25

*Public Citizen v. Federal Motor Carrier Safety Administration,*
    374 F.3d 1209 (D.C. Cir. 2004) ............................................................... 30

*Ranjan v. U.S. Department of Homeland Security,*
    747 F. Supp. 3d 192 (D.D.C. 2024) ......................................................... 25

*Sierra Club v. Mainella,*
    459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................... 16

*Tootle v. Secretary of the Navy,*
    446 F.3d 167 (D.C. Cir. 2006) ................................................................. 28

*Town of Chester v. Laroe Estates, Inc.,*
    581 U.S. 433 (2017) ................................................................................. 17

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................................. 18

*Waterkeeper Alliance, Inc. v. Regan,*
    41 F.4th 654 (D.C. Cir. 2022) ................................................................. 17

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) ................................................................. 22

**Statutes**

5 U.S.C. § 701(a) ............................................................................................ 28

5 U.S.C. §§ 702, 704 ...................................................................................... 16

5 U.S.C. § 706(2)(A) ................................................................................. 16, 19

5 U.S.C. § 706(2)(C) ...................................................................................... 16

5 U.S.C. § 706(2)(D) ...................................................................................... 16

20 U.S.C. §§ 9501–9584 .................................................................................. 2

20 U.S.C. § 9511 .......................................................................... 3, 28, 30, 31, 34

20 U.S.C. § 9511(b)(1) ............................................................................................... 21, 22

20 U.S.C. § 9512 ............................................................................................ 3, 18, 28, 30

20 U.S.C. § 9512(2) .................................................................................................... 21

20 U.S.C. § 9515(a)(1) ................................................................................................ 32

20 U.S.C. § 9516(b)(3) ........................................................................................... 10, 36

20 U.S.C. § 9520 ........................................................................................................ 10

20 U.S.C. § 9534(b)(1) ...................................................................................... 3, 10, 36

20 U.S.C. § 9543 ..................................................................................... 8, 9, 19, 28, 30

20 U.S.C. § 9543(a)(1) ...................................................................................... 3, 18, 19, 31

20 U.S.C. §§ 9543(a)(1)(B), (L) ................................................................................... 3

20 U.S.C. § 9543(a)(7) .................................................................................... 3, 19, 31

20 U.S.C. § 9546 .................................................................................................. 28, 30

20 U.S.C. § 9546(e)(2) ................................................................................................. 4

20 U.S.C. § 9573(c) .................................................................................................... 13

20 U.S.C. § 9574 .................................................................................... 4, 13, 18, 28, 30

20 U.S.C. § 9575 ............................................................................. 4, 13, 18, 28, 30, 37

20 U.S.C. §§ 9511, 9512, 9520 .................................................................................... 34

20 U.S.C. §§ 9573, 9574 ........................................................................................ 33, 36

Pub. L. 107-110 ............................................................................................................ 2

Pub. L. 107-279 ............................................................................................................ 2

## Rules

Fed. R. Civ. P. 56(a) ........................................................................................................ 16

Local Rule 7(n)(1)............................................................................................................ 15

## Other Authorities

H.R. Rep. 107-404 ............................................................................................................. 2

Association for Education Finance and Policy, *Live Handbook,*............................ 21, 34

Daphna Bassok, *Is Kindergarten the New First Grade?* ................................................ 24

Congressional Research Service, *K-12 Education: Highlights of the No Child Left Behind*
    Act of 2001 (P.L. 107-110), Jan. 7, 2008,
    https://www.congress.gov/crs-product/RL31284. ........................................................ 2

Institute of Education Sciences, *Procedures for Peer Review of Grant Applications*,
    https://ies.ed.gov/sites/default/files/ies/document/2026/04/SRO_
    grant_peerreview1.pdf ................................................................................................ 11

Institute of Education Sciences, *IES Grant Peer Review Guide* 3 (Sept. 25, 2024),
    https://ies.ed.gov/sites/default/files/office-science/document/
    2024/11/IES%20Peer%20Review%20Guide%20FY2025%20Session%202.pdf............ 33

Institute of Education Sciences, *Procedures for Peer Review of Reports* (Jan. 2006),
    https://ies.ed.gov/sites/default/files/ies/document/2026/04/SRO_reports_
    peerreview.pdf ............................................................................................................. 33

Researchdatagov.org ....................................................................................................... 13

Benjamin Michael Superfine, *New Directions in School Funding and Governance: Moving from*
    *Politics to Evidence*,
    98 Ky. L.J. 653 (2010) ................................................................................................ 2

**INTRODUCTION**

In February 2025, Secretary of Education Linda McMahon and the Department of Education took a wrecking ball to the Institute of Education Sciences (IES), cancelling core statutorily mandated functions and mission-critical studies. For well over a year, Defendants have ignored IES's statutory obligations to conduct longitudinal studies, carry out peer review for new grant applications, and make its data available to researchers and the public. As the administrative record confirms, IES did not even begin the process of considering how best to fulfill its statutory obligations in line with the current administration's priorities until months after cancelling the studies and functions at issue in this case, and Department staff made no recommendations for reform of IES until over a year after the agency had ceased to function as Congress directed. The agency's cancel-first, think-later approach is the antithesis of reasoned decision-making, and IES's abandonment of its statutory duties is contrary to law.

Plaintiffs the Association for Education Finance and Policy (AEFP), a membership association of 1,000 education researchers and practitioners, and the Institute for Higher Education Policy (IHEP), a research, policy, and advocacy organization, rely on IES's timely collection and dissemination of up-to-date data on education. In addition, AEFP's members rely on access to IES data and IES grants, which can be issued only after a statutorily required peer review program for new grants, to carry out their work. Plaintiffs bring this action to challenge the termination of four major longitudinal studies, the halt of IES's peer-review of grant applications, and the decision not to process applications for restricted-use data licenses. They ask the Court to vacate the agency's unlawful actions and restore the illegally terminated studies and agency functions.

**BACKGROUND**

I.      **Statutory background**

The turn of the century saw the passage of several landmark pieces of education-related legislation at the federal level, all of which emphasized scientifically based research and accountability. Perhaps most well-known is the No Child Left Behind Act of 2001, Pub. L. 107-110, 115 Stat. 1425, enacted in January 2002, which amended the Elementary and Secondary Education Act of 1962 (ESEA) and "extensively amended and reauthorized most federal elementary and secondary education aid programs."[1] In conjunction with that law, Congress also reorganized the federal government's educational research functions, most of which had previously been located within the Office of Educational Research and Improvement. That office "ha[d] been attacked for supporting fragmented, short-term, and overly politicized research, and funding for educational research ha[d] long been limited."[2] To address those criticisms, Congress enacted the Education Sciences Reform Act of 2002, Pub. L. 107-279, 116 Stat. 1940, "to provide the mechanism for valid research that would be cumulative and inform education practices at the State and local levels with well-documented findings." H.R. Rep. 107-404, at 30–31 (2002). The Act established IES as a new, semi-independent division of the Department of Education, and vested IES with responsibilities both for continuing to conduct existing studies like the National Assessment of Educational Progress (NAEP), and for undertaking or sponsoring new research, along with responsibilities to make research and data widely available to researchers and the public. *See* 20 U.S.C. §§ 9501–9584. The Act specifies that the duties created by it may not be

---

[1] Cong. Rsch. Serv., RL31284, K-12 Education: Highlights of the No Child Left Behind Act of 2001 (P.L. 107-110) (2008), https://www.congress.gov/crs-product/RL31284.

[2] Benjamin Michael Superfine, *New Directions in School Funding and Governance: Moving from Politics to Evidence*, 98 Ky. L.J. 653, 686 (2010).

delegated by the Secretary of Education to entities other than IES and limits the additional responsibilities that the Secretary may impose on IES. *See id.* § 9513.

Within IES are four separate "National Education Centers": the National Center for Education Research (NCER), the National Center for Education Statistics (NCES), the National Center for Education Evaluation and Regional Assistance (NCEE), and the National Center for Special Education Research (NCSER). *Id.* § 9511. In the Education Sciences Reform Act, Congress prescribed duties for both IES as a whole and for each of the centers—duties that include the conduct of research and evaluation on dozens of topics, and the dissemination of the results of that research and evaluation in specific ways. *See, e.g.*, *id.* § 9512 (requiring IES to "conduct and support scientifically valid research activities," and "widely disseminate the findings and results of scientifically valid research in education"). Relevant to this action, Congress mandated that NCES "collect and disseminate data relating to "the condition and progress of education, at the … secondary, postsecondary, and adult levels," 20 U.S.C. § 9543(a)(1), to "conduct[] longitudinal and special data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7), and to collect, analyze, and disseminate data related to early childhood education, *id.* §§ 9543(a)(1)(B), (L).

The statute also contains requirements as to how research is to be conducted, and how the results of that research must be shared.  The statute requires IES to establish a peer review system for evaluating and assessing applications for both grants and cooperative agreements that exceed $100,000, and for evaluating and assessing the products of research by all recipients of grants and cooperative agreements. 20 U.S.C. § 9534(b)(1). Section 9520 further requires grants, contracts, and cooperative agreements to be awarded "when practicable, through a process of peer review." Further, Congress required that any data collected by IES and its subsidiaries "shall be made

3

available to the public, including through use of the internet," *id.* § 9574, and that IES "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," "utilizing the most modern technology and other methods," *id.* § 9575. As to NCES specifically, it required that interested parties be provided "direct access, in the most appropriate form (including, where possible, electronically), to data collected … for the purposes of research and acquiring statistical information." 20 U.S.C. § 9546(e)(2).

IES and the studies and data collections it oversees have been vital to educational research in America over the past several decades. "IES, its data sets, and the principles and demands that it has placed on educational researchers have led to more methodologically sound studies." Decl. of Douglas N. Harris ¶ 10, ECF 6-6 at 4. It has "provid[ed] the education research infrastructure in this country." Decl. of Cara Jackson ¶ 14, ECF 6-5 at 5.

## II.      The challenged agency actions

In early 2025, Defendants Secretary of Education Linda McMahon and the Department of Education terminated many of the programs by which IES carries out its statutory duties—without replacing them. This action challenges six of those terminations: (1) the termination of the 2020/25 Beginning Postsecondary Students Longitudinal Study (BPS:20/25); (2) the termination of the High School Longitudinal Study (HSLS:09); (3) the termination of the High School and Beyond Longitudinal Study of 2022 (HS&B:22); (4) the termination of the Early Childhood Longitudinal Study-Kindergarten:2024 (ECLS-K:2024); (5) the termination of IES's peer review program for new grant funding; and (6) the termination of processing applications for access to restricted-use data.

**A.**      BPS is a large, nationally representative longitudinal study that tracks students' experiences and outcomes through postsecondary education. AR001178. A 2018 report by the

4

National Institute of Statistical Sciences (NISS) Technical Expert Panel described NCES's postsecondary surveys, including BPS, as an "overwhelming success." AR001277. BPS surveys cohorts of first-time postsecondary students at three points in time: at the end of their first year, and three and six years after first starting postsecondary education. AR001124.

BPS builds on surveys conducted as part of the National Postsecondary Student Aid Study (NPSAS), using an administration of the NPSAS as the base year for a follow-up survey. *Id.* The NPSAS survey for the 2019–20 academic year was intended to serve as the base year for the 2025 BPS study. AR001178–79. The Department contracted with Research Triangle Institute to carry out the BPS:20/25 study. AR001136.

On February 7, 2025, Richard Lucas, an employee of the Department's Office of Finance and Operations, sent a spreadsheet containing a summary of IES contracts and listing associated actions to Conor Fennessy at the Office of the Secretary of Education. EDAERA_AR_00003. That spreadsheet included the contract with RTI to carry out the BPS:20/25 study, listing it as "Statutory, Mandated, or Critical" under the "Contract Category" heading, and listing "Review for Descope" under the "Action Bucket" heading. EDAERA_AR_00005 (*see* row 17, award number 91990018C0039). Under the heading "Notes," the spreadsheet stated "Mandated National Postsecondary Student Aid Study (NPSAS). Fully funded. Review for descope of any remaining non-critical tasks." *Id.* Fennessy replied that Lucas could "simply send to Chris [Rosier] for termination to begin," EDAERA_AR_00003, and Lucas sent the spreadsheet to Rosier the same day, ED_AERA_00004.

On February 10, 2025, Lucas sent another spreadsheet to Rosier instructing him to "move out on terminating the contracts in the attachment." AR00001. That spreadsheet included the contract with RTI for the BPS:20/25 study. AR00004 (*see* row 53, award number

5

91990018C0039). The Department terminated the contract the same day. AR001345. The only reason stated for doing so was "for the Government's convenience." *Id.* IES provided no further "active[] support[]" for the BPS study after March 2025. AR001045.

On April 22, 2026, IES posted a Request for Quotations for the 2027–28 NPSAS study, including an optional task listing for a BPS study with a base year of 2028 and follow-up in 2030. AR000917. That posting lists a closing date of May 20, 2026. *Id.* The administrative record contains no further information about a potential future BPS study, including in the revised declaration from IES's Acting Director submitted as part of the administrative record, dated May 28, 2026 (i.e., after the closing date of the listing).

**B.**    The High School Longitudinal Study of 2009 is a nationally representative longitudinal study that follows a cohort of students who were first surveyed in 2009 when they were in 9th grade. AR000016 (citing https://nces.gov/surveys/hsls09). The third follow-up survey of that cohort was scheduled to be conducted in 2025. AR000017, AR001126. IES contracted with RTI to carry out the third HSLS:09 follow-up study. AR000010.

Like BPS:20/25, the HSLS:09 contract was listed on the spreadsheet attached to Lucas's February 7, 2025, email as "Statutory, Mandated, or Critical," with instructions to "Review for Descope." EDAERA_AR_00014 (*see* row 288, award number 91990023D0042). The HSLS:09 contract also appeared on the spreadsheet attached to Lucas's February 10, 2025, email instructing Rosier to "move out on terminating" the listed contracts. EDAERA_AR_00019 (*see* row 35, award number 91990023D0042). The Department terminated the contract on February 10, 2025. AR000083. The only reason stated for doing so was "for the Government's convenience." *Id.* IES provided no further "active[] support[]" for the HSLS study after March 2025. AR001045.

6

**C.**      The High School and Beyond Longitudinal Study of 2022 was designed to follow students who were in ninth grade in fall 2022, with further data collection in spring 2026 when most of the cohort would be in twelfth grade. AR000265. The 2026 twelfth-grade sample was intended to be "freshened" to make it nationally representative and thus comparable to previous longitudinal studies conducted in 1972, 1982, 1992, and 2004. *Id.* HS&B:22 planned to survey students and their parents, as well as teachers, counselors, and school administrators, yielding policy-relevant information on topics including effective high schools, discipline, homework, course-taking patterns, academic growth over time, dropouts, experiences in public versus private schools, career and technical education, special education, instruction for limited English speaking students, postsecondary access and choice, student financial aid, employment during high school and college, transfer behaviors, labor force participation, employment stability, family formation, and graduate/professional training. AR000265–66. Work on updating student locating information, including changes of address, school transfers, and dropout status, was scheduled to be completed during the spring of 2025. IES contracted with RTI to carry out the HS&B:22 study. AR00260.

As with BPS:20/25 and HSLS:09, the contract to carry out HS&B:22 appears on the attachment to Lucas's February 7, 2025, email, listed as "Statutory, Mandated, or Critical," and with instructions to "Review for Descope." EDAERA_AR_00005 (*see* row 19, award number GS00Q14OADU217). It also appears on the spreadsheet attached to Lucas's February 10, 2025, email. EDAERA_AR_00020 (*see* row 54, award number GS00Q14OADU217). The Department terminated the contract on February 10, 2025. AR000371. The only reason stated for doing so was "for the Government's convenience." *Id.* IES provided no further "active[] support[]" for the HS&B:22 study after March 2025. AR001045.

On March 3, 2025, a Department of Education Contracting Officer emailed RTI to state that "[t]he Government is contemplating bringing back portions of" the HS&B:22 study, and stating that an attached Project Work Statement (which Defendants did not produce as part of the administrative record) had been revised "to de-scope the remainder of the requirement down to the Government's minimum needs ONLY to meet statutory requirements." AR000394. In subsequent correspondence dated March 6, 2025, the Contracting Officer stated that "elements from the parent survey are mission-critical (specifically, obtaining information about students that is required by 20 U.S.C 9543)," and that the "High School Transcript Collection work" portion of the HS&B:22 contract "is mission-critical for NCES." AR000391.

In a further email dated March 22, 2025, the Contracting Officer provided instructions to RTI on what to say in automated email responses to queries about HS&B:22, including a statement that "[f]or now, study operations have been suspended. It is possible that contact attempts may resume in the future." AR000385.

**D.**    The Early Childhood Longitudinal Study-Kindergarten:2024 (originally planned to study children in kindergarten in 2023, but delayed until 2024 due to Covid), was intended to be a nationally representative longitudinal study of early childhood education, providing policy-relevant information on early learning and development, preschool experiences, children's transition into kindergarten, and students' progress through elementary school. AR0001391. Data collections were planned for the cohort's preschool, kindergarten, first-grade, and third-grade years, with a possible further survey in fifth grade. AR0001391–92. IES contracted with Westat, Inc. to conduct the ECLS-K:24 study. AR001352.

The contract to carry out the ECLS-K:24 study appears on the spreadsheet attached to Lucas's February 7, 2025, email, listing the study as "Statutory, Mandated, or Critical," with

8

instructions to "Review for Descope," and a note reading "Mandated Early Childhood Longitudinal Study. Review for descope for non-critical tasks." EDAERA_AR_00005 (*see* row 10, award number 91990019C0002). It also appears in the spreadsheet attached to Lucas's February 10, 2025, email ordering the termination of all contracts listed in the attachment. EDAERA_AR_00020 (*see* row 55, award number 91990019C002). The Department terminated the contract on February 10, 2025. AR000574. The only reason stated for doing so was "for the Government's convenience." *Id.* IES provided no further "active[] support[]" for the ECLS-K:24 study after March 2025. AR001045. IES's Acting Director described ECLS-K:24 as a "discontinued stud[y]" in a May 28, 2026, declaration designated by Defendant as part of the administrative record in this case. AR001871.

On February 24, 2025, a Department of Education Contracting Officer emailed Westat to ask "have we already passed the drop dead date that would allow us to still proceed with this national round" of the first-grade survey "if a decision was made to proceed," and to ask for "the absolute last date that a decision would need to be made to proceed." AR000595.

On February 25, 2025, the Contracting Officer emailed Westat to suggest telling schools that had been expecting to participate in the study that the Department "is currently reevaluating study plans" and that "while we hope that we can still collect data this spring as planned, the final approval to proceed has not yet been received." AR000593.

On February 27, 2025, the Contracting Officer emailed Westat, stating that "[t]he Government is contemplating reinstating this contract SIGNIFICANTLY DESCOPED," and that an attached Project Work Statement had been "red-lined to eliminate work/tasks that would no longer be required … while maintaining the ability to meet the minimum statutory requirement."

9

AR000592. Defendants did not include the edited Project Work Statement as part of the administrative record.

On March 6, 2025, the Contracting Officer emailed Westat saying that the revised proposed contract "is with the Office of the Secretary for their review and possible approval," and later the same day emailed to say that "[it] was disapproved yesterday pending more information. The program office provided the info and now we are waiting to here." AR000585.

In May 2026, IES prepared a draft Statement of Objectives for "Procurement of NCES 2024 Early Childhood Longitudinal Study-Kindergarten (ECLS-K) Data Release Support." AR001540. That draft states that "[t]he data from the 2024 Kindergarten class have already been collected," and that publication of the data would "ensure[] the government achieves the full value of its investment in this data," and goes on to note that "these data are critical to researchers' and policymakers' ability to understand the impacts of Covid on topics such as kindergarten readiness." AR001543.

**E.**    By statute, IES is required to establish a peer-review system for evaluating and assessing applications for both grants and cooperative agreements that exceed $100,000, and for evaluating and assessing the products of research by all recipients of grants and cooperative agreements. 20 U.S.C. § 9534(b)(1). IES is also statutorily required to award grants, contracts, and cooperative agreements "when practicable, through a process of peer review." *Id.* § 9520.

The National Board for Education Sciences, which serves as the board of directors for IES, has the statutory duty to "review and approve procedures for technical and scientific peer review of the activities of the Institute." 20 U.S.C. § 9516(b)(3). The board approved IES procedures for the peer review of reports and grant applications in 2006. AR000926. Those procedures, available on IES's website, specify that peer review is conducted in panels including a Panel Chair, a

10

Scientific Review Administrator, and panel members; that panels conduct at least one review meeting; that panel members complete Conflict of Interest forms; and that panel members assign numerical scores to applications based on specified review criteria, among other requirements.[3]

IES relies on contractors for "integrated support for the full range of scientific peer review activities" it conducts. AR000926. In a typical year, IES runs 9–12 discretionary grant competitions on over 35 topic areas for which it receives over 1,000 grant applications, and also reviews 50–70 report manuscripts. AR000926. To do so, it relies on over 400 external experts to serve as peer reviewers each year, meeting in 28–35 peer-review panels of 4–20 members. *Id.*

In the most recent contract for support with peer review, IES assigned a wide variety of essential support tasks to the contractor, including: operating and maintaining IES's online peer-review management system, AR000929; recruiting "Scientific Review Officers," "highly skilled professionals who possess years of experience in peer review procedures as well as knowledge of education and behavioral research" to "oversee the peer review panel meeting[s]" and Technical Assistants to provide administrative support to the peer-review panels, AR000932; screening grant applications for responsiveness and compliance, AR000935; coordinating logistics for in-person panel meetings, including hotel and travel arrangements for panel members, AR000939–41; managing conflict-of-interest and related paperwork for panel members, AR000940; post-meeting tasks including preparation of review summaries, AR000947; and preparation for the next competition cycle, AR000950, among many other tasks. *See generally* AR000931–53.

IES most recently awarded a contract for support with peer review in 2022, to General Dynamics Information Technology. AR000921. That contract appears on the spreadsheet attached

---

[3] *See* Inst. of Educ. Scis., *Procedures for Peer Review of Grant Applications* (2006), https://ies.ed.gov/sites/default/files/ies/document/2026/04/SRO_grant_peerreview1.pdf.

to Lucas's February 7, 2025, email, flagged as "Statutory, Mandated, or Critical," with instructions to "Review for Descope." EDAERA_AR_00006 (*see* row 38, award number 91990022C0066). It also appears on the spreadsheet attached to Lucas's February 10, 2025, email listing contracts for termination. EDAERA_AR_00018 (*see* row 6, award number 91990022C0066). The Department terminated the contract on February 10, 2025. AR001019. The only reason stated for doing so was "for the Government's convenience." *Id.*

On May 7, 2026—after almost 15 months without a contract for peer-review support services—the Department issued a Request for Quotes for a new support contract to start in August 2026. AR001723–24. Aside from switching to virtual rather than in-person meetings, the proposed contract tasks in the Request for Quotes are substantively almost identical to the contract tasks from the 2022 contract. *Compare* AR000931–51 *with* AR001767–86.

In a deposition taken in December 2025 in another case challenging IES's actions, Matthew Soldner, IES's Acting Director, explained that "IES peer review is jointly managed by IES staff and contractors," and that without the "logistical support" of contractors, "we were not able to continue to the review process as we would have in typical years." Soldner Dep. 136:19–23.[4] As a result, IES was unable to review 588 pending grant applications. *Id.* at 136:24–137:10. Soldner suggested that "some subset of these may end up getting reviewed," but confirmed that none had yet been reviewed and that it was unlikely that all would be reviewed. *Id.* at 137:2–10. Although he subsequently stated that "our peer review process will continue as it has traditionally to ensure

---

[4] Simultaneously with this motion, Plaintiffs are filing a motion to supplement the administrative record with Soldner's deposition and other materials that are necessary to facilitate judicial review in this case. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (permitting supplementation of the administrative record "when agency action is not adequately explained in the record before the court" or "when the agency failed to consider factors which are relevant to its final decision," among other circumstances).

12

quality," that statement immediately followed his statement that "[i]t's my sense that the contractors themselves will continue to do the same high-quality work they have traditionally." *Id.* 165:15–19.

F.      IES is required by statute to make all data that it collects publicly available "including through use of the internet." 20 U.S.C. § 9574. It is also required to "disseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," by "utilizing the most modern technology and other methods." *Id.* § 9575. Because some data collected by IES contains individually identifiable information, 20 U.S.C. § 9573(c) requires IES to develop and enforce confidentiality standards regarding access to and use of that data, which IES refers to as "Restricted Use Data," AR001806. Access to restricted-use data is provided through a strict IES-administered licensing process. AR001844.

In March 2025, the website researchdatagov.org, which was until June 15, 2026, the web portal for requesting access to restricted microdata from federal statistical agencies, including NCES, was updated to state that "The National Center for Education Statistics (NCES) is currently not accepting new applications for access to data through the standard application process. Review of applications for access to data from the National Center for Education Statistics is also paused until further notice." Solt Decl. Ex. 1. As of June 16, 2026, when the new Standard Application Process web portal for access to federal confidential data assets launched, the front page contained a banner notice stating that "the National Center for Education Statistics is not accepting new proposals or reviewing proposals." *Id.* Ex. 3.

Plaintiffs' Second Amended Complaint alleges that NCES announced that applications for access to restricted-use data were "paused until further notice" in February 2025, and that no

13

explanation for that pause was given. SAC ¶¶ 66–68, ECF 32 at 19. Nevertheless, the administrative record contains nothing about the decision to stop accepting applications for restricted-use data licenses. The only documents in the record concerning restricted-use data are: (a) a contract with The Coleridge Initiative Inc., dated July 1, 2025 (i.e., after NCES had announced the pause in applications), for services including data hosting, storage, and "[r]emote user access, service and administration for 262 users," AR001020; (b) a six-month extension of that contract through June 30, 2026, AR001036; and (c) a contract solicitation notice published May 7, 2026, on SAM.gov for restricted-use data program services, AR001806–1869, including a specification that "the contractor must make determinations regarding applications within 30 days of submission by the applicant," AR001848. The period of performance for the solicited contract is listed as July 1, 2026, to June 30, 2031. AR001807.

  **G.**  The decisions to cancel the four longitudinal studies, the peer-review program for new grants, and the processing of new applications for access to restricted-use data were taken in February and March 2025. Defendants, however, have designated a range of materials from over a year after those decisions were taken as part of the administrative record, including two blog posts and two declarations from IES's Acting Director and a report titled "Reimagining the Institute of Education Sciences," as well as contract solicitation notices for a new NPSAS study and new peer-review support and restricted-use data contracts. ECF 45-1 at 4, 7–8. Although those documents are not properly included in the administrative record for decisions made over a year before the documents were created, *see infra* p. 35, the documents nevertheless confirm that Defendants first acted to terminate core IES studies and functions, and only much later began to consider how IES should carry out its statutory mandates. Dr. Amber Northern, appointed as a Senior Advisor to the Department with a focus on reforming IES, and whose report constitutes the

only evidence in the record of any reasoning by the Department about how to carry out its statutory functions, did not join the Department until May 25, 2025, and did not release her report with recommendations for reforming IES until February 27, 2026. AR001870.

## III.    Procedural history

Plaintiffs filed the initial complaint in this action on April 4, 2025, seeking to challenge a range of actions taken by Defendants that Plaintiffs alleged were intended to terminate IES's work, including mass cancellation of contracts, a "reduction in force" that eliminated approximately 90 percent of IES's staff, and the termination of outside researchers' remote access to data. *See* ECF 1 at 2. Plaintiffs subsequently moved for a preliminary injunction on April 17, 2025. *See* ECF 6. The Court held a hearing on the motion on May 16, 2025, and issued an opinion and order denying the preliminary injunction motion on June 3, 2025. *See* ECF 25, 26. The Court concluded that Plaintiffs' claims constituted an impermissible programmatic challenge to Defendants' operation of IES, and that the remedies Plaintiffs sought amounted to "wholesale modifications to agency operations writ large." ECF 25 at 2.

Plaintiffs filed a First Amended Complaint on June 18, 2025, *see* ECF 28, which was followed by a motion to dismiss on July 2, 2025, *see* ECF 29. After Defendants took certain actions that mooted some of the claims in the First Amended Complaint, Plaintiffs filed the currently operative Second Amended Complaint on July 16, 2025. *See* ECF 32. Defendants again moved to dismiss. *See* ECF 33.

The Court denied that motion on February 25, 2026, holding that Plaintiffs had standing to bring all their claims, that there was no other barrier to jurisdiction or reviewability, and that Plaintiffs had adequately stated claims on the merits. *See* ECF 38. Pursuant to Local Rule 7(n)(1), the Court also ordered Defendants to produce the administrative record. *Id.* at 24.

Defendant produced an administrative record on April 30, 2026, *see* ECF 43, and, after consultation with Plaintiffs, produced a supplemental administrative record on June 2, 2026. ECF 45.

## LEGAL STANDARD

The Administrative Procedure Act (APA) provides for judicial review of final agency actions, 5 U.S.C. §§ 702, 704, and directs courts to vacate such actions if they are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D). "In an APA case, summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Al-Eryani v. Immigrant Inv. Program Off.*, 754 F. Supp. 3d 101, 104 (D.D.C. 2024) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). Summary judgment is appropriate "if the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## ARGUMENT

### I. Plaintiffs have standing.

This Court correctly concluded at the motion to dismiss stage that Plaintiffs had established standing for all their claims, to the extent necessary at that point, and that there was no other bar to the Court's jurisdiction. ECF 38 at 9. Now that the administrative record is available, the same conclusions hold at the summary judgment stage.

"To establish Article III standing, a plaintiff must show that it 'suffered or [is] imminently threatened with a concrete and particularized injury in fact that is fairly traceable to the challenged

16

action of the defendant and likely to be redressed by a favorable judicial decision.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (alteration in original) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014)). Because standing "is a claim-specific inquiry," *Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022), "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint," *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *see also Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (requiring only one plaintiff to have standing as to each claim). "An organization can establish standing 'by showing either an injury to itself' (organizational standing) or 'a cognizable injury to one or more of its members' (associational standing)." *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 84 (D.D.C. 2022) (quoting *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016)).

Although a plaintiff must set forth specific facts supporting standing at summary judgment, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), for purposes of standing, a court "must assume, *arguendo*, the merits of [a plaintiff's] legal claim," *Parker v. Dist. of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007). Otherwise, a court would never have jurisdiction to enter summary judgment on the merits against a plaintiff advancing an incorrect legal claim.

Here, AEFP has both organizational and associational standing, and IHEP has organizational standing, based on informational injuries to each organization and to AEFP's members. Specifically, Defendants' actions have deprived, and continue to deprive, IHEP, AEFP, and AEFP's members of information that, on Plaintiffs' interpretation, "a statute requires the government or a third party to disclose to [them]," and they suffer, "by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir.

17

2017) (citation omitted); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 441–42 (2021) (recognizing that a plaintiff suffers a concrete injury when they are denied information required to be disclosed by law, and that denial has "downstream consequences"); *Byrd v. U.S. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) (recognizing denial of "timely access" to documents as "informational injury.")

### A. Plaintiffs have organizational standing to challenge the terminations of the BPS:20/25 (Plaintiff IHEP) and ECLS-K:24 (Plaintiff AEFP) studies.

Both Plaintiffs have been harmed in their own right by Defendants' illegal actions cancelling specific studies—BPS:20/25 in the case of Plaintiff IHEP, and ECLS-K:2024 in the case of Plaintiff AEFP—and both Plaintiffs thus have organizational standing to challenge those actions. Each organization has been deprived of information that they allege a statute requires the government to disclose, and each has thereby suffered the type of harm that Congress sought to prevent by requiring disclosure.

Several provisions of the Education Sciences Reform Act require IES to provide information to IHEP, AEFP, and AEFP members. The statute requires IES both to conduct research on the "condition and progress of education" at all levels, including "preschool" and "postsecondary," 20 U.S.C. § 9543(a)(1), and to "widely disseminate the findings and results of scientifically valid research in education," *id.* § 9512. It requires that all data collected by IES "be made available to the public," subject to privacy protections. *Id.* § 9574. And it requires IES to "[d]isseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," to "utilize the most modern technology and other methods available … to ensure the efficient collection and timely distribution of information," and to "mak[e] information available to the public in an expeditious fashion." *Id.* § 9575. The statute also specifies specific methods that IES must employ, including "conducting

18

longitudinal and special data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7), and specific subject matters it must study and disseminate data on, including education "at the preschool, elementary, secondary, postsecondary, and adult levels in the United States," *id.* § 9543(a)(1).

Those provisions reflect a "clear command" for IES "to provide robust public information," and thus "there can be no doubt that these provisions create a right to information sufficient for [Plaintiffs'] injury." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023). Moreover, the APA prohibits arbitrary and capricious agency action, 5 U.S.C. § 706(2)(A), including action that fails to consider "serious reliance interests" engendered by prior agency policy, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted). Assuming, as the standing analysis requires, that Plaintiffs are correct that Defendants acted arbitrarily and capriciously in cancelling the ECLS-K:24 and BPS:20/25 studies, those studies were not validly cancelled. Until and unless IES made a legally valid decision to cancel the studies, it remained obliged to carry them out and to publish the data that it collected. Plaintiffs are injured by being deprived of that information.

The administrative record confirms that Defendants have deprived Plaintiffs of information they are entitled to by arbitrarily and capriciously cancelling both the contracts supporting the studies and the studies themselves. For instance, the record shows that the Department had operated the BPS:20/25 study through an outside contractor, *see* AR001136, and it cancelled that study on February 10, 2025, *see* AR001345. From at least March 2025, IES was no longer "actively supporting" the BPS data collection, AR001045, and therefore did not conduct the planned 2025 data collection and cannot publish any of the data from that cancelled collection.

Likewise, the Department operated the ECLS-K:24 study through a contractor, *see* AR001352, and it cancelled that contract on February 10, 2025. AR000574. From at least March 2025, IES was no longer "actively supporting" the ECLS-K data collection, AR001045, and IES's Acting Director subsequently described ECLS-K as a "discontinued stud[y]," AR001871. IES admits that the ECLS-K:24 data it has already collected but not released are "critical to researchers' and policymakers' ability to understand the impacts of Covid on topics such as kindergarten readiness," and that releasing the data is necessary to ensure that "the government achieves the full value of its investment in this data." AR001543. There is no evidence in the record that IES has released any information from the ECLS-K:24 study.

IHEP has been injured by the cancellation of the BPS:20/25 and ECLS-K:24 studies. As the Second Declaration of Mary Voight explains, IHEP has used BPS data to inform policy recommendations in a variety of areas, and that work would not have been possible without BPS data. *See* Second Voight Decl. ¶ 3, ECF 35-6 at 2. IHEP had planned to use data from the 2020/25 longitudinal study to inform its policy recommendations and support its mission, for example in analyzing the student impact of future changes to financial aid programs such as the Pell Grant, including assessment of restrictions on eligibility or benefits. *Id.* ¶ 6, ECF 35-6 at 3. IHEP had also planned to use BPS data to examine the noneconomic value students receive from pursuing particular educational pathways and working in those fields, because BPS includes unique data on a student's field of study, occupation, and measures of noneconomic employment benefits, such as job satisfaction and ability to balance work and family. *Id.* ¶ 5, ECF 35-6 at 3. The most recent available data from BPS are from the 2012/17 study, which is now out of date, particularly in light of the unique impacts of the COVID-19 pandemic on higher education. *Id.* ¶ 4, ECF 35-6 at 2. There are no comparable data that can substitute for what would have been produced by the now-

20

cancelled BPS:20/25 study. Without those data, IHEP will be unable to conduct a wide range of timely research analyses on student experiences and outcomes or analyze the impact of proposed changes to financial aid policies. *Id.* ¶ 7, ECF 35-6 at 3–4.

AEFP too has been injured in its own right by the cancellation of the ECLS-K:2024 study. As Daphna Bassok's declaration explains, AEFP will be unable to update chapters on early childhood achievement gaps in its *Live Handbook* without the data that study would have produced. *See* Bassok Decl. ¶ 12, ECF 35-2 at 4–5. The predecessor to *Live Handbook*, titled *Handbook of Research in Education Finance and Policy*, relied on data from prior ECLS iterations and is no longer relevant. *Id.* ¶¶ 11–12, ECF 35-2 at 4. There is no substitute for new ECLS data, because no other studies provide a national representative view of children's early learning experiences with direct assessments of their skills. *Id.* ¶ 13, ECF 35-2 at 5. AEFP is thus "flying blind" on early childhood trends and unable to provide evidence-based policy recommendations on topics such as pre-kindergarten, childcare subsidies, and other early interventions, thereby directly impairing AEFP's mission to inform education policy. *Id.* ¶¶ 10, 14, ECF 35-2 at 4–6.

Each organization has thus suffered precisely the kind of harm Congress sought to avoid when it made it the mission of IES "to provide national leadership in expanding fundamental knowledge and understanding of education from early childhood through post-secondary study, in order to provide … researchers, policymakers, and the general public with reliable information" about education, 20 U.S.C. § 9511(b)(1), and specified that one of IES's functions would be to "widely disseminate the findings and results of scientifically valid research in education," *id.* § 9512(2).

Causation and redressability are also clear. The Department made the decision to cancel the studies, and that decision caused Plaintiffs' injuries. Plaintiffs' injuries "follow[] inexorably

21

from the decision" to cancel the studies. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013). And this Court can provide relief by declaring that the decision to cancel the studies was unlawful and ordering Defendants to resume the studies.

**B. AEFP has associational standing to challenge the terminations of the BPS:20/25, HSLS:09, HS&B:22, and ECLS-K:24 studies.**

AEFP also has associational standing to challenge all four study terminations on behalf of its members. A membership organization may assert associational standing if "(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation." *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022). Each of those requirements is satisfied.

AEFP members are scholars whose research informs policymakers and the public about the state of education. In creating IES, Congress expressly intended to promote the distribution of reliable information about educational policies and progress. *See* 20 U.S.C. § 9511(b)(1). The cancellations of the BPS:20/25, HSLS:09, HS&B:22, and ECLS-K:2024 studies have deprived AEFP members of information that the Education Sciences Reform Act requires IES to disclose.

For example, Kevin Stange is a member of AEFP and has relied on data from multiple waves of BPS studies in his research, and had planned to use data from the BPS:20/25 study to make comparisons between college enrollment, persistence, and completion patterns between Michigan and the United States overall, which would shed light on whether patterns seen in Michigan are generalizable beyond that state. *See* Second Stange Decl. ¶¶ 1–3, ECF 35-5 at 1–2. There is no adequate alternative to the BPS:20/25 study because the available alternatives are either

22

not nationally representative or do not follow students longitudinally over time to measure persistence or degree attainment. *Id.* ¶ 4, ECF 35-5 at 2.

Another member of AEFP, Brent J. Evans, has previously relied on earlier waves of BPS, HSLS, and HS&B data in his work. *See* Second Evans Decl. ¶ 1, ECF 35-4 at 1. He had planned to use data from the BPS:20/25 study to research education policy questions including whether baccalaureate degree attainment rates increased in line with college access rates for different populations across the country relative to prior decades, and how the relationships between postsecondary experience, educational outcomes, and student loan borrowing have changed relative to prior decades. *Id.* ¶ 2, ECF 35-4 at 1–2. There is no readily available alternative data source that duplicates the data that would have been gathered and disseminated as part of BPS:20/25. *Id.* ¶ 4, ECF 35-4 at 2. He had also planned to use data from the 2025 data collection for HSLS in both teaching and research, as he has done with previous data collection years from that study, but will now be unable to do the work that he had planned because of the cancellation of the HSLS data collection, which cannot be replaced by any other source. *Id.* ¶¶ 5–6, ECF 35-4 at 2–3. And he had planned to use future data from the now-cancelled HS&B:22 data collection to study topics such as changes in educational trajectories over time in different decades and how patterns of two-year to four-year college transfer rates across student income levels have changed relative to prior decades. *Id.* ¶ 7, ECF 35-4 at 3.

AEFP member Jordan Matsudaira had planned to use data from the BPS:20/25 data collection to study topics such as the root causes of the growing debt burden faced by postsecondary students, the impacts of federal loan limits for graduate students, and the impacts of online learning during the COVID-19 pandemic. *See* Matsudaira Decl. ¶¶ 5–6, 12, ECF 35-7 at

2–3. Without the BPS:20/25 data collection, Professor Matsudaira and his colleagues will have to rely on less comprehensive, older, or less reliable data sets. *Id.* ¶ 12, ECF 35-7 at 3.

Similarly, AEFP member Daphna Bassok, who serves as its President-Elect, *see* Bassok Decl. ¶ 3, ECF 35-2 at 1, had relied on previous waves of ECLS data in her research and had planned to use data from the ECLS-K:2024 data collection to study the "school readiness" skills of a more recent cohort of children, *id.* ¶ 9, ECF 35-2 at 3–4. She had also planned to use data from the ECLS-K:2024 data collection to revisit her paper "*Is Kindergarten the New First Grade?*," which garnered significant public interest, with more recent observations. *Id.* She can no longer do so because IES has cancelled ECLS-K:2024. *Id.*

Another AEFP member, Kevin Gee, had planned to use ECLS-K:2024 data to conduct a study comparing absenteeism between sets of students, pre- and post-COVID-19, building off a previous paper he published based on 2011 data. *See* Gee Decl. ¶¶ 2, 13, ECF 6-8 at 1, 5–6. His plans have halted due to the termination of ECLS-K:2024. *Id.* ¶ 13.

Rebecca Callahan is a member of AEFP who had planned to use HS&B:22 data to study how English-Learner (EL)-identified students' course-taking patterns varied by school context, and how access to college preparatory and career-and-technical education (CTE) courses varies by urbanicity (e.g., rural, suburban, and urban centers). Callahan Decl. ¶¶ 3, 5. Because the HS&B:22 study has been cancelled, she can no longer carry out the research she had planned. *Id.* ¶ 9.

As the declarations establish, AEFP's individual members are suffering harm from the deprivation of information of the kind that Congress sought to avoid by requiring IES to conduct research and disseminate the results. Causation and redressability are satisfied for AEFP's members for the same reasons as for AEFP and IHEP. *See supra* pp. 21–22. And the other elements of associational standing are also easily met: This action is plainly germane to AEFP's mission of

24

promoting research and partnerships that inform education policy and finance and improve educational outcomes. *See* Bassok Decl. ¶ 10, ECF 35-2; at 4; Kurlaender Decl. ¶¶ 5–7, ECF 6-11 at 2–3. And individual member participation is not necessary in this case because of the nature of Plaintiffs' claims, which "seek prospective and injunctive relief, not damages for its members." *Powder River Basin Res. Council v. Dep't of Interior*, 749 F. Supp. 3d 151, 163 (D.D.C. 2024).

### C. AEFP has associational standing to challenge the termination of the peer-review program.

AEFP also has associational standing to challenge the termination of the peer-review program for new grant funding. "[L]ost professional opportunities" are among the "traditional harms that are obviously concrete." *Ranjan v. U.S. Dep't of Homeland Sec.*, 747 F. Supp. 3d 192, 199 (D.D.C. 2024). AEFP member Matt Giani, a Research Associate Professor in the Department of Sociology at the University of Texas at Austin, has suffered professional harm because of the termination of the program.

Professor Giani intends to seek promotion to professorship in the next few years. *Id.* ¶¶ 2, 5. Because his current position does not require teaching, his record of service activities will be particularly important to his application for promotion. *Id.* ¶ 5. Before Defendants cancelled peer review, Professor Giani was serving a five-year term as a peer reviewer on IES's Education Systems and Broad Reform panel when his service was abruptly terminated on February 10, 2025. *See* Giani Decl. ¶¶ 3, 6–7. Had IES not cancelled the panel and its program of peer review for new grants, he would have continued to serve on the panel and would likely have applied to serve as its chair. *Id.* ¶ 9. If the Court were to order IES to resume its peer review program as it existed before February 10, 2025, Professor Giani would intend to resume his service as a peer reviewer for the Education Systems and Broad Reform panel. *Id.* Active service on the Education Systems and Broad Reform review panel would be particularly helpful to his application for promotion,

25

and other forms of service, including his ad hoc review work for IES, are not adequate substitutes. *Id.* ¶ 11. IES's decision to cancel its peer review program for new grant applications has therefore harmed his prospects for promotion. *Id.*

As for the other associational standing factors, challenging the termination of IES's peer-review process is plainly germane to AEFP's mission of promoting research into educational policy and improving educational outcomes, and it does not require the participation of individual AEFP members because AEFP seeks only prospective relief.

### D. AEFP has associational standing to challenge the halt of restricted-use data application processing.

AEFP also has associational standing to challenge Defendants' decision to halt processing for restricted-use data applications, which has inflicted informational injury on its members. AEFP member Jordan Matsudaira needs access to restricted-use data to conduct his research because the statistical analysis he intends to perform can only be done using individual-level data that is only available on a restricted-use basis. *See* Matsudaira Decl. ¶ 7, ECF 35-7 at 2. Additionally, the restricted-use datasets that Professor Matsudaira seeks to access allow for the use of statistical software to conduct data analysis, which is not possible with the public versions of the relevant datasets. *Id.* Professor Matsudaira began the process of applying for a restricted-use license in early 2025 and completed the application on or about May 21, 2025. *Id.* ¶ 8, ECF 35-7 at 3. On May 29, 2025, he received an email from IES Data Security stating that "IES is pausing the issuance of new Restricted Use Data Licenses and activities associated with the issuance of new licenses, until further notice." *Id.* Professor Matsudaira has received no further communications from IES regarding his restricted-data license application since that time, and as a result has been unable to begin the research he had planned into the factors influencing student postsecondary education borrowing over time. *Id.* ¶ 10, ECF 35-7 at 3.

AEFP member Kirsten Slungaard Mumma needs access to restricted-use IES data to conduct research on broad trends in the adult education sector over time for a paper that is under submission at the journal Education Finance and Policy. *See* Mumma Decl. ¶¶ 3, 5–7, ECF 35-3 at 1–2. she submitted an application for a restricted-use data license in December 2024, and received an email from IES on January 14, 2025, acknowledging receipt of the application and stating that "[T]he review process for new applications is typically around 4 weeks." *Id.* ¶ 8, ECF 35-3 at 2. On April 25, 2025, she received another email from IES, stating that "IES is pausing the issuance of new Restricted Use Data Licenses and activities associated with the issuance of new licenses, until further notice." *Id.* ¶ 9, ECF 35-3 at 3. She has since heard nothing further from IES on the status of her application. *Id.* ¶ 10, ECF 35-3 at 3. The IES website continues to list her application as being "under review," as it has since January 2025. *Id.*

AEFP member Rebecca Callahan would need access to restricted-use data from the HS&B:22 data collection to conduct research she had planned on the high school experiences of English Learner (EL) students and how their course-taking patterns vary by school context (e.g., rural, suburban, and urban centers). *See* Callahan Decl. ¶ 5. That research would require access to student-level data available only with a restricted-use data license and, therefore, the research cannot be done until IES resumes processing applications for such licenses. *Id.* ¶¶ 5, 6.

All three AEFP members have been harmed by being denied access to restricted-use data, and an order from this Court requiring IES to resume processing applications for new restricted-use data licenses would remedy that harm. (For full redress, Professor Callahan would also need the Court to vacate the separately illegal cancellation of the HS&B:22 study).

As for the other associational standing factors, challenging the termination of processing for restricted-use data licenses is plainly germane to AEFP's mission of promoting research into

27

educational policy and improving educational outcomes, and it does not require the participation of individual AEFP members because AEFP seeks only prospective relief.

## II.      Plaintiffs challenge final agency actions that are reviewable under the APA.

As the Court recognized at the motion to dismiss stage, Plaintiffs also satisfy the threshold criteria for APA review. ECF 38 at 20. Those legal conclusions remain applicable at summary judgment. Plaintiffs challenge six discrete "identifiable action[s]" rather than raising a programmatic challenge to the day-to-day operations of the agency as a whole. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). And Plaintiffs lack alternative remedies under the Tucker Act because they do not seek contractual relief. ECF 38 at 22; *Tootle v. Sec'y of the Navy,* 446 F.3d 167, 176 (D.C. Cir. 2006) ("categorically reject[ing] the suggestion that a federal district court can be deprived of jurisdiction [under the APA] by the Tucker Act when no jurisdiction lies in the Court of Federal Claims.").

Moreover, the challenged actions are not committed to agency discretion by law, *see* 5 U.S.C. § 701(a), a "very narrow exception" to the strong presumption of reviewability that "applies only 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Cook v. U.S. Food & Drug Admin.*, 733 F.3d 1, 6 (D.C. Cir. 2013) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). The Education Sciences Reform Act provides detailed instructions to IES on the scope of its mission and how that mission should be carried out, *see, e.g.*, 20 U.S.C. §§ 9511 (defining IES's mission), 9512 (defining IES's functions), 9543 (defining NCES's duties), 9546 (requiring NCES to provide access to data), 9574 (requiring public access to IES data, subject to confidentiality protections), 9575 (requiring IES to

prioritize customer service, including by "[d]isseminating information in a timely fashion and in formats that are easily accessible").

Finally, the record and undisputable facts establish that Plaintiffs challenge final agency actions, as Defendants have not previously disputed except as to the pause in issuing restricted-use data licenses. To constitute final agency action, a challenged action must "mark the 'consummation' of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)), and must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow,'" *id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The study cancellations are final because no further agency action is necessary for them to take effect; the studies have been "discontinued," AR001871, and IES has "no longitudinal studies in the field," Soldner Dep. 131:19–22. The termination of peer review for new grants is also final because it resulted in the dismissal of the peer review panel members, *see* Giani Decl. ¶ 7, and because the peer review process was "not able to continue" without the "logistical support" provided by the cancelled contract. Soldner Dep. 136:20–23.

The decision to stop processing new restricted-use data applications is likewise final. The "decision to institute a pause is itself final" when "nothing suggests the Department 'condition[ed] any such pause' on further consideration." ECF 38 at 21 (quoting *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025)). IES has publicly stated on the relevant websites since at least March 2025 that it is not processing new applications for access to restricted-use data, *see* Solt Decl. Ex.'s 1–3, and it has refused to process applications from AEFP members. *See* Matsudaira Decl. ¶ 9, ECF 35-7 at 3, 5; Mumma Decl. ¶ 9, ECF 35-3 at 3, 4. Nothing in the administrative record gives any "indication that some other authority would later bless or

29

reject that decision," ECF 38 at 21—indeed, Defendants failed to produce any documentation whatsoever in the administrative record regarding the decision to pause issuing new licenses.

## III.    The challenged agency actions are arbitrary and capricious.

The APA "requires agencies to engage in reasoned decisionmaking," *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted), and agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When an agency changes position, it "must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *Fox Television Stations*, 556 U.S. at 515)). An agency's action is arbitrary and capricious when it fails "to take account of a statutory limit on its authority." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1211 (D.C. Cir. 2004).

**A.** As to each of the challenged actions, the administrative record shows that Defendants failed to engage in reasoned decisionmaking. Indeed, the record contains no reasoning whatsoever and no evidence of Defendants' having considered the detailed instructions that Congress provided for IES in the Education Sciences Reform Act, *see, e.g.*, 20 U.S.C. §§ 9511 (establishing IES's mission), 9512 (defining IES's functions), 9543 (defining NCES's duties), 9546 (requiring NCES to provide access to data), 9574 (requiring public access to IES data), 9575 (requiring IES to "make customer service a priority," including by "[d]isseminating information in a timely fashion and in formats that are easily accessible").

30

**Cancellation of Longitudinal Studies and Data Collection**: With respect to the cancellation of the four longitudinal studies and the logistical support necessary to carry out peer review for new grants, the only contemporaneous explanation was the "Government's convenience." AR001345 (BPS:20/25); AR000083 (HSLS:09); AR000371 (HS&B:22); AR000574 (ECLS-K:24); AR001019 (peer review). This explanation cannot substitute for reasoned decisionmaking; instead, it reflects that Defendants did not consider important aspects of the problem.

To begin, the cancellations compromised or entirely eliminated IES's ability to comply with direct statutory mandates. IES is obliged by law to "conduct[] longitudinal and special data collections necessary to report on the condition and progress of education," 20 U.S.C. § 9543(a)(7), as well as to collect data on "State and local early childhood school readiness activities," *id.* § 9543(a)(1)(B). But since cancelling all of its extant longitudinal studies, IES has had "no longitudinal studies in the field." Soldner Dep. 131:21–22. Likewise, having cancelled the ECLS-K:24 study, NCES is currently not collecting any data on early childhood education. *See* Soldner Dep. 142:13–15 ("Q: Is NCES now collecting data on early childhood education? A: No."). Although IES is not required to conduct any specific study, the record shows that it failed even to consider that it could not satisfy its statutory mandate when it cancelled all of them.

Further, the record shows no acknowledgement that the cancelled studies had furthered IES's statutory mission to "expand[] fundamental knowledge and understanding of education." 20 U.S.C. § 9511. For example, when cancelling the BPS:20/25 study, Defendants did not take into consideration the National Institute of Statistical Sciences' endorsement of BPS and its related studies as an "overwhelming success." AR001277. Likewise, although Defendants would, in May 2026, acknowledge that the data already collected in the ECLS-K:24 study are "critical to

31

researchers' and policymakers' ability to understand the impacts of Covid on topics such as kindergarten readiness," AR001543, Defendants gave no weight to such considerations when they made the decision to cancel that study, including the work that would have been done to publish already-existing data. Similarly, Defendants failed to consider that each of the cancelled studies used large, nationally representative samples, *see* AR001178 (BPS:20/25), AR000016 (HSLS:09), AR000265 (HS&B:22), AR0001391 (ECLS-K:24), and did not consider whether any other studies could provide comparable insights into national-level trends, or allow scholars to draw nationally valid conclusions about educational trends and interventions. Defendants also failed to consider how the studies they cancelled built on previous studies, allowing comparisons of educational trends across time and enhancing the value of data that IES collected in previous years. *See, e.g.*, Bassok Decl. ¶ 9, ECF 35-2 at 3–4 (stating that she planned to use data from the ECLS-K:24 collection to study how school readiness in young children has changed over time). In addition, Defendants failed to consider how cutting off new restricted-use data licenses would stymie research efforts that directly advance statutory priorities of the Institute such as closing "achievement gaps between minority and nonminority children and between disadvantaged children and such children's more advantaged peers." 20 U.S.C. § 9515(a)(1). For example, Callahan's intended research on high-school course-enrollment decisions by English Learner students could not proceed because new restricted-use data licenses are no longer available, and because IES cancelled the HS&B:22 data collection that would have furnished the necessary data. *See* Callahan Decl. ¶¶ 5–6.

**Peer review**: The record with respect to the decisions to cancel peer review is similarly barren. IES is required to conduct peer review for "all applications for grants and cooperative agreements that exceed $100,000." 20 U.S.C. § 9534(b)(1). But cancelling its peer review program

32

left IES with 588 pending applications that could not be reviewed. *See* Soldner Dep. 136:24–137:1. As IES has long recognized, peer review is both required by statute and an invaluable tool for assuring the value of IES-funded studies. *See* Inst. of Educ. Scis., *IES Grant Peer Review Guide* 3 (2024) (explaining peer review in terms of statutory requirements and the need for the work of IES "to conform to high standards of quality, integrity, and accuracy; to be objective, secular, neutral, nonideological, and free of partisan political influence; and to be free of racial, cultural, gender, or regional bias")[5]; Inst. of Educ. Scis., *Procedures for Peer Review of Reports* 2 (2006) (recognizing statutory requirements); *id.* at 4 ("Typically, reviewers are asked to consider significance of the topic for the field of education, quality of the scholarship, appropriateness of the conclusions, and clarity of the presentation. Institute reports do not include presentation of policy implications or recommendations. In addition, reviewers receive specific guidance on assuring that language that advances causal claims is adequately supported by the methods and analyses used in the report.").[6] Yet the record reflects that IES failed to give any consideration to these important concerns, much less to explain its stark about-face.

**Access to Data**: The Education Sciences Reform Act requires IES to "make available to the public" any data it collects, subject to confidentiality protections for individually identifiable information. 20 U.S.C. §§ 9573, 9574. The administrative record offers no indication that Defendants took statutory requirements into account when they decided to stop processing new applications for access to restricted-use data. The sole explanation for the pause in processing restricted-use data applications is contained in emails attached to Matsudaira and Mumma's declarations, which state that Defendants did so "[t]o adjust to a recent reduction in force." ECF

---

[5] https://ies.ed.gov/sites/default/files/office-science/document/2024/11/IES%20Peer%20Review%20Guide%20FY2025%20Session%202.pdf.

[6] https://ies.ed.gov/sites/default/files/ies/document/2026/04/SRO_reports_peerreview.pdf.

35-3 at 4, 35-7 at 5; *see also* Soldner Dep. 174:4–14 (stating that, following the RIF, a decision was made "either at the request or insistence of the Office of Management and Budget … to halt researcher use of the portal via which researchers make requests for restricted-use data). Defendants' voluntary decision to fire people is not a reasoned justification for neglecting statutory mandates.

The administrative record reveals that IES also failed to consider substantial reliance interests. That reliance was amply justified, given that Congress specifically designed IES to be a national leader in education research and expressly directed it to conduct peer review and disseminate data. *See* 20 U.S.C. §§ 9511, 9512, 9520. Plaintiffs have devoted substantial time and effort to developing products like AEFP's *Live Handbook* in reliance on the availability of data from studies that IES has now canceled, and no adequate substitute is available. *See* Bassok Decl. ¶¶ 12–13, ECF 35-2 at 4–5. And AEFP's members have planned research projects on the assumption that IES would not abandon its existing research studies mid-stream and would continue to collect and release data as planned and announced, including on a restricted-use basis. *See, e.g.*, Evans Decl. ¶ 3, ECF 35-4 at 2 (planned research project based on BPS:20/25 data); Matsudaira Decl. ¶¶ 4, 11, ECF 35-7 at 1–2, 11 (co-founded research center at American University to connect postsecondary education researchers with policymakers; without a restricted use data license, the center cannot carry out the research it had planned). Others like Giani have invested years in IES's peer-review system on the understanding that active service as a peer reviewer would help to bolster an application for promotion. *See* Giani Decl. ¶ 11.

**B.** Defendants have attempted to bolster their position by designating in the administrative record materials from over a year *after* the relevant decisions were taken. *See* ECF 45-1 at 2, 7–8; AR001039–1135, AR01723–1872 (blog posts, two declarations from IES's Acting Director, a

34

report on IES's future prepared by Dr. Amber Northern, and various contract solicitation materials). The administrative record, however, consists only of materials "that were 'before the agency at the time the decision was made.'" *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (quoting *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981)).

In any event, those materials do not reflect consideration of the relevant factors and do not retroactively validate Defendants' actions. Dr. Northern's report, released over a year after the studies were cancelled, contains half a page detailing various criticisms of the four longitudinal studies, including concerns about cost, overlapping purposes, and study methodology. *See* AR001045. It also claims that "[n]one of these data collections and surveys are specifically called out by name in [the] statute," and that "[s]ome have robust statutory language to support them, others less so," but does not cite or discuss any specific statutory provisions. *Id.* Dr. Northern, however, does not contest that the statute requires IES to conduct such studies, does not consider the effect of cancelling *all* extant longitudinal studies on IES's ability to satisfy its statutory obligation to carry out such studies, and does not offer a reasoned justification for their cancellation. For instance, her report does not consider how the studies advanced IES's mission to expand knowledge and understanding of education, and it does not address the reliance interests of scholars and policymakers, including AEFP members, or the value of maintaining continuity with data collections conducted in a similar manner over decades.

On peer review, Dr. Northern notes that "[t]he peer review process has a strong commitment to scientific rigor," but states that "there needs to be a better balance between scientific rigor and speed, efficiency, and effectiveness." AR001116. That is hardly a justification

35

for cancelling peer review entirely for at least 588 pending applications, *see* Soldner Dep. 136:24–137:1, a decision that simultaneously set back scientific rigor, speed, efficiency, and effectiveness.

Finally, the recent contract solicitation materials Defendants designated as part of the administrative record underscore that the initial decisions to cancel the functions that the soon-to-be-replaced contracts supported was arbitrary and capricious. After July 1, 2026, IES will require the contractor running its restricted-use data infrastructure to accept and process applications for new restricted-use data licenses. AR001848. The record offers no explanation of why that function was cancelled for more than a year. Similarly, IES is seeking contractor support for its peer-review program from August 2026 onward on terms almost identical to those of the contract it abruptly cancelled in February 2025. *Compare* AR000931–51, *with* AR001767–86. To the extent it is relevant at all, the new document reflects that IES understands that its decision to cancel peer review was arbitrary.

## IV.    The terminations of IES's peer-review program for new grants and IES's processing of new applications for restricted-use data licenses were contrary to law.

IES is required to conduct peer review to evaluate "all applications for grants and cooperative agreements that exceed $100,000," 20 U.S.C. § 9534(b)(1), in accordance with procedures approved by the National Board for Education Sciences, *id.* § 9516(b)(3). Defendants' decision to cancel the contract for support services for the peer review process meant that IES was "not able to continue the review process as [it] would have in a typical year," Soldner Dep. 136:22–23. As a result, grant applications went unreviewed, *see* Bassok Decl. ¶ 16, ECF 35-2 at 6; Gee Decl. ¶ 8, ECF 6-8 at 3–4, and members of peer review panels were required to stop their work, Giani Decl. ¶ 7.

IES also has a duty to "make available to the public" any data it collects, subject to confidentiality protections for individually identifiable information, 20 U.S.C. §§ 9573, 9574, and

36

to "[d]isseminate information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," *id.* § 9575. But for well over a year, IES has refused all applications for access to restricted use data, *see* Solt Decl. Ex 1; Soldner Dep. 174:8–14, making it impossible for researchers to gain access to data necessary for their research.

## V.     The appropriate remedy is vacatur.

Defendants' actions are arbitrary, capricious, and contrary to law. It is well-established in this Circuit that, where a court finds agency action unlawful, the "ordinary result" is vacatur of that action. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) ("the ordinary result is that the [actions] are vacated") (Kavanaugh, J., concurring) (citation omitted). Vacatur restores the state of affairs as it existed before Defendants took their unlawful action. *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) ("vacatur restores the status quo before the invalid [action] took effect").

The Court should vacate Defendants' cancellation of the longitudinal studies and the peer review process for new grants and the halt in processing new restricted-use data applications, thus requiring Defendants to resume the interrupted studies and functions. Restoring the interrupted studies and agency functions would remedy Plaintiffs' injuries and bring the agency back into compliance with its statutory obligations.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment and vacate the challenged agency actions.

Dated: June 26, 2026                             Respectfully submitted,

                                                 /s/ Cormac A. Early
                                                 Cormac A. Early (DC Bar No. 1033835)
                                                 Adina H. Rosenbaum (DC Bar No. 490928)
                                                 Adam R. Pulver (DC Bar No. 486293)
                                                 Public Citizen Litigation Group
                                                 1600 20th Street NW
                                                 Washington, DC 20009
                                                 (202) 588-1000
                                                 cearly@citizen.org

                                                 *Attorneys for Plaintiffs*