UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as Secretary of Education, *et al.*,<br><br>Defendants. | Civil Action No. 25-0999 (TNM) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................4

BACKGROUND ....................................................................................................8

I. THE EDUCATION SCIENCES REFORM ACT OF 2002 ....................................8

II. THE CONTRACT ACTIONS AND WHAT HAS HAPPENED SINCE ....................11

III. PROCEDURAL HISTORY ....................................................................................13

STANDARD OF REVIEW ......................................................................................13

ARGUMENT ..........................................................................................................15

B. Plaintiffs Failed to Prove Traceability as to Each Claim and Request for Relief. ........25

C. Plaintiffs Have Not Proven Redressability as to Each Claim and Request for Relief. .25

D. Defendants Preserve Their Tucker Act Position. ....................................................27

II. EVEN IF ANY PLAINTIFF HAD STANDING, THE APA CLAIMS FAIL. ..................28

A. The APA Claims Are Barred By Threshold Matters. ................................................28

1. The Contract Decisions Are Committed to Agency Discretion By Law. ................28

C. The Peer-Review Claims Fail on the Merits (Counts V and VI). ................................31

D. The Restricted-Use Data License Claims Fail on the Merits (Counts VII and VIII)....33

# TABLE OF AUTHORITIES

**Cases**

*Am. Bioscience, Inc. v. Thomson*, 269 F.3d 1077 (D.C. Cir. 2001)..................................... passim

*Am. Whitewater v. FERC*, 125 F.4th 1139 (D.C. Cir. 2025) .......................................................14

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) ....................................................14

*Bennett v. Spear*, 520 U.S. 154 (1997) .........................................................................................30

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ........................ passim

*Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141 (D.D.C. 2019) ...14, 15

*Camp v. Pitts*, 411 U.S. 138 (1973) ...............................................................................................15

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................................................24

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)................................................................ passim

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022)............. passim

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)...............................15

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ..........................................................__

*Healthy Gulf v. Dep't of the Interior*, 152 F.4th 180 (2025) .......................................................20

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......................................................................................28

*Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015) ..................................... passim

*Lawyers Committee for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428 (D.C. Cir. 2021)...... passim

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...................................................................................25, 28, 30

*Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42 (D.C. Cir. 2016)............................. passim

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) .................................................. passim

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...............14, 15

*Appalachian Power Co. v. E.P.A.*, 135 F.3d 791 (D.C. Cir. 1998) .............................................__

*Oryszak v. Sullivan*, 576 F.3d 522 (D.C. Cir. 2009) ....................................................................29

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)............................................17, 19

*Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984) .......................................30

*Ranjan v. U.S. Dep't of Homeland Security*, 747 F. Supp. 3d 192 (D.C. Cir. 2024)....................24

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026) ....7, 14, 27

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .........................................................7, 26

*Tex. Neighborhood Servs. v. U.S. Dep't of Health & Human Servs.*, 172 F. Supp. 3d 236 (D.D.C. 2016) .....7, 14, 27

*The Fund for Animals, Inc. v. BLM*, 460 F.3d 13 (D.C. Cir. 2006) ..... passim

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .....__

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021 .....4

*Webster v. Doe*, 486 U.S. 592 (1988) .....32

**Statutes**

5 U.S.C. § 701 .....8, 28, 29

5 U.S.C. § 701(a)(2) .....8, 28, 29

5 U.S.C. § 704 .....31

5 U.S.C. § 706(1) ..... passim

5 U.S.C. § 706(2)(A) ..... passim

20 U.S.C. § 9511 .....5, 8, 9, 30

20 U.S.C. § 9511(a) .....5

20 U.S.C. § 9511(b)(2) .....30

20 U.S.C. § 9511(c)(3)(B) .....5

20 U.S.C. § 9512 ..... passim

20 U.S.C. § 9512(1) .....18

20 U.S.C. § 9520 ..... passim

20 U.S.C. § 9534(b)(1) .....10, 23, 31, 32

20 U.S.C. § 9543(a)(1) .....9, 17, 18

20 U.S.C. § 9543(a)(1)(B) .....9, 18

20 U.S.C. § 9544(a) .....9, 18, 29, 30

20 U.S.C. § 9546(e)(2) .....6, 10, 22, 33

20 U.S.C. § 9573(c)) .....10, 21

20 U.S.C. § 9574 ..... passim

20 U.S.C. § 9575 .....6, 10, 23, 33

20 U.S.C. § 9575(2) .....23, 33

**Rules**

Fed. R. Civ. P. 56 .....__

## INTRODUCTION

This case begins and ends with standing. Plaintiffs have shown that the U.S. Department of Education (the "Department") has not given them everything they want. But they have not shown that the federal statute they rely upon, the Education Sciences Reform Act of 2002 ("ESRA"), entitles them to it. A duty to report statistics on a broad topic is not entitlement to a particular dataset. Plaintiffs' claims under the Administrative Procedure Act ("APA") fail as a matter of law, and summary judgment should be entered in Defendants' favor with the case dismissed for lack of subject matter jurisdiction.

Article III standing has three elements, and Plaintiffs failed to establish each element as to "each claim that they press and for each form of relief that they seek" because standing is "not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Plaintiffs must prove an injury in fact, that the injury is fairly traceable to the agency actions they challenge, and that the injury is "likely" to be "redressed" by relief the Court can lawfully grant. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Court credited Plaintiffs' allegations at the pleading stage, which was a "low bar," but cautioned that the "standing analysis may come out differently at the case's future stages." Mem. Op'n at 2, 15 (ECF No. 38) ("Op'n"). This is because a plaintiff's burden of proof, including the "manner and degree of evidence required," increases with the "successive stages of the litigation." *Lujan*, 504 U.S. at 561. Plaintiffs have failed to carry their evidentiary burden.

Starting with the first element, injury in fact. Plaintiffs are two organizations: the Association for Education Finance and Policy ("AEFP") and the Institute for Higher Education Policy ("IHEP"). They challenge six agency actions taken beginning in February 2025, which can be organized into three categories: the termination of contracts supporting four studies (BPS:20/25,

HSLS:09, HS&B:22, and ECLS-K:24); the termination of the logistics support contract for the peer-review process concerning applications for grants; and the pause in accepting and processing applications for restricted-use data licenses. Plaintiffs' standing theories rest principally on an informational injury, which has two requirements: the plaintiff must prove that a statute entitles it to the information at issue, and that the failure to receive that information caused "adverse effects," which the Supreme Court has called "downstream consequences." *TransUnion*, 594 U.S. at 442. Plaintiffs' evidence does not satisfy either requirement as to each claim and request for relief.

The informational injury theory as to the four studies fails at the first step. ESRA established the Institute of Education Sciences ("IES" or the "Institute"), which is part of the Department, 20 U.S.C. § 9511(a), and serves as the Department's research arm. ESRA requires IES to conduct research on certain broad topics, but it does not give Plaintiffs the right to the specific datasets they demand. Plaintiffs challenge the Department's decisions beginning in February 2025 to terminate, descope, or rescope (*i.e.*, to end, narrow, or restructure) contracts that supported four of IES's statistical programs. Each of the four programs is administered by the National Center for Education Statistics ("NCES" or the "Statistics Center"), which is part of IES. *See* 20 U.S.C. §§ 9511(c)(3)(B), 9541(a).

ESRA does not mention any of the four studies by name. Plaintiffs instead rely upon ESRA's general provisions, principally 20 U.S.C. § 9574, which provides that, "[s]ubject to section 9573 of this title, data collected by [IES] . . . in carrying out the priorities and mission of [IES], shall be made available to the public." The duty is real, and Defendants do not deny it. But it is expressly subject to Section 9573's confidentiality regime, it reaches only data actually collected, and, importantly, sets no deadline, cycle, or form. It imposes no obligation to create data, so it states nothing about studies whose collections did not take place. The other provisions

Plaintiffs invoke are weaker still: Section 9546(e)(2) conditions access on "such terms and conditions as the Center [NCES] may [choose to] prescribe," and Section 9575 (titled "Performance management") is a customer-service management directive to the IES Director. Plaintiffs' own brief acknowledges that "IES is not required to conduct any specific study," Pls.' Mem. at 31, and a statute that requires no specific study entitles no one to the data a specific study would have produced. The informational injury theory fails at *TransUnion*'s second requirement as well: the consequences Plaintiffs describe are planned uses of datasets no statute promised them, and harms of that kind cannot substitute for the entitlement the first requirement demands. No entitlement, no informational injury, and "[n]o concrete harm, no standing." *TransUnion*, 594 U.S. at 442.

The peer-review theories are not informational injuries at all. One declarant's lost panel seat rests on a chain of contingencies ending in decisions of a third party (a university) not before the Court, which defeats traceability and redressability alike, and another declarant's grant application was submitted to a competition that has since been closed without any grant being awarded to anyone. The restricted-use theories fare no differently: one declarant claims she needs data from a collection that never took place, and Plaintiffs concede this declarant "would also need the Court to vacate" the study's cancellation for full redress, Pls.' Mem. at 27. Another declarant applied for restricted-use data in December 2024, which was before any challenged agency action in this case, and no declaration provided by Plaintiffs identifies a statute that entitles an applicant to a restricted-use data license on any specific schedule.

Redressability, the third element for Article III standing, also fails for most of what Plaintiffs seek. For the studies whose collection waves did not take place, no order can collect

data retroactively. For the programs that continue, the alleged injury is dissatisfaction with the scope and pace of operations, which vacatur also does not remedy.

Vacatur under Section 706 of the APA "functions quite differently from an injunction" because it "simply holds unlawful and sets aside the action." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119 (D.C. Cir. 2026) (cleaned up). Plaintiffs' own filings prove the point: their brief equates vacatur with an order "requir[ing] Defendants to resume the interrupted studies and functions," Pls.' Mem. at 37, and their proposed order then adds six separate commands that Defendants be "ORDERED to resume" each study and function, ECF No. 47-4. Those are commands which vacatur cannot supply. An order compelling injunctive relief is available, if at all, only under 5 U.S.C. § 706(1). Plaintiffs know that provision: they pleaded it in Count IX of their Second Amended Complaint, ECF No. 32, and have voluntarily dismissed that count, *see* Op'n at 6 n.3.

In any event, an order directing the Department to resume programs that are not legally required and then supervise their quality is precisely the kind of order the Supreme Court has forbidden. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) ("*SUWA*"). Under Section 706(1) of the APA—which is no longer at issue here—a court may compel an agency to take a discrete action that is "legally *required*," *id.* at 63 (emphasis in original), but it may not superintend an agency's program at the level required by Plaintiffs because such an order would compel "compliance with broad statutory mandates" and "inject[] the judge into day-to-day agency management." *Id.* at 66-67. That same concept applies equally to Plaintiffs' remaining claims, all of which proceed under Section 706(2)(A). *See The Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 21 n.9 (D.C. Cir. 2006) ("Although the complainants in *Southern Utah* sought to compel agency

action allegedly withheld, *see* 5 U.S.C. § 706(1), the Court's reasoning applies with equal force to claims regarding action taken under § 706(2).").

Even if any Plaintiff had standing, which they do not, the claims would still fail. What studies to support, which contracts to use, and whether to renew them are decisions committed to agency discretion by law, 5 U.S.C. § 701(a)(2). The pause in processing applications for restricted-use data licenses is not final agency action, and the record shows an interim measure alongside a support function maintained and re-procured, with no application denied. The peer-review provisions concerning grant applications command the establishment of a review system, which currently exists, and condition peer review on practicability. The administrative record also does not show that any challenged decision was arbitrary or capricious within the meaning of 5 U.S.C. § 706(2)(A). The administrative record does not show an agency that abandoned its statistical mission. It shows an agency that reviewed its contracts, ended some, narrowed others, and continued, restarted, or re-procured the work that Congress entrusted to its judgment.

The Court should deny Plaintiffs' motion for summary judgment, grant summary judgment for Defendants, and dismiss this case for lack of subject matter jurisdiction or, in the alternative, enter judgment for Defendants on Plaintiffs' claims under 5 U.S.C. § 706(2)(A) because those claims are not reviewable, 5 U.S.C. § 701(a)(2) or otherwise fail on the administrative record.

## BACKGROUND

### I. THE EDUCATION SCIENCES REFORM ACT OF 2002

ESRA established IES within the Department as its research arm. *See* 20 U.S.C. § 9511 ("Establishment"). IES's mission is to provide national leadership in expanding fundamental knowledge of education "in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about" the condition and progress

of education, educational practices, and the effectiveness of federal education programs. *Id.* § 9511(b)(1). NCES is the statistics center within IES. *See id.* §§ 9541-9548.

Congress assigned NCES its duties by subject matter, not by study. NCES must collect and disseminate "full and complete statistics . . . on the condition and progress of education" covering enumerated subjects such as early childhood school readiness and access to and opportunity for postsecondary education, including financial aid, 20 U.S.C. § 9543(a)(1)(B), (E), and "conducting longitudinal and special data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7).

Congress addressed how that work would be done in a separate provision, and it left the choice of means to the agency. Section 9512 of ESRA provides: "From funds appropriated under section 9584 of this title, the Institute, directly or through grants, contracts, or cooperative agreements, shall" perform the functions the section lists, including to "widely disseminate the findings and results of scientifically valid research in education." *Id.* § 9512, (2). Section 9544 ("Performance of duties") speaks in permissive terms as to NCES, providing that the NCES Commissioner "may award grants, enter into contracts and cooperative agreements, and provide technical assistance," *id.* § 9544(a), and those grants, contracts, and cooperative agreements "may be renewed at the discretion of the Statistics Commissioner[,]" *id.* § 9544(c).

For data that IES collects, Section 9574 of ESRA provides that, "[s]ubject to section 9573 of this title," such data "shall be made available to the public, including through use of the Internet." 20 U.S.C. § 9574. Section 9573 ("Confidentiality") requires that all collection, maintenance, use, and dissemination of data by IES conform to confidentiality standards the IES Director must "develop and enforce standards designed to protect the confidentiality of persons in the collection, reporting, and publication of data[.]" *Id.* § 9573(c)(1)(A). No person may use

individually identifiable information for a non-research purpose, publish data in identifiable form, or "permit anyone other than the individuals authorized by the [IES] Director to examine the individual reports." *Id.* § 9573(c)(2)(A)-(C). Access to data containing individually identifiable information accordingly runs through a restricted-use data license, the authorization this Court has recognized a researcher "must obtain" from IES. Op'n at 4 (citing 20 U.S.C. § 9573(c)).

Section 9546 of ESRA (titled "Dissemination") addresses access to collected data. Its subsection (e)(2) provides that "[t]he Statistics Center shall, in accordance with such terms and conditions as the Center may prescribe, provide all interested parties, including public and private agencies, parents, and other individuals, direct access, in the most appropriate form (including, where possible, electronically), to data collected by the Statistics Center for the purposes of research and acquiring statistical information." 20 U.S.C. § 9546(e)(2). Subsection (a)(1) provides that NCES "may" furnish copies, compilations, and surveys, and subsection (d) permits cost-based fees for compilations and surveys under the section. Section 9575 (titled "Performance management") directs the IES Director to "ensure that all activities conducted or supported by the Institute or a National Education Center make customer service a priority" through six listed methods. *Id.* § 9575.

Two provisions of ESRA govern the evaluation of grant applications. Section 9534(b)(1) directs the IES Director to "establish a peer review system, involving highly qualified individuals with an in-depth knowledge of the subject to be investigated, for reviewing and evaluating all applications for grants and cooperative agreements that exceed $100,000, and for evaluating and assessing the products of research by all recipients of grants and cooperative agreements under this Act." 20 U.S.C. § 9534(b)(1). Section 9520 (titled "Competitive awards") provides that "[a]ctivities carried out under this Act through grants, contracts, or cooperative agreements, at a

minimum, shall be awarded on a competitive basis and, when practicable, through a process of peer review." *Id.* § 9520.

## II. THE CONTRACT ACTIONS AND WHAT HAS HAPPENED SINCE

Plaintiffs challenge six agency actions, which can be organized into three categories. First, the termination in February 2025 of contracts supporting four studies: BPS:20/25, HSLS:09, HS&B:22, and ECLS-K:24. Second, the termination of the logistics support contract for the peer-review process. Third, the pause, announced to applicants in the spring of 2025, in accepting and processing applications for restricted-use data licenses. *See* Pls.' Mem. at 4-15.

**A. The four studies.** The termination notices for the four study-support contracts issued in February 2025 are included in the administrative record at: AR001345 (BPS:20/25); AR000083 (HSLS:09); AR000371 (HS&B:22); and AR000574 (ECLS-K:24).

For ECLS-K:24, the kindergarten collection was completed before the contract was terminated on February 10, 2025, and the first-grade collection scheduled for March 3, 2025 did not take place. *See* Aug. 11, 2026 Decl. of Matthew Soldner, Acting Director for IES ("Soldner Decl.") ¶ 30. The contract was not immediately reinstated. *Id.* ¶ 31. However, as part of a planned termination settlement, work was completed to assemble and deliver draft kindergarten data files and draft documentation, which were provided in a series of deliverables through April 1, 2026. *Id.* On August 7, 2026, the Department reinstated the contract to finalize the kindergarten data files and documentation, with performance through February 6, 2027. *Id.* ¶ 32. The Department anticipates releasing a restricted-use file after disclosure risk evaluation, and no public-use file is anticipated. *Id.* ¶ 33.

HSLS:09 follows a cohort of 2009 ninth graders. Soldner Decl. ¶ 17. Work for HSLS:09 was conducted under contract 91990023D0042/91990024F0321. *Id.* ¶ 18. Its third follow-up was

planned for the summer of 2025, but data collection for that follow-up did not begin. *Id.* ¶ 17. The supporting contract was terminated on February 10, 2025, and was not reinstated. *Id.* ¶¶ 19-20. The Department approved a termination settlement on May 29, 2025. *Id.*

For BPS:20/25, the contract supporting BPS:20/25 was terminated on February 10, 2025. Soldner Decl. ¶ 9. The 2025 collection wave for the 2020/25 cohort did not take place, and no data from that wave exists. *Id.* ¶ 10.

For HS&B:22, the initial collection was completed in 2022-2023, and a restricted-use file was released in January 2025. Soldner Decl. ¶ 23. The contract supporting HS&B:22 was terminated on February 10, 2025, *id.* ¶ 24, and no follow-up collection for the HS&B:22 cohort has been conducted. *See id.* ¶ 25. On August 10, 2026, the Department issued a modification to the NPSAS:28 contract, GS-00F-354CA/91990026F0051/P00001, to collect high school transcripts, as well as postsecondary enrollment and federal financial aid data if available, of HS&B:22 participants. *Id.* ¶ 26.

**B. Peer review.** The logistics support contract for the peer-review process was terminated on February 10, 2025. *See* AR001019; Aug. 11, 2026 Declaration of Anne Ricciuti, Deputy Director for Science at IES ("Ricciuti Decl.") ¶ 2. During the interim, IES conducted a smaller number of competitions with peer review organized in-house. Ricciuti Decl. ¶¶ 4-6. On May 7, 2026, IES solicited a successor support contract for the peer review function, with performance to begin by August 1, 2026. *See* AR001723-24. The Department's contracting office is currently preparing the award package for a new support contract and anticipates making the award at the end of the month of August 2026. *Id.* ¶ 8.

The grant competition to which Dr. Bassok applied was closed without any grants being awarded to anyone, and IES notified Dr. Bassok on March 18, 2026. Ricciuti Decl. ¶¶ 9-11.

**C. Restricted-use data licenses.** Applicants were notified in April and May 2025 that IES was pausing the issuance of new restricted-use data licenses and associated activities. *See* Mumma Decl. ¶ 9, ECF No. 35-3; Matsudaira Decl. ¶ 9, ECF No. 35-7. The support contract for license administration took effect on July 1, 2025, *see* AR001020, and was extended through June 30, 2026, *see* AR001036. A successor solicitation requires the contractor to accept and process new applications after July 1, 2026, and the successor contract was awarded on August 6, 2026. Ricciuti Decl. ¶ 15. No application for restricted-use data licenses has been denied, and pending applications remain in the queue. *Id.* ¶ 14.

## III. PROCEDURAL HISTORY

Plaintiffs filed their Second Amended Complaint on July 16, 2025, pleading nine counts. ECF No. 32. The Court denied Defendants' motion to dismiss on February 25, 2026. ECF No. 38. Count IX, in which IHEP invoked 5 U.S.C. § 706(1), has been voluntarily dismissed. *See* Op'n at 6 n.3. On April 30, 2026, Defendants filed a certified list of the contents of the Administrative Record, ECF No. 43-1. On June 2, 2026, Defendants filed a certified list of a supplement to the Administrative Record, ECF No. 45-1. On June 26, 2026, Plaintiffs filed a Motion to Supplement the Administrative Record, ECF No. 46, which Defendants will oppose separately. On the same day, Plaintiffs filed their Motion for Summary Judgment. ECF No. 47.

# STANDARD OF REVIEW

## I. STANDING AT THE SUMMMARY JUDGMENT STAGE

Standing must be proved with evidence at summary judgment, not pleaded. Each element must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. The burden "grows heavier throughout the litigation."

Op'n at 8 (citing *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019) (McFadden, J)).

Article III standing has three elements, and "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Plaintiffs "must show (1) injury in fact that is concrete and particularized and actual or imminent rather than conjectural or hypothetical, (2) causation fairly traceable to the defendant's challenged action and (3) redressability by a favorable decision that is likely as opposed to merely speculative." *Am. Whitewater v. FERC*, 125 F.4th 1139, 1150 (D.C. Cir. 2025) (citing *Lujan*, 504 U.S. at 560-61). Plaintiffs must prove each element for "each claim that they press and for each form of relief that they seek," because standing is "not dispensed in gross." *TransUnion*, 594 U.S. at 431. The failure to establish standing means the Court lacks subject matter jurisdiction and the claim must be dismissed. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (classifying lack of standing as a defect in subject matter jurisdiction).

## II. SUMMARY JUDGMENT STANDARD UNDER THE APA

The standard of review for motions for summary judgment under the APA is narrow and deferential to agency action. The question before the court is "'whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Tex. Neighborhood Servs. v. U.S. Dep't of Health & Human Servs.*, 172 F. Supp. 3d 236, 242 (D.D.C. 2016) (citation omitted). On such review, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction," *id.* § 706(2)(C), or "without observance of procedure required by law." *Id.* § 706(2)(D).

The scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

When "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thomson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation omitted). "[J]udicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quotation marks omitted). The "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Where an explanation by the agency is inadequate, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## ARGUMENT

### I. THE CASE SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS FAILED TO CARRY THEIR EVIDENTIARY BURDEN OF PROVING ARTICLE III STANDING AS TO EACH CLAIM AND REQUEST FOR RELIEF.

The Court credited Plaintiffs' allegations at the pleading stage, which was a "low bar," but cautioned that the "standing analysis may come out differently at the case's future stages." Op'n at 2, 15. This is because a plaintiff must support each element "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. *See also Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016) (stating that "a court's

determination that a plaintiff has established standing at the motion to dismiss stage by *alleging* sufficient facts in her pleadings is only the first step, because that finding does not obviate the court's responsibility to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek summary judgment." (emphasis in original)). As discussed below, Plaintiffs failed to carry their evidentiary burden of proving every Article III element as to each claim and request for relief. The case, therefore, should be dismissed for lack of subject matter jurisdiction.

**A. Plaintiffs Failed to Prove an Injury in Fact as to Each Claim and Request for Relief.**

Plaintiffs challenge six agency actions, which can be organized into three categories. First, they challenge the termination of contracts supporting four studies: the 2020/25 cohort of the Beginning Postsecondary Students Longitudinal Study ("BPS:20/25"), 2d Am. Compl. ¶¶ 76-78 (Count I), ECF No. 32; the High School Longitudinal Study of 2009 ("HSLS:09"), *id.* ¶¶ 79-82 (Count II); the High School and Beyond Longitudinal Study of 2022 ("HS&B:22"), *id.* ¶¶ 83-86 (Count III); and the Early Childhood Longitudinal Study, Kindergarten Class of 2023-24 ("ECLS-K:24"), *id.* ¶¶ 87-90 (Count IV). Second, they challenge the pause in accepting and processing applications for restricted-use data licenses. *See id.* ¶¶ 98-106 (Counts VII & VIII). Third, they challenge the termination of the logistics support contract for the peer-review process, *see id.* ¶¶ 91-97 (Counts V & VI).

Plaintiffs' organizational standing theories, and the member theories tied to the four studies and applications for restricted-use data licenses, rest on asserted "informational" injuries. *See* Op'n at 16 ("Plaintiffs base their organizational standing claims on informational injuries they suffered directly."). This is the theory Plaintiffs' press for their AEFP's members as well. *See* Pls.' Mem. at 18 (arguing that ESRA's provisions "require IES to provide information to IHEP, AEFP, and AEFP members"). An informational injury has two requirements: the plaintiffs must

prove that a statute entitles them to the specific information, and they must prove that the failure to receive it caused the "downstream consequences" *TransUnion* requires. 594 U.S. at 441-42. Plaintiffs have failed to meet both *TransUnion* requirements for their asserted informational injuries. Their claims concerning the peer-review process for grant applications do not appear to be based upon informational injuries, but those claims should be dismissed for lack of standing on other grounds.

**1. The Informational Injury Theory Fails at the First *TransUnion* Requirement: No Statute Entitles Plaintiffs to the Four Studies or Restricted-Use Data Licenses on the Terms and Schedules They Demand.**

A court evaluating standing assumes the merits of the plaintiff's legal claim, *see Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), but the plaintiff's reading of a statute must be plausible. *See Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015); *Lawyers Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 429 (D.C. Cir. 2021) ("[A]s with any claimed basis for standing, the plaintiff's reading of a statute for informational standing purposes must at least be plausible.") (citing *Vilsack*, 797 F.3d at 8). Plaintiffs' reading of ESRA is not plausible.

**a. Plaintiffs Are Not Statutorily Entitled to the Datasets in the Four Studies.**

ERSA does not mention by name any of the four studies. Instead, Plaintiffs rely on 20 U.S.C. § 9543(a)(1)'s direction to NCES to collect statistics on the "condition and progress of education" at the "preschool" through "postsecondary" levels, on Section 9512(2)'s direction to "widely disseminate the findings and results of scientifically valid research in education," and on Section 9574's "availability of data," which Plaintiffs invoke both for the data the four studies would have produced and for the restricted-use data that IES already holds. *See* Pls.' Mem. at 18-19, 21.

Section 9543(a) of ESRA assigns broad subjects on which NCES must "collect, report, analyze, and disseminate" statistical data. This includes, for example, "State and local early childhood school readiness activities," 20 U.S.C. § 9543(a)(1)(B); "secondary school completions, dropouts, and adult literacy and reading skills," *id.* § 9543(a)(1)(D); "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students," *id.* § 9543(a)(1)(E); and "longitudinal and special data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7). The BPS, HSLS, HS&B, and ECLS-K are not mentioned by name in Section 9543 or anywhere else in ESRA.

While Section 9543(a) assigns broad topics that NCES must cover, ESRA leaves it to IES to decide how the work required in Section 9543(a) gets done. Section 9512 ("Functions") makes this point: "From funds appropriated . . . the Institute, directly *or* through grants, contracts, or cooperative agreements, shall" carry out the functions listed in that section, including "conduct[ing] and support[ing] scientifically valid research activities" and "widely disseminat[ing] the findings and results" of that research. 20 U.S.C. § 9512(1)-(2) (emphasis added). IES thus may choose to keep the work in-house, which is what the statute means by "directly," or it may use "contracts" or the other listed means.

Similarly, Section 9544 of ESRA speaks in permissive terms as to NCES. The NCES Commissioner "may award grants, enter into contracts and cooperative agreements, and provide technical assistance." 20 U.S.C. § 9544(a). The NCES Commissioner "may use the statistical method known as sampling (including random sampling)" and "may, as appropriate, use information collected" from States, local educational agencies, and schools. *Id.* § 9544(b)(1), (2). Contracts awarded under that section "may be renewed at the discretion of the Statistics Commissioner[.]" *Id.* § 9544(c).

The choice of means belongs to the agency unless ESRA expressly provides otherwise. Section 9622(a) shows what an express command looks like: it names the National Assessment of Educational Progress and names its performance, requiring that it be carried out "through grants, contracts, or cooperative agreements with one or more qualified organizations," leaving no option to keep that work in-house. Congress wrote no comparable command for BPS:20/25, HSLS:09, HS&B:22, or ECLS-K:24. A statute that requires no specific study entitles no one to the data a specific study would have produced.

Plaintiffs close their organizational-standing argument with a different move. They cite *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), for the proposition that agencies must account for "serious reliance interests," and argue that because the standing analysis assumes they are correct on the merits, the studies "were not validly cancelled," and that "[u]ntil and unless IES made a legally valid decision to cancel the studies, it remained obliged to carry them out." Pls.' Mem. at 19. *Fox* is a merits decision about a policy change and contains no Article III holding and no discussion of informational injury. The assumption Plaintiffs invoke does not do the work they assign to it. A court evaluating standing assumes the merits of the plaintiff's legal claim, *see Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), but that assumption supplies the legal theory, not the injury. *TransUnion* requires concrete harm, proven with evidence of downstream consequences, 594 U.S. at 442, and assuming a violation cannot supply that proof. On Plaintiffs' approach, standing would collapse into the merits in every APA case: any plaintiff alleging unlawful agency action would have standing because, the merits assumed, the agency was "obliged" to act differently.

For their associational standing theory as to the four studies, Plaintiffs rely upon supporting declarations from members. An association has standing to sue on behalf of its membership only

when it shows that "(1) at least one of their members would have standing to sue in their own right, (2) the interests the members seek to protect are germane to their organizations' purposes, and (3) neither the claim asserted, nor the relief requested requires the members to participate individually in the lawsuit." *Healthy Gulf v. Dep't of the Interior*, 152 F.4th 180, 189 (D.C. Cir. 2025) (citations omitted). Standing is "not dispensed in gross," so Plaintiffs also need a member with standing for each separate claim and request for relief. *TransUnion*, 594 U.S. at 431. Their theory fails at the first *TransUnion* requirement: Plaintiffs' associational theory rests on member declarations, but none identifies a dataset that ESRA entitles its members to receive and which the Second Amended Complaint challenges. Without a statutory entitlement, no member has an informational injury of his or her own, and without a member injured in his or her own right, there is no associational standing.

Dr. Kevin Stange and Dr. Brent Evans, AEFP members, each aver that they have used data from earlier BPS cohorts in their research and that the BPS:20/25 termination, and for Dr. Evans the HSLS:09 and HS&B:22 terminations as well, impacts their planned work. Stange Decl. ¶¶ 1-2, ECF No. 35-5; Evans Decl. ¶¶ 1-2, ECF No. 35-4. Research built on prior cohorts' data shows the perceived value of those datasets, but it does not show a statute entitling any member to a 2020/25 cohort dataset. The member theories therefore fail at the same entitlement step. For HS&B:22, the analysis for Dr. Callahan applies equally to Dr. Evans, discussed later.

IHEP's standing for Count I of the Second Amended Complaint rests on the Second Declaration of Mary Voight, IHEP's President and Chief Executive Officer. She avers that IHEP staff rely on IES "data collections on a daily basis," that IHEP has used BPS data from prior cohorts to inform policy recommendations, and that IHEP planned to use BPS:20/25 data in future work, including analysis of changes to federal student aid programs. Voight Decl. ¶¶ 2-3, 6, ECF No.

35-6. That is another supposed informational injury, *see* Pls.' Mem. at 20-21, and it fails where every informational theory in this case fails: no statute names BPS or entitles anyone to a BPS:20/25 dataset. IHEP's reliance on data the Department previously chose to collect is not an entitlement to data from a particular future cohort, and planned future uses of a dataset no statute promised are not the "downstream consequences" *TransUnion* requires, 594 U.S. at 442.

**b. Plaintiffs Are Not Statutorily Entitled to Restricted-Use Data Licenses on Their Terms and Their Schedules.**

Section 9574 of ESRA, the "Availability of data" provision, does not mean that Plaintiffs are entitled to receive restricted-use data licenses on their terms and on their schedules. That provision is one sentence: "[s]ubject to section 9573 of this title, data collected by the Institute, including any office, board, committee, or center of the Institute, in carrying out the priorities and mission of the Institute, shall be made available to the public, including through use of the Internet." 20 U.S.C. § 9574. The duty is real, and Defendants do not deny it. But three features of that text defeat the entitlement Plaintiffs assert to receiving restricted-use data licenses on their terms and on their schedules. The duty opens with the words "[s]ubject to section 9573," ESRA's confidentiality provision, so the confidentiality regime sits inside the availability command itself. The duty reaches "data collected" and thus imposes no obligation to create data. It sets no deadline, no cycle, and no form beyond internet publication.

That structure decides the claims built on restricted-use data, which includes Counts VII and VIII. 2d Am. Compl. ¶¶ 98-106. Restricted-use data is, by definition, data that cannot simply be posted for the public: it contains individually identifiable information that Section 9573 protects, and access to it runs through a restricted-use data license, the authorization this Court previously recognized a researcher "must obtain" from the IES. Op'n at 4 (citing 20 U.S.C. § 9573(c)). A provision that conditions public availability on confidentiality protection, read

together with a provision that permits only supervised, Director-authorized access to protected data, gives no one an entitlement to a restricted-use data license at all, and therefore none on any particular terms or schedule.

Plaintiffs also invoke 20 U.S.C. § 9546(e)(2) to support their claim concerning the pause in processing restricted-use data license applications. *See* 2d Am. Compl. ¶ 102; Pls.' Mem. at 4. Their quotation of Section 9546(e)(2) omits the part that decides the question. That subsection provides, in full: "[t]he Statistics Center shall, in accordance with such terms and conditions as the Center may prescribe, provide all interested parties, including public and private agencies, parents, and other individuals, direct access, in the most appropriate form (including, where possible, electronically), to data collected by the Statistics Center for the purposes of research and acquiring statistical information." 20 U.S.C. § 9546(e)(2). Plaintiffs' summary judgment brief begins the quotation at "direct access," leaving out "in accordance with such terms and conditions as the Center may prescribe." *See* Pls.' Mem. at 4. The omitted part conditions the access duty on terms that NCES *may prescribe*. Two further qualifiers do the same work: access is due "in the most appropriate form," which commits form to the agency's judgment, and electronic access is required only "where possible." 20 U.S.C. § 9546(e)(2). The restricted-use data license regime is precisely the kind of terms and conditions the statute authorizes NCES to prescribe for data that Section 9573 protects. The rest of Section 9546 confirms the reading, with subsection (a)(1) providing that NCES "may" furnish copies, compilations, and surveys, and subsection (d) permitting NCES to make compilations and surveys under the section "subject to the payment of the actual or estimated cost of such work." A section that makes access subject to prescribed conditions, and that permits cost-based fees, is not a public-disclosure statute of the kind that supports an informational injury.

Section 9575 of ESRA also does not aid Plaintiffs, even though they attempt to frame it as an entitlement source for the four studies' data and Count VII's claim concerning restricted-use data application pause. *See* 2d Am. Compl. ¶ 101; Pls.' Mem. at 18 & 36. Section 9575 is titled "Performance management" and the duty runs to the IES Director, who "shall ensure that all activities conducted or supported by the Institute or a National Education Center make customer service a priority" through six listed methods. 20 U.S.C. § 9575. Plaintiffs quote three of the methods: disseminating information "in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public"; utilizing the most modern technology available "to ensure the efficient collection and timely distribution of information"; and "[m]aking information available to the public in an expeditious fashion." Pls.' Mem. at 18-19 (quoting 20 U.S.C. § 9575(2), (3), (6)). The duty Section 9575 imposes runs to the IES Director's management of the Institute's activities, through methods that include improving the Institute's own management practices. It commands the disclosure of no dataset, to no person, by no date. "Customer satisfaction" supplies no standard a court could administer. A management directive of that character does not confer on any researcher a judicially enforceable right to any dataset on any date.

**2. Plaintiffs Failed to Prove an Injury in Fact for the Peer-Review Claims (Counts V and VI).**

The peer-review provisions cited by Plaintiffs to support their associational standing theory, *see* Pls.' Mem. at 3, 10, 36-37, belong in a different category altogether. Sections 9520 and 9534(b)(1) of ESRA govern how the Institute evaluates applications for research grant funding and makes awards of grants and cooperative agreements. Neither section requires the disclosure of any information to anyone, so neither can support an informational injury. The peer-review

claim rests on different injury theories for different declarants, and none establishes an injury in fact at the summary judgment stage.

Dr. Matt Giani, a Research Associate Professor in the Department of Sociology at the University of Texas at Austin, served a five-year term on an IES peer-review panel that ended in February 2025. Giani Decl. ¶¶ 2, 6-7, ECF No. 47-3. He states that panel service is professionally valuable (describing it as "very helpful form of external validation for my application for promotion"), *id.* ¶ 11, that he would likely have applied to chair an IES peer-review panel, *id.* ¶ 10, and that being removed from the panel "harmed [his] ability to be promoted to full professor" at his university. *Id.* ¶ 11.

Plaintiffs invoke *Ranjan v. U.S. Dep't of Homeland Security*, 747 F. Supp. 3d 192, 199 (D.D.C. 2024), for the proposition that lost professional opportunities are concrete harms. Some are. But Plaintiffs' theory relies upon theory a chain of contingencies: IES resumes the program in its prior form, Dr. Giani resumes service, he applies to chair, he is selected, the service proves valuable, and his university (a third party not before this Court) promotes him. Article III does not permit standing built on a "highly attenuated chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), including when the final links depend on the independent decisions of actors not before the Court. *See Lujan*, 504 U.S. at 562.

Dr. Bassok, AEFP's President-Elect, applied for research grant funding to IES in September 2024, which the IES system listed as "pending" and "forwarded for peer review." Bassok Decl. ¶¶ 3, 15-17, ECF No. 35-2. At the pleading stage, the Court credited Dr. Bassok's lost opportunity to compete for possible grant funding. *See* Op'n at 15. At summary judgment, the theory requires proof of an opportunity that exists. The competition to which Dr. Bassok applied was closed without awards, and IES notified her of that disposition on March 18, 2026.

*See* Ricciuti Decl. ¶¶ 9-11. A lost opportunity to compete presupposes a competition, and whether to run one, and how to allocate appropriated funds among competitions, are judgments the statute leaves with the agency. *See Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993). An order restoring a review process would not reopen a closed competition and would not award any grant to Dr. Bassok.

**B. Plaintiffs Failed to Prove Traceability as to Each Claim and Request for Relief.**

Traceability, the second requirement for Article III standing, requires that each alleged injury be fairly traceable to the agency action the claim challenges, not to the independent decisions of third parties and not to actions no count challenges. *See Lujan*, 504 U.S. at 562. Three failures follow. Dr. Mumma's delay predates every challenged action, as set out below. Dr. Giani's promotion theory runs through his university's independent decisions. And the closure of the competition to which Dr. Bassok applied reflects allocation judgments committed to the agency, *see Lincoln*, 508 U.S. at 192-93, that no count of the Second Amended Complaint challenges.

Dr. Mumma stands on a different footing, and Defendants address her application on its own terms. She applied for a restricted-use data license in December 2024, before any agency action challenged in this case, and IES acknowledged the application in January 2025. Mumma Decl. ¶ 8, ECF No. 35-3. The delay she describes began before the challenged agency actions, so it does not trace to the February 2025 contract terminations or to the application pause that followed. Her application's present status is addressed with the restricted-use data license claims later on.

**C. Plaintiffs Have Not Proven Redressability as to Each Claim and Request for Relief.**

Plaintiffs' ask the Court to "enjoin Defendants to resume" each study and each function. 2d Am. Compl., Prayer (A)-(F). Their brief equates vacatur with that relief, arguing that vacatur

would "requir[e] Defendants to resume the interrupted studies and functions." Pls.' Mem. at 37. Their proposed order adds six separate commands that Defendants be "ORDERED to resume" each study and function. ECF No. 47-4. The proposed order proves what the brief obscures: vacatur does not compel resumption, which is why six affirmative commands were added to it. Vacatur "functions quite differently from an injunction" because it "simply holds unlawful and sets aside the action." *Mullin*, 174 F.4th at 119.

An order compelling resumption is an order compelling agency action, and the APA provision for that relief is 5 U.S.C. § 706(1). Plaintiffs know the provision. Count IX of the Second Amended Complaint expressly invoked Section 706(1) for IHEP's disclosure-review delay claim, and that count has been voluntarily dismissed. *See* Op'n at 6 n.3. Every surviving count invokes Section 706(2)(A) alone. Plaintiffs pleaded Section 706(1) where they meant to plead it (the dismissed Count IX), and they did not plead it for any claim now before the Court.

Even if they had, Section 706(1) reaches only "a discrete agency action that [the agency] is *required to take*." *SUWA*, 542 U.S. at 64 (emphasis in original). A statute that requires no specific study identifies no discrete, legally required act to compel. An order that the Department "resume" four studies and functions, and maintain them to Plaintiffs' satisfaction, would impermissibly compel "compliance with broad statutory mandates" and "inject[] the judge into day-to-day agency management." *SUWA*, 542 U.S. at 66-67.

Dr. Callahan's alleged injuries are also not redressable by the relief requested by Plaintiffs. She states that she would need restricted-use data from HS&B:22 for research on English Learner course-taking. Callahan Decl. ¶¶ 5-6, ECF No. 47-2. The follow-up data her research describes was never collected. Soldner Decl. ¶ 25. Data that does not exist cannot be the subject of a restricted-use data license. An order directing the processing of restricted-use data license

applications would give her nothing, and the additional relief she needs is relief that vacatur cannot supply, as explained later.

Dr. Matsudaira completed his application for a restricted-use data license on or about May 21, 2025, and received the pause notice on May 29, 2025. Matsudaira Decl. ¶¶ 8-10, ECF No. 35-7. His application, like all pending applications, has not been processed. Ricciuti Decl. ¶¶ 13-14. For him the entitlement question is the whole question: no statute sets a specific processing deadline or entitles an applicant to a restricted-use data license, and an order compelling processing is relief under 5 U.S.C. § 706(1), which no surviving count invokes.

**D. Defendants Preserve Their Tucker Act Position.**

Defendants preserve their position that the Tucker Act channels these claims to the Court of Federal Claims. Whether a claim is "at its essence" contractual turns on the source of the rights asserted and the type of relief sought. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106-07 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982)). The Court rejected that argument at the pleading stage, *see* Op'n at 17-18, and Defendants do not re-argue it at length here but incorporate their prior argument by reference. The summary judgment record supports the position. The actions Plaintiffs challenge are contract terminations and a pause in a contract-supported function, and the relief Plaintiffs seek, six orders that Defendants "resume" each study and function, ECF No. 47-4, would operate on those contracts even more directly than vacatur would.

## II. EVEN IF ANY PLAINTIFF HAD STANDING, THE APA CLAIMS FAIL.

### A. The APA Claims Are Barred By Threshold Matters.

#### 1. The Contract Decisions Are Committed to Agency Discretion By Law.

Standing is dispositive, but if the Court reaches the claims, Defendants are entitled to summary judgment on them. The contract decisions that Plaintiffs challenge are committed to agency discretion by law and are therefore unreviewable under the APA. 5 U.S.C. § 701(a)(2). The APA excludes from review "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Review is unavailable where a statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The allocation of funds among permissible activities is the paradigm: "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).

In *Lincoln v. Vigil,* the Supreme Court considered a challenge to an agency's decision to discontinue a program aiding "handicapped Indian children in the Southwest" in order to "reallocate the Program's resources to a nationwide effort to assist such children" through other means. *Id*. at 184. The plaintiffs brought suit arguing that the agency's decision to discontinue the program was arbitrary and capricious. The Supreme Court held that the agency's decision was "unreviewable under § 701(a)(2)." *Id.* at 193. The Court observed that the program was not required by statute, but rather had been funded from "annual lump-sum appropriations" to the agency. *Id.* at 187. The Court explained that the "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court thus

reasoned that "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, [the APA] gives the courts no leave to intrude." *Id.* at 193; *see also id.* at 192. The Court accordingly held that plaintiffs could not compel the agency to continue directing funds to their preferred program.

Applying this authority to the administrative record and ESRA's text, the challenged decisions fall within Section 701(a)(2) and cannot be challenged under the APA.[1].

Start with the statute. ESRA assigns the Department subjects to cover, but three features of the statute commit which studies to support, which contracts to use, and whether to renew them, to the agency. First, Section 9512 allows the agency to choose between performing work itself and contracting it out. *See* 20 U.S.C. § 9512. That provision supplies no standard for reviewing the decision to end one contract, because ending a contract is consistent with every option the statute leaves open to the agency, such as performing the work itself.

Second, the contracting authority for the statistics work is permissive throughout. The NCES Commissioner "may award grants, enter into contracts and cooperative agreements," 20 U.S.C. § 9544(a), "may" use sampling and State-reported records, *id.* § 9544(b), and contracts "may be renewed at the discretion of the Statistics Commissioner," *id.* § 9544(c). Congress did not merely fail to constrain renewal decisions; it expressly assigned them to the NCES Commissioner's discretion. *See Appalachian Power Co. v. E.P.A.*, 135 F.3d 791, 807 (D.C. Cir. 1998) ("when a statute uses the permissive 'may' rather than the mandatory 'shall,' [it] suggests that Congress intends to confer some discretion on the agency"). Compare this to Section 1622 of ESRA, which mandates that the NCES Commissioner "shall" carry out the NAEP

---

[1] The D.C. Circuit has observed that the "judicial review provisions of the APA, 5 U.S.C. §§ 701-706, provide a limited cause of action for parties adversely affected by agency action" but do not operate as a jurisdictional bar. *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009).

"through grants, contracts, or cooperative agreements with one or more qualified organizations, or consortia thereof," 20 U.S.C. 1622(a), and thus does not leave discretion to the NCES Commissioner to carry out NAEP through in-house or "direct" work. *Cf. Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 843 (D.C. Cir. 1984) (the use of different language in different parts of the same statute creates a strong inference that different meanings are intended).

Third, IES's undertakings are tied to "areas of demonstrated national need" and to the federal funds "appropriated to the Institute." 20 U.S.C. § 9511(b)(2). Determining which studies serve demonstrated national need, and how to allocate appropriated funds among them, are the agency judgments *Lincoln*, 508 U.S. at 192-93, holds unreviewable. Similarly, determining which contracts to use for those studies, whether to end one support contract and procure another, and whether to renew, 20 U.S.C. §§ 9512, 9544(a), (c), are choices ESRA commits to the agency, and the provisions Plaintiffs invoke supply no meaningful standard for judging them.

**2. The Application Pause for Restricted-Use Data Licenses Is Not Final Agency Action.**

Final agency action marks "the consummation of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations omitted). The May 2025 pause notice for restricted-use data license applications was an interim operational measure, not the consummation of any decisionmaking process about restricted-use access. The certified record contains no document adopting a policy against issuing restricted-use data licenses. What it contains is a sequence of contract actions through which the license-administration function has been maintained and re-procured: the support contract effective July 1, 2025, AR001020; its extension through June 30, 2026, AR001036; and the successor contract was awarded on August 6, 2026. Ricciuti Decl. ¶ 15.

An agency that contracts for the continuation of a function has not definitively decided to end it. No application has been denied, and pending applications remain in the queue. *See* Ricciuti Decl. ¶ 14. A pause of that character determines no rights and marks no final position, and the claims that rest on it are unreviewable under 5 U.S.C. § 704.

### B. The Termination of the Four Study-Support Contracts Was Not Arbitrary or Capricious (Counts I-IV).

Under Section 706(2)(A) of the APA, the question is whether the agency's decision was reasonable and reasonably explained on the record before it. *See supra* Standard of Review. The record shows the February 2025 terminations of the four study-support contracts, AR001345 (BPS:20/25); AR000083 (HSLS:09); AR000371 (HS&B:22); AR000574 (ECLS-K:24), and the actions that followed for each study. *See supra* Background.

Plaintiffs' arguments on the terminations of support contracts reduce to supposed unconsidered statutory factors, unconsidered reliance interests, and inadequate explanation. On the record, the termination notices issued on February 10, 2025, AR001345; AR000083; AR000371; AR000574, and the sequence that followed shows program-by-program judgment rather than indiscriminate abandonment. This includes settlement and delivery of the completed ECLS-K kindergarten files, reinstatement to finalize them, and re-procurement of the peer-review and license-administration functions. *See supra* Background.

### C. The Peer-Review Claims Fail on the Merits (Counts V and VI).

Count V asserts that the termination of a support contract for the peer-review of grant applications was contrary to law under 20 U.S.C. §§ 9520 and 9534(b)(1). *See* 2d Am. Compl. ¶¶ 91-97. Neither provision says what Plaintiffs need it to say. Section 9534(b)(1) provides that the IES Director "shall establish a peer review system, involving highly qualified individuals with an in-depth knowledge of the subject to be investigated, for reviewing and evaluating all

applications for grants and cooperative agreements that exceed $100,000, and for evaluating and assessing the products of research by all recipients of grants and cooperative agreements under this Act." 20 U.S.C. § 9534(b)(1). Plaintiffs' own Background section states the duty correctly: the statute "requires IES to establish a peer review system." Pls.' Mem. at 3. But their Argument section restates it as a duty "to conduct peer review to evaluate all applications for grants and cooperative agreements that exceed $100,000[.]" *Id.* at 36. The commanded act is establishing a system. The $100,000 clause defines the system's scope; it is not a per-application processing mandate, and the provision sets no timetable for any application. What was terminated in February 2025 was not the system but the logistics support contract for the peer-review process, and Section 9534(b)(1) does not require any particular support contract to exist.

Section 9520 of ESRA does not fill the gap. That section, titled "Competitive awards," provides that "[a]ctivities carried out under this Act through grants, contracts, or cooperative agreements, at a minimum, shall be awarded on a competitive basis and, when practicable, through a process of peer review." 20 U.S.C. § 9520. That is an award-process provision. It presupposes that awards of grants and cooperative agreements are being made and prescribes how they are made. It does not impose any duty to make any award or to process any application on any schedule. Its mandatory core is competition. Peer review is qualified by "when practicable," and practicability is a judgment the statute leaves with the agency. *See Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J., concurring in the judgment) (the term "practicable" confers "broad policy discretion" on an agency). A standard of that kind "fairly exudes deference" and supplies no meaningful standard for judicial review of the judgment it commits. *Cf. Webster v. Doe*, 486 U.S. 592, 600 (1988).

Count V's pleaded theory is also self-limiting. The claim is that the IES terminated the logistics support contract for the peer-review process "without instituting a replacement." 2d Am. Compl. ¶ 93. The record answers it: on May 7, 2026, the Institute solicited a successor support contract for the review function, AR001723-24, and during the interim IES conducted a smaller number of competitions with review organized in-house. *See* Ricciuti Decl. ¶¶ 4-6.

Count VI pleads that the termination of the logistics support contract for the peer-review process was arbitrary and capricious, *see* 2d Am. Compl. ¶¶ 91-97, but nothing in Plaintiffs' presentation identifies a factor the APA required the agency to weigh before replacing one support contract with another. The record shows the February 10, 2025 termination of that contract among the contract actions taken that day, AR001019, the interim in-house arrangements described above, and the May 7, 2026 solicitation. AR001723-24.

**D. The Restricted-Use Data License Claims Fail on the Merits (Counts VII and VIII).**

Count VII claims the pause in processing restricted-use data license applications is contrary to law under 20 U.S.C. § 9574, *see* 2d Am. Compl. ¶ 100, § 9575(2)-(3), *id.* ¶ 101, and § 9546(e)(2), *id.* ¶ 102. Plaintiffs' summary judgment brief builds the argument on Sections 9573, 9574, and 9575. *See* Pls.' Mem. at 36-36. As already discussed, Section 9574's availability duty is expressly "[s]ubject to section 9573"; Section 9546(e)(2) conditions access on "such terms and conditions as the Center may prescribe"; and Section 9575 is a management directive to the Director. None of those provisions set a deadline for processing applications for restricted-use data licenses, and none entitles an applicant to a license. A pause in accepting and processing new applications violates no command those provisions contain.

The record shows the function maintained and re-procured, not ended. The support contract for license administration took effect on July 1, 2025, *see* AR001020, and was extended

through June 30, 2026, *see* AR001036. A successor solicitation requires the contractor to accept and process new applications after July 1, 2026, and the successor contract was awarded on August 6, 2026. Ricciuti Decl. ¶ 15.

Count VIII pleads that the pause was arbitrary and capricious. Applicants were notified of the pause in April and May 2025. *See* Mumma Decl. ¶ 9, ECF No. 35-3; Matsudaira Decl. ¶ 9, ECF No. 35-7. No application has been denied, and pending applications remain in the queue. Ricciuti Decl. ¶ 14. An interim pause maintained alongside the continuous re-procurement of the function, with no application denied, is not arbitrary abandonment.

## CONCLUSION

Based on the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and dismiss this case for lack of subject matter jurisdiction or failure to state a cognizable claim.

Dated: August 11, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: /s/ Brett Covington

BRETT COVINGTON
D.C. Bar #1003835
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-0888
Brett.Covington@usdoj.gov

*Attorney for Defendants*