**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASSOCIATION FOR EDUCATION FINANCE AND POLICY, INC., and THE INSTITUTE FOR HIGHER EDUCATION POLICY,<br>*Plaintiffs*,<br>v.<br>LINDA MCMAHON, in her official capacity as Secretary of Education, and U.S. DEPARTMENT OF EDUCATION,<br>*Defendants*. | Civil Action No. 1:25-cv-999-TNM |

**COMBINED REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Adam R. Pulver (DC Bar No. 486293)
Cormac A. Early (DC Bar No. 1033835)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

*Attorneys for Plaintiffs*

September 1, 2026

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. Plaintiffs have standing for each of their claims. ........ 3

A. AEFP and IHEP have standing to challenge the study terminations. ........ 3

1. Plaintiffs and their members have suffered an injury-in-fact from the study cancellations. ........ 4

a. Plaintiffs have identified statutory disclosure obligations. ........ 5

b. Plaintiffs have shown harms resulting from the loss of information. ........ 7

2. Plaintiffs and their members' injuries from the study cancellations are redressable. ........ 8

B. AEFP has standing to challenge the termination of the peer review program. ........ 11

C. AEFP has standing to challenge the halt of restricted-use data application processing. ........ 14

1. The halt of the processing of restricted-use data license applications caused injury to AEFP members. ........ 14

2. AEFP members' injuries are redressable by vacatur of the halt in processing of restricted-use data license applications. ........ 17

II. The Tucker Act does not eliminate this Court's jurisdiction. ........ 18

III. The Department has not met its burden to show that any challenged action is committed to agency discretion. ........ 19

IV. The study terminations were arbitrary and capricious. ........ 25

V. The termination of the peer review system was contrary to statute and arbitrary and capricious. ........ 27

VI. The Department's halt of restricted-use data license application processing was a final agency action, was contrary to statute, and was arbitrary and capricious. ........ 30

A. The Department's "pause" is a reviewable final agency action. ........ 31

B. The Department's "pause" violates ESRA. ........ 33

C. The Department's "pause" was arbitrary and capricious. ........ 35

VII. Vacatur is the proper remedy. ........ 36

CONCLUSION ........ 36

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Action on Smoking & Health v. Civil Aeronautics Board*,
713 F.2d 795 (D.C. Cir. 1983) ........ 9

*Advanced Energy United v. Federal Energy Regulatory Commission*,
__ F.4th __, No. 23-1282, 2026 WL 2211250 (D.C. Cir. July 31, 2026) ........ 27

*Alliance to Save the Mattaponi v. United States Army Corps of Engineers*,
515 F. Supp. 2d 1 (D.D.C. 2007) ........ 10

*American Legion v. Derwinski*,
54 F.3d 789 (D.C. Cir. 1995) ........ 21

*American Wildlands v. Kempthorne*,
530 F.3d 991 (D.C. Cir. 2008) ........ 27

*Ass'n of Flight Attendants–CWA v. United States Department of Transportation*,
564 F.3d 462 (D.C. Cir. 2009) ........ 3

*Autor v. Blank*,
892 F. Supp. 2d 264 (D.D.C. 2012) ........ 12

*Biden v. Texas*,
597 U.S. 785 (2022) ........ 8

*Bowman Transportation, Inc. v. Arkansas-Best Freight System*,
419 U.S. 281 (1974) ........ 26

* *Campaign for Accountability v. United States Department of Justice*,
155 F.4th 724 (D.C. Cir. 2025) ........ 5, 8

*Campaign Legal Center v. Federal Election Commission*,
31 F.4th 781 (D.C. Cir. 2022) ........ 5

*Campaign Legal Center v. Federal Election Commission*,
952 F.3d 352 (D.C. Cir. 2020) ........ 19

*Capital Area Immigrants' Rights Coalition v. U.S. Department of Justice*,
264 F. Supp. 2d 14 (D.D.C. 2003) ........ 20

* *Center for Biological Diversity v. United States International Development Finance Corp.*,
77 F.4th 679 (D.C. Cir. 2023) ........ 4, 5, 7

*Center for Biological Diversity v. Environmental Protection Agency*,
56 F.4th 55 (D.C. Cir. 2022) ........ 4

*Chef Time 1520 LLC v. Small Business Association*,
646 F. Supp. 3d 101 (D.D.C. 2022) ........ 36

*Church of Scientology of California v. United State*s,
506 U.S. 9 (1992) ........ 11, 18

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........ 19

*City of Dania Beach v. Federal Aviation Administration*,
628 F.3d 581 (D.C. Cir. 2010) ........ 26

*City of Kansas City v. Department of Housing & Urban Development*,
923 F.2d 188 (D.C. Cir. 1991) ........ 28

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) ........ 12

*Cody v. Cox*,
509 F.3d 606 (D.C. Cir. 2007) ........ 19

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) ........ 9

*Davis v. Federal Election Commission*,
554 U.S. 724 (2008) ........ 3

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ........ 20

* *Department of Homeland Security v. Regents of the University of California*,
591 U.S. 1 (2020) ........ 9

*District Hospital Partners v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) ........ 27

* *Duberry v. District of Columbia*,
924 F.3d 570 (D.C. Cir. 2019) ........ 8, 9, 10, 14, 17, 18

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ........ 26, 27

* *Environmental Integrity Project v. McCarthy*,
139 F. Supp. 3d 25 (D.D.C. 2015) ........................................................................ 7

* *Erwin v. Federal Aviation Administration*,
21 F.4th 154 (D.C. Cir. 2021) ........................................................................ 9, 11

*Federal Communications Commission v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................................ 29

*Federal Election Commission v. Akins*,
524 U.S. 11 (1998) ........................................................................ 10

*Fowler v. Benson*,
924 F.3d 247 (6th Cir. 2019) ........................................................................ 18

*Grace v. Whitaker*,
344 F. Supp. 3d 96 (D.D.C. 2018) ........................................................................ 26

*Hennepin County v. United States Department of Health & Human Services*,
No. 1:26-cv-02460-CRC, 2026 WL 2426300 (D.D.C. Aug. 19, 2026) ........................... 19

*Huddy v. Federal Communications Commission*,
236 F.3d 720 (D.C. Cir. 2001) ........................................................................ 17

*Hospital Menonita De Guayama, Inc. v. National Labor Relations Board*,
__ F.4th __, No. 22-1163, 2026 WL 2093902 (D.C. Cir. July 21, 2026) ......................... 34

* *Independent U.S. Tanker Owners Committee v. Dole*,
809 F.2d 847 (D.C. Cir. 1987) ........................................................................ 9

*Larson v. Valente*,
456 U.S. 228 (1982) ........................................................................ 9

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................................ 19, 20

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ........................................................................ 29, 34

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) ........................................................................ 32

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................ 3

*Megapulse, Inc. v. Lewis*,
672 F.3d 959 (D.C. Cir. 1982) ........ 18

*Moini v. Wrighton*,
602 F. Supp. 3d 162 (D.D.C. 2022) ........ 13

* *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) ........ 26, 35

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024) ........ 12

*National Council of Nonprofits v. Office of Management & Budget*,
763 F. Supp. 3d 36 (D.D.C. 2025) ........ 31

*National Security Archive v. Central Intelligence Agency*,
104 F.4th 267 (D.C. Cir. 2024) ........ 16

* *Natural Resources Defense Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ........ 31, 32

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) ........ 5

*Physicians for Social Responsibility v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) ........ 21

*Physicians for Social Responsibility v. Wheeler*,
359 F. Supp. 3d 27 (D.D.C. 2019) ........ 12

*Public Citizen v. Federal Motor Carrier Safety Administration*,
374 F.3d 1209 (D.C. Cir. 2004) ........ 29

*Public Citizen v. United States Department of Justice*,
491 U.S. 440 (1989) ........ 16

*Public Citizen, Inc. v. National Highway Traffic Safety Administration*,
489 F.3d 1279 (D.C. Cir. 2007) ........ 17

* *Public Citizen Health Research Group v. Acosta*,
363 F. Supp. 3d 1 (D.D.C. 2018) ........ 7, 22, 25

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985) ........ 24

*Salazar v. King*,
822 F.3d 61 (2d Cir. 2016)....................32

*Secretary of Labor v. Twentymile Coal Co.*,
456 F.3d 151 (D.C. Cir. 2006)....................19

* *Shawnee Tribe v Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021)....................19, 20

*Sierra Club v. Jackson*,
648 F.3d 848 (D.C. Cir. 2011)....................19

*Sierra Club v. United States Department of the Interior*,
899 F.3d 260 (4th Cir. 2018)....................9

*Sisseton Wahpeton Oyate of the Lake Traverse Reservation v. Jewell*,
130 F. Supp. 3d 391 (D.D.C. 2015)....................10

*Texas v. United States*,
524 F. Supp. 3d 598 (S.D. Tex. 2021)....................33, 36

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................5, 8

*United Student Aid Funds, Inc. v. DeVos*,
237 F. Supp. 3d 1 (D.D.C. 2017)....................26

* *Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021)....................11, 17

* *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977)....................10, 14, 18

*Western Coal Traffic League v. Surface Transportation Board*,
216 F.3d 1168 (D.C. Cir. 2000)....................21

**Statutes**

5 U.S.C. § 552(a)(3)....................16

5 U.S.C. § 552a....................33

5 U.S.C. § 701(a)(2)....................19

20 U.S.C. § 1232g....................33

20 U.S.C. § 1232h .......... 33

Education Sciences Reform Act:

20 U.S.C. § 9520 .......... 27, 29

20 U.S.C. § 9534(b)(1) .......... 23, 24, 27, 28, 29

20 U.S.C. § 9541(b) .......... 22, 36

20 U.S.C. § 9543(a)(1) .......... 6, 22

20 U.S.C. § 9543(a)(7) .......... 6

20 U.S.C. § 9546(e) .......... 24, 34

20 U.S.C. § 9546(e)(2) .......... 24

20 U.S.C. § 9573 .......... 15, 24, 33

20 U.S.C. § 9573(a) .......... 33

20 U.S.C. § 9574 .......... 15, 24, 33, 34

20 U.S.C. § 9575 .......... 16, 24, 35

**Other Authorities**

Institute of Education Sciences, *Celebrating the ECLS-K:2024: Providing Key National Data on Our Country's Youngest Learners*, Mar. 11, 2024 .......... 23, 25

National Center for Education Statistics, *2020/25 Beginning Postsecondary Students (BPS:20/25) Full-Scale Study*, Supporting Statement Part A, OMB #1850-0631 v.21, Oct. 2024 .......... 23, 25

National Center for Education Statistics, *About HS&B:22* .......... 25–26

National Center for Education Statistics, *High School Longitudinal Study of 2009 (HSLS:09) - Third Follow-Up*, Supporting Statement Part A, OMB #1850-0852 v.30, Dec. 2024 .......... 23, 26

National Center for Education Statistics, *Restricted-Use Data Procedures Manual* .......... 34

National Center for Education Statistics, Statistical Standards Program, *Confidentiality Procedures* .......... 33

University of Texas at Austin, *General Guidelines for Promotion and Tenure Review of Tenured and Tenure-Track Faculty* .................................................................... 13

## INTRODUCTION

In enacting the Education Sciences Reform Act of 2002 (ESRA), Congress mandated that, through the Institute of Education Sciences (IES), the Department of Education conduct studies on certain topics, establish a peer review program to be used in awarding grants, and make all data that it collects—including confidential data—available to researchers. Plaintiffs Association for Education Finance and Policy (AEFP) and the Institute for Higher Education Policy (IHEP) are organizations who, themselves and via AEFP's members, rely on IES's studies and access to the data that the studies produce. AEFP members also participate in the peer review program. Plaintiffs brought this case alleging, as now confirmed by the record, that Defendants Secretary of Education Linda McMahon and the Department of Education (collectively, the Department) terminated four studies IES had conducted in furtherance of its statutory mandate—the resulting data from which researchers like IHEP, AEFP, and AEFP members would have been statutorily entitled to access and were relying upon for their work. Plaintiffs alleged, and the record now confirms, that the Department dismantled IES's peer review program, depriving AEFP members of the professional opportunities associated with participating in that program. And they alleged, and the record confirms, that the Department instituted a halt to processing new and pending restricted-use data license applications, making it impossible for AEFP members (or anyone else) to obtain access to confidential data they rely on for their work.

The Department makes little attempt to show that these actions, taken in February and March 2025, were the products of reasoned decisionmaking or otherwise complied with relevant statutory provisions. Rather, it launches a hodgepodge of largely cursory attacks on Plaintiffs' standing, some duplicative of arguments rejected by this Court in denying the Department's motion to dismiss. Among those attacks are an attempt at rewriting the D.C. Circuit's longstanding (and recently reaffirmed) standard for informational standing, arguments about causation that are

belied by the record, and a redressability argument that ignores the well-established meaning of vacatur and would, contrary to a wealth of precedent, make it impossible for any plaintiff to ever challenge an agency's decision to halt a program under section 706(2) of the Administrative Procedure Act (APA). The Court should reject those threshold arguments.

As to the merits, the Department recycles arguments about reviewability and final agency action that the Court also previously rejected as a legal matter. The Department's cursory responses to Plaintiffs' claims that the decisions to terminate all four of the agency's longitudinal studies, end the peer review program, and indefinitely halt the processing of restricted-use data license applications were arbitrary and capricious amount to little more than the agency's insistence that they were not, without pointing to anything in the record that would allow the Court to conclude those actions were the product of reasoned decisionmaking. As to AEFP's statutory claims, the Department relies on tortured readings of statutory language, suggesting that provisions that on their face impose mandatory duties do not require the Department to do anything. For the peer review and restricted-use data claims, the Department points to actions taken in summer 2026 as evidence that its February and March 2025 actions were lawful. But those actions are not before the Court, and they cannot in any event show that the hastily made February and March 2025 actions were the products of reasoned decisionmaking or consistent with the pertinent statutes. ESRA requires the Department to have a peer review program and means for researchers to access confidential data in place; that the Department in summer 2026 is looking into restarting peer review and access to restricted-use data does not show that its February and March 2025 actions did not violate the law.

As explained below and in Plaintiffs' motion for summary judgment, Plaintiffs are entitled to summary judgment on each of their claims and vacatur of the challenged actions.

## ARGUMENT

### I. Plaintiffs have standing for each of their claims.

"The 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." *Ass'n of Flight Attendants–CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In their memorandum, Defendants broadly attack each of these requirements. Defs. Mem., ECF 54-1 at 12–24. But just as a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Davis v. FEC*, 554 U.S. 724, 734 (2008), attacks on the elements of standing must be considered on a claim-by-claim basis. As explained in their opening memorandum and further below, Plaintiffs have organizational and associational standing for their study termination claims, and Plaintiff AEFP has associational standing for the peer review and restricted-use data license application processing claims. Defendants' contrary arguments lack merit.

#### A. AEFP and IHEP have standing to challenge the study terminations.

Plaintiffs challenge the terminations of four separate longitudinal studies: the 2020/25 Beginning Postsecondary Students Longitudinal Study (BPS:20/25), the High School Longitudinal Study (HSLS:09), the High School and Beyond Longitudinal Study of 2022 (HS&B:22), and the Early Childhood Longitudinal Study-Kindergarten: 2024 (ECLS-K:24). As of March 2025, these studies were no longer "actively supported" by IES. AR001045; *see also* AR001061 (stating that "Prior to March 2025, IES ran four longitudinal studies"—the four at issue here). As explained in their opening memorandum, IHEP and AEFP were relying on the BPS:20/25 and ECLS-K:24 studies, respectively, to do their work and have standing to challenge the termination of those studies on a theory of organizational standing. *See* Pls. Mem., ECF 47-1 at 25–29; *see also* MTD Op., ECF 38 at 9–13 (finding IHEP and AEFP had organizational standing to challenge study

terminations). In addition, identified AEFP members rely on the information produced by all four studies in doing their work, supporting an associational theory of standing. *See* Pls. Mem., ECF 47-1 at 22–25.[1]

In arguing otherwise, the Department does not dispute that Plaintiffs and/or their members rely on the four challenged studies in their work, and it does not engage with their showing of the harm resulting from the loss of data. Rather, it argues that (1) there can be no informational standing unless a statute confers a right to a particular dataset by name, and (2) Plaintiffs' injuries are not redressable by the requested relief. Both arguments fail.

**1. Plaintiffs and their members have suffered an injury-in-fact from the study cancellations.**

As Plaintiffs' opening memorandum demonstrates, the Department's abrupt cancellation of all four longitudinal studies injured each Plaintiff in its own right and injured AEFP's members by causing an informational injury. A plaintiff suffers an informational injury when "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023); *see also* MTD Op., ECF 38 at 9–13 (applying this standard). Plaintiffs and AEFP's members have suffered that kind of injury: Because the Department canceled the four studies, Plaintiffs and AEFP's members are being deprived of

[1] A membership organization may assert associational standing if "(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation." *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022). In disputing Plaintiffs' associational standing, Defendants address only the first requirement. Defs. Mem., ECF 54-1 at 21. The latter two requirements are satisfied for the reasons stated in Plaintiffs' memorandum in support of their motion for summary judgment. *See* Pls. Mem., ECF 47-1 at 31–32; *see also* MTD Op., ECF 38 at 14 (discussing germaneness and participation requirements).

information that, on their interpretation of ESRA, they are entitled to, and Congress clearly contemplated that researchers like them would have access to that information in enacting the information dissemination provisions of ESRA. The deprivation of access to the information from the canceled studies that they should have been able to obtain has impaired Plaintiffs' and their members' organizational and professional activities. *See generally* Pls. Mem., ECF 47-1 at 25–32.

Ignoring the standard and cases that Plaintiffs cite, and that this Court applied in its earlier opinion, ECF 38 at 9, the Department proposes a different framework, based on their interpretation of *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). But the test identified by Plaintiffs remains the one that governs in the D.C. Circuit. *See Campaign for Accountability v. U.S. Dep't of Justice*, 155 F.4th 724, 734–35 (D.C. Cir. 2025) (applying two-prong test post *TransUnion*); *Ctr. for Biological Diversity*, 77 F.4th at 685 (same); *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 789 (D.C. Cir. 2022) (same). Under that test, Plaintiffs have met their burden.

**a. Plaintiffs have identified statutory disclosure obligations.**

For purposes of standing, the Court assumes that Plaintiffs are correct on the merits of their legal position. *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007). Thus, Plaintiffs need only identify a statute that, "on [their] interpretation," provides a right to information. *See Ctr. for Biological Diversity*, 77 F.4th at 685. Indeed, the Department concedes that "the plaintiffs' reading of a statute" need only be "plausible." *Id.* at 18. As explained in Plaintiffs' opening memorandum, Pls. Mem., ECF 47-1 at 18–19, 22, and as the Court concluded in denying the Department's motion to dismiss, MTD Op., ECF 38 at 9–10, Plaintiffs have identified such a statute. On their view, ESRA requires IES to conduct longitudinal studies and studies on particular topics, and to make the data from those studies available to Plaintiffs.

Arguing otherwise, the Department notes that "ESRA does not mention by name any of the four studies" and does not require any "specific study" to be undertaken. Defs. Mem., ECF 54-

1 at 14, 16. But the statute *does* require IES "to collect, report, analyze, and disseminate statistical data" on specified topics and to conduct longitudinal studies. 20 U.S.C. § 9543(a)(1), (7). And the record indicates that the Department itself treated each of the four studies as its sole means of complying with those statutory mandates. *See*, *e.g.*, AR000267 (identifying HS&B:22 as Department's means of "compliance with the mandate stated in" 20 U.S.C. § 9543(a)(1)); AR000592 (exploring possibility of reinstating ECLS-K:2024 "to meet the minimum statutory requirement"); AR000786 (stating that all tasks in contract that included BPS:20/24 "were necessary for the efficient implementation and fulfillment of NCES's statutory requirements"); AR001044 (acknowledging that the terminated studies reflected how IES "chose[] to operationalize flexible and often nondescript 'shall' statements in ESRA or other legislation"). That the Department itself referred to these studies as statutorily mandated shows that Plaintiffs' view is "plausible."

Moreover, there is no dispute—legally or factually—that, had the Department not canceled the studies, those studies would have produced information that Plaintiffs and AEFP members would have been legally entitled to access. The deprivation of information that, but for the challenged agency action, Plaintiffs would have been able to access, has caused an injury cognizable under Article III. Recognizing as much, courts have found plaintiffs to have informational standing to challenge an agency's decision to cease an information collection where a statute grants them a right to access any information the agency collects, even if there is no statute that requires the information to be collected in a specific form.

For example, in *Environmental Integrity Project v. McCarthy*, 139 F. Supp. 3d 25 (D.D.C. 2015), the plaintiffs challenged the EPA's decision to withdraw an information collection rule that would have implemented a broader statutory information-gathering mandate. *Id*. at 36. Although

the rule's specific information collection mechanism was not mentioned in the statute, the court found the plaintiffs had informational standing based on a statutory provision that, like the provisions of ESRA, required any information that the agency does collect be made available to the public. *Id.* The court explained that, "[i]f Plaintiffs are correct and any final action on the EPA's proposed rule consistent with the APA would have required the EPA to obtain the CAFO information that Plaintiffs seek, Plaintiffs—and their individual members—would be legally entitled to that information." *Id.* at 37. So too here: If Plaintiffs are correct that action consistent with the APA would have required the Department to continue each of the four longitudinal studies, Plaintiffs and AEFP members would be legally entitled to that information. *See also Public Citizen Health Research Group v. Acosta*, 363 F. Supp. 3d 1, 12–15 (D.D.C. 2018) (holding plaintiffs had informational standing to challenge suspension of data collection requirement not specified in statute, on theory that they would have been able to access any records collected via FOIA).

**b. Plaintiffs have shown harms resulting from the loss of information.**

The Department does not directly engage with the second prong of the informational injury test—which requires plaintiffs to show that they have suffered, "by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Ctr for Biological Diversity*, 77 F.4th at 686. It does make a somewhat confusing argument about the showing Plaintiffs made, suggesting that they are attempting to rely on an "assumption" of a statutory violation as their proof of injury. Defs. Mem., ECF 54-1 at 20. But Plaintiffs have never argued that they were injured merely by the fact that the Department violated ESRA or that the deprivation of information itself constituted the injury. Plaintiffs have been injured by the undisputed concrete harms to their research and advocacy activities detailed at length in Plaintiffs' opening brief and declarations. *See* Pls. Mem., ECF 47-1 at 20–24; *see also* MTD Op., ECF 38 at

12 (finding harms identified by AEFP and IHEP satisfied standard). The Department does not dispute (nor could it) either that these harms are real or that they are the types of harm Congress sought to prevent by requiring disclosure of IES data.

To the extent the Department relies on *TransUnion*'s reference to the plaintiffs' failure there to identify "downstream consequences," ECF 54-1 at 18 (quoting 594 U.S. at 441–42), the D.C. Circuit has explicitly declined to read *TransUnion* as requiring a plaintiff alleging informational injury to "identify a 'downstream' or 'adverse' effect" apart from the denial of information itself. *Campaign for Accountability*, 155 F.4th 724, 734–35 (D.C. Cir. 2025). Even so, Plaintiffs here would meet the Department's preferred standard, based on their detailed explanations as to how the challenged deprivations of information impede their work and the work of AEFP members, as discussed at length in their opening memorandum. *See* Pls. Mem., ECF 47-1 at 27–28 (explaining how cancellation of BPS:20/25 has impacted IHEP's work and how cancellation of ECLS-K:2024 has impacted AEFP's work); *id.* at 29–31 (explaining how cancellation of BPS:20/25, ECLS-K:2024, HSLS:09, and HS&B:22 have impacted AEFP members' work).

**2. Plaintiffs and their members' injuries from the study cancellations are redressable.**

"Redressability requires a litigant to demonstrate a likelihood that the requested relief will redress the alleged injury." *Duberry v. District of Columbia*, 924 F.3d 570, 581 (D.C. Cir. 2019) (citation and marks omitted). In analyzing redressability, courts assume that the relief sought by the plaintiff is available. *See Biden v. Texas*, 597 U.S. 785, 801 (2022) ("[T]he question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims."). To meet the redressability requirement, a plaintiff "need not prove that granting the requested relief is certain to redress his

injury, especially where some uncertainty is inevitable." *Erwin v. FAA*, 21 F.4th 154, 160 (D.C. Cir. 2021) (cleaned up). To the contrary, "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018) (citing *Larson v. Valente*, 456 U.S. 228, 242–43 (1982)) (cited in *Duberry*, 924 F.3d at 583).

The Department's primary argument about redressability as to the study-termination claims is one it levies broadly as to all of Plaintiffs' claims: that vacatur is the only relief available under section 706(2) of the APA, and that vacatur would not redress Plaintiffs' injuries. But vacatur here would have real impact. Vacatur of an action deprives that action of any prospective effect and leaves "conditions returned to the *status quo ante,* before the [unlawful action] took effect." *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829–30 (2024) (Kavanaugh, J., concurring) (discussing meaning of "set aside" in section 706(2)); *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795 (D.C. Cir. 1983) (defining "vacate" as "to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside" (quoting 91 C.J.S. Vacate (1955)). Thus, where the action being vacated is an agency's cessation of something, vacatur *does* compel resumption. For example, in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), the Supreme Court affirmed the vacatur of the rescission of "an immigration program known as Deferred Action for Childhood Arrivals, or DACA." 591 U.S. at 7. Vacating that rescission compelled the resumption of the DACA program. To be sure, vacatur did not, as a permanent injunction might, bar DHS from taking *new* agency action to end the DACA program, but it restored the program. So too here, the effect of vacating the terminations of each of the four studies

at issue would be to restore those studies. *See FEC v. Akins*, 524 U.S. 11, 25 (1998) (holding that the fact that, on remand, agency "might reach the same result exercising its discretionary powers lawfully" did not defeat redressability). As the Court recognized in denying the Department's motion to dismiss, Plaintiffs are not asking the Court to order the restoration of any particular contract, and there are several ways the Department could resume each study. *See* MTD Op., ECF 38 at 18. But the complete cancellation of each of the four studies is "an absolute barrier" to Plaintiffs' ability to access the data they seek. *Duberry*, 924 F.3d at 583 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)). Plaintiffs therefore "have standing to seek to remove," i.e., vacate, "this barrier." *Id.*[2]

In the introduction section of its memorandum, Defendants briefly allude to other redressability arguments that do not otherwise appear in its memorandum. First, they state that, "[f]or the studies whose collection waves did not take place, no order can collect data retroactively." Defs.' Mem., ECF 54-1 at 7–8. But neither the administrative record nor any of the declarations submitted by the Department along with its memorandum indicate that it would be impossible to resume any of the four studies; counsel's assertion is not evidence. And even if the studies could not be restored to the exact state they were in at the time of cancellation, some data collection, analysis, and processing could certainly occur. For example, part of BPS:20/25 was the collection of certain administrative data retained by higher education institutions—like student transcript records, and federal financial aid records held by the Department itself. *See* AR001193,

[2] That relief under section 706(2) can require an agency to do something is also clear from the fact that plaintiffs can bring section 706(2) claims based on agencies' inaction. *See Sisseton Wahpeton Oyate of the Lake Traverse Reserv. v. Jewell*, 130 F. Supp. 3d 391, 396 (D.D.C. 2015); *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 10 (D.D.C. 2007). Under the Department's theory that relief in a section 706(2) could never redress an injury based on an agency's failure to do something, no plaintiff would ever have standing to bring such a claim.

AR001196. There is no barrier to "retroactively" collecting and analyzing this data, which remains retained by those institutions and the Department. The collection and analysis of this data alone would be of value to Plaintiffs and AEFP's members, and "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (quoting *Church of Scientology of Cal. v. United State*s, 506 U.S. 9, 13 (1992)).

Second, the Department states that, "[f]or the programs that continue, the alleged injury is dissatisfaction with the scope and pace of operations, which vacatur also does not remedy." Defs.' Mem., ECF 54-1 at 7–8. It is unclear to which programs the Department is referring, but Plaintiffs do not claim to have suffered any injury from "dissatisfaction with the scope and pace of operations" of any study, but rather from the Department's decision that the studies would no longer continue or, as one IES official put it, would no longer be "actively support[ed]." AR001045. As discussed above, vacatur of the decision to terminate these studies would redress Plaintiffs' injuries, at least in part. No more is required to show redressability. *See Erwin*, 21 F.4th at 160.

**B. AEFP has standing to challenge the termination of the peer review program.**

As explained in the memorandum in support of Plaintiffs' motion for summary judgment, AEFP grounds its associational standing to challenge the termination of the peer review program on the standing of member Matt Giani. *See* Pls. Mem., ECF 47-1 at 32–33.[3] Professor Giani had been serving as a peer review panel member at the time the Department terminated the peer review program, and his service was terminated as a result. *See* Giani Decl., ECF 47-3 ¶¶ 7, 10. The

[3] While the Department is correct that Plaintiffs relied on injuries to Dr. Daphna Bassok to show standing at the motion to dismiss stage, ECF 54-1 at 25, they no longer do so. Plaintiffs therefore do not address the Department's arguments about Dr. Bassok's standing. *See id.* at 25–26.

Department argues that Professor Giani fails to satisfy each of the three elements of standing.[4] But that argument largely rests on a misunderstanding of Professor Giani's injury: he alleges that, as a result of a termination of the peer review program, he has been deprived of meaningful professional opportunities—a deprivation that itself constitutes an injury-in-fact. That injury was caused by the Department and can be redressed.

Professor Giani has explained that his termination as a peer reviewer has deprived him of a valuable experience and credential that would have been useful to him in seeking promotion. *Id.* ¶ 11. Arguing that this harm is not an injury-in-fact, the Department stated the truism that "Article III does not permit standing built on a 'highly attenuated chain of possibilities.'" Defs. Mem., ECF 54-1 at 21 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). No such chain exists here. It is certain that Professor Giani was deprived of a professional opportunity: the opportunity to serve on a peer review panel. Numerous cases reflect that such a deprivation is a cognizable harm. *See, e.g.*, *Physicians for Soc. Resp. v. Wheeler*, 359 F. Supp. 3d 27, 36 (D.D.C. 2019), *rev'd on other grounds*, 956 F.3d 634 (D.C. Cir. 2020) (holding that the plaintiffs had alleged injury-in-fact based on removal from an advisory board based on lost "recognition and even prestige"); *Autor v. Blank*, 892 F. Supp. 2d 264, 273 (D.D.C. 2012), *rev'd on other grounds sub nom. Autor v. Pritzker*, 740 F.3d 176 (D.C. Cir. 2014) (finding that loss of "professional satisfaction," "valuable expertise," "enjoyable experience," "valuable experience and education," "professional contacts," and "the satisfaction of making a contribution" constituted injury-in-fact); *cf. Muldrow v. City of St. Louis*, 601 U.S. 346, 365 (2024) (Kavanaugh, J., concurring) (recognizing that actionable harm under Title VII may include harm to "career prospects, … professional

[4] The Department does not argue that AEFP fails to satisfy the germaneness and individual-participation elements of associational standing.

relationships, [and] networking opportunities"). To recognize that such professional opportunities have real value, including a value in in the tenure and promotion process, does not require the sort of rank speculation in which the *Clapper* Court refused to indulge. *See*, *e.g.*, *Moini v. Wrighton*, 602 F. Supp. 3d 162, 182 (D.D.C. 2022), *aff'd sub nom. Moini v. Granberg*, No. 22-7101, 2024 WL 2106214 (D.C. Cir. May 1, 2024) (noting that the university evaluated tenure applications based on "scholarship, teaching, and engagement in service"); *see* Univ. of Tex. at Austin, *General Guidelines for Promotion and Tenure Review of Tenured and Tenure-Track Faculty* at 7, available at https://provost.utexas.edu/the-office/faculty-affairs/promotion-tenure/2025-26-promotion-tenure/ (noting that each candidate's contributions are evaluated in four areas, including "professional public service to the nation, state, and society").

As for causation, the Department does not dispute that termination of the peer review program caused Dr. Giani's inability to serve as a peer reviewer. Nonetheless disputing causation, it states, "Dr. Giani's promotion theory runs through his university's independent decisions." Defs.' Mem., ECF 54-1 at 26. This assertion mischaracterizes the nature of Dr. Giani's injury. Dr. Giani's injury is the loss of a professional development opportunity—which has value because, among other things, it is a factor in promotion decisions. It is the Department, not a third party, that caused this injury in terminating the peer review program, making it impossible for Dr. Giani to continue to serve as a peer reviewer, and depriving him of the valuable professional development opportunity.

Finally, the Department makes no argument about redressability specific to the peer review claims beyond its general argument that vacatur of the agency's termination of its activities will not result in the resumption of those activities. As explained above in the context of the terminated study claims, *supra* pp. 9–10, vacatur of the agency's termination of the peer review program

would restore the status quo—under which the peer review program was operational. The cessation of the peer review program is "an absolute barrier" to Professor Giani's ability to serve as a peer reviewer. *Duberry*, 924 F.3d at 583 (quoting *Arlington Heights*, 429 U.S. at 261). He thus has "standing to seek to remove this barrier." *Id.*

### C. AEFP has standing to challenge the halt of restricted-use data application processing.

Plaintiffs have identified three AEFP members who have been unable to access restricted-use data as a result of the challenged halt in processing restricted-use data license applications. Professors Jordan Matsudaira and Kirsten Slungaard Mumma both submitted applications that were pending as of the halt, and Professor Rebecca Callahan was (and remains) unable to submit an application once the Department stopped accepting them. *See* Matsudaira Decl., ECF 35-7 ¶ 8; Mumma Decl., ECF 35-3 ¶ 8; Callahan Decl., ECF 47-2 ¶¶ 8–9; *see also* Ricciuti Decl., ECF 54-3 ¶ 14. Although the Department does not suggest there is any way for these members to obtain the data they seek, it argues that the three members lack standing to challenge the halt to the licensing process.[5] Those arguments are wrong.

#### 1. The halt of the processing of restricted-use data license applications caused injury to AEFP members.

Plaintiffs established in their summary judgment memorandum that AEFP members have suffered an informational injury as a result of the indefinite halt of processing for restricted-use data applications. Pls. Mem., ECF 47-1 at 33–35. As Plaintiffs read the relevant provisions of ESRA, IES must provide *some* means for researchers like AEFP's members to access even confidential data, and there is no factual dispute that, as a result of the halt in processing restricted-use data applications, no such means exist.

[5] As with the other claims, ED does not challenge the germaneness and individual-participation elements of AEFP's associational standing.

The Department insists that Plaintiffs lack standing because, it claims, there is no statutory entitlement to "receiving restricted-use data licenses on their terms and on their schedules." Defs. Mem., ECF 54-1 at 22. That frames the issue exactly backwards: The Department is refusing to issue restricted-use data licenses on *any* terms or on *any* schedule, and Plaintiffs are seeking to have the Department apply the terms and conditions for access that the Department itself instituted—exactly what the relevant statutes require.

For standing purposes, as noted above, *supra* p. 5, all that matters is that Plaintiffs' reading of the statutes is a plausible one. Given the statutory text, their reading easily clears that bar. Section 9574 states that, "[s]ubject to section 9573," all data collected by IES "shall be made available to the public." 20 U.S.C. § 9574. Section 9573, in relevant part, requires that IES's dissemination of data "conform with" statutory privacy and confidentiality requirements, and requires IES to "develop and enforce" confidentiality standards. 20 U.S.C. § 9573. Reading these two provisions together, members of the public have a right to data IES collects from members of the public unless disclosure would violate one of the cited statutes or IES's confidentiality standards. The Department does not suggest that any statute or confidentiality standard poses an obstacle to Professors Matsudaira, Mumma, or Callahan obtaining the data they seek, and thus they may rely on their right to that data under section 9574 to support their standing.

Section 9546(e)(2) similarly requires the National Center for Education Statistics (NCES) (a component of IES) to provide "direct access, in the most appropriate form" to data it collects, "in accordance with such terms and conditions as the Center may prescribe." As the Department concedes, NCES has prescribed such terms and conditions, and "[t]he restricted-use data license regime is precisely the kind of terms and conditions" ESRA authorizes for protecting confidential data. Defs. Mem., ECF 54-1 at 19. Plaintiffs do not challenge that regime. Rather, they challenge

the Department's failure to provide Professors Matsudaira, Mumma, or Callahan access "in accordance" with that regime—that is, the access to which they are entitled under the statute.

Defendants' remaining arguments are makeweights. The Department states that a statute like ESRA that "makes access subject to prescribed conditions, and that permits cost-based fees, is not a public-disclosure statute of the kind that supports an informational injury." Defs. Mem., ECF 54-1 at 19. It is not surprising that the Department has no citation to support this proposition, given that FOIA—the archetypal public-disclosure statute of the kind that supports an informational injury, *see*, *e.g.*, *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989); *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 (D.C. Cir. 2024)—shares those same features. *See* 5 U.S.C. § 552(a)(3) (requiring agencies to make records available "in accordance with published rules stating the time, place, fees (if any), and procedures to be followed").

Last, Defendants argue that statutory duties appearing in a section entitled "Performance management," which specifies that the IES "Director shall ensure a high level of customer satisfaction" by, among other things, "Disseminating information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," and "making information available to the public in an expeditious fashion," 20 U.S.C. § 9575(2), (6), do not supply a "standard a court could administer." Defs.' Mem., ECF 54-1 at 24. Even if the Department were right (and it is not), Plaintiffs do not rely on that statutory provision to establish their injury.

In addition, the Department disputes causation for Professor Mumma, on the theory that, because she submitted her application in December 2024, the agency's "delay" in processing it cannot be traced to its February 2025 "pause" in processing all applications. Defs. Mem., ECF 54-1 at 26. But Plaintiffs challenge a policy under which Defendants halted the processing of both

new *and pending* applications. IES staff advised Dr. Mumma that the agency would not be acting on her application due to its "pause" of "activities associated with the issuance of new licenses." Mumma Decl., ECF 35-3, at 4. And the Department's declarant has confirmed that Dr. Mumma's application "remain[s] on file," and there is no dispute that that application will not be acted upon so long as the "pause" is in place. Ricciuti Decl., ECF 54-3 ¶ 14. There can be no question that the halt in processing of restricted-use data applications "materially increase[d] the probability" that Dr. Mumma would not get access to restricted-use data she was relying on for her work, which is all the causation element requires. *Huddy v. FCC*, 236 F.3d 720, 722 (D.C. Cir. 2001).

**2. AEFP members' injuries are redressable by vacatur of the halt in processing of restricted-use data license applications.**

The Department's non-specific redressability arguments fail with respect to the restricted-use data claims for the same reasons they fail for the other claims. While the Department's halt in the processing of restricted-use data license applications is in effect, there is no way any of the identified AEFP members can access the data they seek. Vacatur of that halt would thus eliminate "an absolute barrier" to those members' access, thus making their injuries redressable. *Duberry*, 924 F.3d at 583. As discussed above, vacatur would restore the status quo—under which the Department was accepting and processing applications from individuals like AEFP's members.

The only redressability argument that the Department raises specific to the restricted-use data claims goes to Professor Callahan, who seeks access to restricted-use data from the now-canceled HS&B:22 study. As Plaintiffs acknowledged in their opening memorandum, "for full redress, Professor Callahan would also need the Court to vacate the separately illegal cancellation of the HS&B:22 study." Pls. Mem., ECF 47-1 at 34. But, contrary to the Department's assertion, Defs. Mem., ECF 54-1 at 23–24, that does not make her injury nonredressable by this action. In evaluating standing, the Court assumes that Plaintiffs will prevail on all of their claims. *See Pub.*

*Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289 (D.C. Cir. 2007). Moreover, as noted above, "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam*, 592 U.S. at 291 (quoting *Church of Scientology of Cal.*, 506 U.S. at 9). That a plaintiff may have to succeed on multiple claims, or even in multiple fora, to obtain complete relief, does not eliminate standing. *See Duberry*, 923 F.3d at 583. "The elimination of one substantial obstacle" for Professor Callahan to obtain the data she seeks establishes redressability. *Fowler v. Benson*, 924 F.3d 247, 254 (6th Cir. 2019) (citing *Arlington Heights*, 429 U.S. at 261).

## II. The Tucker Act does not eliminate this Court's jurisdiction.

In its memorandum, the Department asserts that "the Tucker Act channels [Plaintiffs'] claims to the Court of Federal Claims," and "incorporate[s] [its] prior argument [to that effect] by reference." Defs. Mem., ECF 54-1 at 28. The Court should reject that argument for the same reasons it rejected the Department's prior argument in denying the Department's motion to dismiss. Whether the Tucker Act bars district court jurisdiction over an APA claim turns on two considerations: (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.3d 959, 968 (D.C. Cir. 1982). As the Court has recognized, "this dispute concerns statutory constraints, not contracts." MTD Op., ECF 38 at 18. And Plaintiffs do not ask the Court to order the reinstatement of any contract, but rather to vacate the Department's decisions to end particular studies, to end the peer review program, and to halt processing restricted-use data license applications. Should this Court vacate those decisions, the Department could resume these functions through new contracts, or it could choose to operate the studies and the peer review program in-house or through grants or cooperative agreements. "Any of these options would redress Plaintiffs' injuries, so their challenge amounts to more than a contract claim and thus does not require the Court of Claims." MTD Op., ECF 38 at 18.

**III. The Department has not met its burden to show that any challenged action is committed to agency discretion.**

"Per *Lincoln* [*v. Vigil*, 508 U.S. 182, 191 (1993),] and its progeny, the § 701(a)(2) bar on judicial review under the APA applies where Congress has left an agency with virtually 'unbounded discretion.'" *Hennepin Cnty. v. HHS*, No. 1:26-cv-02460-CRC, 2026 WL 2426300, at *17 (D.D.C. Aug. 19, 2026) (quoting *Shawnee Tribe v Mnuchin*, 984 F.3d 94, 100–01 (D.C. Cir. 2021)). As this Court has already held, MTD Op., ECF 38 at 22, in enacting a comprehensive statutory scheme setting out IES's duties and identifying relevant considerations to guide its performance of those duties, Congress did not leave the Department with such discretion.

Nonetheless, the Department repeats its argument that the challenged agency actions are committed to agency discretion by law and thus unreviewable under 5 U.S.C. § 701(a)(2). Defs. Mem., ECF 54-1 at 29–31. As in its motion to dismiss, the Department has come nowhere close to meeting its burden to establish this "very narrow exception" to the strong presumption of reviewability, an exception that "applies only 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Campaign Legal Ctr. v. FEC*, 952 F.3d 352, 359 (D.C. Cir. 2020) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)); *see Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (recognizing that the agency bears the burden). "To determine whether a matter has been committed to agency discretion, [courts] 'consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action.'" *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (quoting *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)). The Department's argument fails on both counts.

First, the Supreme Court has "generally limited the exception to 'certain categories of administrative decisions that courts traditionally have regarded as committed to agency

discretion.'" *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Lincoln*, 508 U.S. at 191). "Categories of actions committed to agency discretion include: (1) agency decisions to institute enforcement proceedings; (2) an agency's refusal to grant reconsideration of an action; (3) a decision by the CIA to terminate an employee in the interests of national security; and (4) an agency's allocation of funds from a lump-sum appropriation." *Cap. Area Immigrants' Rts. Coal. v. DOJ*, 264 F. Supp. 2d 14, 22 (D.D.C. 2003) (citing *Lincoln*, 508 U.S. at 191–92).

The Department attempts to characterize Plaintiffs' claims as challenges to "contract decisions" and, thus, to "[t]he allocation of funds" deemed unreviewable in *Lincoln*. Defs. Mem., ECF 54-1 at 29. But not every "allocation of funds" is unreviewable under *Lincoln*, as the D.C. Circuit recognized in *Shawnee Tribe*, where it held that the Department of Treasury's allocation of funds pursuant to the CARES Act was reviewable. 984 F.3d at 99–101. As the D.C. Circuit explained, *Lincoln* concerned the unique situation "where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds," *id.* at 99 (quoting *Lincoln*, 508 U.S. at 192). This case does not involve a similar appropriation.

The Department's nonreviewability argument fails for a more fundamental reason as well. As this Court recognized in rejecting the Department's Tucker Act argument, Plaintiffs are *not* challenging the Department's decisions to terminate specific contracts; they are challenging its decisions to cease studies, the peer review program, and the processing of restricted-use data licensing applications entirely, as violative of statutory duties and/or arbitrary and capricious. *See*, *e.g.*, Second Am. Compl., ECF 32, ¶¶ 78, 82, 86, 90, 93, 97, 100–102, 106. "Whether contracts funded these programs is beside the point." MTD Op., ECF 38 at 18. And there is no factual dispute that each of these functions was halted entirely in February or March 2025. *See*, *e.g.*, AR001045 (noting that each of the four studies at issue were no longer "actively support[ed]" as of March

2025); Solt Decl., ECF 46-2, Exs. 1–3 (reflecting that agency has not been accepting or processing restricted-use data license applications since at least March 2025); Ricciuti Decl., ECF 54–3 ¶ 3 (acknowledging that all peer review work was halted in February 2025); *id.* ¶¶ 13–14 (acknowledging that no restricted-use data license applications have been processed since February 2025); Soldner Dep., ECF 46-1 at 118:7–18 (noting that ECLS-K and HSB were halted), 136:19–23 (noting agency did not continue peer review).[6] Plaintiffs do not contend that the Department was required to maintain any particular contract to continue these functions, just that statute or the reasoned decisionmaking requirements that govern all agency action prevented them from ceasing those functions entirely. The decision to halt studies, to terminate peer review, and to halt the processing of licensing applications are not akin to the kinds of agency actions that have traditionally been found to be wholly discretionary and thus nonreviewable. *Cf. Am. Legion v. Derwinski*, 54 F.3d 789 (D.C. Cir. 1995) (reviewing agency's decision to end a study); *W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168 (D.C. Cir. 2000) (reviewing agency's moratorium on filing of applications).

For each of Plaintiffs' claims, both ESRA and the agency's own statements provide judicially manageable standards. *See Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020), *abrogation on other grounds recognized by Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237 (D.C. Cir. 2026) (recognizing that judicially manageable standards can come from both statute and agencies' formal and informal policy statements and regulations). To start, for the claims that the study terminations were arbitrary and capricious, ESRA provides

[6] As noted in the contemporaneously filed reply memorandum in support of Plaintiffs' motion to supplement the record, the agency's certified administrative record does not contain contemporaneous documentation of the decisions to terminate these functions. But the post-decisional documents submitted to the Court by Plaintiffs *and* the Department confirm these actions were taken.

several guideposts courts can look to in determining whether terminating a particular study was arbitrary and capricious. For example, the statute specifies that NCES, the entity responsible for the four canceled studies, shall have a mission "(1) to collect and analyze education information and statistics in a manner that meets the highest methodological standards; (2) to report education information and statistics in a timely manner; and to collect, analyze, and report education information and statistics in a manner that — (A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b). The statute charges NCES with collecting, analyzing, and disseminating data on specific topics, including "State and local early childhood school readiness activities," "secondary school completions, dropouts, and adult literacy and reading skills," "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students," "access to, and opportunity for, early childhood education," and "student participation in and completion of secondary and postsecondary vocational and technical education programs by specific program area." 20 U.S.C. § 9543(a)(1)(B–(F), (L), (N). The statute also prescribes that collected data should be analyzed and cross-tabulated based on certain student characteristics, and it directs NCES to "conduct[] longitudinal and special data collections necessary to report on the condition and progress of education." *Id.* § 9543(a)(3), (7). These provisions supply sufficient guidance for the Court to determine whether the agency has considered relevant factors in canceling a study.

Further, an agency's own explanation of how something promotes a statutory purpose and goal can "provide[] a benchmark by which the Court can review [the agency]'s decision to subsequently" stop doing it. *Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 19 (D.D.C. 2018). Here, the Department has previously explained why each of the four studies was

important and properly conducted, and the Court may look to those explanations in evaluating the termination of those studies. *See, e.g.*, NCES, *2020/25 Beginning Postsecondary Students (BPS:20/25) Full-Scale Study*, Supporting Statement Part A, OMB #1850-0631 v.21, Oct. 2024, (BPS Supporting Statement) at 1, https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202410-1850-005 (explaining why BPS "provides a much more complete picture of postsecondary persistence and success than" other studies); NCES, *High School Longitudinal Study of 2009 (HSLS:09)-Third Follow-Up*, Supporting Statement Part AOMB #1850-0852 v.30, Dec. 2024 (HSLS Supporting Statement), https://downloads.regulations.gov/ED-2024-SCC-0145-0002/attachment_1.docx (explaining importance of HSLS:09 and inadequacy of existing datasets); AR000265–266 (explaining how HS&B:22 results "can be used to address educational policy issues and to better understand the critical transitions experienced by individuals as they complete their schooling and enter or reenter the world of work"); IES, *Celebrating the ECLS-K:2024: Providing Key National Data on Our Country's Youngest Learner*s, Mar. 11, 2024, https://ies.ed.gov/learn/blog/celebrating-ecls-k2024-providing-key-national-data-our-countrys-youngest-learners (explaining the value of ECLS-K:2024). These statements, which emphasize how the studies provide information not available from other sources and provide information that would be useful in shaping policy, provide the Court with relevant benchmarks in assessing whether the agency's termination of those studies considered all relevant factors.

As to the peer review program, the relevant statutory language suggests no discretion at all. ESRA says that IES "shall establish a peer review system … for reviewing and evaluating all applications for grants and cooperative agreements that exceed $100,000." 20 U.S.C. § 9534(b)(1). A reviewing court can easily assess whether such a system is in place.

And as to the restricted-use data program, as noted above, the statute obligates the Department to make data, including confidential data, available to researchers. *See supra* pp.15–16 (discussing 20 U.S.C. §§ 9546(e)(2), 9573, and 9574). While the statute allows the agency to set certain conditions on such access, "the mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable under the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985). The statutory scheme provides clear guidance as to how any discretion the Department has to limit access to data should be exercised. The Department acknowledges as much, when it states that "the restricted-use data license regime," which has been halted since February 2025, "is precisely the terms and conditions the statute authorizes NCES to prescribe for data that Section 9573 protects." Defs. Mem., ECF 54-1 at 23. The references to section 9573 in sections 9546(e) and 9574 plainly authorize the Department to consider confidentiality concerns in exercising any discretion to deny access to data. And section 9575 provides the Department with additional guidance as to how it should exercise any discretion, directing IES to "ensure a high level of customer satisfaction" by, among other things, "[d]isseminating information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public," "[u]tilizing the most modern technology and other methods available … to ensure the efficient collection and timely distribution of information, including data and reports," and "[m]aking information available to the public in an expeditious fashion." *See*, *e.g.*, 20 U.S.C. § 9575.

Ignoring these provisions, the Department points to statutory provisions that give the agency broad authority to determine whether to enter into contracts to aid the agency in fulfilling

its statutory duties and to determine which contracts would best enable it to do so. Defs. Mem., ECF 54-1 at 30–31. But Plaintiffs are not challenging the decision to discontinue the use of any particular contract, as opposed to the broader decision to stop performing functions more generally. Those statutes are therefore irrelevant here.

**IV. The study terminations were arbitrary and capricious.**

As Plaintiffs have explained, Pls. Mem., ECF 47-1 at 31–32, the decision to terminate BPS:20/25, HSLS:09, HS&B:22, and ECLS-K:24 was arbitrary and capricious, because the agency failed to consider various statutory provisions, the importance of the data that would be produced by the ongoing studies, and how terminating the studies would impact researchers like Plaintiffs and their members. The Department does not point to anything in the record that suggests otherwise. The Department also points to nothing showing that it considered the waste associated with terminating these studies midstream. Further, the Department did not acknowledge, or address, its own previous statements about the irreplaceable value of each study. *See*, *e.g.*, AR001277 (noting that BPS has been "an overwhelming success"); BPS Supporting Statement, (noting that "BPS:20/25 is uniquely positioned to provide longitudinal data on the experiences of students from year one of the pandemic through six years later, to enable researchers to examine enrollment, persistence, attainment, educational experiences, and employment outcomes for a cohort of students whose postsecondary education began during an unprecedented and far-reaching event"); Celebrating the ECLS-K:2024, (stating that ECLS-K:2024 was uniquely valuable as it would be "the first of [NCES]'s early childhood studies to provide data on a cohort of students who experienced the coronavirus pandemic" and would "provide information on a variety of topics not fully examined in previous national early childhood studies"); NCES, *About HS&B:22*, https://surveys.nces.ed.gov/hsb22/Home/About (stating that "HS&B:22 will help educators, parents, researchers, and policymakers better understand the factors that contribute to student

success. Information collected through the study also can be used to improve high school educational experiences for this generation and beyond"); HSLS Supporting Statement, (explaining importance of HSLS:09 and inadequacy of existing datasets).[7] And while the agency has acknowledged that these studies were its means of complying with statutory obligations, *see supra* p. 6, it does not point to anything in the record that shows it considered how it would comply with those statutory obligations without these studies, *before* terminating them.

The Department does *not* dispute that the principles of reasoned decisionmaking required it to consider all these factors—nor could it, given the clarity of the law. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Instead, it asserts that contract termination notices "show[] program-by-program judgment rather than indiscriminate abandonment." Defs. Mem., ECF 54-1 at 32 (citing AR001345, AR000083, AR000371, AR000574). Those documents show no such thing. As Plaintiffs have explained, ECF 47-1 at 31, each says that a particular contract was terminated for the Government's convenience. The documents do not show the Department considered *any* factor whatsoever in terminating the particular contract, and they do not say anything about the broader decision to cease not only the study-support contracts but the studies themselves.

[7] While the Department did not include these prior official statements in the administrative record, courts in this district have considered an agency's prior statements in determining whether an agency has adequately acknowledged and explained a reversal in position. *See, e.g.*, *Grace v. Whitaker*, 344 F. Supp. 3d 96, 113 (D.D.C. 2018), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1 (D.D.C. 2017). The agency's prior positions are pertinent to consideration of whether an agency has considered all relevant factors—specifically, the consistency of its action with its prior positions. *See City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (recognizing extra-record evidence is properly considered where "background information [i]s needed to determine whether the agency considered all the relevant factors").

To satisfy the requirements of reasoned decisionmaking, the record must be "clear enough that [the agency's] 'path may reasonably be discerned.'" *Encino Motorcars*, 579 U.S. at 221 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). The contract documents that the Department points to "fail[] to provide even that minimal level of analysis." *Id.* Plaintiffs are therefore entitled to summary judgment on their claims that the termination of each of the four studies was arbitrary and capricious.

## V. The termination of the peer review system was contrary to statute and arbitrary and capricious.

Plaintiffs have brought two separate claims regarding the Department's February 2025 termination of the peer review system on two grounds: (1) that it was contrary to 20 U.S.C. §§ 9520 and 9534(b)(1), and (2) that it was arbitrary and capricious. *See* Second Am. Compl. ¶¶ 91–97 (Counts V and VI). In arguing that it is entitled to summary judgment on both claims, the Department notes that, *in May 2026*, it initiated the process for a new "logistics support contract" that would allow it to restore the program. Defs. Mem., ECF 54-1 at 33–34. But while Plaintiffs are certainly pleased that, nearly a year after they commenced this lawsuit, the Department began taking steps to resume this all-important function, the Department's May 2026 actions are irrelevant to the question of whether what the Department did in February 2025 was lawful. In fact, the Department's May 2026 actions are not properly before this Court at all. As the Department rightly acknowledges in its opposition to Plaintiffs' motion to supplement the record, ECF 53 at 3, judicial review under the APA "must 'be based on the full administrative record that was before the Secretary' *when she made her decision*," unless "'unusual circumstances'" are present. *Dist. Hosp. Partners v. Burwell*, 786 F.3d 46, 55 (D.C. Cir. 2015) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). No such unusual circumstances exist here. And because nothing in the record suggests that, at the time of its decision, the Department had

any plan to restart the peer review program, its reliance on later events are no more than a "*post hoc* rationalization for agency action," which may not be "accept[ed] as evidence of reasoned decisionmaking." *Advanced Energy United v. FERC*, No. 23-1282, 2026 WL 2211250, at *10 (D.C. Cir. July 31, 2026) (quoting *City of Kansas City v. HUD*, 923 F.2d 188, 194 (D.C. Cir. 1991)).

Looking at the action that Plaintiffs challenge and the agency's rationale for that action, Plaintiffs are entitled to summary judgment on each of their claims related to peer review. First, section 9534(b)(1) requires the agency to "establish a peer review system, involving highly qualified individuals with an in-depth knowledge of the subject to be investigated, for reviewing and evaluating all applications for grants and cooperative agreements that exceed $100,000, and for evaluating and assessing the products of research by all recipients of grants and cooperative agreements under [ESRA]." 20 U.S.C. § 9534(b)(1). The Department concedes that the "commanded act" under this provision is "establishing a system." Defs. Mem., ECF 54-1 at 33. It asserts, though, without citation, that "[w]hat was terminated in February 2025 was not the system but the logistics support contract for the peer-review process." *Id.* But the evidence suggests otherwise: The peer review system that the Department has established relies on contractors for its functioning. *See* AR000926–953 (summarizing IES's peer review system and identifying tasks performed by contractors). Without any contractors, that peer review system was non-operational as of February 2025. *See* Soldner Decl., ECF 46-1 at 136 (noting that the agency was "not able to continue the [peer] review process as [it] would have in typical years"); Ricciuti Decl., ECF 54-3 ¶ 3 (noting that work of peer review panels was halted in February 2025). And indeed, IES was only able to resume limited grantmaking activities only after establishing a *new*, temporary "peer review system"—one that did not rely on "contractor support" or the agency's pre-existing

"PRIMO" peer review system. Ricciuti Decl., ECF 54-3 ¶ 6. Had the agency not de-established its peer review system, it would have no need to establish a new one. And nothing in the record indicates that, at the time of the challenged action, the agency had any plan to create this new, makeshift system. Accordingly, the decision to dismantle the peer review system ran afoul of the statutory mandate to "establish a peer review system." 20 U.S.C. § 9534(b)(1).

Moreover, section 9534(b) is not the only statute regarding peer review. Section 9520 requires IES to award grants, contracts, or cooperative agreements "on a competitive basis and, when practicable, through a process of peer review." 20 U.S.C. § 9520. This statute does not grant the Department unfettered discretion to take acts that make it impossible to do peer review at all. Whether or not "practicability is a judgment the statute leaves with the agency," Defs. Mem., ECF 54-1 at 33, the statute is not best read as allowing the agency to make peer review impossible by terminating the program. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (recognizing that, even where statute "delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits"). But that is exactly what the Department did.

Even if section 9520 could somehow be construed to allow the Department to make peer review "impracticable" for grants, principles of reasoned decisionmaking required the Department to display an awareness that it was doing so and to consider Congress's strongly stated view as to the importance of peer review in the grant-making process. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, (2009) (holding that an agency must "display awareness that it is changing position"); *Pub. Citizen v. FMCSA*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (holding that an agency must consider a factor where Congress "expresses its judgment that such a factor is important").

As Plaintiffs have explained, ECF 47-1 at 39–40, the record does not indicate that the Department considered this, or any other, factor—including the impact on peer reviewers like Professor Giani and on grant applicants like the AEFP members who had invested time and energy preparing grant applications that could not be acted upon due to the lack of peer review, *see*, *e.g.*, Bassok Decl., ECF 35-2 at ¶¶ 15–17, or the wastefulness of terminating the work of peer review panels that were in the midst of evaluating grants. Nothing in the Department's cursory argument suggests otherwise, simply advancing the strawman argument that Plaintiffs did not identify factors that "the APA required the agency to weigh before replacing one support contract with another." Defs. Mem., ECF 54-1 at 34. As noted above, Plaintiffs do not challenge the decision to replace one support contract with another; indeed, as of this date, the agency has *not* replaced the peer review support contract, and the agency did not even begin the process to replace the support contract until months after the challenged decision.

## VI. The Department's halt of restricted-use data license application processing was a final agency action, was contrary to statute, and was arbitrary and capricious.

There is no dispute that, in February 2025, the Department indefinitely ceased processing pending applications for restricted-use data licenses and ceased accepting new applications. *See* Solt Decl., ECF 46-2, Exs. 1–3; Ricciuti Decl., ECF 54-3 ¶¶ 13–14; Soldner Dep., ECF 46-1 at 17:4–14; Mumma Decl., ECF 35-3 at 4; Matsudaira Decl., ECF 35-7 at 5.[8] This action, which the Department refers to as a "pause," constitutes a final agency action. Because it deprived researchers of *any* way of accessing data that Congress mandated be made available, that pause

[8] Although the Department's memorandum refers to a "May 2025 pause notice," ECF 54-1 at 27, it is clear that the pause was initiated before May 2025. *See* Ricciuti Decl., ECF 55-3 ¶ 13 (stating that pause was initiated "shortly" after February 10, 2025, contract termination); Soldner Dep., ECF 46-1 at 174:8–14 (explaining that decision was made at time of March 2025 reduction-in-force); Mumma Decl., ECF 35-3 at 4 (email from Department referencing pause in April 2025).

was contrary to statute. And because it was not the product of reasoned decisionmaking, that pause was arbitrary and capricious.

**A. The Department's "pause" is a reviewable final agency action.**

As it did in seeking dismissal of Plaintiffs' restricted-use data claims, the Department argues that its pause was not a final agency action reviewable under the APA. Defs. Mem., ECF 54-1 at 31–32.[9] And as the Court explained in rejecting that argument, a "decision to institute a pause is itself final when, as alleged here, nothing suggests the Department 'condition[ed] any such pause' on further consideration." MTD Op., ECF 38 at 21 (quoting *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025)). *See also NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) ("[O]ur precedents make clear that an interim agency resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency."). There has been no relevant change in the evidentiary record. The Department's decision to pause the processing of applications was not a tentative one, needing final sign-off before it could take effect. The pause went into effect and has remained in effect ever since—with real consequences for researchers.

The Department does not suggest otherwise. Nonetheless, it asserts that "[t]he certified record contains no document adopting a policy against issuing restricted-use data licenses." Defs. Mem., ECF 54-1 at 31. But a deficient administrative record does not entitle Defendants to summary judgment, when, as discussed above, government agency websites and emails to AEFP members confirm that there *is* a policy against issuing restricted-use data licenses, and that the

[9] The Department's arguments go only to the "consummation prong" of the final agency action requirement. *See NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). The Department's "pause" undoubtedly gave rise to legal consequences for purposes of the second prong of the finality test," *id.* at 80—the pause means AEFP members, and others, have no way of obtaining licenses to access restricted-use data.

policy has been in place for eighteen months.[10] The contract documents that the Department points to as proof of non-finality, Defs. Mem., ECF 54-1 at 27, are irrelevant. Beyond the fact that some of these documents post-date the relevant decision, Plaintiffs' claims are not tied to the existence or nonexistence of any contract, but whether the Department is accepting or processing applications for licenses.[11] Regardless, there is no dispute that the agency made the final decision not to accept or process such applications "until further notice." Matsudaira Decl., ECF 35-7 at 5.

The Department also argues that its August 2026 decision to resume, at some point in the future, accepting and processing applications means that its February 2025 action was not a final agency action. ECF 55-1 at 32. But this argument mistakes the finality requirement for a *permanence* requirement. "The APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review." *Salazar v. King*, 822 F.3d 61, 83–84 (2d Cir. 2016). As the D.C. Circuit has explained, "*any* agency action is *always* subject to displacement by a future rulemaking. If the mere possibility of displacement rendered a governing agency rule non-final for purposes of judicial review, no rule would ever count as final." *NRDC*, 955 F.3d at 80. Where, as here, "the interim resolution is the final word from the agency on what will happen up to the time of any different permanent decision," the finality requirement is satisfied. *Id.* at 78; *see Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–93 (W.D. La. 2022) (collecting cases and holding that "pause" of new leases was reviewable final

---

[10] As explained in Plaintiffs' reply in support of their motion to supplement the record, this argument by the Department highlights why it is appropriate for the Court to consider extra-record evidence.

[11] And, as Director Soldner explained in his deposition, the decision to pause doing so was *not* tied to the termination of a contractor, but rather to the Department's reduction-in-force. Soldner Dep., ECF 46-1 at 174:78.

agency action); *Texas v. United States*, 524 F. Supp. 3d 598, 642 (S.D. Tex. 2021) (holding that 100-day "pause" on removals was final agency action).

**B. The Department's "pause" violates ESRA.**

As discussed in the context of standing, *see supra* pp. 15–16, Plaintiffs assert that by halting the processing of restricted-use data license applications, and thus making it impossible for anyone, on any terms, to gain access to restricted-use data unless they had a license prior to February 2025, the Department has violated both 20 U.S.C. § 9574 and § 9546(e)(2). The Department claims that neither of these statutes are violated because they do not "set a deadline for processing applications for restricted-use licenses" or "entitle[] an applicant to a license." Defs. Mem., ECF 54-1 at 34. This assertion reflects a misunderstanding of Plaintiffs' argument and the meaning of the statutory provisions.

Section 9574 requires IES to make data that it collects available to the public, subject to the provisions of section 9573. 20 U.S.C. § 9574. Section 9573, in turn, requires IES to collect, maintain, use, and disseminate data consistent with (1) the Privacy Act, 5 U.S.C. § 552a; (2) the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; (3) the Protection of Pupils Rights Amendment, 20 U.S.C. § 1232h, and (4) confidentiality standards developed by IES, as provided for in § 9573(c). 20 U.S.C. § 9573(a). The Department's only explanation as to why its "pause" does not violate section 9574 is that "Section 9574's availability duty is expressly 'subject to section 9573.'" Defs. Mem., ECF 54-1 at 30. Indeed it is. But section 9573 only allows the Department to limit access to data for particular reasons—none of which are relevant here. IES has developed confidentiality standards pursuant to section 9573—including those set out in the restricted-use data license protocol. *See* NCES, Statistical Standards Program, Confidentiality Procedures, https://nces.ed.gov/statprog/confproc.asp. The decision to put that protocol on hold

and simply deny access irrespective of whether it complies with the agency's confidentiality standards is not itself a "confidentiality standard."

Section 9546(e) requires NCES to "provide all interested parties … direct access, in the most appropriate form (including, where possible, electronically), to data collected by the Statistics Center for the purposes of research and acquiring statistical information," "in accordance with such terms and conditions as [NCES] may prescribe." 20 U.S.C. § 9546(e). The Department suggests that the "terms and conditions" clause defeats Plaintiffs' claim with no exposition. Defs. Mem., ECF 54-1 at 34. But the best reading of the statute is that, as a general matter, NCES must provide interested parties with direct access to all its data, though the agency has been delegated some authority to prescribe reasonable "terms and conditions" for such access. *Cf. Hosp. Menonita De Guayama, Inc. v. NLRB*, __ F.4th __, No. 22-1163, 2026 WL 2093902, at *4 (D.C. Cir. July 21, 2026) ("When Congress 'delegates discretionary authority to an agency,' courts must 'fix the boundaries of the delegated authority.'" (quoting *Loper Bright*, 603 U.S. at 395)). Here, Plaintiffs do not challenge the terms and conditions that NCES has prescribed for access to restricted-use data—which are set out in its Restricted-Use Data Procedures Manual, available at https://nces.ed.gov/statprog/rudman/. As the Department concedes, "the restricted-use data license regime is precisely the kind of terms and the conditions the statute authorizes NCES to prescribe." Defs. Mem., ECF 54-1 at 23. The problem is that the Department is *not* providing access in accordance with these prescribed "terms and conditions," and instead has turned off access to restricted-use data for new users under *any* terms or conditions. Such an obstacle to accessing data exceeds the boundaries of any discretionary authority that has been delegated to the Department.

**C. The Department's "pause" was arbitrary and capricious.**

Finally, as Plaintiffs have explained, nothing in the record indicates that, prior to instituting the "pause," the agency considered any of the statutory provisions regarding access to data—including the statutory priorities set out in 20 U.S.C. § 9575(2)—the reliance interests of researchers, or how eliminating any ability for researchers to access restricted-use data would impact the advancement of knowledge about education in the United States more generally. *See* Pls. Mem. ECF 47-1 at 33–34. The failure to consider these plainly relevant factors renders the pause arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

In arguing otherwise, the Department does not point to anything in the record that shows such factors—or any other factors—were considered. Instead, it states that "no application has been denied, and pending applications remain in the queue." Defs. Mem., ECF 54-1 at 35. That statement, however, describes the pause in processing applications; it does not demonstrate that the pause was the product of reasoned decisionmaking. The Department then asserts, without citation, that "[a]n interim pause maintained alongside the continuous re-procurement of the function, with no application denied, is not arbitrary abandonment." *Id.* This statement is wrong as to both the facts and the law. Nothing in the record suggests that the agency was considering "re-procurement of the function" when it imposed the halt. That the agency months *later* decided to initiate "re-procurement of the function" is irrelevant to the question whether the pause was the product of reasoned decisionmaking—which, as discussed above, is a question to be answered based on the record before the agency at the time of the action. Moreover, no evidence in the record suggests that the agency, when it halted the process, was planning to restart processing restricted-use data applications. And regardless of whether it was planning to do so, it was still required to consider how a lapse in access caused by its pause would impact researchers and NCES's

fulfillment of its statutory mission to "report education information and statistics in a manner that … is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b) (prescribing ESRA's statutory mission). Even temporary measures are subject to the requirements of reasoned decisionmaking. *See, e.g.*, *Chef Time 1520 LLC v. SBA*, 646 F. Supp. 3d 101, 113–14 (D.D.C. 2022) (holding that agency's decision to pause priority processing for grant funds was likely arbitrary and capricious); *Texas v. United States*, 524 F. Supp. 3d at 653–55 (finding 100-day pause likely arbitrary and capricious where agency failed to consider relevant factors).

## VII. Vacatur is the proper remedy.

As Plaintiffs have explained, vacatur is the proper remedy for their claims. *See* Pls.' Mem., ECF 47-1 at 44. The Department makes no argument that the Court should depart from this default, and thus the Court should vacate each of the challenged agency actions it finds unlawful. As explained above, *supra* pp. 9–10, 13–14, 17, setting aside the Department's actions terminating the four studies, the peer review program for new grants, and the processing of restricted-use data license applications, would restore the ex ante status quo, under which the Department was continuing those functions.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' memorandum in support of their motion for summary judgment, this Court should grant Plaintiffs' motion for summary judgment, deny Defendants' motion for summary judgment, and vacate the challenged agency actions.

Dated: September 1, 2026

Respectfully submitted,

/s/ Adam R. Pulver
Adam R. Pulver (DC Bar No. 486293)
Cormac A. Early (DC Bar No. 1033835)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

*Attorneys for Plaintiffs*